**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO**

|  |  |
|---|---|
| JOHN NOAKES<br>c/o Engel & Martin, LLC<br>4660 Duke Dr., Suite 101<br>Mason, OH  45040, | Case No. |
|  | Judge: |
| PLAINTIFF, | VERIFIED COMPLAINT |
| v. | AND |
| THE UNIVERSITY OF CINCINNATI,<br>2600 Clifton Avenue<br>Cincinnati, OH 45220 | JURY DEMAND |
| ALECIA TRAMMER<br>Director, Office of Equity, Inclusion and<br>Community Impact<br>University of Cincinnati<br>2618 University Cir.<br>Cincinnati OH 45221 |  |
| ADRIENNE LYLES<br>Title IX Coordinator<br>University of Cincinnati<br>225 Calhoun Street<br>Cincinnati OH 45219 |  |
| BLEUZETTE MARSHALL<br>Vice President for Equity, Inclusion &<br>Community Impact<br>University of Cincinnati<br>2618 University Cir.<br>Cincinnati OH 45221 |  |

1

AND

ASHLEIGH WADE
Director of Student Conduct & Community
Standards
University of Cincinnati
2801 UC MainStreet
Cincinnati OH 45221

DEFENDANTS

## INTRODUCTION

1. Plaintiff John Noakes[1] brings this action for violation of his due process rights and Title IX.

2. UC has adopted various policies and procedures to respond to allegations of sexual assault on campus in direct response to pressure from the U.S. Education Department's Office of Civil Rights ("OCR") related to the enforcement of Title IX. In the course of implementing these policies and procedures, UC has adopted practices that reinforce and rely upon gender stereotypes and abrogate the due process rights of students.

3. This case arises out of the efforts of UC to expel John Noakes after a female UC student, Jane Roe, had alleged that John Noakes had engaged in non-consensual sexual activity. The UC police declined to pursue any charges. The matter was reported to the UC Office of Equity, which took no action for months before initiating a cursory and incomplete investigation followed by a biased hearing conduct by paid consultants.

---

[1] Plaintiff has chosen the pseudonym "John Noakes" instead of the more commonly used "John Noakes" in order to avoid confusion with a prior case titled *Doe v. Univ. of Cincinnati,* 872 F.3d 393 (6th Cir. 2017). The pseudonym "John Noakes" was used in English Law. *See https://www.merriam-webster.com/dictionary/John-a-Nokes.* Counsel has used this alternative synonym in other cases. *See e.g. Noakes v. Case Western Reserve University et al,* N.D.Ohio No. 1:21-cv-01776; *Nokes [sic] v. Miami University et al,* S.D. Ohio 1:17-cv-00482; *Noakes v. Syracuse Univ.,* N.D.N.Y. No. 5:18-cv-00043.

**PARTIES**

4.  John Noakes is a student at UC.

    a.  Plaintiff is an Ohio resident with a residence in [REDACTED].

    b.  Plaintiff has paid a significant amount of money to UC in the expectation of receiving an education and, if he successfully completes his classwork, a degree.

    c.  The disclosure of Plaintiff' identity will cause the student irreparable harm as this case involves matters of the utmost personal intimacy, including education records protected from disclosure by the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g; 34 CFR Part 99.

5.  Defendant UC is a public university created by the Ohio Legislature.

    a.  UC has a principal place of business at 2600 Clifton Avenue, Cincinnati, OH 45220. Under Ohio Revised Code 3361.01, the University of Cincinnati's Board of Trustees is the governing body of the University of Cincinnati.

    b.  UC voluntarily participates in federal spending programs.

6.  Defendant Alecia Trammer is the Director of the Office of Equity, Inclusion and Community Impact for the University of Cincinnati.

    a.  Trammer has a principal place of business at 2618 University Cir., Cincinnati OH 45221

    b.  Trammer is sued in her official capacity for injunctive relief. On information and belief, Trammer in conjunction with the other individual defendants has the authority to provide all of the injunctive relief sought in this Complaint.

    c.  Trammer has responsibility for implementing the various policies and procedures UC has adopted related to student conduct and the enforcement of Title IX.

7.  Defendant Adrienne Lyles is the Title IX Coordinator for the University of Cincinnati.

    a. Lyles has a principal place of business at 225 Calhoun Street, Cincinnati OH 45219

    b. Lyles is sued in her official capacity for injunctive relief. On information and belief, Lyles in conjunction with the other individual defendants has the authority to provide all of the injunctive relief sought in this Complaint.

    c. Lyles has responsibility for implementing the various policies and procedures UC has adopted related to student conduct and the enforcement of Title IX.

8. Defendant Bleuzette Marshall is the Vice President for Equity, Inclusion & Community Impact for the University of Cincinnati.

    a. Marshall has a principal place of business at 2618 University Cir., Cincinnati OH 45221

    b. Marshall is sued in her official capacity for injunctive relief. On information and belief, Marshall in conjunction with the other individual defendants has the authority to provide all of the injunctive relief sought in this Complaint.

    c. Marshall has responsibility for implementing the various policies and procedures UC has adopted related to student conduct and the enforcement of Title IX.

9. Defendant Ashleigh Wade is the Director of Student Conduct & Community Standards for the University of Cincinnati.

    a. Wade has a principal place of business at 2801 UC MainStreet, Cincinnati OH 45221

    b. Wade is sued in her official capacity for injunctive relief. On information and belief, Wade in conjunction with the other individual defendants has the authority to provide all of the injunctive relief sought in this Complaint.

    c. Wade has responsibility for implementing the various policies and procedures UC has adopted related to student conduct and the enforcement of Title IX.

## JURISDICTION AND VENUE

10. This case arises, in part, under the laws of the United States, specifically Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. § 1681 *et seq.*, and the due process guarantees of the United States Constitution, and 42 U.S.C.S. § 1983. Accordingly, this Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1331 and 1343.

11. This Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over any other claims in this case, as the claims are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

12. This Court is an appropriate venue for this cause of action pursuant to 28 U.S.C. § 1391. The defendant is a resident of the State in which this district is located and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## FACTS

## THE RESPONSE OF UC TO PRESSURES TO CRACK DOWN ON SEXUAL MISCONDUCT

13. This case is one of many amidst a continuing national controversy about the responses of colleges and universities to alleged sexual assaults on campuses.

14. UC has adopted various policies and procedures to respond to allegations of sexual assault on campus in direct response to pressure from the U.S. Education Department's Office of Civil Rights ("OCR") related to the enforcement of Title IX.

15. On April 11, 2011, OCR sent a "Dear Colleague Letter" to colleges and universities. The Dear Colleague Letter indicated that, in order to comply with Title IX, colleges and universities must have transparent, prompt procedures to investigate and resolve complaints of sexual misconduct. After the Dear Colleague Letter was published, many schools changed their sexual assault and sexual harassment policies and procedures in a manner that, while not completely ignoring due process concerns, shifted the focus more on victim advocacy.

16. The Obama administration, through OCR, pressured colleges and universities to aggressively pursue investigations of sexual assaults on campuses.

   a. The "Dear Colleague" letter was a step in the increased enforcement of Title IX on colleges and universities. NPR described the Dear Colleague Letter as the government's "first warning shot."[2]

   b. In February 2014, Catherine E. Lhamon, the assistant secretary of education who heads the department's Office for Civil Rights, told college officials attending a conference at the University of Virginia that schools need to make "radical" change.  According to the Chronicle of Higher Education, college presidents suggested afterward that there were "crisp marching orders from Washington."[3]

   c. Lhamon was quoted in the LA Times stating, "We don't treat rape and sexual assault as seriously as we should, . . . [There is] a need to push the country forward."[4]

17. The 2011 Dear Colleague Letter dictated specific procedures that colleges needed to use in adjudicating sexual misconduct allegations.  Each of the letter's significant procedural changes increased the chances that an accused student would be found responsible for a sexual misconduct allegation. OCR threatened to pull federal funds from any school that did not comply.

18. Colleges and Universities, including UC, were scared of being investigated or sanctioned by the Department of Education and/or of potential Title lawsuits by the Department of Justice.

---

[2] *How Campus Sexual Assaults Came to Command New Attention*, NPR, August 12, 2014.

[3]*Colleges Are Reminded of Federal Eye on Handling of Sexual-Assault Cases*, Chronicle of Higher Education, February 11, 2014.

[4] David G. Savage and Timothy M. Phelps, *How a little-known education office has forced far-reaching changes to campus sex assault investigations,* LA Times August 17, 2015.

a.  The Federal government has created a significant amount of pressure on colleges and universities to treat all those accused of sexual misconduct with a presumption of guilt. The Chronicle of Higher Education noted that "Colleges face increasing pressure from survivors and the federal government to improve the campus climate."[5]  Education, September 1, 2014.  In the same article, the Chronicle noted that different standards were applied to men and women: "Under current interpretations of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no. That is because in heterosexual cases, colleges typically see the male student as the one physically able to initiate sex, and therefore responsible for gaining the woman's consent."

b.  Lhamon told a national conference at Dartmouth in the summer of 2014, "I will go to enforcement, and I am prepared to withhold federal funds."[6]  In that same article, Anne Neal of the American Council of Trustees and Alumni was quoted as follows: "There is a certain hysteria in the air on this topic, . . . It's really a surreal situation, I think."  She explained that schools are running so scared of violating the civil rights of alleged victims that they end up violating the due process rights of defendants instead.

c.  Other news reports suggested that the threat to withdraw federal funding from schools was credible.  MSNBC reports:[7]

---

[5] *Presumed Guilty: College men accused of rape say the scales are tipped against them,* Chronicle of Higher

[6] *How Campus Sexual Assaults Came To Command New Attention*, NPR, August 12, 2014.

[7] Meredith Clark, *Official to colleges: Fix sexual assault or lose funding,* July 15, 2014 (available at: http://www.msnbc.com/msnbc/campus-sexual-assault-conference-dartmouth-college#51832)

Speaking at a conference on campus sexual assault held at Dartmouth College, Assistant Secretary for Civil Rights at the Department of Education Catherine Lhamon said that despite the fact it has never been done before, she is prepared to cut off federal funding to schools that violate Title IX, the 1972 gender equity law.

Calling that one enforcement mechanism part of a set of "very, very effective tools," Lhamon said, "If a school refuses to comply with Title IX in any respect, I will enforce."

In her 10-month tenure at the Department of Education, Lhamon has threatened to withdraw federal funding from four schools. "It's not surprising to me that we haven't gone to the last step," she said. "It means that so far the process has been working."

d.  The White House issued a report entitled "Not Alone" in April 2014, which includes a warning that if the OCR finds that a Title IX violation, the "school risks losing federal funds" and that the DOJ shares authority with OCR for enforcing Title IX, and may initiate an investigation or compliance review of schools, if a voluntary resolution cannot be reached, the DOJ may initiate litigation.[8]

e.  In June 2014, Lhamon told a Senate Committee, "This Administration is committed to using all its tools to ensure that all schools comply with Title IX . . ."  She further told the Committee:

If OCR cannot secure voluntary compliance from the recipient, OCR may initiate an administrative action to terminate and/or refuse to grant federal funds or refer the case to the DOJ to file a lawsuit against the school. To revoke federal funds—the ultimate penalty—is a powerful tool because institutions receive billions of dollars a year from the federal government for student financial aid, academic resources and many other functions of higher education. OCR has not had to impose this severe penalty on any institution recently because our enforcement has consistently resulted in institutions agreeing to

---

[8] https://obamawhitehouse.archives.gov/sites/default/files/docs/report_0.pdf

take the steps necessary to come into compliance and ensure that students can learn in safe, nondiscriminatory environments.

f.  Robert Dana, dean of students at the University of Maine, told NPR that some rush to judgment is inevitable. "I expect that that can't help but be true," he says. "Colleges and universities are getting very jittery about it."[9]

g.  In 2015, the Office's director, Catherine Lhamon, told a national media publication that "[w]e don't treat rape and sexual assault as seriously as we should," citing data "about the rate of unwanted sexual activity experienced specifically by college women." Lhamon had also recently warned university administrators that they could lose all their federal funding if they did not heed the Office's mandates, and elsewhere cited "a need to push the country forward."

h.  In July 2016, then-Vice President Biden suggested that schools that do not comply with administration guidelines could be stripped of federal funding.[10]

19. On September 22, 2017, the Department of Education withdrew the Dear Colleague Letter and indicated its intent to issue new guidance "through a rulemaking process that responds to public comment."

a.  In withdrawing the Dear Colleague Letter, OCR observed that prior actions "may have been well-intentioned, but . . . led to the deprivation of rights for many students—both accused students denied fair process and victims denied an adequate resolution of their complaints." *Id.* at 1-2.

