

**University of CINCINNATI**

**Division of Equity, Inclusion and Community Impact**
Un vers ty of C nc nnat
PO Box 210395
C nc nnat , OH 45221 0395

Un vers ty Pav on, Su te 600
2618 McM cken C rc e
(513) 556 8463

March 23, 2023



Sent electronically to: ████████████

**PERSONAL AND CONFIDENTIAL**

Dear ████ ████████

This serves as official correspondence regarding the outcome of the formal hearing held on Monday, February 20, 2023. The Complainant submitted a formal Complainant on July 26, 2022, alleging that you engaged in behaviors that violated the University of Cincinnati's Title IX Sexual Harassment Policy. Investigator Morgan Shaw conducted a formal investigation of the allegations and the Final Investigation Report served as the basis for the formal hearing held pursuant to the University of Cincinnati's policy.

As noted in the Final Investigation Report the procedural timeline was as follows:

3/31/22 Maxient report to OGEI
4/6/22  Investigator introductory meeting with Complainant
7/26/22 Complainant submits signed Formal Complainant
7/28/22 Investigator follow up meeting with Complainant
8/18/22 Notice of Commencement of Investigation sent to parties
8/25/22 Second/Final Notice of Commencement of Investigation sent to both parties
8/30/22 Interview with Complainant
9/2/22  Email update to parties
9/9/22  Introductory meeting with Respondent
9/9/22  Follow up Interview with Complainant
9/9/22  Email update to parties
9/12/22 Email to the Respondent following up from introductory meeting
9/15/22 Interview with Witness ████
9/19/22 Email update to parties
9/20/22 Interview with Respondent
9/23/22 Interview with Witness ██████
9/23/22 Email update to parties
9/27/22 Interview with Witness ██████
10/3/22 Email update to parties
10/5/22 Meeting with Witness ████

10/5/22 Interview with Witness ███
10/6/22 Interview with Witness ████
10/7/22 Email update to parties
10/7/22 Respondent submits evidence and names of witnesses via email
10/7/22 Follow up Interview with Witness ███
10/14/22 Email update to parties
10/17/22 Interview with Witness ███
10/18/22 Interview with Witness ███
10/18/22 Written statement submitted by Witness ███
10/24/22 Email update to parties
10/25/22 Interview with Witness ███
11/3/22   Complainant submits evidence via email
11/10/22 Access to Preliminary Investigative Report (PIR) emailed to parties
11/22/22 Respondent provided PIR response
11/28/22 Complainant provided PIR response
11/29/22 Email to Respondent
11/29/22 Respondent responds to Investigator's email
11/29/22 End of PIR review
12/6/22  Access to Final Investigative Report (FIR) email to parties and hearing administrator

The method used to gather documentary or other evidence was submission of materials via email to the investigator. Evidence is referenced in the appendices of the Final Investigation Report that was shared with parties via email on December 6, 2022. On December 9, 2022, both parties and their advisors were notified the pre-hearing conference and the hearing would be scheduled.   Both parties and their advisors were notified on December 20, 2022, of the prehearing conference on January 13, 2023, and the hearing scheduled on January 18, 2022.  Requests to change the dates of the hearing were made by the Respondent on December 28, 2022, and the Complainant on January 2, 2022. Both parties and their advisors were notified on January 10, 2023, the prehearing conference was rescheduled for February 6, 2023, and the hearing was rescheduled for February 20, 2023. Both parties' witnesses were notified on February 7, 2023, the hearing was scheduled for February 20, 2023.  Between February 7 and February 15, witnesses confirmed their participation or did not respond regarding their participation in the hearing.

### Statement of Finding, Final Determination, and Rationale Form

**Respondent:** ███  ███
**Complainant:** ███
**Incident Date(s):** September 10, 2021          **Hearing Date:** February 20, 2023

### Introduction
The University of Cincinnati Hearing Panel (comprised of Joseph Vincent, Kayleigh Baker, and Aaron Austin, hereinafter referred to as "the Panel") met on February 20, 2023, to hear a sexual harassment Complainant filed by ███ (hereinafter referred to as "Complainant") against ███ (hereinafter referred to as "Respondent"). Complainant and Respondent attended the hearing and answered all questions asked of them, both in direct examination by the Panel and their respective Advisors, and in cross-examination conducted by the opposing parties'

Advisors. Following the conclusion of the hearing, the University of Cincinnati attempted to schedule a subsequent hearing date to hear four witnesses who did not appear on February 20. On March 3, the parties agreed to forgo a second hearing date and move to deliberations. The panel requested a transcript of the hearing, and the transcript was provided by the University on March 13, 2023.

