Please accept my appeal of the March 23, 2023 Outcome Letter

Respondent has identified the following procedural errors in the investigative and hearing process. These are substantial procedural errors that occurred in the process which affected the decision in the case.

1) The Hearing Panel improperly received and reviewed statements by witnesses who did not appear before the Committee. In particular, the Outcome Letter indicates that ▇▇▇▇, ▇▇▇▇, and ▇▇▇▇ were not present at the hearing and did not submit to cross-examination. However, their statements were in the investigative reports that the Panel reviewed prior to the hearing. The Panel states that "Consistent with University of Cincinnati policy, the panel did not rely on any statements of these witnesses in reaching a determination regarding responsibility." However, this is insufficient. The Outcome letter mentions these witnesses at numerous points. The report given to the Panel should have had this information redacted.

The statements were highly prejudicial and, therefore, cannot simply be put aside. ▇▇▇ was a good friend of the Complainant. ▇▇▇ stated to the investigator that the Complainant was "crying and upset sitting at one of the tables" at the party. He described the Complainant as mumbling and needing assistance walking and said that she "insinuated" that something had been done to her by Respondent. ▇▇▇ repeated this information and uncounseled statements by Respondent. ▇▇▇ provided a statement that the Complainant "was falling over the band speakers, something she never does. She seemed very intoxicated."

The risk that the hearing panel would be unable to put aside these statements, and the consequence of failure is so vital to Respondent, means that the practical and human limitations cannot be ignored. In this situation, powerfully inculpatory statements were provided to the hearing panel with no opportunity for cross-examination. The Outcome Letter, for example makes five references to ▇▇▇ and six references to ▇▇▇ is describing the facts, This prevented a fair hearing as it is difficult, if not impossible, to prove that these statements did not influence the outcome.

This problem is compounded by the conduct of the chair of the hearing panel following the hearing. Following the close of the hearing, the panel indicated a desire to hear from these witnesses. This, in itself, was improper and not in accordance with UC policies because the hearing was concluded. When the witnesses were not available, on March 3, 2023 the chair of the panel wrote, "The remaining witness testimony will be accepted as provided in the investigation report and the panel will begin deliberations." When Respondent objected that this was not permissible, the Chair later suggested that he was intending to give Respondent the "choice" to allow these statements to be considered.

This is 100% not true.

The March 3, 2023, email from the Chair did not indicate that this was a "choice" of the parties but indicated a foregone conclusion.[1] This statement, combined with the fact that the hearing panel clearly sought the witness statements significant enough to want to schedule a new hearing date, suggests that a stated intention to not rely on the statements is insufficient to protect the integrity of the process.

2) Respondent did not receive sufficient notice as required by Policy and the applicable Title IX Regulations. The Notice received on August 18, 2022 stated only, "The Formal Complaint alleges that on September 10, 2021, at approximately 11:49pm, at 2707 Clifton Ave. (Sigma Alpha Epsilon house), Respondent John DiTullio engaged in vaginal intercourse with Complainant Clara Hash without Hash's consent." The Regulations require that notice include "sufficient details known at the time and with sufficient time to prepare a response before any initial interview."[2] The notice does not state that the Complainant alleged she was incapacitated and therefore incapable of consent due to alcohol and/or drugs. I requested additional information from the investigator prior to my interview, but the investigator refused this request. On August 31, 2022, Respondent wrote to the investigator: "I don't believe that the Notice of Commencement of OGEI Investigation sent on August 18, 2022 provides me with adequate notice of the allegations against me. I am again requesting more details, including a copy of any statements or complaints submitted." The investigator initially ignored this request. Later, Respondent requested a copy of the complaint. This request, too, was refused.

3) The Investigative Report and Hearing Panel improperly characterized Respondent's refusal to make a statement.