---

[9] Source: *Some Accused Of Sexual Assault On Campus Say System Works Against Them*, NPR, September 3, 2014.

[10] Source: *Obama, Biden Won't Visit Universities That Fall Short In Addressing Sexual Assault*, Huffington Post, July 4, 2016 ("The vice president said he'd like to take away federal funding from those universities.")

b. OCR further said:  "Legal commentators have criticized the 2011 Letter . . . for placing "improper pressure upon universities to adopt procedures that do not afford fundamental fairness." As a result, many schools have established procedures for resolving allegations that "lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and are in no way required by Title IX law or regulation." [11]

20. On May 6, 2020, the Department of Education released a Final Rule under Title IX of the Education Amendments of 1972.  The Final Rule, *inter alia*, prescribes a transparent grievance process that treats accused students as innocent until proven guilty, requires the school to state a standard of evidence, and requires the school to provide a hearing process where accused students may question adverse witnesses.  The Final Rule carried the force and effect of law as of August 14, 2020.

21. The Biden Administration had indicated that it intends to initiate a new rulemaking in an effort to repeal the 2020 rules.

a. During the presidential campaign, President Biden vowed to scrap the Trump administration's new regulation on campus sexual misconduct; in March 2021, the President signed an executive order directing Education Secretary Miguel Cardona to review and consider rewriting the regulation.

b. President Biden nominated Lhamon to again run the Department of Education's Office of Civil Rights.  During her confirmation hearings, Lhamon stated that she still believed that "the regulation permits students to rape and sexually harass with impunity." One

---

[11] Letter from Office for Civil Rights, U.S. Dep't of Educ. (September 22, 2017). (Available at https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf  ), q*uoting Open Letter From Members Of The Penn Law School Faculty:  Sexual Assault Complaints: Protecting Complainants And The Accused Students At Universities*, Feb. 8, 2015; *Rethink Harvard's Sexual Harassment Policy*, Boston Globe (Oct. 15, 2014) (statement of 28 members of the Harvard Law School faculty).

scholar who has studied Title IX enforcement extensively wrote: "During a pre-hearing meeting with [a senator], Lhamon challenged the portrayal of her as someone who only believed complainants. Her performance during the confirmation hearing confirmed that perception."[12]

22. On information and belief, UC, like other schools nationwide, was scared of being investigated or sanctioned by the Department of Education for not taking seriously complaints of female students alleging sexual assault by male students. Sanctions would include the loss of eligibility for all federal funding. Upon information and belief, UC annually receives millions of dollars in government grants and contracts, and students depend on federal financial aid.

23. In the years preceding the disciplinary actions against John Noakes, there was substantial criticism of UC, both in the student body and in the public media, accusing UC of not taking seriously complaints of female students alleging sexual assault by male students. This has included adverse news coverage and, campus meetings or protests, and enforcement actions concerning UC. This criticism included criticism of the manner in which UC handled Title IX investigations.

   a. In 2014, a UC spokesperson recently explained the impossible position of UC. The spokesperson told the New York Post, "college campuses are expected to serve as prosecutors, defense attorneys, judges, juries and courts of appeals all in one."[13]

   b. Two students who founded a group at UC called "Students for Survivors" said, the UC "administration was going to pretend to care as much as they had to."[14]

---

[12] KC Johnson, *Catherine Lhamon Returns to Form*, Real Clear Politics, July 14, 2021 (https://www.realclearpolitics.com/articles/2021/07/14/catherine_lhamon_returns_to_form_146080.html).
[13] Andrea Peyser, '*Rape Culture' Leads to Manhunts on Campus*, NY POST, August 11, 2014.
[14] *UC Has Failed Sexual Assault Victims*, December 9, 2017 (https://www.hercampus.com/school/cincinnati/uc-has-failed-sexual-assault-victims/).

c. According to the student newspaper, UC has been attempting to minimize coverage of sexual assault on campus. The Student newspaper reviewed records showing that "24 on-campus rapes were reported to UC officials in 2018 and 2019, but the Department of Public Safety issued five crime alerts – just 21% of all reported rapes for both years."[15]

d. In 2021, the News Record quoted a student who had been sexually assaulted stating, "At the end of the day, UC does not give a f--k because they feel like they don't have to." The student added, "UC is very selective in the alerts they send out, their approach to sexual violence is this realm of the less we talk about it, the less likely people think it's a problem." In noting that UC was not diligent in sending out alerts about sexual assaults, one student said, "I feel like UC tries to hide these things as much as they can…"[16]

e. In 2022, following a series of reports of sexual assaults on campus, the News Record noted that "social pressures make it difficult for women to come forward with allegations of assault."[17]

24. UC has a pattern and practices of both not taking allegations of sexual assault against female students seriously. UC also has a pattern and practice of not respecting the due process rights of both accused students and alleged victims. In 2020, one of the founders of Students for Survivors submitted an affidavit to this Court critical of the manner in which Marshall oversees the Title IX Office and UC's response to the problem of sexual assault on campus: "Marshall was good at seeming like she cared, but she did not take Title IX issues seriously. … She had several

---

[15] *A Troubling Trend: As on-campus rape reports rise, UC continues to issue few alerts*, News Record, April 15, 2021 (https://www.newsrecord.org/news/a-troubling-trend-as-on-campus-rape-reports-rise-uc-continues-to-issue-few-alerts/article_743241da-9e57-11eb-bc39-c7bc652c9b61.html).

[16] https://www.newsrecord.org/news/a-troubling-trend-as-on-campus-rape-reports-rise-uc-continues-to-issue-few-alerts/article_743241da-9e57-11eb-bc39-c7bc652c9b61.html

[17] https://www.newsrecord.org/news/monday-incident-adds-to-series-of-sexual-assaults-at-uc/article_919c5f30-3a7d-11ed-827a-837789c2f65c.html

opportunities to address the systemic failures of Title IX, but she did not do so. My impression was that Marshall was seeking to save face for the university and placate us, so we would stop talking about the issue."[18]

25. UC has been the subject of a number of lawsuits in this and other courts for the manner in which it investigates and adjudicates allegations of sexual assault and harassment. Most notably, in *Doe v. Univ. of Cincinnati*, 872 F.3d 393 (6th Cir. 2017), the Sixth Circuit held that UC had violated the due process rights of students by not permitting cross-examination of adverse witnesses in Title IX proceedings.

26. On information and belief, UC has been the subject of a number of investigations by the Department of Education for the manner in which it investigates and adjudicates allegations of sexual assault and harassment.

    a. On February 9, 2016, UC was informed that the Department of Education would be initiating an investigation into a complaint that UC failed to "promptly and equitably respond to complaints, reports, and/or incidents of sexual violence." OCR Docket #15-16-2039. This matter is not listed as resolved in the Department of Education database.

    b. On February 17, 2017, UC was informed that the Department of Education would be initiating an investigation into a complaint that UC failed to "adequately respond" to a complaint of sexual assault. OCR Docket #15-16-2178. This matter is not listed as resolved in the Department of Education database.

    c. The Cincinnati Enquirer reported in August 2016 that UC was under investigation by the Department of Education for possibly mishandling Title IX complaints. The newspaper noted that the investigation was spurred by a complaint that UC discriminated against

---

[18] Case: 1:19-cv-00398-MWM-SKB Doc #: 69-3.

students by "failing to properly and equitably respond" to incidents of sexual violence it knew about. The complaint alleges UC's actions, or lack thereof, made the campus a "sexually hostile environment" for students.[19]

d. According to the Department of Education website, UC is currently subject to five open Title IX investigations:[20]

| State | Institution | Institution Type | Type of Discrimination | Open Investigation Date |
|-------|-------------|------------------|------------------------|-------------------------|
| OH | UNIVERSITY OF CINCINNATI-MAIN CAMPUS | PSE | Title IX - Denial of Benefits | 1/31/2023 |
| OH | UNIVERSITY OF CINCINNATI-MAIN CAMPUS | PSE | Title IX - Retaliation | 12/20/2022 |
| OH | UNIVERSITY OF CINCINNATI-MAIN CAMPUS | PSE | Title IX - Sexual Harassment | 12/20/2022 |
| OH | UNIVERSITY OF CINCINNATI-MAIN CAMPUS | PSE | Title IX - Single Sex Campus Programs | 3/4/2020 |
| OH | UNIVERSITY OF CINCINNATI-MAIN CAMPUS | PSE | Title IX - Single Sex Scholarships | 4/20/2020 |

27. Despite recent efforts of the Biden Administration to restore Obama administration enforcement priorities, UC has continued to see a backlash to the efforts to hold accused students accountable. In many instances, accused students, not just alleged victims, have filed complaints with OCR.  A student note in the UC Law Review states:[21]

> Despite mechanisms by both the OCR and the courts, enforcement remains erratic, and school liability for Title IX infractions is not guaranteed. Part of the problem lies in the pendulum swing of enforcement as various Presidents' administrations have expanded and contracted Title IX, changing the various harms for which students can recover and the rules governing how the Title IX regulations should be applied.

---

[19] https://www.cincinnati.com/story/news/2016/12/30/uc-investigated-sexually-hostile-environment/95970434/

[20] https://www2.ed.gov/about/offices/list/ocr/docs/investigations/open-investigations/tix.html

[21] Keeley B. Gogul, *The Title IX Pendulum: Taking Student Survivors Along for the Ride*, 90 U. Cin. L. Rev. (2022).

14

**THE UC CODE OF STUDENT CONDUCT AND TITLE IX POLICY**

28. UC has codified its Code of Student Conduct in O.A.C 3361:40-5-05.  This was adopted pursuant to R.C. 3345.21.

29. UC has carved out an exception for the Code of Student Conduct for cases involving sexual harassment under Title IX.  A copy of the Code of Conduct is attached as an exhibit.  The Student Code of Conduct states:

> (i) The university president has authority to create and implement policies to bring the university in compliance with Title IX regulations and applicable laws. The president may delegate this authority to the proper university department, who must work in consultation with the office of general counsel and in coordination and collaboration with other appropriate university offices.

> (ii) Students should refer to university Title IX policies for information on jurisdiction, definitions, hearings, and other related procedures.

30. UC has adopted a "Sexual Harassment Policy and Procedures for All Faculty, Students, Employees, and Third Parties."  This is referred to as the "Title IX Policy."  A copy of the Title IX Policy is attached as an Exhibit.

31. Unlike the Code of Conduct, the Title IX Policy was not submitted to the Ohio Legislature for approval or included in the Ohio Administrative Code.

    a. UC is an "agency" as that term is defined under R.C. 111.15(A)(2).

    b. Under Ohio law, a rule can be effective as part of the law only after its adopting agency has taken it through the statutorily prescribed rule-making procedure.  Ohio law requires that the rule be prepared and submitted in compliance with the rules of the legislative service commission d is subject to legislative review and invalidation under R.C. 106.021. A proposed rule that is subject to legislative review may not be adopted unless the proposed rule has been filed with the Joint Committee on Agency Rule Review.

32. The Title IX Policy contains fewer procedural protections for students accused of sexual misconduct.  These lesser protections include:

    a. Under the Title IX Policy, students do not receive a notice that clearly and accurately states the factual charges prior to being asked to provide a statement to the investigator. Under the Student Code of Conduct, students are entitled to receive notice informing the students not just of the basic conduct allegedly constituting a violation of school rules, but also "about the reported circumstances underlying the alleged violation."

    b. The decision-makers for the Student Code of Conduct consist of UC faculty, staff and students. In contrast, for Title IX matters, UC uses outside consultants as decision-makers.

33. The Title IX policy prohibits "Sexual Assault" which includes "Any sexual act directed against another person, without the consent of the complainant, including instances in which the complainant is incapable of giving consent because of incapacitation."

    a. The Title IX Policy defines "Consent" as "An affirmative agreement through clear actions or words to engage in intimate and/or sexual activity."

    b. The Title IX Policy further provides that "A person cannot give consent if the person is mentally or physically incapacitated such that the person cannot understand the fact, nature or extent of the sexual situation" and that "Consent does not exist when one knew or should have known of the other's incapacitation."

    c. The Title IX Policy defines "Incapacitated or incapacitation" as "A state in which rational decision-making or the ability to consent is rendered impossible because of a person's temporary or permanent physical or mental impairment…" The Title IX Policy further explains, "Incapacitation is determined based on the totality of the circumstances. Incapacitation is more than intoxication, but intoxication can cause incapacitation."