The Panel's findings come after reviewing all available evidence, including interviews, witness statements and evidence provided to the investigator, presented in the investigation report, and related appendices, and all relevant evidence and testimony presented at the hearing. In considering the allegations, the Panel applied the presumption of innocence, and then relied upon the preponderance of the evidence in making all findings. The Panel did not and does not have a bias toward or against either party, or toward or against complainants or respondents. The Panel also considered the relative credibility of the parties in making the findings. The Panel unanimously determined that Respondent is **responsible** for violating the University of Cincinnati's *Title IX Sexual Harassment Policy*, specifically related to the prohibition against Sexual Assault (Forcible Rape).

**The Hearing**
The Hearing Panel provided each party with a full and fair opportunity to introduce evidence, make opening and closing statements, and respond to questions. The hearing was held via the online platform Zoom and was recorded.

Of the witnesses interviewed as part of the investigation, the following **were present** at the hearing and submitted to cross-examination: Respondent, Complainant,  and

and **were not present** at the hearing and did not submit to cross-examination. Consistent with University of Cincinnati policy, the panel did not rely on any statements of these witnesses in reaching a determination regarding responsibility.

In addition, Complainant's comments during her opening statement included references to Complainant's sexual predisposition and history. These statements are precluded from admissibility as evidence by University of Cincinnati policy, and the panel did not rely on these statements in reaching a determination regarding responsibility.

**The Allegations**
Per the investigation report dated December 6, 2022, Complainant alleged that on September 10, 2021, at approximately 11:49pm, at 2707 Clifton Ave. (Sigma Alpha Epsilon house), Respondent engaged in vaginal penetration of Complainant without Complainant's consent.

**Implicated Policy Provisions**
If true, the alleged conduct could violate the following provisions of the University of Cincinnati's *Title IX Sexual Harassment Policy*:

**Sexual Assault [Forcible Rape]**: "Penetration, no matter how slight, of the vagina or anus with any body part or object, or oral penetration by a sex organ of another person, without the consent of the complainant."

**Relevant Policy Definitions**

The implicated policy provisions related to Forcible Rape include elements related to the consent of the Complainant. The University of Cincinnati's *Title IX Sexual Harassment Policy* defines "Consent" as:

> An affirmative agreement through clear actions or words to engage in intimate and/or sexual activity. Individuals giving the consent must act freely, voluntarily, and with understanding of their actions. Consent can be withdrawn at any time. A person cannot give consent if the person is mentally or physically incapacitated such that the person cannot understand the fact, nature, or extent of the sexual situation. Similarly, a person cannot give consent if force (expressed or implied) duress, intimidation, threats, or deception are used on the person. Silence or the absence of resistance does not necessarily imply consent. Consent to some sexual acts does not imply consent to other acts, nor does prior consent to sexual activities imply ongoing future consent with that person or consent to that same sexual activity with another person. Consent does not exist when one knew or should have known of the other's incapacitation. A factor in determining consent is whether an individual has taken advantage of a position of influence or authority. Proof of consent or non-consent is not a burden placed on either party involved in an incident. Instead, the burden remains on the University to determine whether this Policy has been violated.

The *Title IX Sexual Harassment Policy* further defines "Incapacitation" as:

> Incapacitated or incapacitation: A state in which rational decision-making or the ability to consent is rendered impossible because of a person's temporary or permanent physical or mental impairment including, but not limited to, physical or mental impairment resulting from drugs or alcohol, disability, sleep, unconsciousness, or illness. Incapacitation is determined based on the totality of the circumstances. Incapacitation is more than intoxication, but intoxication can cause incapacitation. Factors to consider in determining incapacitation include, but are not limited to, the following:
> - Lack of awareness of circumstances or surroundings (e.g., an inability to understand, either temporarily or permanently, the who, what, where, how and/or why of the circumstances; blackout state);
> - Inability to physically or verbally communicate coherently, particularly with regard to consent (e.g., slurred or incoherent speech);
> - Lack of full control over physical movements (e.g., difficulty walking or standing without stumbling or assistance); and/or
> - Physical symptoms (e.g., vomiting or incontinence).