---

[1] The full text of the email from the Chair is set forth here:

> Good morning,
>
> It's been two weeks since our hearing in the matter involving [Complainant-Respondent]. If you recall, four witnesses originally planned to attend the hearing were not able to attend. In the intervening period, we have not been able to successfully coordinate in such a way that the remaining witnesses, parties, advisors, and panelists can meet for a follow-up hearing session.
>
> I would like to propose to you that we consider the hearing complete so that the panel can move to deliberations. The panelists and Cincinnati administrators are comfortable with this proposal.
>
> Would you please respond to me indicating your agreement to conclude the hearing? The remaining witness testimony will be accepted as provided in the investigation report and the panel will begin deliberations.
>
> Thanks for your attention to this matter. I know we all are ready to reach a conclusion. Have a good day.
>
> Joe

[2] 34 C.F.R. 106.45(b)(2).

Nothing in the UC Policy requires Respondent to provide a statement to the Investigator.  It was a substantial procedural error – inconsistent with the presumption that Respondent is "Not Responsible" – for the investigator to characterize Respondents reasons for declining to make a statement, or the hearing panel to question Respondent about his refusal to make a statement to the investigator.

The description of the statement Responded provided in the Investigative Report is inaccurate. The statement says, "This Investigator reminded the Respondent that the allegations were contained in OGEI's Notice of Commencement sent to the Respondent on August 18, 2022." However, Respondent had indicated to the investigator on a number of occasions that the Notice was inadequate because it failed to tell Respondent exactly what conduct he allegedly did that violated school rules. The report should have noted that had Respondent been provided a copy of the complaint provided by the complainant, he would have been willing to provide a full and detailed statement.

At the hearing, one of the panelists improperly questioned Respondent about his refusal to provide a statement.  The panelist said to Respondent:  "You said that what happened was consensual but you didn't offer any of the reasons why you believed it was consensual, like you did today… was there a reason that you only use the word consensual with no explanation in your statement to" the investigator.

The outcome letter (page 9) states, in assessing Respondents credibility, "Respondent did not provide any statements during the course of the grievance process prior to the hearing…"  This was highly improper, as this statement, combined with the inaccurate comments in the investigative reports and Panel questions about Respondent's decision to not answer questions by the investigator amounts to an improper comment on Respondent's right to remain silent.  This is a significant error because the investigator and Panel both implicitly suggest – and then explicitly state in the Outcome letter -- that the refusal to provide a statement was seen as an admission of guilt or affected Respondent's credibility.

4)  The Investigative Report and the hearing contained numerous references to the Complainant possibly being drugged prior to the sexual encounter.  There was no evidence for this claim and the inclusion in the investigative report and during the hearing was unduly prejudicial.  In fact, the Panel noted that "Credibility is largely a function of consistency and corroboration (emphasis supplied)."  The Panel then concluded, "there is insufficient evidence to suggest drugging…"  The Panel committed a substantial procedural error in applying the credibility test: the Panel did not consider that the failure of Complainant to provide support for this allegation of drugging significantly undermined her credibility.

5) The report also included rumor, innuendo, and improper reputation statements about this issue. For example, On page 17, the witness states, "They all seemed like they were drugged." On Page 19 the report states, "SAE has a reputation of drugging

people." Again, there is no evidence for this.  This is a significant error because the information's only probative value was to suggest that Respondent had a propensity or disposition to commit the charged offense.  The inclusion of references to such evidence should have been redacted prior to being provided to the hearing panel as it was likely to cause confusion and undue prejudice.

6)  The Investigative Report did not seek evidence that may have undermined the credibility of the Complainant.  The investigator did not consider the fact that the Complainant delayed pursuing an investigation or possibly received academic and housing benefits.  The investigator also did not make significant efforts to include medical records.  The report does not indicate the supportive measures, accommodations, or other benefits that the complainant received as a result of her claim that she was a victim of sexual misconduct. This information is crucial to assessing the Complainant's credibility.  This is a significant error because the evidence was in the possession of the Title IX Office, Respondent did not have access to this information, and the investigator was specifically requested to include this information in the Report.[3]

7)  This matter was unduly delayed.  The UC Title IX Office was aware of the allegations against Respondent on March 31, 2022.  Respondent was not informed about the allegations until August, 2022.  This delay was prejudicial and material. Respondent's ability to defend himself was impacted because of the delay in informing Respondent of the allegations and initiating an investigation.  This delay is a significant error because witnesses are likely to forget important details and physical evidence, including surveillance tapes, could be lost.  During the hearing, Respondent was questioned in detail about an incident that occurred over a year before – he may have been able to provide better answers had he been informed of the allegations in a timely manner so that he could record his recollections.