16

34. The Title IX Policy provides that no individual involved in the process – including all decision-makers, "may have a conflict of interest or bias for or against complainants or respondents generally or an individual complainant or respondent.

35. The Title IX Policy requires that Title IX Coordinators, investigators and decision-makers receive appropriate training and requires that all training materials "be made publicly available on the University's website."

36. The Title IX Policy provides that "Supportive measures" "designed to restore or preserve equal access to the University's education program or activity" are available to both complainants and those accused of violating the title IX Policy. The Title IX Policy differentiates between "reports" and "formal complaints."

   a. The Title IX Policy requires all University employees (with certain exceptions not relevant here) "to report incidents that may be a violation of this Policy."

   b. The Title IX Policy defines a "Formal complaint" as "A document filed by a complainant or signed by the Title IX Coordinator alleging conduct in violation of this Policy against a respondent and requesting that the University investigate the allegation(s) of sexual harassment." A "Report" of sexual misconduct "is not a formal complaint and does not initiate the grievance process."

37. Reports of sexual misconduct may be made by any "means that results in the Title IX Coordinator receiving the verbal or written report." However, "In order to initiate the grievance process, a complainant must file a formal complaint with the Title IX Coordinator."

38. After receiving a report, the UC Title IX Office is required to "promptly contact the complainant to provide information on supportive measures and the grievance process." The Title IX Policy provides that a complainant "may choose whether or not to initiate the grievance process by filing a formal complaint…"

17

39. Only after a formal complaint is received – not when the Title IX Office receives a report – is the accused student provided with notice of the allegations of sexual harassment. The Title IX Policy provides:

> The notice will provide sufficient details known at the time, which include the identities of the parties involved in the incident, if known, the conduct allegedly constituting sexual harassment, and the date and location of the alleged incident, if known.

40. The Title IX Policy provides that "While there is no strict deadline for filing a formal complaint, and timeliness may vary according to the specific circumstances, prompt reporting is important to facilitate a thorough investigation."

   a. The Policy further provides that "It is expected that reports and formal complaints about sexual harassment will be reported within a proximate time of the occurrence of the alleged conduct or the date upon which the alleged conduct became known to the reporting party."

   b. The Title IX Policy acknowledges that "Delayed reporting or filing of a formal complaint may limit the University's ability to gather relevant evidence, to effectively address the conduct at issue, and to initiate the grievance process."

41. The Title IX Policy contains certain time requirements for the "reasonably prompt" resolution of allegations.

   a. The Title IX Policy allows for delays and "the limited extension of timeframes" only for good cause, with written notice to the complainant and the respondent of the delay or extension and the reasons for the action. "Good cause" under the Title IX Policy, "may include, but is not limited to, considerations such as the absence of a party, a party's advisor, or a witness; concurrent law enforcement activity; or the need for language assistance or accommodation of disabilities."

18

    b. The Title IX Policy states that "from the date of its receipt of a formal complaint, the investigation, hearing, and issuance of the adjudicating body's report shall be concluded in ninety (90) business days."

    c. The Title IX Policy states that "Appeals are expected to be resolved within twenty (20) business days after the parties' submission of their statements."

42. The Title IX Policy provides that "Throughout the process, there is a presumption that the respondent is not responsible for the alleged conduct until a determination regarding responsibility is made at the conclusion of the grievance process."

    a. UC uses the preponderance of the evidence standard in making a determination about whether a student violated the Title IX Policy.

    b. Under the Title IX Policy, UC "has the burden of proof and the burden of gathering evidence sufficient to reach a determination regarding responsibility."

43. During the Title IX investigative and adjudicatory process, both the complainant and respondent are permitted up to two "advisors." The role of the advisor is extremely limited, however. An advisor generally "may not participate as a spokesperson or vocal advocate in meetings, interviews, or hearings." However, at hearings an advisor conducts cross-examination of witnesses.

44. During an investigation, the investigator is required to interview "individuals involved, witnesses, and any other persons determined to have relevant knowledge of the circumstances…" The investigator is supposed to "review of related physical evidence and/or materials…" however, UC may not access medical or psychiatric records without the consent of a party.

45. UC will provide all parties with a copy of the investigative report prior to any hearing "for their review and written response." The report does not contain any findings or conclusions, but "will instead fairly summarize the relevant evidence…"

46. A live hearing is conducted to determine responsibility. The Hearing Panel consist of persons who are "trained on issues relating to this Policy as well as how to conduct hearings."  Parties are permitted to challenge the participation of certain hearing members on the grounds of conflict of interest. Challenges are reviewed by the Vice President for Equity, Inclusion &Community Impact.

47. The Title IX Policy provides that if a party or a witness "does not submit to cross-examination at the hearing, the panel must not rely on any statement of that party or witness in reaching a determination regarding responsibility.  However, the Hearing Panel members are still permitted to review statements by absent witnesses in the investigative report.

48. The Hearing Panel does not have any rules of evidence, beyond a generalized statement that "The Hearing Panel shall determine the relevance of evidence and its admissibility."  Similarly, for cross-examination the Hearing Panel shall determine the relevance of questions before they are answered and shall explain any decision to exclude a question as not relevant.

49. The Title IX Policy contains a limitation on the use of a complainant's – but not a respondent's – sexual history:

> Questions and evidence about the complainant's sexual predisposition or prior sexual behavior are not relevant, unless such questions and evidence about the complainant's prior sexual behavior are offered to prove that someone other than the respondent committed the conduct alleged by the complainant, or if the questions and evidence concern specific incidents of the complainant's prior sexual behavior with respect to the respondent and are offered to prove consent.

50. Within ten (10) business days, the Hearing Panel will issue a written determination "including a determination regarding responsibility [and] any disciplinary sanctions the University imposes on the respondent…"

51. An appeal on certain limited grounds is permitted.  Grounds for appeals are:

1. Procedural irregularity that affected the outcome of the matter

2. New evidence that was not reasonably available at the time of the determination regarding responsibility or dismissal was made, that could affect the outcome of the matter

    3. The Title IX Coordinator, investigator(s), or decision-maker(s) had a conflict of interest or bias for or against complainants or respondents generally or the individual complainant or respondent that affected the outcome of the matter.

    4. A sanction is not commensurate with the violation.

52. A party is permitted to object to the participation of appeal panel members based on bias and/or conflict of interest.

53. Students found to have engaged in prohibited conduct in violation of the Title IX Policy are subject to a range of sanctions ranging from educational discussions to probation, suspension, or dismissal from the University.

**THE DISCIPLINARY PROCEEDINGS AGAINST JOHN NOAKES**

54. On Friday, September 10, 2021, John Noakes and a female UC student, Jane Roe, engaged in sexual activity after meeting at a fraternity party.

    a. Jane Roe and John Noakes met at the party. They spoke. Later in the evening, Jane Roe, approached John Noakes and, after complimenting his looks, asked for his Snapchat information. After a brief conversation, John Noakes asked Jane Roe if she would like to go to his room. She agreed. In the room, John Noakes and Jane Roe kissed and then engaged in consensual sexual activity.

    b. Jane Roe, over the next few days, came to believe that she had been drugged and raped.

    c. John Noakes unequivocally denies Jane Roe's allegations. Specifically, John Noakes unequivocally denies that he violated the UC Code of Student Conduct or the Title IX Policy.

55. On Sunday, September 12, 2021, Jane Roe went to the hospital for a SANE examination. Jane Roe contacted a detective from the Cincinnati Police Department but the police declined to pursue criminal charges.

56. On Sunday September 12, 2021 John Noakes texted Jane Roe, stating, "Would you mind if I could talk to you over the phone or in person sometime tomorrow morning? I would really appreciate it if we could talk." She did not reply.

57. On Saturday, September 11, 2021 Jane Roe talked to a leader of the fraternity on the phone. He told Jane Roe that there would be a meeting Monday night to discuss the matter. The fraternity learned about the alleged incident and, following a meeting, decided to remove John Noakes.

58. On March 30, 2022, the Office of Gender Equity & Inclusion ("OGEI") received an online report from the Assistant Director of Fraternity & Sorority Life. The report indicated that Jane Roe had "recounted an incident that happened in September at a party hosted by Sigma Alpha Epsilon fraternity at their chapter house." Jane Roe alleged that she had been drugged and sexually assaulted by John Noakes.

59. On March 31, 2022, OGEI emailed Jane Roe.

60. On April 6, 2022, the Jane Roe met with OGEI Investigator Morgan Shaw ("Investigator") for an intake meeting.

61. On June 6, 2022, OGEI received a report via email from a UC Academic Advisor. The Academic Advisor forwarded an email she received from Jane Roe stating, "At the beginning of the 2021-22 school year I was sexually assaulted."

62. On July 26, 2022, Jane Roe submitted a signed Formal Complaint to OGEI via email.

63. On July 28, 2022, Shaw met with Jane Roe to discuss the Formal Complaint and Notice of Commencement.

64. On August 18, 2022, the Notice of Commencement of OGEI Investigation was sent to John Noakes. The notice stated only that on "September 10, 2021 at approximately 11:49 pm, at 2707 Clifton Ave. (Sigma Alpha Epsilon house) [John Noakes] engaged in vaginal intercourse with [Jane Roe] without [Roe's] consent." The notice did not indicate that Jane Roe alleged that she was unable to provide consent as a result of being drugged or excessive alcohol use. The Notice is set forth here:

**From:** Title IX (title9) <title9@ucmail.uc.edu>
**Sent:** Thursday, August 18, 2022 2:50:01 PM
**To:** ████████████████████████████████>
**Subject:** PERSONAL AND CONFIDENTIAL: Notice of Commencement of OGEI
Investigation – ████████████

August 18, 2022


Dear ████████████ :

This letter is to inform you that the Office of Gender Equity & Inclusion ("OGEI") at the
University of Cincinnati is initiating an investigation
 in response to a Formal Complaint filed on July 27, 2022, pursuant to the University's
Title IX Sexual Harassment Policy. The Formal Complaint alleges that on September 10,
2021, at approximately 11:49pm, at 2707 Clifton Ave. (Sigma Alpha Epsilon house),
 Respondent ████████████ engaged in vaginal intercourse with Complainant ████████████
without ████ 's consent. The conduct alleged has been determined to fall within the scope
of the following University of Cincinnati Policy:

65. On August 26, 2022 John Noakes responded to Shaw's Notice. He stated, "I intend to fully cooperate with any investigation." Noakes also requested more details of the nature of the allegations being made, a copy of the complaint filed by Jane Roe, and "the date of the initial contact between [Jane Roe] and the Title IX Office. His email is set forth here:

**From:** ████████████████████ >
**Sent:** Friday, August 26, 2022 11:28 AM
**To:** Shaw, Morgan (shawmo) <shawmo@ucmail.uc.edu>
**Cc:** tamashasky@engelandmartin.com
**Subject:** PERSONAL AND CONFIDENTIAL: Notice of Commencement of OGEI
Investigation - ██████████

Morgan,
I have received you August 18 Notice of Commencement of OGEI
Investigation.
I intend to fully cooperate with any investigation. So that I can gather any
evidence and provide you with appropriate witnesses, please provide me
with more details of the nature of the allegations being made, including the
date and location of the alleged incident, if known.  In particular, please
provide me with a copy of the complaint filed in this matter and the date of
the initial contact between the complainant and the Title IX Office.
I have retained Ms. Anne Tamashasky as my advisor.  She is copied on this
email.  In setting up all upcoming meetings, please make sure to include
Ms. Tamashasky.  If you need me to execute a FERPA release form so that
you can speak to Ms. Tamashasky, please let me know and I will send it
right back.
Please let me know some good times for an initial meeting.  I assume this
meeting can occur by Zoom to better accommodate everyone's schedule.

66. On August 29, 2022, Shaw responded to Noakes' requests.  She wrote: "The purpose of the initial

meeting is to discuss the process, allegations and allow an opportunity for you to ask any questions

you may have."