**Forcible Rape**

Complainant said that she attended a party at the Sigma Alpha Epsilon house with ███ and ███ Complainant said she had one drink of wine and one beer prior to arriving at the party, and once she arrived around 9:00 pm, consumed an additional six to seven drinks of wine. Complainant said she introduced herself to Respondent and exchanged Snapchat contact information. At the hearing Complainant stated that she felt like Respondent was someone she knew for "five minutes" and she did not know who he was prior to the party. Complainant said she took a photo with some friends around 11:49 pm outside the house and remembered going back into the house but struggled to recall anything after that. Complainant said she only recalled "flashes" of memory, like "a one second snapshot of memory."

Complainant said "[t]he first flash was in a bedroom at the SAE house. I was standing in the doorway facing the beds and I was with [Respondent]. Then, another period where there is no memory. [The second] flash [of memory] was me facing the door and [Respondent] was kissing me. [Then] again nothing. [The third] flash [of memory], I was laying on my back in a bed and [Respondent] was kissing my neck. I remember saying, 'Where are we? Is the door locked.' then [no memory]. The [fourth flash of memory] my dress was on, and my shorts [that I was wearing under my dress] were off. His shorts were off, and he was having sex with me. Then [no memory]. [The fifth flash of memory] I was standing by [Respondent's] bed, and he held up some shorts and said, 'Are these your shorts.' The [sixth flash of memory] I was calling Grace ███ and I was sobbing on the phone. [Then] a [period] of no memory. [The seventh flash of memory] I was in the frat basement still crying talking to ███ and Trey ███ was there. I don't remember the conversation between me and ███ The next thing I remember is being home and I barely remember that. I remember being on the couch in my living room and ███ being there with my shoes and my phone wallet, I remember [that] vaguely. Then I remember being in my bed around 3:00 am."

During the hearing, Complainant also stated that she had a memory of asking Respondent if he had a condom. Complainant was not able to remember if Respondent answered the question. Complainant did not include this memory in her Complainant, possibly because this memory was "piecey" or "fuzzy."

Prior to the hearing, Respondent did not provide a detailed account of the events on September 10, 2021; however, Respondent consistently denied lacking consent for any sexual activities that occurred. At the hearing, Respondent provided a more detailed account from his perspective. Respondent said he arrived to the party sometime between 9:00 pm and 9:30 pm and met Complainant briefly and then didn't interact with her again until shortly before midnight. Respondent could not offer any approximate timeframe for the introduction to Complainant. Respondent said he heard someone calling his name and that Complainant approached him. Respondent said Complainant complimented his looks and the two exchanged Snapchat contact information. Respondent said Complainant's apparent romantic interest emboldened him to ask Complainant if she wanted to go to his room in the SAE house.

Respondent said that once he and Complainant arrived at his room, they closed the door and began kissing. Respondent said they continued kissing as they made their way onto the bed, and both laid down on the bed. Respondent said both he and Complainant were fully clothed at this time. Respondent said Complainant asked him if he had a condom, and Respondent said he responded "no, I do not. But we do not have to do anything that you do not want." Respondent said Complainant then offered to perform oral sex on Respondent and attempted to remove Respondent's belt. Respondent said he did not verbally respond to Complainant's offer and did not assist Complainant in attempting to remove Respondent's belt, and that Complainant eventually stopped trying to remove it. Respondent said Complainant moved back to a position to kiss Respondent, and that the two switched positions, so that Complainant was lying on the bed and Respondent was on top.

Respondent said that once they switched positions, Complainant removed her shorts with a little help from Respondent, and Respondent pulled his pants down below his knees. Respondent said Complainant asked again if he had a condom, and Respondent again responded, "No, I do not. You do not have to do anything that you do not want to do." Respondent said Complainant positioned his penis in her vagina, and that they had vaginal intercourse for "a few seconds" before Respondent "realized… this wasn't something that I wanted to take part in." Respondent said he removed his penis and moved to his couch to get dressed. Respondent said he handed Complainant her shorts. Respondent said "she came over to me while I was sitting down, finishing up, getting [ready] to go back out. She came over to me and gave me a kiss on the lips and then walked out." Respondent said he did not see Complainant again after she left his room. Respondent estimated that from the time Respondent and Complainant left the area of the house with the party, until Complainant left his room, was about 10 minutes.