8)  The investigative process was unduly delayed once a formal complaint was filed.  A Formal Complaint was submitted to the Title IX Office on July 26, 2022.  Respondent was not provided notice until August 18, 2022 – over three weeks later.  The investigation was not completed until December 6, 2022.  Although Respondent received notices that the matter would be delayed, no explanation was given and the Title IX Office never, as required by the Policy, made a finding that "good cause exists for the investigator to extend the timeframe of the investigatory process…"[4]  This is a significant error because witnesses are likely to forget important details and physical evidence, including surveillance tapes, could be lost.

---

[3] *See*  34 C.F.R. 106.45(b)(1)(ii) (require "an objective evaluation of all relevant evidence — including both inculpatory and exculpatory evidence").

[4] The Title IX Regulations states that "Good cause may include considerations such as the absence of a party, a party's advisor, or a witness; concurrent law enforcement activity; or the need for language assistance or accommodation of disabilities."  34 C.F.R. 106.45(b)(1)(v).  None of those factors were ever stated by the investigator in any communications to Respondent.

9) The Hearing Panel did not draw an adverse inference from the failure of the Complainant to provide important medical records. Instead, the Complainant was permitted to testify about the results of her medical examinations and tests without providing the records or a scientific basis for the results.

The Complainant indicated that she had a rape exam done shortly after the alleged incident. At the hearing, she stated that the investigators told her that she did not need to provide this significant evidence. The report does not describe (i) the results of the examination of (ii) what steps the investigator took to obtain this important evidence. At a minimum, the complainant should be asked to produce all of the medical records related to the SANE examination. If she declined to produce this evidence, the report should have included a statement that since the complainant failed to provide evidence within her power to produce, the finder of fact should infer that the evidence would be unfavorable and unsupportive of her story.[5] The Hearing Panel then committed a procedural error by failing to draw an adverse inference from Complainant's failure to provide this evidence. This is a significant error because the failure of the Complainant to produce evidence in her custody and control that would have supported her claims should have led to an inference that the evidence was, actually, unfavorable.

10) The Complainant was permitted to provide false and misleading characterizations of medical evidence. She testified that the results of a urine test "came back with no drugs or even alcohol in my system, because it had been too long of a period of time, but there were no signs or any other foreign [substance] in my urine."

This was a substantial procedural error for three reasons.

First, there is no testimony or other evidence in the record that Complainant was qualified to offer an expert conclusion about how long alcohol is detectable in urine samples. Respondent's right to be aware of all of the evidence that would be offered against him includes the right to be aware of scientific evidence. See also Error #10.

Second, similar to error #8, it was fundamentally unfair to allow Complainant to describe the content of medical records without allowing Respondent to review those medical records to verify the contents or obtain contrary opinions/interpretations.

---

[5] The SANE examination is highly likely to have included in the standard protocol and I invite you to review the best practices. (https://www.ojp.gov/pdffiles1/ovw/241903.pdf) The discussion starting on page 107 of the standard practices for the collection of evidence in suspected alcohol and drug-facilitated sexual assault cases indicates that in such cases, toxicology samples are commonly collected as soon as possible after a suspected drug-facilitated sexual assault, even if patients are undecided about reporting to law enforcement. Urine samples can provide valuable information if the alleged victim may have ingested a drug used for facilitating sexual assault within 96 hours prior to the exam. Similarly, blood samples can provide valuable information if ingestion of drugs used to facilitate sexual assault may have occurred within 24 hours prior to the exam.