67. On August 30, 2022, John Noakes again requested more information about the allegations.  He

specifically requested three pieces of information:  (i) a more detailed statement of the conduct

that allegedly violates any UC policy; (ii) the date when the complainant first contacted the Title

IX Office; and (iii) any accommodations or benefits provided to Jane Roe as a result of her claim

to be a victim of sexual misconduct.  He added, "This information is vital to my gathering evidence

in my defense."  His email is set forth here:

24

**From:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ >
**Sent:** Tuesday, August 30, 2022 7:56 PM
**To:** Shaw, Morgan (shawmo) <shawmo@ucmail.uc.edu>
**Cc:** tamashasky@engelandmartin.com
**Subject:** Re: PERSONAL AND CONFIDENTIAL: Notice of Commencement of OGEI Investigation - ▮▮▮▮▮▮▮▮▮▮

Hi Morgan,

Thank you for the message. Would you please provide me with a more detailed statement of the conduct that allegedly violates any UC policy? In particular, I am unclear on whether I am accused on engaging of sexual activity through the use of force or coercion or because the complainant was unable to provide consent because of intoxication, or otherwise. This information is vital to my gathering evidence in my defense.

Anne and I are available to meet on 9/9 10am-3pm. At that meeting I expect to be provided with any statements from the complainant. I will not be able to answer any substantive questions without being provided with that information.

Finally, please let me know the date when the complainant first contacted the Title IX Office and alleged that I had engaged in misconduct. Please also provide me with any accommodations or benefits provided to the complainant as a result of her claim to be a victim of sexual misconduct, as this will aid in our efforts to obtain evidence that will help the investigator and hearing panel assess her credibility.

The FERPA is attached for your reference.

Thanks,

▮▮▮▮

68. On August 30, 2022, Shaw interviewed Jane Roe.

    a. Jane Roe never told Shaw that she did not consent to sexual activity with John Noakes.

    b. Jane Roe never told Shaw that she was too intoxicated to consent to sexual activity with John Noakes.

        i. Jane Roe indicated that she had been drinking at the fraternity party. She told Shaw, "I was feeling tipsy but no signs of me thinking [to myself that] I need to slow down or stop." Jane Roe later said, "I could tell I'd been drinking. I was tipsy but it wasn't like anything crazy." Jane Roe told Shaw, "When I woke up [the next morning], I didn't feel hungover at all, I just felt confused."

     ii.  Jane Roe suggested to Shaw that she had "maybe six to seven" drinks during the night, but that "half of everything I poured spilled on my dress just from bumping into other people and dancing…" She also said that the cups were "small."

     iii.  The information Jane Roe provided to Shaw suggested that it was unlikely anyone put drugs in her drink. She said that she "All of the drinks I poured myself" and that the only time she put her glass down "I was just fixing my hair. I was watching it the whole time, it was quick."

  c.  Jane Roe indicated that her memory was hazy: "I think the last thing I remember was going back in the house. After that I don't remember anything." She claimed to have "flashes" of memory. She recalled being in a bedroom with John Noakes and then laying on her back in a bed with John Noakes kissing her neck. Then she recalled having sex with John Noakes. Her next reported memory was speaking to the friends and crying. She added, "there were such big chunks [of the night] that I don't remember." She also reported that she woke up with some bruises and hickies.

  d.  Jane Roe told Shaw that she went to the hospital on Sunday to have an examination.

69. On August 31, 2022, in response to John Noakes' request, Shaw wrote, that Jane Roe "submitted a Formal Complaint on July 26, 2022" but did not disclose that the initial report to the Title IX Office had occurred in March. Shaw refused to provide any more information about the details of the allegations and simply referred him the Notice provided by UC.

70. On August 31, 2022, John Noakes responded, "I don't believe that the Notice of Commencement of OGEI Investigation… provides me with adequate notice of the allegations against me. I am again requesting more details, including a copy of any statements or complaints submitted." He also specifically requested when Jane Roe "first submitted an incident report or otherwise informed the OGEI about the alleged misconduct." His full email is set forth here:

> **From:** ███████████████████
> **Sent:** Wednesday, August 31, 2022 2:38 PM
> **To:** Shaw, Morgan (shawmo) <shawmo@ucmail.uc.edu>
> **Cc:** tamashasky@engelandmartin.com
> **Subject:** Re: PERSONAL AND CONFIDENTIAL: Notice of Commencement of OGEI Investigation - ████████████
>
> Morgan,
>
>
>
> Thanks for the information. There is no need to copy Josh Engel on invites at this time, Ms. Tamashasky will be acting as my advisor.
>
> I will be at the meeting, but I don't believe that the Notice of Commencement of OGEI Investigation sent on August 18, 2022 provides me with adequate notice of the allegations against me. I am again requesting more details, including a copy of any statements or complaints submitted.
>
> In addition, would you please let me know when the complainant first submitted an incident report or otherwise informed the OGEI about the alleged misconduct.
>
> Thanks,
>
> ████████████

71. Shaw did not respond to any of the requests in John Noakes' August 31, 2022 email.

72. On September 9, 2022, Shaw emailed John Noakes stating, "I am continuing to investigate…"

73. On September 9, 2022 Shaw re-interviewed Jane Roe.  Shaw asked Jane Roe "if she could summarize the information that was told to her from others after the night of September 10, 2021."

    a.  Jane Roe recounted friends saying that she "was hysterical" and that friend had helped her leave the party.

b. Jane Roe indicated that she had spoked to the Cincinnati Police Department but that the investigation had not gone anywhere. She said, "I personally kept putting off how I was feeling and dealing with everything." Jane Roe indicated she was upset when she saw John Noakes' name on a list to attend a sorority party. At that time, she reached out the Fraternity & Sorority Life office, who subsequently reported the matter to the Title IX Office..

c. Jane Roe, again, never told Shaw that she did not consent to sexual activity with John Noakes. She said, "I don't remember a thought process" while she was in the room with John Noakes.

d. Jane Roe, again, never told Shaw that she was too intoxicated to consent to sexual activity with John Noakes.

e. Shaw asked Jane Roe about medical tests at the hospital. Jane Roe said, "They did not draw my blood which I later found out they usually do that so I don't know what happened with mine."

74. On September 12, 2022 Shaw told John Noakes that he would "have an opportunity to meet with me to give a verbal statement or provide a written statement." John Noakes responded, "We would like to meet with you, but before doing so would like the opportunity to review the statement provided by the complainant." Shaw told John Noakes that he would only be able to view the statement by Jane Roe after the entire investigation is completed. The exchange is set forth here:

**From:** Shaw, Morgan (shawmo) <shawmo@ucmail.uc.edu>
**Sent:** Tuesday, September 13, 2022 10:24:19 AM
**To:** ████████████████████████████ >
**Cc:** tamashasky@engelandmartin.com <tamashasky@engelandmartin.com>
**Subject:** RE: Follow Up from 9/9/22 Meeting

Hi ██████

Thank you so much for your message. Please send me some times in which you and your advisor are available to meet and I am happy to get that scheduled.

As discussed in our meeting last week, you will have an opportunity to review the Complainant's statement, along with all witness statements and evidence provided, once the Preliminary Investigation Report (PIR) is complete.

Thank you,

Morgan



**Morgan Shaw (she/her)**
**Gender Equity Specialist**

Email: Morgan.Shaw@uc.edu
Phone: 513-556-3349

308 USquare, 225 Calhoun St.
Cincinnati, OH 45221-0158
www.uc.edu/titleix



---

**From:** ████████████████████████████
**Sent:** Tuesday, September 13, 2022 10:16 AM
**To:** Shaw, Morgan (shawmo) <shawmo@ucmail.uc.edu>
**Cc:** tamashasky@engelandmartin.com
**Subject:** Re: Follow Up from 9/9/22 Meeting

Hi Morgan,

We would like to meet with you, but before doing so would like the opportunity to review the statement provided by the complainant.

Thanks,



75. On September 15, 2022, Shaw interviewed Witness G.

    a.   Witness G in Jane Roe's roommate and friend.

    b.   Witness G was at the fraternity party but had no first-hand observations of any of the sexual encounter between John Noakes and Jane Roe.

    c.  Witness G reported that after her encounter with John Noakes, Jane Roe was crying and upset. She described Jane Roe as "She didn't seem like she was in the right state of mind." She said, "You could tell [jane Roe] was intoxicated."

    d.  Witness G said that Jane Roe could not remember most of the evening. She suggested that Jane Roe and other women at the party had been drugged: "They all seemed like they were drugged."

76. On September 19, 2022 Shaw sent an email to John Noakes stating that she was "continuing to investigate" and that she "will continue to provide weekly updates…" Shaw did not indicate what, if any, investigative steps she had taken.

77. On September 20, 2022, Shaw met with John Noakes.

    a.  John Noakes told Shaw that he believed that the sexual activity with Jane Roe was consensual.

    b.  John Noakes indicated that he would provide a detailed statement after he was told the exact nature of the allegations against him. In particular, John Noakes did not know if Jane Roe was claiming that she did not consent to sexual activity, or if she was claiming that her consent was ineffective due to the use of alcohol for drugs. Shaw declined to provide to John Noakes any further information about the nature of the allegations against him.

78. On September 23, 2022 Shaw interviewed Witness H1.

    a.  Witness H1 is a friend of Jane Roe.

    b.  Witness H1 was at the fraternity party but had no first-hand observations of any of the sexual encounter between John Noakes and Jane Roe.

     c.  Witness H1 had one drink with Jane Roe together before they left for the fraternity. Witness H1 believed that Jane Roe "only had a couple of drinks," adding, "I don't remember the exact amount."

     a.  Witness H1 said that the fraternity "has a reputation of drugging people…" She indicated that her memory was hazy about the evening after drinking some of the wine at the party. Witness H1 spoke to Jane Roe the next morning: "[Jane Roe] told me what happened" and said, I think I was drugged." Witness H1 replied, "Dude I think I was too."

79. On September 23, 2022 Shaw sent an email to John Noakes stating that she was "continuing to investigate" and that she "will continue to provide weekly updates…" Shaw did not indicate what, if any, investigative steps she had taken.

80. On September 27, 2022 Shaw interviewed Witness H2.

     a.  Witness H2 is an acquaintance of Jane Roe.

     b.  Witness H2 was at the fraternity party but had no first-hand observations of any of the sexual encounter between John Noakes and Jane Roe.

     c.  Witness H2 saw Jane Roe crying after her sexual encounter with John Noakes. He indicated that he had to assist Jane Roe in leaving the Fraternity.

     d.  Witness H2 spoke to John Noakes about the incident. He said:

> Basically the way he described it, he was at the [date party]. He saw her and she was being flirty with him. And then they went back to his room. Then they started to hook up. He said that she asked for a condom, and he said, "no" and that he said, "we don't have to do anything if you don't want to" and she said she did so they proceeded. It lasted 10 minutes and she got up and left.

81. On October 3, 2022 Shaw sent an email to John Noakes stating that she was "continuing to investigate" and that she "will continue to provide weekly updates…" Shaw did not indicate what, if any, investigative steps she had taken.

82. On October 5, 2022 Shaw interviewed Witness J.  No notes of this interview are included in the Report.  Witness J subsequently provided a written statement that was not summarized in Shaw's report.

83. On October 5, 2022 Shaw interviewed Witness R.

    a.  Witness R is a former president of the fraternity.

    b.  Witness R was at the fraternity party but had no first-hand observations of any of the sexual encounter between John Noakes and Jane Roe.

    c.  Witness R received a report about Jane Roe's allegations a day or two after the party. Witness R was part of the decision to suspend John Noakes.  HE explained, "We had a lack of information, that's why we ultimately decided to wait to gather more information." He added, "We consulted with our chapter advisor. He said to hold off on removing [the Respondent] but to suspend him for the time being and we would wait to gather more information."

    d.  Witness R could not recall a statement made by John Noakes to the fraternity.

84. On October 6, 2022 Shaw interviewed Witness C.

    a.  Witness C is a friend of Jane Roe.

    b.  Witness C was at the fraternity party but had no first-hand observations of any of the sexual encounter between John Noakes and Jane Roe.

    c.  Witness C stated that when she saw Jane Roe, she "was very coherent and was able to talk to me."  She said that later in the evening Jane Roe "was falling over the band speakers, something she never does."  Witness C said, "[Jane Roe] seemed very intoxicated."

    d.  Witness C stated that she had pictures and videos of Jane Roe from the evening.  Shaw wrote in her report, "This Investigator asked [Witness C] if she would be open to sharing

those videos. [Witness C] replied, 'Yea.'"  However, there is no indication that Shaw made any effort to obtain these videos.