If sustained, Complainant's allegation could implicate the University's prohibition of Forcible Rape.

The allegation is analyzed below.

### Finding – Sustained
Complainant alleged that Respondent penetrated Complainant's vagina with Respondent's penis without Complainant's consent. Based on the evidence and testimony provided during the grievance process, Complainant's allegation regarding her lack of consent implicates the portion of the University of Cincinnati's definition of "Consent" which states that "a person cannot give consent if the person is mentally or physically incapacitated such that the person cannot understand the fact, nature or extent of the sexual situation." The definition further indicates that "consent does not exist when one knew or should have known of the other's incapacitation."

As a preliminary matter, the Panel concluded that the Respondent engaged in vaginal penetration of Complainant with Respondent's penis, based on the parties' mutual agreement that the act occurred. For the purposes of evaluating the University of Cincinnati's prohibition

of Forcible Rape, the element related to penetration is satisfied by the undisputed evidence provided by the parties. Therefore, the remaining issues the Panel evaluated related to Complainant's capacity to consent, and, if the Panel concluded Complainant lacked the capacity to consent, whether Respondent knew or should have known. If the Panel concluded that Complainant had the capacity to consent, then the Panel must determine whether Complainant conveyed "affirmative agreement through clear actions or words" to Respondent to engage in the sexual interaction.

**Complainant's capacity to consent**

Complainant said that her physical condition and experiences on the night/morning of the alleged incident indicated that she was incapable of consenting to sexual activity with Respondent. Complainant indicated she did not suffer from any injuries or conditions that would have rendered her incapable of providing consent. Complainant also indicated she did not take any medications or use any recreational drugs that could have contributed to her alleged incapacity. Complainant said that she ate regular meals and did not engage in any other behaviors that might have caused or contributed to her alleged incapacity.



Throughout the grievance process, Complainant suggested that she might have been drugged on the night/morning of the incident, but the Panel concluded there is insufficient evidence to suggest drugging and the preponderance of the evidence supports a conclusion that any potential incapacitation was caused by alcohol intoxication. Complainant said she had one drink of wine with ▌▌ while getting ready for the party. ▌▌ indicated in her hearing testimony that the two stopped at another location on the way to the SAE house and drank a beer before continuing to the party at SAE. At the party, Complainant indicated that she, ▌▌ and ▌▌ drank from a box of wine provided by ▌▌

Complainant stated that she drank from the same box of wine all night; however, ▌▌ stated that at some point the boxes were all moved to a table and she, along with presumably most other partygoers, began drinking from random boxes because they were not easily distinguishable. Complainant agreed that the boxes were all moved to a table at some point. ▌▌ and Complainant reported experiencing physical responses after the party that were not in alignment with their typical "drunk" experiences, forming the basis for Complainant's suspicion that she, as well as ▌▌ and ▌▌ had been drugged. Complainant and ▌▌ also inferred from ▌▌ comments to them that he was also drugged. However, there is no evidence that any other partygoer experienced similar effects. Further, the Panel rejected as implausible the possibility that ▌▌ drugged himself in order to also drug Complainant and ▌▌ with no perceptible motivation to do so.

Complainant said she had her first drink of wine with ▌▌ at around 8:50 pm prior to going to the SAE house. Complainant said she had her first drink of wine at the SAE house at around 9:30 pm. ▌▌ said, and Complainant confirmed, that Complainant had one beer between 8:50 pm and 9:30 pm. From 9:30 pm until shortly before midnight, Complainant said she had six to seven drinks of wine. Complainant said the first drink was in a red solo cup filled about halfway,

and all subsequent drinks were in small plastic wine glasses. ▮▮▮ estimated the plastic glasses held four ounces of wine. The evidence provided by Complainant and ▮▮▮ indicates that Complainant consumed approximately eight standard drinks[1] in a span of roughly three hours. Complainant indicated she spilled portions of many of the drinks due to dancing and bumping into other partygoers, lowering the approximate amount she consumed. Assuming she did not spill the drink, she consumed at ▮▮▮ residence, did not spill the beer, and did not spill the first drink at SAE, the Panel concluded Complainant's total consumption over the three-hour period was roughly six to seven standard drinks.