Third, Complainant's testimony was incorrect and misleading.  She was wrong about the ability to detect drugs and/or alcohol in urine samples and, had she been drinking as heavily as she claimed, her urine tests would have revealed this information.  Medical reviews indicate that urine tests can "detect heavy drinking for up to five days and any drinking during the previous two days."  McDonell MG, Skalisky J, Leickly E, McPherson S, Battalio S, Nepom JR, Srebnik D, Roll J, Ries RK. *Using ethyl glucuronide in urine to detect light and heavy drinking in alcohol dependent outpatients*. Drug Alcohol Depend. 2015 Dec 1;157:184-7.  *See also* https://medicine.musc.edu/departments/psychiatry/divisions-and-programs/programs/cnl/heavy-alcohol-testing/etg ("EtG can be present in the urine up to 48 hours, and sometimes up to 72 or hours or longer if the drinking is heavier").

11)  The Hearing Panel considered undisclosed scientific evidence.  *See* Outcome Letter at 8-9.  The hearing panel considered information from a website to estimate the blood alcohol level of the Complainant.  This was a substantial procedural error for two reasons.

First, there was no evidence obtained about the accuracy or reliability of the information used.   There was no evidence before the Panel establishing that the results generated by the website relied upon by the Panel were based on sufficient facts or data or were the product of reliable principles and methods.  Typically, experts in the field of forensic toxicology consider many factors that impact how an individual is affected by alcohol consumption, including size, health, time period, food, and intake of other drugs – but none of this appears to be included in the calculation relied upon by the Panel.[6]  In fact, the Panel used this information even while acknowledging that "Calculating an individual's blood alcohol content (BAC) is an imprecise exercise, and measurements based on limited inputs like gender, weight, number of drinks, and timespan produce only rough approximations."[7]

Second, the scientific evidence used by the Panel was not provided to Respondent in advance of the Hearing.  As a result, Respondent was given no opportunity to rebut or respond to this evidence.[8]

12) The Hearing Panel did not permit full cross-examination by Respondent's Advisor.  The Advisor was cut off even though he indicated he had a good faith basis for questions.  This exchange occurred:

---

[6] *See e.g. State v. Kilbarger*, 5th Dist. Fairfield No. 13-CA-64, 2014-Ohio-4949, ¶ 40

[7] The Panel even acknowledged that the information provided on the website "is not intended to be used for… legal advice" but then proceeded to do just that!

[8] In *Doe v. Miami Univ.*, 882 F.3d 579, 603(6th Cir. 2018), a court said, "The Constitution does require… that the student be provided the evidence against him."), *citing Doe v. Univ. of Cincinnati*, 872 F.3d 393, 399 (6th Cir. 2017)  .

> ADVISOR [To Complainant]: Do you ever remember asking to provide oral sex to him?
>
> CHAIR:  Can I interject here? Where are we drawing these questions from the notion of agreeing to go to his room asking for a condom more than wines? I just heard a question about asking perform oral sex? Are you just making these up out of the blue? Or is this coming from somewhere?
>
> ADVISOR: No, this is this is coming from some obviously I, the advisor of [Respondent] here…. So these are things that he's relayed to me…
>
> CHAIR: I'm just asking whether we don't have any of this evidence in the record…. So if we can keep questions to what's contained in evidence, that'd be great. Okay.

This was a substantial procedural error because the UC rules permit relevant questions (with exceptions for the complainant's sexual predisposition or prior sexual behavior). Nothing in the Rules prohibit questions because the information was not previously in the record. The statement by the Chair – "if we can keep questions to what's contained in evidence" is not consistent with UC Policy and, therefore, error.