85. On October 7, 2022 Shaw sent an email to John Noakes stating that she was "continuing to investigate" and that she "will continue to provide weekly updates…"  Shaw did not indicate what, if any, investigative steps she had taken.

86. On October 14, 2022 Shaw sent an email to John Noakes stating that she was "continuing to investigate" and that she "will continue to provide weekly updates…"  Shaw did not indicate what, if any, investigative steps she had taken.

87. On October 17, 2022 Shaw interviewed Witness A

    a. Witness A is a former president of the fraternity.

    b. Witness A was at the fraternity party but had no first-hand observations of any of the sexual encounter between John Noakes and Jane Roe.

    c. Witness A originally possessed some text messages about the alleged incident.  However, by the time Shaw asked for the messages, they had been automatically deleted.  Witness A said, "My phone deletes [text messages] after a year."

    d. Witness A indicated that he had a written statement from Jane Roe and Witness H2.  These statements were included in an appendix to the investigative report.

88. On October 18, 2022 Shaw interviewed Witness W.

    a. Witness W is a friend of Jane Roe.

    b. Witness W was at the fraternity party but had no first-hand observations of any of the sexual encounter between John Noakes and Jane Roe.

    c. Witness W was unable to provide information about the party.  She said, "It's very hard to recall specifics because it was a long time ago."  Witness W also indicated that she deleted some pictures from that evening.

33

    d.   Witness W spoke to Jane Roe about the incident.  She said, "She was with a boy,  I'm assuming in a room. He violated her and I think at the time there was talk that she had been drugged because she didn't remember and was confused, and she had enough of a sense to know that he violated her."

89.  On October 14, 2022 Shaw sent an email to John Noakes stating that she was "continuing to investigate" and that she "will continue to provide weekly updates…" Shaw did not indicate what, if any, investigative steps she had taken.

90.  John Noakes asked that Shaw " please provide me with more details of the investigative steps that were taken so I can be assured that this matter is proceeding in a diligent manner."  Shaw responded with no additional information.  She said:  "I am currently interviewing witnesses and gathering evidence. When the Preliminary Investigation Report (PIR) is sent for your review, you will be able to see witness statements including the dates in which I interviewed them."  The exchange is set forth here:

**From:** Shaw, Morgan (shawmo) <shawmo@ucmail.uc.edu>
**Sent:** Tuesday, October 25, 2022 3:59:23 PM
**To:** ███████████████████████████>
**Cc:** tamashasky@engelandmartin.com <tamashasky@engelandmartin.com>
**Subject:** RE: OGEI Investigation Update - ██████████

Hi █████

Thank you for your message. I am currently interviewing witnesses and gathering evidence. When the Preliminary Investigation Report (PIR) is sent for your review, you will be able to see witness statements including the dates in which I interviewed them.

All the best,

Morgan

**Morgan Shaw (she/her)**
**Gender Equity Specialist**
Email: Morgan.Shaw@uc.edu
Phone: 513-556-3349

308 USquare, 225 Calhoun St.
Cincinnati, OH 45221-0158
www.uc.edu/titleix

---

**From:** ██████████████████████████>
**Sent:** Monday, October 24, 2022 5:47 PM
**To:** Shaw, Morgan (shawmo) <shawmo@ucmail.uc.edu>
**Cc:** tamashasky@engelandmartin.com
**Subject:** Re: OGEI Investigation Update - ██████████

Hi Morgan,

~~Th─── f── ────── S── ─── ── ─── ── ──────~~

Thanks for the update. Could you please provide me with more details of the investigative steps that were taken so I can be assured that this matter is proceeding in a diligent manner. In particular, please let me know how many witnesses were interviewed during the past week and the type and quantity of physical evidence obtained during the past week.

91. On October 25, 2022 Shaw interviewed Witness D.

    a.   Witness D has known Jane Roe since grade school.

    b.   Witness D was at the fraternity party but had no first-hand observations of any of the sexual encounter between John Noakes and Jane Roe.

c.  Witness D spoke to John Noakes about the incident.  He said John Noakes reported that Jane Roe "came up to me last night, we walked to my room and we started making out. Then we started removing clothing."  John Noakes added that Jane Roe had asked him if he had a condom; when he said, "no" she said "that was fine."

d.  Witness D spoke to Witness H2 about the incident.  He said:  ""I remember this. I talked to [Witness H2] and he said that [Jane Roe] was changing her story every 5 minutes. Then [Witness H2] went back to her house and asked her questions and I think that's where the blackout thing came from."

92.  On October 28, 2022, Shaw sent an email to John Noakes stating that she was "continuing to investigate" and that she anticipated that the report would be available to review "sometime next week."

93.  On November 4, 2022, Shaw sent an email to John Noakes stating that "evidence needed by the investigator [was] delayed" and that, as a result, "good cause exists for the investigator to extend the timeframe of the investigatory process…"  Shaw did not indicate what new evidence was provided or why that evidence could not have been obtained in a timely manner.

94.  On November 10, 2022, Shaw provided John Noakes with a draft investigative report.

95.  On November 22, 2022, John Noakes provided an initial response to the draft investigative report. He specifically denied "any wrongdoing or violations of any school policies."  He stated that the sexual activity between himself and Jane Roe was "consensual" and that Jane Roe "did not seem to be impaired nor under the influence of drugs."  John Noakes also complained that "the delay in investigating this matter has prejudiced my ability to defend myself."  His full email is set forth here:

**From:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Tuesday, November 22, 2022 11:09 AM
**To:** Shaw, Morgan (shawmo) <shawmo@ucmail.uc.edu>
**Cc:** tamashasky@engelandmartin.com
**Subject:** Re: Invitation to Review Preliminary Investigative Report – ▮▮▮▮▮▮▮▮

Hi Morgan,

Thank you for the PIR. I deny any wrongdoing or violations of any school policies. The complainant and I did engage in sexual intercourse; however, I vehemently disagree that the sexual intercourse was not consensual. I have no knowledge nor participated in the use or distribution of any illicit drug. Based on my recollection, the complainant did not seem to be impaired nor under the influence of drugs. I also have no knowledge and cannot speak to any potential or actual bruising the complainant experienced on that night or any other night. I remain concerned that the delay in investigating this matter has prejudiced my ability to defend myself.

Have a good day,

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

96. Later on November 22, 2022, John Noakes provided a further written response to the Report. A copy of this response is set forth below:

   a. John Noakes stated that the description of his statement was inaccurate. He wrote, "The report should note that had I simply been provided a copy of the complaint provided by the complainant, I would have been willing to provide a full and detailed statement."

   b. John Noakes requested that the Report include the supportive measures, accommodations, or other benefits that Jane Roe received as a result of her claim that she was a victim of sexual misconduct. He wrote, "This information is crucial to assessing her credibility. Please be sure to include this information in the Report."

   c. John Noakes stated that the "report was unreasonably delayed which made it difficult for me to obtain witnesses and other evidence to support my version of the events."

37

d.  John Noakes requested that the report remove any references to Jane Roe possibly being drugged since there was no evidence to support such a claim.  John Noakes also requested the removal of improper "rumor, innuendo, and improper reputation statements about" the fraternity, such as "SAE has a reputation of drugging people."

e.  John Noakes noted that the results of Jane Roe's medical examination was likely to contain significant relevant evidence and the investigator made little or no effort to obtain this information.  John Noakes requested that the Report indicate that if Jane Roe declined to produce this evidence, the finder of fact should infer that the evidence would be unfavorable and unsupportive of her story.

---

From: ██████████████████████████
Sent: Monday, December 12, 2022 3:38 PM
To: Shaw, Morgan (shawmo) <shawmo@ucmail.uc.edu>
Cc: tarnashasky@engelandmartin.com
Subject: Re: Office of Gender Equity & Inclusion Final Investigative Report - ████████████████████

Hi Morgan,

Thank you for the opportunity to provide comments on reports.

1)  The description of the statement provided is inaccurate. The statement says, "This Investigator reminded the Respondent that the allegations were contained in OGEI's Notice of Commencement sent to the Respondent on August 18, 2022." However, I indicated to you on a number of occasions that the Notice was inadequate because it failed to tell me exactly what conduct I allegedly did that violated school rules. This states only that I alleged "engaged in vaginal intercourse with Complainant… without [her] consent." This does not provide any information about the nature of the allegation including, most specifically, the allegation that the complainant was unable to consent due to the use of drugs or alcohol. The report should note that had I simply been provided a copy of the complaint provided by the complainant, I would have been willing to provide a full and detailed statement.

2)  The report does not indicate the supportive measures, accommodations, or other benefits that the complainant received as a result of her claim that she was a victim of sexual misconduct. This information is crucial to assessing her credibility. Please be sure to include this information in the Report.

3)  The report was unreasonably delayed which made it difficult for me to obtain witnesses and other evidence to support my version of the events. In particular, I note that OEI received information about the allegations on 3/31/22 but did not provide me with any notice until 8/18/22. The investigation was not completed for at least another four months. At times, I requested an update on exactly what steps were being taken to investigate the matter; these requests were denied.

4)  In a number of places, the report contains information alleging that the complainant was drugged. (Page 18 ("…I think I was drugged."); Page 30 ("I think at the time there was talk that she had been drugged because she didn't remember and was confused, and she had enough of a sense to know that he violated her." This information is not supported by any evidence. Worse, the report includes rumor, innuendo, and improper reputation statements about this issue. For example, on page 17, the witness states, "They all seemed like they were drugged." On Page 19 the report states, "SAE has a reputation of drugging people." Again, there is no evidence for this. The inclusion of references to drugs should be redacted as it is likely to cause confusion and undue prejudice.

5)  The report indicates on page 7 that the Complainant went to the hospital and had a SANE examination. The report does not describe (i) the results of the examination of (ii) what steps the investigator took to obtain this important evidence. The SANE examination is highly likely to have included in the standard protocol and I invite you to review the best practices. (https://www.ojp.gov/pdffiles1/ovw/241903.pdf) In particular I draw your attention to the discussion starting on page 107 of the standard practices for the collection of evidence in suspected alcohol and drug-facilitated sexual assault cases. In such cases, toxicology samples are commonly collected as soon as possible after a suspected drug-facilitated sexual assault, even if patients are undecided about reporting to law enforcement. Urine samples can provide valuable information if the alleged victim may have ingested a drug used for facilitating sexual assault within 96 hours prior to the exam. Similarly, blood samples can provide valuable information if ingestion of drugs used to facilitate sexual assault may have occurred within 24 hours prior to the exam. At a minimum, the complainant should be asked to produce all of the medical records related to the SANE examination. If she declines to produce this evidence, the report should include a statement that since the complainant has failed to provide evidence within her power to produce, the finder of fact should infer that the evidence would be unfavorable and unsupportive of her story.

Thanks,
████████████████████

---

97. Shaw did not make any changes to the investigative report as a result of the comments received from John Noakes.  Instead, she just indicated she would include his comments in the final report.

98. On January 10, 2023, John Noakes was informed that the matter had been referred for a hearing.

99. The hearing was originally scheduled for February 20, 2023 via Zoom. However, John Noakes asked for, and received, a continuance because his original advisor was receiving cancer treatments and therefore unavailable.

100. Prior to the hearing, UC informed John Noakes that it was designating Brett Sokolow as the chair of the Hearing Panel.

101. John Noakes objected to the participation of Sokolow.

    a. John Noakes objected on the grounds that Sokolow has a conflict of interest because he has appeared as an expert witness on behold of education institutions in a number of cases.

    b. John Noakes noted that there was significant reason to doubt the honesty and integrity of Sokolow. John Noakes wrote, "According to the Chronicle of Higher Ed., Sokolow is being sued by a former executive for allegedly committing tax fraud, breach of contract, and retaliation. The lawsuit alleges that Sokolow fired an employee for reporting and objecting to multiple instances of Sokolow using company funds for personal purposes and defrauding clients."