Calculating an individual's blood alcohol content (BAC) is an imprecise exercise, and measurements based on limited inputs like gender, weight, number of drinks, and timespan produce only rough approximations. There is no conversion chart for BAC that automatically establishes incapacitation; however, looking at the level of intoxication is still helpful for evaluating evidence of Complainant's capacity to consent in this matter. The Blood Alcohol Content Calculator provided by the American Addiction Centers (AAC)[2] indicates that a 150 lbs. female who consumed six to seven standard drinks over a three-hour period, resulting in a BAC of roughly 0.19% to 0.23%, could experience nausea, slow reflexes, staggering and slurring of words, and reduced mental capacity. Loss of consciousness and memory impairment are also listed as common at this level of intoxication, according to the AAC website.



While this information is provided as an educational tool only and is not intended to be used for medical or legal advice, the panel considered this information in light of testimony provided by Complainant, ▮▮▮▮▮ and ▮▮▮ as it related to Complainant's observable motor and cognitive function. ▮▮▮ said that at one point prior to midnight, Complainant fell over some equipment being used by the band performing at the party and had to be helped up. Complainant said she experienced a near-total loss of memory, with sparse, "snapshot-like" impressions of her experiences from shortly before midnight to almost 3:00 am. ▮▮▮ observed Complainant at around 1:00 am in a portion of the house not being used for the party. ▮▮▮ said he was with ▮▮▮ who knew Complainant, and so he left Complainant in the care of ▮▮▮ but ▮▮▮ described Complainant as looking disheveled, like she had been crying, and evidently ▮▮▮ believed Complainant needed assistance by virtue of his statement that he was satisfied when he saw that ▮▮▮ would take care of her.

▮▮▮ described the difficulty of attempting to communicate on the phone with Complainant at around 1:00 am, and ultimately ▮▮ said she talked to ▮▮▮ to arrange an Uber for Complainant so that she could come to where ▮▮ was. ▮▮ said her concern for Complainant compelled her to stay on the phone with Complainant during the short Uber ride, and when

---

[1] In the United States, one "standard" drink (or one alcoholic drink equivalent) contains roughly 14 grams of pure alcohol, which is found in: 12 ounces of regular beer, which is usually about 5% alcohol; 5 ounces of wine, which is typically about 12% alcohol; and 1.5 ounces of distilled spirits, which is about 40% alcohol.

See https://www.niaaa.nih.gov/alcohols-effects-health/overview-alcohol-consumption/what-standard-drink#:~:text=12%20ounces%20of%20regular%20beer,which%20is%20about%2040%25%20alcohol.
[2] See https://alcohol.org/bac-calculator/.

Complainant arrived, she appeared upset, had trouble walking unassisted, appeared to mentally process information very slowly, and struggled to coherently respond. ▉ said Complainant remained disoriented and confused, as well as struggled to walk and respond competently, until about 3:00 am, when she appeared to regain some sense of orientation and awareness. Complainant also said she recalled being in her bed at around 3:00 am before falling asleep.

Complainant's description of her state of intoxication was ultimately determined to be credible. Credibility is largely a function of consistency and corroboration. Here, although the Panel did not find sufficient evidence that anyone was "drugged," as discussed more below, the preponderance of the evidence does support that Complainant was incapacitated, as defined by University of Cincinnati policy, due to alcohol consumption. Complainant's description of her own consumption was corroborated by other witnesses, including ▉ and was materially consistent over the multiple statements made by Complainant in the course of the grievance process. Complainant's "flashes" of memory also seem in line with what a reasonable person of Complainant's stature might experience given the amount of alcohol consumed over the same time period. To put it another way, Complainant's lack of memory is logically consistent, given the relevant testimony provided by Complainant and the other witnesses.

In contrast to the evidence indicating Complainant may have been incapacitated, Respondent offered evidence indicating Complainant was lucid, situationally aware, and proactive in her sexual interaction with Respondent. Respondent said that around midnight, Complainant engaged him in conversation, complimented his looks, and added him on Snapchat shortly before the two went to Respondent's room, indicating Complainant's situational awareness and ability to use her phone. Respondent said he asked Complainant if her date to the party would be upset if the parties engaged in sexual activity, and Complainant answered coherently and accurately in describing her date and why there was no concern about upsetting her date. Respondent said Complainant asked if Respondent had a condom, indicating some situational and consequential awareness. Complainant recalled asking about the condom as well, but indicated it was an isolated memory and she did not recall how Respondent answered her or what happened immediately after. Respondent said Complainant removed her own shorts with some assistance from Respondent, that Complainant said she was going to find her friends after the sexual activity concluded, and that Complainant kissed Respondent before leaving, all of which could be indications of Complainant's situational awareness.