13) The Complainant was permitted to submit pictures and testify about bruising. However, such injuries are often consistent with consensual sexual activity and, therefore, this evidence was not relevant.  In particular, many Ohio Courts have observed that bruising may be consistent with sexual activity and it was error to consider evidence contrary to this established law.  *See e.g. State v. Williams*, (5th Dist.) (SANE nurse "agreed the bruising could be consistent with consensual sexual activity"); *State v. Messenger*, 2012-Ohio-2692 (3d Dist.) ("medical testimony" indicated that "some of the bruises including one on the anus were older indicating potentially consensual sexual activity"); *State v. Sanchez*, 2d Dist. Greene C.A. Case No. 97-CA-32, 1998 Ohio App. LEXIS 1734, at *42 (Apr. 24, 1998) (doctor testified that "bruising can result from consensual sex); *State v. Serva*, 2007-Ohio-3060 (9th Dist.) (SANE nurse testified that injuries, including bruises, "could also be consistent with consensual sex").

14)  The Title IX Office denied Respondent's challenge the participation of any panel members, including the hearing chair, who are part of organizations that provide training and expert advice to educational institutions.  This is a conflict of interest because in this case, the chair was required to rule on evidentiary matters related to, and the other panel members consider, the investigation in this case and Respondent's challenges that it was inadequate. The hearing panel members are associated with TNG Consulting and ATIXA, which are organizations that routinely provide opinions on behalf of schools that investigations were adequate in response to challenges by students found to have engaged in sexual misconduct.  Their own website says, "We are frequently called upon to serve as expert witnesses and litigation strategists for K-12 and college cases in state and federal courts, in government investigations (OCR,

program reviews, etc.), and internal investigations. TNG consultants have been expert witnesses in more than 100 state and federal cases."[9]

These are companies that derive significant income from training to schools in Title IX matters, and thus the employees of that organization may be unwilling to take any actions to "upset" the Title IX Office or its staff (such as the investigator). The company likely helped train the investigator — meaning that the panel members would be the ones to review that very same investigator's work.

Due to the nature of the work done by TNG Consultants and ATIXA, members of these organizations may be considered advocates for a cause and their use on hearing panels was unfair.[10] These members likely have preconceived notions about Title IX issues and are primarily concerned with upholding the interests of the educational institutions that pay their bills, not the rights of students. In addition, members of TNG Consulting are likely advocates of for the specific procedures adopted by the school and, therefore, would be unable to evaluate if they are adequate under the circumstances of this case. In other words, it was a substantial procedural error for employees of organizations that provide training and expert advice to educational institutions would be unable to evaluate if there had been a full, fair, and equitable investigation in this case but, instead, would be evaluating whether adherence to procedures recommended by their own company was fair and equitable.

(15) The Panel Members are not UC faculty and staff and therefore may not serve as decision-makers. The University procedures that are codified as part of the Ohio Administrative Code anticipate that hearing panel members will include faculty and staff.[11] The use of hearing panel members who have no affiliation with UC is not specifically authorized by the Student Code of Conduct or the UC Title IX Policy.

(16) UC failed to make the trainings undertaken by all panel members available on its website prior to the hearing. The Federal Regulations state:

> A recipient must maintain for a period of seven years records of—…
>
>> (D) All materials used to train Title IX Coordinators, investigators, decision-makers, and any person who facilitates an informal resolution process. A recipient must make these training materials publicly available on its website…

---

[9] https://www.tngconsulting.com/consulting/expert-services/expert-witness-and-litigation-support/

[10] *See* 34 C.F.R. 106.45(b)(1)(iii) (requiring that decision-makers "not have a conflict of interest or bias for or against complainants or respondents generally").

[11] *See* O.A.C. 3361:40-5-05.

34 C.F.R. 106.45(b)(10)(i).  The UC website contains training materials for UC faculty and staff but does not include any materials for the outside consultants hired as panel members.[12]  This was a substantial procedural error because Respondent was unable to evaluate whether the training provided to the panel members were adequate or contained bias.

17)  The UC process was not fundamentally fair.  Respondent was treated like a suspect and the investigator used law enforcement tactics like asking to prepare a written statement without even knowing the exact charges he faced. The accumulation of errors outlined above – even if each is not independently sufficient to justify reversal – suggest a process that was biased and fundamentally unfair.

---

[12] https://www.uc.edu/about/equity-inclusion/gender-equity/training-materials-for-uc-title-ix-personnel.html