102. UC agreed to remove Sokolow from the panel, but substituted individuals who work for Sokolow's for-profit consulting firm, TNG Consulting.

    a. TNG Consulting is a risk-management firm that manages eight other affiliates focused on education law and policy, including the Association of Title IX Administrators ("ATIXA") Due to the nature of the work done by TNG and ATIXA, members of these organizations are advocates for a cause and have preconceived notions about Title IX issues. These organizations are primarily concerned with upholding the interests of educational institutions and serve as advocates for the specific procedures adopted by UC.

b. TNG consulting and its affiliates routinely provide opinions on behalf of schools that investigations were adequate in response to challenges by students found to have engaged in sexual misconduct. The TNG website says, "We are frequently called upon to serve as expert witnesses and litigation strategists for K-12 and college cases in state and federal courts…"[22]

c. On information and belief, TNG and its affiliates derive significant income from training to UC and other schools in Title IX matters, and thus the employees of that organization are unwilling to take criticize investigation or take ay other any actions to "upset" the Title IX Office or its staff.

d. On information and belief, TNG has hired lobbying firms to advocate on behalf of victims of sexual misconduct on college and university campuses.[23]

103. John Noakes, again, objected to the participation by any panel members, including the hearing chair, who are a part of TNG or other organizations that provide training and expert advice to educational institutions." UC responded only, "your request is denied" without any substantive analysis.

104. A hearing in this matter occurred on February 20, 2023.

a. Prior to the hearing, all of the Hearing Panelists received and reviewed un redacted investigation report prepared by Shaw.

i. This report included witness statements and information obtained from witnesses who did not appear at the hearing.

---

[22]https://www.tngconsulting.com/consulting/expert-services/expert-witness-and-litigation-support/

[23] https://projects.propublica.org/represent/lobbying/search?search=tng+AND+consulting

      ii. This report included numerous inflammatory and irrelevant statements suggesting that John Noakes and his fraternity have a reputation for drugging students for the purpose of taking advantage of them sexually.

b. In addition to John Noakes and Jane Roe, the Hearing Panel heard from Witness G, Witness H1, Witness W, Witness D, and Witness R.

c. Witness H2, Witness J, Witness A and Witness C were not present at the hearing and did not submit to cross-examination.

d. At the hearing Shaw falsely stated that John Noakes "indicated that they were not interested in providing any additional information or a statement…" In reality, John Noakes was willing to provide a statement after receiving more detailed information about the accusations he was facing.

e. At the hearing, one of the panelists improperly questioned Respondent about his refusal to provide a statement. The panelist said to Respondent: "You said that what happened was consensual, but you didn't offer any of the reasons why you believed it was consensual, like you did today… was there a reason that you only use the word consensual with no explanation in your statement to" the investigator.

f. Jane Roe testified that she had a rape exam done shortly after the alleged incident. Jane Roe submitted some photographs taken at the hospital, but no medical records or test results from this examination were provides.

      i. Jane Roe stated that the investigators told her that she did not need to provide this significant evidence. She testified:

          Q. Did you ever provide all of those results to Miss Shaw to the investigator at any time?... every piece of the SANE exam that you could get, did you ever go get a release from the university? Did you get it at University Hospital?

A.  Yes, but I didn't. I didn't release those because there was too much time had passed before I got the SANE exam. So there was no results to that I felt needed to be included.

Q.  Did the investigator ever ask you to get those for her? Because I know you're saying that it wasn't helpful, but did she indicate I should probably get those as part of my investigation? ….

A. It wasn't. It wasn't asked of me that I should. Nor that I shouldn't. It was just kind of if you want, you can, there were. I didn't want to include the whole exam. There were pictures of my body and some parts that I didn't feel comfortable releasing the entire SANE exam.

ii.   Jane Roe was permitted to provide false and misleading characterizations of medical evidence. She testified that the results of a urine test "came back with no drugs or even alcohol in my system, because it had been too long of a period of time, but there were no signs or any other foreign [substance] in my urine." However, Jane Roe was not qualified to offer an expert conclusion about how long alcohol or drugs is detectable in urine samples.  Moreover, toxicology samples are commonly collected as soon as possible after a suspected drug-facilitated sexual assault, even if patients are undecided about reporting to law enforcement. Urine samples can provide valuable information if the alleged victim may have ingested a drug used for facilitating sexual assault within 96 hours prior to the exam and urine tests can detect heavy drinking for up to five days and any drinking during the previous two days.[24]

iii.   Jane Roe admitted that she had photographs from the fraternity party that were not provided to the investigator.

---

[24] McDonell MG, Skalisky J, Leickly E, McPherson S, Battalio S, Nepom JR, Srebnik D, Roll J, Ries RK. *Using ethyl glucuronide in urine to detect light and heavy drinking in alcohol dependent outpatients.* Drug Alcohol Depend. 2015 Dec 1;157:184-7.

g. John Noakes' Advisor was cut off from asking relevant questions.  For example, this exchange occurred:

> ADVISOR [To Complainant]: Do you ever remember asking to provide oral sex to him?
>
> CHAIR: Can I interject here? Where are we drawing these questions from the notion of agreeing to go to his room asking for a condom more than once? I just heard a question about asking perform oral sex? Are you just making these up out of the blue? Or is this coming from somewhere?
>
> ADVISOR: No, this is this is coming from some obviously I, the advisor of [Respondent] here…. So these are things that he's relayed to me…
>
> CHAIR: I'm just asking whether we don't have any of this evidence in the record…. So if we can keep questions to what's contained in evidence, that'd be great. Okay.

The Chair of the Hearing Panel, thus, prohibited questions about certain topics – condoms and oral sex.  The Chair falsely claimed they were not "contained in evidence."  However, John Noakes testified multiple times that Jane Roe offered to provide oral sex to him and both Jane Roe and John Noakes testified about the use of a condom during their sexual encounter.

h. John Noakes was asked inappropriate and irrelevant questions by the Hearing Panel.  He was asked about switching advisors ((the reason is his prior advisor was unable to attend because she was receiving cancer treatments) and whether he had taken any medications or recreational drugs before the party.

i. John Noakes complained that his memory was poor about some details because "I just over the span of the span of two years, or however specifically long it's been the focus that I've been dealing with is what like why we're here today."

105. On March 3, 2023, the chair of the Hearing Panel emailed John Noakes.  He said that the Hearing Panel wanted to hear from additional witnesses.  The UC process does not permit the re-opening of hearings.  Regardless, the Chair indicated that a further hearing to hear additional

witnesses could not be scheduled and that he intended to use the statements of witnesses who had

not been subject to cross-examination. He wrote:

> I would like to propose to you that we consider the hearing complete so that the panel can move to deliberations. The panelists and Cincinnati administrators are comfortable with this proposal.
>
> Would you please respond to me indicating your agreement to conclude the hearing? The remaining witness testimony will be accepted as provided in the investigation report and the panel will begin deliberations.

106.    On March 4, 2023, Noakes responded. He stated that "This continued delay is prejudicial

and opens the process up to bias and the consideration of improper evidence." John Noakes also

objected to the use of evidence from witnesses who had not been made available for cross-

examination. His full email is here:



107.    The Chair of the Hearing Panel responded by falsely suggesting that he was simply asking for

John Noakes' agreement to use statements from witnesses who had not been made available for

cross-examination.

108.    On March 23, 2023, John Noakes received from Trammer a letter describing the outcome of

the Hearing Panel. John Noakes was found responsible for violating the UC Title IX Policy. A

redacted copy of the Letter is attached as an Exhibit.

109.   The Hearing Panel concluded that Jane Roe was unable to consent to sexual activity.  The Hearing Panel rejected the claim that Jane Roe had been drugged.  Instead, the Hearing Panel concluded that "the preponderance of the evidence supports a conclusion that any potential incapacitation was caused by alcohol intoxication."

   a.   The Hearing Panel concluded that Jane Roe had consumed "roughly six to seven standard drinks" over the course of the evening.  The Hearing Panel reached this conclusion even though Jane Roe had told Shaw that that she had "maybe six to seven" drinks during the night, but that "half of everything I poured spilled on my dress just from bumping into other people and dancing…"  The Hearing Panel also ignored Jane Roe's statement to Shaw that the cups were "small."

   b.   The Hearing Panel then, without providing any notice to the parties, sought to calculate Jane Roe's blood alcohol level based on an online calculator provided by the American Addiction Centers.

      i.   The Hearing Panel did this even after acknowledging that "Calculating an individual's blood alcohol content (BAC) is an imprecise exercise, and measurements based on limited inputs like gender, weight, number of drinks, and timespan produce only rough approximations."

      ii.   The Hearing Panel did this even after acknowledging that "this information is provided as an educational tool only and is not intended to be used for medical or legal advice."

      iii.   The Hearing Panel calculated that Jane Roe's blood alcohol level was between "0.19% to 0.23%." The Hearing Panel noted that, according to this website, a person with this level of intoxication could suffer "Loss of consciousness and memory impairment…" The Hearing Panel stated that it "considered this

45

information in light of testimony provided by [Jane Roe], and as it related to [Jane Roe's] observable motor and cognitive function."

    iv. Ultimately, the Hearing Panel concluded that jane Roe's "description of her state of intoxication was ultimately determined to be credible." Notably, the Hearing Panel believed that Jane Roe's "lack of memory is logically consistent," and, actually, enhanced her credibility.

c. The Hearing Panel determined that John Noakes' description of Jane Roe as "lucid, situationally aware, and proactive in her sexual interaction" was found to be not credible. The Hearing Panel based this conclusion, in part, because John Noakes "did not provide any statements during the course of the grievance process prior to the hearing."

d. The Hearing Panel claimed that it did not "rely" on statements by Witness H2, Witness J, Witness A and Witness C. However, the Hearing Panel reviewed these statements and evidence provided by these witnesses prior to the hearing.

    i. The Hearing Panel stated that its findings come "after reviewing all available evidence, including interviews, witness statements and evidence provided to the investigator, presented in the investigation report, and related appendices, and all relevant evidence and testimony presented at the hearing."

    i. The Hearing Panel admitted that it considered "the witness and party testimony and evidence collected during the investigation" in determining that Jane Roe's "description of her mental and physical condition was ultimately credible." This would include information provided by witnesses who were not available for cross-examination.

e. The Hearing Panel applied different standards to witnesses. The Hearing Panel accepted the testimony of witnesses, like Witness H, who were friends with Jane Roe. At the same

time, the Hearing Panel noted that "Based on the relationship between [Witness D] and [John Noakes], the panel found [Witness D's] statement to have little persuasive value.

110. The Hearing Panel recommended that John Noakes be expelled from UC.

111. On March 24, 2023, John Noakes requested a brief extension of time to submit an appeal. This request was denied.

112. On March 30, 2023, John Noakes submitted an appeal. A copy of the appeal is attached as an exhibit. In his Appeal, John Noakes raised multiple categories of errors:

    a. The Hearing Panel improperly received and reviewed statements by witnesses who did not appear before the Committee.

    b. UC did not provide John Noakes with sufficient notice as required by Policy and the applicable Title IX Regulations.

    c. The Investigative Report and Hearing Panel improperly characterized Respondent's refusal to make a statement to the Investigator.

    d. The Investigative Report and the hearing improperly contained numerous references to the Complainant possibly being drugged prior to the sexual encounter despite the lack of evidentiary support for this claim.

    e. The report improperly included rumor, innuendo, and improper reputation statements about this issue.

    f. The Investigator did not seek evidence that may have undermined the credibility of Jane Roe such as the supportive measures, accommodations, or other benefits that she received as a result of her claim that she was a victim of sexual misconduct.

    g. This matter was unduly delayed prior to the initiation of the investigation.

    h. This matter was unduly delayed once the investigation started.

 i. The Hearing Panel did not draw an adverse inference from the failure of Jane Roe to provide important medical records.

 j. The Hearing Panel considered undisclosed scientific evidence by using an Internet blood alcohol calculator.

 k. The Hearing Panel did not permit full cross-examination by Respondent's Advisor.

 l. Jane Roe was permitted to present evidence about bruising without providing expert testimony that the bruising she suffered was inconsistent with consensual sexual activity.

 m. The Hearing Panel members were biased because they are part of an organization that provides training and expert advice to educational institutions, including serving as expert witnesses in litigation brought by students against schools.

 n. The Hearing Panel members are not UC faculty and staff as required by the Student Code of Conduct.

 o. UC failed to comply with federal regulations by making the trainings undertaken by all panel members available on its website prior to the hearing.

 p. The entire process was not fundamentally fair.