During the hearing, Respondent's credibility was weakened as it related to his description of the encounter in the bedroom. Respondent did not provide any statements during the course of the grievance process prior to the hearing; however, he did make contemporaneous statements to ▉ about the events. Based on those secondhand accounts of Respondent's statements, the panel determined that *some* parts of Respondent's statement were consistent over time. On the other hand, Respondent's testimony at the hearing was not consistent with nor corroborated by ▉ testimony on multiple points. Respondent's description at the hearing of Complainant's behavior varied substantially from the account recalled by ▉ both before and after Complainant was in Respondent's room. Although Complainant's own

memories of these points were sparse, Respondent's description that she was lucid and proactive was determined by the panel to be not credible. In addition, the degree of variation between Respondent's stated recollection at the hearing and ███ recollection of Respondent's contemporaneous statements led the Panel to conclude that neither Respondent nor ███ were reliable witnesses.

An additional indicator of Respondent's credibility, or lack thereof, relates to the inherent plausibility of the situation. Put another way, credibility analysis requires assessment of the question, "does this account make sense?" Respondent's description of Complainant's behavior ultimately lacked credibility because it did not make sense when compared to other parts of Respondent's testimony. Respondent indicated that there was very little conversation while the parties were in his room – most notably, Respondent said that he abruptly stopped the sexual interaction ten seconds after initially penetrating Complainant and moved to the couch to get redressed. Respondent said he did not discuss his reservations with Complainant, did not explain why he stopped, and Complainant did not ask. The Panel found this description implausible in light of Respondent's insistence that Complainant pursued Respondent and enthusiastically engaged in sexual activity with him. In addition, Respondent said Complainant attempted to perform oral sex on Respondent but could not remove Respondent's belt. Respondent said he did not assist Complainant despite her attempts to remove his belt, which ultimately failed. Respondent then said the parties switched positions and removed their pants – immediately after Respondent declined to assist Complainant in removing his pants. Again, the Panel questioned the credibility of this description and, as a result, the panel determined that Respondent's testimony regarding the parties' interactions in his bedroom to be largely unreliable.

Relying on Complainant's testimony, corroborated by witness testimony, the Panel concluded that the preponderance of the evidence supports Complainant's assertion that she was incapacitated at the time of the sexual interaction with Respondent. Incapacity is determined based on the totality of the circumstances. Under the University of Cincinnati policy, incapacity is more than intoxication, but intoxication can cause incapacitation. Using the factors supplied by the policy, Complainant exhibited multiple factors that are generally used to determine whether someone is incapacitated, including:

- Complainant's near total loss of memory
- Complainant's spatial disorientation
- Complainant's inability to remove Respondent's belt
- Instability demonstrated by falling over the band equipment
- Difficulty walking without assistance
- Asking for a condom more than once (repeating herself) and failing to register or respond to Respondent's reply
- Lacking any visible or verbal response when Respondent abruptly ended sexual intercourse

The Panel considered the witness and party testimony and evidence collected during the investigation and determined that Complainant's description of her mental and physical

condition was ultimately credible, and that Respondent's assertions regarding Complainant's capacity to consent lacked credibility. Observations of Complainant by ███ ██ and ██ are consistent with Complainant's description of, and her lack of ability to further speak to, her mental and physical condition as well as the likely impact on Complainant's cognitive and motor function of Complainant's alcohol consumption. Complainant lacked the capacity to consent to sexual activity with Respondent.

Respondent provided testimony that contradicted Complainant's alleged incapacity, but the preponderance of the evidence was insufficient to sustain Respondent's claims, which included:

1) Complainant asked about a condom, which could demonstrate some level of situational awareness. However, the Complainant's total lack of a verbal response to Respondent telling her that he did not have a condom calls into question Complainant's ability to make rational, reasonable decisions about the situation. Within the entire context described by Complainant in her sparse memories, Complainant's question appears to be more indicative of disorientation, lack of context, and lack of situational awareness than it does of situational and consequential awareness. This conclusion is further supported by the fact that Respondent said Complainant made multiple requests for a condom and did not respond to Respondent's reply, even when he informed her (twice) that she did not have to do anything she didn't want to do, which would appear to invite a response from Complainant.