113. On April 3, 2023, Marshall sent an email to Noakes stating, "This is to inform you that members of the appeal panel have been identified.  Please see the attached letter with more details."  However, no letter or information about the appeal panel was attached.  Noakes immediately responded stating that no information was attached,

114. On April 6, 2023 Marshall responded to Noakes' request for the identities of the Appeal Panel.  Marshall wrote, "Please see the attached letter with the Appeal Panel.  Please contact me with any potential conflicts of interest ASAP."

115. On April 7, 2023 Noakes objected to the Appeal Panel members.

a. Noakes objected that appeal panel members were not "faculty and staff" as required by O.A.C. 3361:40-5-05(D)(1).

b. Noakes objected that UC had failed, to make the trainings undertaken by all panel members available on its website prior to the hearing as required by 34 C.F.R. 106.45(b)(10)(i).

c. Noakes objected that the proposed panel members were biased because they are part of organizations that provide training, legal representation, and expert advice to educational institutions including UC. Specifically, Noakes objected that the panel members were all affiliated with Bricker & Eckler, a law firm that derives significant income from providing training and legal representation to UC in Title IX matters and that represents schools in responding to Title IX claims.[25]

> …members of this organization may be considered advocates for a cause and their use on Hearing Panels would be unfair. These members likely have preconceived notions about Title IX issues and are concerned with upholding the interests of the educational institutions that pay their bills, not the rights of students. In addition, members of the Firm are likely advocates for the specific procedures adopted by the school and, therefore, would be unable to evaluate if they are adequate under the circumstances of this case.

d. Noakes objected to the use of three panel members from the same organization. Noakes believed that the use of members who work for the same organization – especially when the organizational structure has not been disclosed – raises the possibility that the panel members will be unable to work independently.

116. On May 5, 2023, John Noakes' appeal was denied. The Appeals Panel rejected most of John Noakes' claims of error:

---

[25] *See e.g. Maseru v. Univ. of Cincinnati,* S.D.Ohio No. 1:18-cv-106*; United States ex rel. Lynch v. Univ. of Cincinnati Med. Ctr., LLC,* S.D.Ohio No. 1:18-cv-587*; Doe v. Kenyon College,* S.D.Ohio No. 2:20-cv-4972; *Navarro v. Florida Inst. of Technology, Inc.,* M.D.Fla. No. 6:22-cv-1950.

a.  The Appeals Panel rejected John Noakes' complaint that the Hearing Panel improperly received and reviewed statements by witnesses who did not appear before the Panel.  The Appeals Panel did not evaluate whether the inclusion of statements from witnesses who were not subject to cross-examination in the investigative report resulted in a fundamentally unfair process.  Instead, the Appeals Panel stated in a conclusory fashion that "Nothing in the policy requires that statements of witnesses that chose not to participate in the hearing be redacted or removed from the report."

b.  The appeals Panel rejected John Noakes' complaint that he did not receive sufficient notice.  The Appeals Panel believed that the Notice did not need to include a statement that Jane Roe was claiming a lack of capacity to consent because the Title IX Policy includes incapacitation in the definition of consent.

c.  The appeals Panel rejected John Noakes' complaint that the Investigator and Hearing Panel improperly referenced his decision to not provide a statement to the investigator. In doing so, the Appeals Panel failed to account for the misrepresentations contained in the investigative report.

d.  The Appeals Panel also did not address whether the inclusion of testimony and evidence about drug use was unduly prejudicial.  Rather, the Appeals Panel seemed to support the inclusion of this evidence despite a finding that the claim was unsupported by the evidence. The Appeals decision includes this remarkable sentence:  "Although this was not found by a preponderance of the evidence, this finding does not mean that the conduct did not occur…"

e.  The Appeals Panel rejected John Noakes' argument that the investigator failed to obtain evidence that could undermine the credibility of Jane Roe.  Instead, the Appeals Panel stated that John Noakes could have "was provided the opportunity to present evidence in

this case, including by presenting evidence that could undermine the Complainant's credibility." But the Appeals Panel never explained how John Noakes would be able to obtain this evidence. Worse, the Appeals Panel acknowledged that Jane Roe could have received benefits as a result of her claim to have been a victim a sexual misconduct, but rejected the idea that this could have affected her credibility because ""Whether Complainant received supportive measures and what those supportive measures were is not only confidential, it is irrelevant to the subject of the investigation."

f.  The Appeals Panel rejected John Noakes' argument that the matter was unduly delayed. The Appeals Panel acknowledged that the Title IX Office was aware of Jane Roe's allegations in March 2022 but did not provide notice to John Noakes until August 2022. The Appeals Panel said, "This delay of six months was not attributable to the University" and found no error because ""By the time the report was made to the University, memories were already affected and surveillance tapes were certainly long overwritten."

g.  The Appeals Panel rejected John Noakes' argument that the investigative process was unduly delayed. The Appeals Panel acknowledged the existence of unexplained delays, and that evidence could be lost, but concluded that the delays "were [not]material, given that the incident in question had occurred many months earlier and memories were likely already affected due to the passage of time."

h.  The Appeals Panel rejected John Noakes' argument that the Hearing Panel was required to draw an adverse inference from the failure of Jane Roe to provide important medical records. The Appeals Panel merely concluded that Jane Roe had no obligation to provide the records, and then inappropriately compared the failure of Jane Roe to provide records in her possession to John Noakes decision to not provide a statement to the investigator without receiving sufficient notice.

51

i. The Appeals Panel rejected John Noakes' argument that Jane Roe was permitted to provide false and misleading characterizations of medical evidence. The Appeals Panel simply concluded that "The Hearing Panel does not appear to have taken the contested statement into account when reaching a decision."

j. The Appeals Panel rejected John Noakes' argument that Jane Roe should not have been permitted to submit pictures of her alleged bruising because the Appeals Panel did not believe that "the pictures or the testimony had any impact on the Hearing Panel's decision."

k. The Appeals Panel rejected John Noakes' claim that the Student Code of Conduct does not permit the use of outside consultants as decision-makers. The Appeal Panels simply noted that The Code of Student Conduct itself states that "Students should refer to university Title IX policies for information on jurisdiction, definitions, hearings, and other related procedures.'" The Appeals Panel did not address the fact that the Title IX Policy had not been codified in the Ohio Administrative Code.

l. The Appeals Panel rejected John Noakes' argument that there was an accumulation of errors that rendered the process unfair. The Appeals Penal simply said, "The University's policy does not permit an 'accumulation of errors' appeal."

m. The Appeals Panel rejected John Noakes' argument that the Hearing Panel members had a conflict of interest by virtue of their work with an organization that provides Title IX training and "expert advice" to educational institutions.

    i. Notably, the Appeals Panel did not address the claim that the members of the Appeals Panel had the exact same conflict.

    ii. The Appeals Panel did not evaluate whether the Hearing Panel members were biased. Instead, the Appeal Panel simply observed that "the University's Title IX

Office reviewed that challenge and denied it.."  And accepted at face value the statement of the Hearing Panel that the members "did not and [do] not have a bias toward or against either party, or toward or against complainants or respondents."

]

117.　The Appeals Panel acknowledged some procedural or "compliance" errors, but still declined to order a new hearing.

 a.　The Appeals Panel rejected John Noakes' argument that the Hearing Panel considered undisclosed scientific evidence.  The Appeals Panel agreed that "it was inappropriate for the Panel to use an outside website to calculate blood alcohol content without providing the parties the opportunity to review and provide feedback to the information."  However, the Appeals Panel concluded that "there is insufficient evidence to demonstrate that the procedural error affected the outcome of the matter."

 b.　The Appeals Panel rejected John Noakes' argument that the Hearing Panel did not permit full cross-examination by John Noakes' Advisor.  The Appeals Panel agreed that "the Chair was incorrect" but concluded that the error was "immaterial to the outcome."

 c.　The Appeals Panel rejected John Noakes' argument that UC had failed to disclose the training attended by decision-makers as required by federal regulations.  The Appeals Panel acknowledged that John Noakes was "correct in noting that he did not have an opportunity to review the trainings undertaken by the panel members."  However, the Appeal Panel rejected this argument as a "compliance error", stating "that it is unclear how this impacted the outcome in this matter.

118.　John Noakes has been expelled from UC.  As a result, John Noakes has been denied the benefits of education at his chosen school.  His academic and professional reputations have been damaged, as has his ability to enroll at other institutions of higher education and to pursue a career.

John Noakes's damages include diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, and mental and emotional anguish and distress.

## COUNT I
## (VIOLATION OF TITLE IX – ERRONEOUS OUTCOME)

119. Plaintiff repeats and incorporates all the allegations of this Complaint, as if fully set forth herein.

120. Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

121. The Title IX regulations promulgated by the Department of Education provide that "A recipient's treatment of a complainant or a respondent in response to a formal complaint of sexual harassment may constitute discrimination on the basis of sex under title IX." 34 C.F.R. 106.45(a).

122. There is significant and doubt about the accuracy of the disciplinary proceeding's outcome.

123. Clear procedural irregularities in UC's response to the allegations of sexual misconduct permit a plausible inference of sex discrimination.

   a. The degree of doubt in the outcome is grave; accordingly, the merits of the decision itself supports an inference of sex bias.

   b. The Hearing Panel improperly received and reviewed statements by witnesses who did not appear before the Committee. In this situation, powerfully inculpatory statements were provided to the Hearing Panel with no opportunity for cross-examination. The risk that the Hearing Panel would be unable to put aside these statements, and the consequence of

54

failure is so vital to Respondent, means that even if the Hearing Panel claims to have put aside this testimony, the practical and human limitations cannot be ignored.

c. John Noakes did not receive sufficient notice as required by Policy and the applicable Title IX Regulations. The Notice received on August 18, 2022 did not include sufficient details known at the time and provide John Noakes with sufficient time to prepare a response before any initial interview. Specifically, the notice does not state that Jane Roe alleged she was incapacitated and therefore incapable of consent due to alcohol and/or drugs.

d. The Investigative Report and Hearing Panel improperly characterized John Noakes' refusal to make a statement. Nothing in the Title IX Policy required John Noakes to provide a statement to the Investigator and it was a substantial procedural error for the investigator to incorrectly characterize John Noakes' reasons for declining to make a statement, or the Hearing Panel to question John Noakes about his refusal to make a statement to the investigator.

e. The Investigative Report and the hearing contained numerous references to the Jane Roe possibly being drugged prior to the sexual encounter. There was no evidence for this claim and the inclusion in the investigative report and during the hearing was unduly prejudicial.

f. The investigator did not seek evidence that may have undermined the credibility of the Jane Roe.

    i. The investigator did not consider the fact that Jane Roe delayed pursuing an investigation or possibly received academic and housing benefits. The report does not indicate the supportive measures, accommodations, or other benefits that Jane Roe received as a result of her claim that she was a victim of sexual misconduct.

    ii. The investigator also did not make significant efforts to include medical records.

g. This matter was unduly delayed.  The UC Title IX Policy requires that all matters be completed in 90 "business days."  Ninety business days from when the Title IX Office first became aware of the allegations against John Noakes on March 31, 2022 would be approximately August 9, 2022.    Ninety business days from when a Formal Complaint was submitted to the Title IX Office on July 26, 2022 would be approximately December 5, 2022.  The Outcome Letter is dated March 23, 2023.

h. The Hearing Panel did not draw an adverse inference from the failure of Jane Roe to provide her medical records.

i. Jane Roe was permitted to provide false and misleading characterizations of medical evidence.

j. The Hearing Panel considered unreliable and undisclosed scientific evidence in attempting to calculate Jane Roe's blood alcohol level.

k. The Hearing Panel did not permit full cross-examination by Respondent's Advisor.

l. Jane Roe was permitted to submit pictures and testify about bruising without providing any expert evidence that such bruising was not inconsistent with consensual sexual activity.

m. The decision makers were biased because they are employed by organizations that provide training and expert advice to educational institutions.

    i. The Hearing Panel members are associated with TNG Consulting and ATIXA, which are organizations that routinely provide expert opinions on behalf of schools that investigations were adequate in response to challenges by students found to have engaged in sexual misconduct.

    ii. The Appeals Panel members were affiliated with Bricker & Eckler, a law firm that derives significant income from providing training and legal representation to UC in Title IX matters and that represents schools in responding to Title IX claims.

      n.  The decision makers were not UC faculty and staff and therefore were not authorized to serve as decision-makers under the Student Code of Conduct.

      o.  UC failed to make the trainings undertaken by all decision-makers available on its website prior to the hearing as required by 34 C.F.R. 106.45(b)(10)(i).