2) Complainant actively attempted to perform oral sex on Respondent but was not able to remove Respondent's belt. The Panel determined that this description was not credible, particularly given the fact that Respondent said he declined to assist Complainant, but then removed his belt and pants to engage in vaginal penetration with Complainant immediately after Complainant gave up trying to remove his pants.

3) Complainant positioned Respondent's penis near Complainant's vaginal opening, which prompted Respondent to penetrate Complainant's vagina with his penis. The Panel concluded that Respondent's general lack of credibility, coupled with Complainant's mental and physical condition, made this assertion implausible and unsupported by a preponderance of the evidence.

4) Complainant added Respondent on Snapchat immediately before agreeing to go to Respondent's room with him, ostensibly to engage in sexual activity. Complainant and Respondent described virtually the same encounter, but Complainant said the Snapchat information was exchanged nearer to the beginning of the party. Complainant had a clear and complete memory of the interaction, which she contributed to her lack of intoxication at that time, and the panel determined that Complainant's description was more credible than Respondent's -- who claimed to have very little recollection of the entire incident due to the length of time that had passed since it occurred -- and who the Panel determined to be generally less credible than Complainant.

**Respondent's knowledge of Complainant's incapacity**

The University of Cincinnati's *Title IX Sexual Harassment Policy* indicates that "Consent does not exist when one knew or should have known of the other's incapacitation." Because the Panel

determined that Complainant lacked the capacity to consent to sexual activity with Respondent, the Panel must further determine whether Respondent knew or should have known of Complainant's incapacity. Relying on the comparative credibility of each party, the Panel determined that the Respondent should have known about Complainant's inability to consent.

To determine whether Respondent knew or should have known about Complainant's condition, the Panel looked at the situation from the perspective of a reasonable person similarly situated to Respondent. It is worth noting that while Respondent did not describe himself as incapacitated, he did indicate that he had consumed some wine throughout the night. Despite this, when considering the events from the perspective of a reasonable person, the reasonable person is always sober, therefore Respondent does not get a "pass" for failing to notice behaviors that would have been indicators of incapacitation that a reasonable person would have noticed.

Respondent described Complainant as coherent and participatory in the sexual activity; however, some of Respondent's indicators are inconsistent with what a reasonable person would describe as coherent and Respondent's description is also inconsistent with that of other witnesses who saw Complainant before and after the sexual encounter.

Prior to leaving the party, Complainant was falling and spilling wine. Respondent denied observing this behavior and did not acknowledge noticing whether Complainant's clothes were disheveled or wet. While it is possible Respondent was not aware of Complainant's behavior at the party, his complete lack of observing Complainant's incapacitation became less plausible when the Panel considered the additional statements of witnesses *after* Complainant left Respondent's room.

███ and ███ described Complainant's condition at 1:00 am, four hours after Complainant began drinking and one hour after the parties initially engaged in sexual activity. ███ shared very little information based on his lack of proximity, but what he described was consistent with ███ observations that Complainant appeared upset, had trouble walking unassisted, appeared to mentally process information very slowly, and struggled to coherently respond. The corroboration between these two witnesses, one who is friends with Respondent and one who is friends with Complainant, led the Panel to find both witnesses to be credible even considering the possible gaps in memory when accounting for time and alcohol consumption by the witnesses.

There is no evidence that Respondent saw Complainant after she left his room. However, it is reasonable to infer that Complainant was extremely intoxicated at 11:49pm, given her physical and mental state as described by witnesses at 1:11am. The Panel concluded it is more likely than not that Complainant exhibited multiple signs of incapacitation while she was in Respondent's room. However, Respondent did not describe noticing any signs. Instead, Respondent said that Complainant was an active participant by offering to perform oral sex, asking for a condom, attempting to remove Respondent's clothes, and assisting with

positioning Respondent's penis into her own vagina. As discussed above, Respondent's description of these actions lacks credibility and, specifically related to the condom conversation and the failed attempt to remove Respondent's belt, should have been interpreted as signs of disorientation and lack of motor skill. A reasonable person would have persisted in getting some affirmative response from Complainant regarding her request for a condom, and not just interpreted her silence and passivity as consent, as Respondent did.