124.    Particular circumstances suggest that gender bias was a motivating factor behind the erroneous findings and the decision to impose discipline upon John Noakes. These circumstances include a general atmosphere at UC where those who lodge a complaint of sexual assault are immediately treated as "survivors." This general atmosphere is a direct result of pressure on UC from OCR, DOJ, student groups, and public opinion.

      a.  Prior to the disciplinary proceedings against John Noakes, there was substantial criticism of UC, both in the student body and in the public media, accusing UC of not taking seriously complaints of female students alleging sexual assault by male students. UC was under pressure from students and the community to combat vigorously sexual assault against women on and the severe potential punishment – loss of all federal funds – if UC was found to not be in compliance with federal mandates yields a reasonable inference" of sex discrimination.

      b.  Prior to the disciplinary proceedings against John Noakes, the federal Department of Education's Office of Civil Rights had engaged in systemic investigations of UC's policies, procedures, and practices with respect to its sexual harassment and sexual assault complaint process.

125.    As a direct and proximate result of defendants' violations of John Noakes's rights under Title IX, John Noakes has suffered severe and substantial damages. These damages include diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional

anguish and distress and other compensatory damages, in an amount to be determined by a jury and the Court.

126.     As a direct and proximate result of defendants' violations of John Noakes's rights under Title IX, John Noakes has been deprived of access to educational opportunities at UC.

127.     UC is liable to John Noakes for his damages.

128.     Pursuant to 42 U.S.C. §1988, John Noakes is entitled to his attorney's fees incurred in bringing this action.

## COUNT II
### (DECLARATORY JUDGMENT – VIOLATION OF DUE PROCESS AND SECTION 1983)

129.     Plaintiff repeats and incorporates all of the allegations of this Complaint, as if fully set forth herein.

130.     This Count is brought against the Individual Defendants for declaratory and injunctive relief.

131.     The Fifth Amendment to the United States Constitution, made applicable to the State of Ohio by the Fourteenth Amendment, provides that no person shall "be deprived of life, liberty, or property, without due process of law."

132.     The Fourteenth Amendment to the United States Constitution provides that no state shall deprive "any person of life, liberty, or property, without due process of law."

133.     UC has a constitutional obligation to provide a fundamentally fair and reliable hearing process.

134.     John Noakes has a constitutionally protected liberty or property interest in his continued enrollment at UC.

    a.   The precise nature of the interest involved in this case is the right to remain at a public institution of higher learning in which John Noakes was a student in good standing.

    b.   Discipline from UC implicates John Noakes' property interest in interest in pursuing an education.

    c.   Discipline from UC implicates John Noakes' liberty interest in his reputation and integrity.

135.   John Noakes is entitled under the Constitution of the United States to the opportunity to be heard in a meaningful manner at the disciplinary hearing. John Noakes, at a minimum, was entitled students to sufficient notice, disclosure of the evidence used against him, the ability to present evidence, and an opportunity to be heard before he is expelled or suspended.

136.   John Noakes interests in the results of the disciplinary hearing are significant.

    a.   Expulsion from UC University would deny him the benefits of education at his chosen school.

    b.   Expulsion from UC would damage John Noakes's academic and professional reputation.

    c.   The expulsion and other sanctions imposed by UC are likely to affect the John Noakes's ability to enroll at other institutions of higher education and to pursue a career.

137.   The Defendants have violated John Noakes's due process rights in the following manner:

    a.   UC unduly delayed the investigation and adjudication of this matter. The UC Title IX Office was aware of the allegations against Respondent on March 31, 2022. A Formal Complaint was submitted to the Title IX Office on July 26, 2022. John Noakes was not provided notice until August 18, 2022 – over four months after the UC Title IX Office became aware of the allegations and over three weeks after a formal complaint was filed. This delay was prejudicial and material. John Noakes' ability to defend himself was impacted. Because of the delay witnesses are likely to forget important details and physical evidence, including surveillance tapes, were lost.

    b.   UC failed to provide adequate notice of the allegations against John Noakes prior to initiating an investigation. UC then mischaracterized and negatively commented upon

John Noakes' decision to not provide a statement to the UC investigator without obtaining adequate notice of the nature of the allegations he faced.

c. UC used biased outside consultants as decision-makers on both the Hearing Panel and the Appeals Panel. UC employed consultants who work for organizations that provide training and expert advice to educational institutions. The Hearing Panel members are associated with TNG Consulting and ATIXA, which are organizations that routinely provide opinions on behalf of schools that investigations were adequate in response to challenges by students found to have engaged in sexual misconduct. The Appeals Panel members were affiliated with Bricker & Eckler, a law firm that derives significant income from providing training and legal representation to UC in Title IX matters and that represents schools in responding to Title IX claims.

d. The UC Hearing Panel improperly reviewed and relied on statements from witnesses who failed to appear before the Hearing Panel an, as a result, were not subject to cross-examination.

e. The Hearing Panel did not permit full cross-examination by John Noakes' Advisor.

f. The UC Hearing Panel improperly relied on evidence – the calculation of Jane Roe Blood-alcohol level by a website calculator – that had not been disclosed to John Noakes prior to the hearing.

g. The UC Hearing Panel improperly relied on scientific and medical evidence that was not reliable and supported by sufficient expert testimony. This evidence included the calculation of Jane Roe's blood alcohol level and the testimony by Jane Roe about the result of her medical examination.

h. The UC investigation failed to seek and/or obtain significant relevant evidence, specifically Jane Roe's medical records. At the hearing, UC refused to draw a negative inference from

the failure of Jane Roe to provide this evidence and permitted Jane Roe to provide inaccurate and misleading testimony summarizing these records.

i. The UC process was not fundamentally fair. The accumulation of errors outlined in this paragraph – even if each is not independently sufficient to create a due process violation – suggest a process that was biased and fundamentally unfair.

138. The Plaintiff and the Individual Defendants acting in their official capacity have a dispute about whether the Title IX Policy and the Code of Student Conduct, as applied to the proceedings against John Noakes, violate the Due Process Clauses of the United States Constitution.

a. The Individual Defendants have both a duty to enforce the provisions of the Title IX Policy and the Code of Student Conduct and have actually enforced those provisions against John Noakes.

b. John Noakes is entitled to a declaration that the Title IX Policy and Code of Student Conduct, as applied to John Noakes, violates the Due Process Clauses of the United States Constitution.

c. John Noakes is entitled to an injunction prohibiting the Individual Defendant from enforcing the Sexual Misconduct Policy and Code of Student Conduct against him in a manner that violates the Due Process Clauses of the United States Constitution.

139. Pursuant to 42 U.S.C. §1988, John Noakes is entitled to his attorney's fees incurred in bringing this action.

## COUNT III
## (DECLARATORY JUDGMENT – VIOLATION OF R.C. 111.15)

140. Plaintiffs repeat and incorporate all of the allegations of this Complaint, as if fully set forth herein.

141. UC is an "Agency" as that term is defined in R.C. 111.15(A)(2).

142.    UC is required by R.C. 3345.21 to "adopt rules for the conduct of the students…"

143.    The Student Code of Conduct is a "Rule" as that term is defined in R.C. 111.15(A)(1).

144.    The Student Code of Conduct was filed by UC in accordance with R.C. 111.15 and has been codified in the Ohio Administrative Code.

145.    The Title IX Policy is a "Rule" as that term is defined in R.C. 111.15(A)(1).

146.    The Title IX Policy was not filed by UC with the secretary of state, the director of the legislative service commission, and the joint committee on agency rule review.  The Title IX Policy was not codified in the Ohio Administrative Code.

147.    Ohio Courts require strict adherence to R.C. 111.15's filing requirements.

    a.    Rules such as the Title IX Policy that have not been filed in accordance with R.C. c. 111 are invalid.

    b.    UC's efforts to avoid the filing requirements of R.C. 111.15 by carving out an exception for the Code of Student Conduct for cases involving sexual harassment under Title IX is ineffective because it defeats the purpose of the statute of providing the public with an opportunity to review the substantive portions of new rules to determine whether the rules exceed the scope of UC's authority, conflict with other rules, or conflict with the legislative intent of the statute pursuant to which the rules are being adopted.

148.    Plaintiff and UC have a dispute about whether the Title IX Policy is valid.

149.    John Noakes is entitled to a judgement declaring that the Title IX Policy is invalid because the rule had not been filed as required by R.C. 111.15.

150.    John Noakes is entitled to a judgment declaring that any disciplinary proceedings held in accordance with the Title IX Policy, and that deviated from the Student Code of Conduct, are invalid because the rule had not been filed as required by R.C. 111.15.

## COUNT IV
## (DECLARATORY JUDGMENT – UNDUE DELAY)

151.    Plaintiffs repeat and incorporate all of the allegations of this Complaint, as if fully set forth herein.

152.    The discipline imposed by UC was in violation of the UC Title IX Policy and the Student Code of Conduct, codified at O.A.C. 3361: 40-5-05.

153.    By asserting this Count, John Noakes is not conceding that the Title IX Policy is valid and applicable to his situation.  John Noakes is also not conceding that the distinction between and "report" and a "formal complaint" is valid.

154.    UC received notice of the complaint against John Noakes on March 31, 2022..

155.    UC received a formal complaint against John Noakes on July 26, 2022.

156.    The outcome letter from the Hearing Panel was dated March 23, 2023.

157.    The Title IX Policy states that "from the date of its receipt of a formal complaint, the investigation, hearing, and issuance of the adjudicating body's report shall be concluded in ninety (90) business days."

158.    The adjudicating body's report was not concluded within the time frame set forth in the Title IX Policy.  Ninety business days from when the Title IX Office first became aware of the allegations against John Noakes on March 31, 2022 would be approximately August 9, 2022. Ninety business days from when a Formal Complaint was submitted to the Title IX Office on July 26, 2022 would be approximately December 5, 2022.

159.    Good cause did not exist for any limited extension of timeframes.

160.    UC acted in violation of the Title IX and the UC Code of Student Conduct by failing to conclude its investigation and adjudication of the allegations against John Doe within 90 business days of the formal complaint.

161. As a result of the delay, John Doe was prejudiced in his ability to defend against the allegations. John Doe was unable to recall the events of that day and obtain witnesses or evidence.

162. John Doe is entitled to a declaration that the discipline imposed by UC was contrary to the school's policies and the Ohio Administrative Code and, therefore, invalid.

**Wherefore**, Plaintiff seeks the following relief from the Court:

- Judgment in favor of John Noakes on all counts, including a declaration that the discipline imposed on John Noakes is invalid under Title IX, the United States Constitution, and Ohio law.

- Pursuant to Fed. R. Civ. P. 65, a Temporary Restraining Order and a Preliminary Injunction vacating any disciplinary findings, compelling Defendants to remove any negative notation from Plaintiff's disciplinary records, and prohibiting further disciplinary proceedings in a manner that violates Title IX, Ohio law, or the United States Constitution.

- A Permanent Injunction vacating any disciplinary findings, compelling Defendants to remove any negative notation from Plaintiff's disciplinary records, and prohibiting further disciplinary proceedings in a manner that violates Title IX, Ohio law, or the United States Constitution.

- Judgment in favor of John Noakes awarding damages in an amount to be determined at trial;

- Court costs and other reasonable expenses incurred in maintaining this action, including reasonable attorney's fees as authorized by 42 U.S.C. §1988.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable.

Respectfully submitted,

_____/s/ Joshua A. Engel_____
Joshua Adam Engel (0075769)
Scott O'Reilly (0075717)
Anne Tamashasky (0064393)
ENGEL AND MARTIN, LLC
4660 Duke Dr., Suite 101
Mason, OH 45040
(513) 445-9600
engel@engelandmartin.com

**VERIFICATION**

[John Noakes], being duly sworn, does depose and state as follows: I am the John Noakes identified in the Complaint. I have reviewed this Complaint. I have personal knowledge of my actions and the action of UC in regard to the matters described in this Complaint. The averments of the Complaint in regard to these matters are true and correct to the best of my knowledge.

Pursuant to 28 U..S. Code § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed this 12th day of May 2023.

[REDACTED] a/k/a John Noakes