Overall, Respondent's description of Complainant's condition during the sexual interaction was incomplete and contradictory at times, leading the panel to conclude that Respondent's memory and/or stated recollection was unreliable at best, and deceptive at worst.

For example, Respondent repeatedly claimed he could not recall the "little itty-bitty details" of the encounter but could specifically recall the exact words he used in response to Complainant's question about whether Respondent had a condom: "No I do not. You do not have to do anything you do not want to do." The Panel found Respondent's assertion of maintaining this very specific and precise memory regarding a critically important verbal exchange implausible in light of Respondent's other memory difficulties and considering Respondent's statement that Complainant did not verbally respond at all, even though Respondent allegedly said the same thing twice.



Respondent's statements were also inconsistent with ▮▮▮▮ account of Respondent's initial description of the events. Ultimately, the panel viewed both ▮▮▮▮ and Respondent as lacking credibility regarding their description of the encounter. Since ▮▮▮▮ was the only person, other than Respondent, to testify regarding Respondent's statements about the encounter closer in time to the event, the panel was unable to determine what version of Respondent's statement was ultimately more accurate. Based on the relationship between ▮▮▮▮ and Respondent, the panel found ▮▮▮▮ statement to have little persuasive value. However, to the extent ▮▮▮▮ statement was even partially credible, it further led the panel to conclude that Respondent's version of events was, at best, unreliable.

The Panel determined that the preponderance of the evidence supports a conclusion that Complainant's condition during the sexual interaction with Respondent at midnight was, at the very least, similar to what it was at 1:00 am when she was observed by ▮▮▮ and ▮▮▮ The Panel concluded that Respondent either knew or should have known of Complainant's incapacity, and consent to the sexual interaction did not exist, per University of Cincinnati policy. Therefore, Respondent is **responsible** for violating the University of Cincinnati's *Title IX Sexual Harassment Policy* regarding Sexual Assault (Forcible Rape).

## Sanctions Assigned
The panel determined that Respondent was responsible for violating the University of Cincinnati's prohibition of Sexual Assault (Forcible Rape). The sustained policy violation relates to one of the more egregious forms of conduct prohibited by the University of Cincinnati.

Therefore, the panel determined that Respondent should be expelled from University of Cincinnati.

**Hearing Panel Members:** Joseph Vincent, Kayleigh Baker, Aaron Austin

Date:  3-21-23
Joseph Vincent, Hearing Chair

Per the University of Cincinnati's Title IX Sexual Harassment Policy, Section X.B. Parties "may appeal hearing written determination within five (5) business days of receipt of the written determination of responsible or not responsible.  The appeal must be made in writing and state the basis and reasoning for the appeal."  The written appeal must be sent to:  Vice President for Equity, Inclusion & Community Impact by email at T9appeal@uc.uc.edu.  The appeal will only be considered if the basis for the appeal includes one or more of the four (4) specific bases outlined in section X.B.i. of the policy. An appeal must be submitted no later than  March 30, 2023.

You will be notified in writing if an appeal request is received regarding this matter. If no appeal requests are received by the conclusion of the five (5) business day period, this decision will become final with respect to this matter. Please refer to the Title IX Sexual Harassment Policy for additional information regarding the appeal process.

The University of Cincinnati maintains the confidentiality of this outcome, and only releases information as permitted or required by law. The Complainant will receive notification as well. Finally, you are again reminded that the University of Cincinnati's policies on retaliation are in effect and will be enforced should any adverse action be taken toward any participant in the resolution process.

If you have any questions regarding the grievance process and procedures related to the Title IX Sexual Harassment Policy, or the contents of this letter, you may contact me at 513-556-0196 trammeaj@ucmail.uc.edu.

Sincerely,

Alecia Trammer
Director, Office of Equity, Inclusion and Community Impact

Cc:  Dr. Adrienne Lyles, Title IX Coordinator
     Dr. Bleuzette Marshall, Vice President for Equity, Inclusion & Community Impact
     Morgan Shaw, Investigator
     Scott O'Reilly, Advisor
     Ashleigh Wade, Director of Student Conduct & Community Standards