Decision on Appeal

In re: Matter of ▮▮▮▮ and ▮▮▮▮
Date: May 4, 2023

      On March 30, ▮▮▮▮ ("the Respondent") appealed a March 23, 2023 decision by a Hearing Panel (the "Decision"), which found a preponderance of the evidence supported a finding that Respondent violated the University of Cincinnati's Title IX Sexual Harassment policy for Sexual Assault (Forcible Rape) as defined under the Policy. Complainant submitted a timely response to Respondent's appeal.

I.      Standards

      The UC Title IX Sexual Harassment Policy provides for appeals to be filed on the following grounds:

- Procedural irregularity that affected the outcome of the matter
- New evidence that was not reasonably available at the time of the determination regarding responsibility or dismissal was made, that could affect the outcome of the matter
- The Title IX Coordinator, investigator(s), or decision-maker(s) had a conflict of interest or bias for or against complainants or respondents generally or the individual complainant or respondent that affected the outcome of the matter.
- A sanction is not commensurate with the violation.

(Policy at X.B.i).

      Respondent appeals based on claimed procedural irregularity and bias. In order to remand, reverse, or revise the Decision, the Appeal Panel must find that the Hearing Panel made one or more procedural error(s) and that the error(s) impacted the outcome of the investigation or decision such that without the error(s), the outcome would have been different.

II.      Procedural History and Resolution Panel Findings

      On July 26, 2022, the University of Cincinnati received a formal complaint alleging that Respondent engaged in behaviors that violated the University of Cincinnati's Title IX and Sexual Harassment Policy. The University subsequently initiated an investigation into whether Respondent violated the Policy. During the investigation, the investigator obtained statements from Complainant, Respondent, and eight witnesses. On February 20, 2023, the University facilitated a neutral hearing before Resolution Panel. Complainant, Respondent, and five witnesses (▮▮▮▮, ▮▮▮▮, ▮▮▮▮, ▮▮▮▮, and ▮▮▮▮) were present and submitted to questioning by the Resolution Panel and representatives for both parties.

      The Panel issued its decision on March 23, 2023 and found Respondent responsible for violating the University's Policy, specifically related to the prohibition against Sexual Assault

(Forcible Rape). The Panel found that Respondent engaged in vaginal penetration of Complainant with his penis, due to agreement of the parties on this point. Decision at 6.

The Panel next considered whether Complainant had the capacity to consent. The Panel determined there was insufficient evidence to show Complainant had been drugged on the evening in question. Decision at 7. The Panel reviewed statements of the Complainant and Witness Hassel and determined that Complainant's total consumption over the three-hour period was roughly six or seven standard drinks. Decision at 8. The Panel considered testimony by Complainant and Witnesses ▇▇▇, ▇▇, and ▇▇▇ relating to Complainant's observable motor and cognitive function, including Complainant's loss of memory, falling over equipment, looking disheveled, crying, having trouble walking unassisted, mentally processing information very slowly, struggling to coherently responded, acting disoriented and confused, and struggled to walk and respond competently. Decision at 8-9. After reviewing this information, the Panel determined that Complainant's description of her state of intoxication was credible and was corroborated by other witnesses.

The Panel next considered Respondent's evidence regarding Complainant's state of cognitive functioning. The Panel noted that Respondent offered evidence indicating Complainant was lucid, situationally aware, and proactive in her sexual interaction with Respondent. The Panel noted that Respondent stated that Complainant engaged him in conversation, complimented his looks, added him on Snapchat, answered coherently a question about how her date to the party would feel if the parties engaged in sexual activity, asked if Respondent had a condom, removed her own shorts with some assistance, stated she was going to find her friends after the sexual activity concluded, and kissed Respondent before leave. Decision at 9. However, the Panel did not find Respondent to be credible because of his contemporaneous statements to Witness ▇▇▇ about the events, which were not consistent with Respondent's statements at the hearing. Decision at 9. The Panel ultimately concluded that Respondent's description of Complainant as lucid and proactive was determined to be not credible, and that neither Respondent nor Witness Deters were reliable witnesses. Decision at 10.

The Panel further indicated that Respondent's description of what happened lacked credibility because it did not make sense when compared to other parts of Respondent's testimony. Decision at 10. Specifically, Respondent stated that he abruptly stopped the sexual interaction ten seconds after initially penetrating Complainant, and moved to the couch to get redressed, and the Panel indicated it found this implausible in light of Respondent's insistence that Complainant was enthusiastically engaged in sexual activity. The Panel further questioned Respondent's credibility based on his description that Complainant attempted, and failed, to remove his belt, but then the parties immediately switched positions and removed their pants. Decision at 10.

The Panel ultimately concluded that a preponderance of the evidence demonstrated that Complainant was incapacitated, and that Respondent either knew or should have known of Complainant's incapacity. Decision at 10-13. Therefore, the Panel found Respondent responsible

for a policy violation. Decision at 13. The Panel ultimately determined it was appropriate to expel Respondent. Decision at 14.

III.     Analysis of Arguments on Appeal

    *1.    Whether the Hearing Panel improperly received and reviewed statements by witnesses who did not appear before the Panel.*

In his written appeal, Respondent said the Hearing Panel improperly considered the statements of ▇, ▇, ▇, and ▇, four witnesses who did not appear at the hearing. (Appeal at 1). Respondent further states that the outcome letter "mentions these witnesses at numerous points." (Appeal at 1). Respondent said the report provided to the panel should have had information regarding those witnesses redacted because of the "risk that the hearing panel would be unable" to set the statements aside. (Appeal at 1). Respondent said he was not provided a "choice" in whether the remaining witness testimony was considered. (Appeal at 1-2; Fn. 1).

According to the Policy, "If either party or a witness does not submit to cross-examination at the hearing, the panel must not ***rely*** on any statement of that party or witness in reaching a determination on responsibility." (Policy at VII.D.iv.5)(Emphasis added). Nothing in the policy requires that statements of witnesses that chose not to participate in the hearing be redacted or removed from the report.

In their written decision, the Hearing Panel wrote, "▇, ▇, ▇, and ▇ **were not present** at the hearing and did not submit to cross-examination. Consistent with University of Cincinnati policy, the panel did not rely on any statements of these witnesses in reaching a determination regarding responsibility." (Decision at 3)(Emphasis in original). Even still, the Appeal Panel reviewed the Decision in its entirety. The Decision makes no mention of ▇ or ▇ in the analysis or factual findings. The Decision's references to witnesses ▇ and ▇ are limited to statements made by the parties and witnesses with respect to those individuals. The Decision does ***not*** use or analyze statements made by ▇ and ▇ during the course of the investigation in assessing the facts at issue in this matter. Respondent has not identified a statement made by ▇, ▇, ▇, or ▇ that the Hearing Panel relied upon in the determination or that impacted the outcome. Accordingly, Respondent's appeal does not demonstrate a material procedural irregularity with respect to the statements of witnesses who did not appear at the hearing.

    *2.    Whether Respondent received insufficient Notice.*

In his written appeal, Respondent stated he was provided insufficient notice, specifically because he was not notified Complainant alleged a lack of consent due to incapacitation. (Appeal at 2).

The Policy sets forth the Notice requirements. Specifically, the Policy states, "the notice will provide sufficient details known at the time, which include the identities of the parties involved in the incident, if known, the conduct allegedly constituting sexual harassment, and the date and location of the alleged conduct if known." (Policy at II). The August 18, 2022 Notice satisfied such requirements by providing Respondent with the identities of the parties, the date and location of the conduct, and the conduct allegedly constituting sexual harassment. The Notice states, "on

September 10, 2021, at approximately 11:49 pm at 2707 Clifton Ave. (Sigma Alpha Epsilon house) Respondent ▮▮▮▮ engaged in vaginal intercourse with Complainant ▮▮▮ without ▮▮ consent." (Report at 48).

To the extent Respondent argues the notice was insufficient because he was not informed that Complainant was alleging a lack of capacity, the policy defines "consent", in relevant part, as the "affirmative agreement through clear actions or words to engage in intimate and/or sexual activity . . . consent does not exist when one knew or should have known of the other's incapacitation." (Policy at Definitions, Consent). The Appeal Panel finds Respondent was provided with sufficient notice as he was informed Complainant alleged a lack of consent, and the Notice contained each of the required elements as required by the Policy. Finally, the Appeal Panel notes that in his September 20, 2022 statement to the investigator, Respondent said "it was consensual, and she was not **incapacitated**," (Report at 15)(emphasis added), this statement supports this Panel's finding that Respondent was provided sufficient notice, as Respondent responded and provided his account of Complainant's capacity. Accordingly, Respondent's appeal does not demonstrate a material procedural irregularity with respect to the sufficiency of the Notice.

> 3. *Whether the Investigation Report and Hearing Panel improperly characterized Respondent's refusal to make a statement.*

In his Appeal, Respondent stated both the Decision and Investigation Report "improperly characterized" Respondent's refusal to make a statement. (Appeal at 2-3). Respondent further suggested that the investigator and Hearing Panel "implicitly suggest[ed] – then explicitly state[d] in the outcome letter – that the refusal to provide a statement was seen as an admission of guilt or affected Respondent's credibility." (Appeal at 3).

The Policy states, "The University will respect determinations made by the complainant(s) and respondent(s) regarding their level of participation in an investigation." (Policy at VII.C.i). additionally, with respect to the Determination, the Policy states, "If either party or a witness does not submit to cross-examination **at the hearing**, . . . the panel cannot draw an inference about the party or witness' testimony or credibility based solely on a party's or witness' absence from the live hearing or refusal to answer cross-examination or other questions." (Policy at VII.D.iv.5)(Emphasis added).

The Report makes two references to Respondent's participation. The first appears in the investigation timeline and notes that the investigator met with Respondent regarding the investigation process and states, "This investigator met with the Respondent and discussed the investigation process." (Report at 2-3). The second reference states:

> The Respondent told this Investigator that he "wants to participate" in the investigation but "does not feel comfortable" providing a statement "without knowing more about the allegations." This Investigator reminded the Respondent that the allegations were contained in OGEI's Notice of Commencement sent to the Respondent on August 18, 2022. This Investigator reminded the Respondent that the parties will be given an opportunity to review

> all evidence during the review of the Preliminary Investigation Report. The Respondent stated, "It was consensual, and she was not incapacitated." The Respondent did not provide any other statements or information during the interview.

(Report at 15).

The Decision also makes references to Respondent's participation in the investigation. The Decision states, "Prior to the hearing, Respondent did not provide a detailed account of the events on September 10, 2021; however, Respondent consistently denied lacking consent for any sexual activities that occurred. At the hearing, Respondent provided a more detailed account from his perspective." (Decision at 5).

The references to Respondent's participation in the investigation as recounted in the Report and Decision do not suggest an adverse inference was drawn from Respondent's decision not to provide additional information at the time of his investigative interview, rather, they appear to be restatements of procedural steps and information provided by Respondent. It is not a procedural error to account for when and how information entered the record, in fact, it is required to be included in the written determination.[1] With respect to the hearing, the Decision highlights that Respondent "consistently denied" a lack of consent. Moreover, the Hearing Panel appeared to focus the analysis on Respondent's hearing testimony as compared to information provided by other witnesses and Complainant. For example, the Hearing Panel considered Respondent's description of Complainant's lucidity at the hearing versus his account of Complainant's lucidity to witness Deters. The Decision states:

> Respondent did not provide any statements during the course of the grievance process prior to the hearing; however, he did make contemporaneous statements to Deters . . . the degree of variation between Respondent's stated recollection at the hearing and Deters' recollection of Respondent's contemporaneous statements led the Panel to conclude that neither Respondent nor Deters were reliable witnesses.

(Decision at 10).

Respondent used this comparison as an example of how the Hearing Panel improperly used Respondent's lack of participation against him. However, this example actually illustrates that the Hearing Panel evaluated the information in the record appropriately—i.e. Respondent's contemporaneous statement to a witness versus Respondent's hearing testimony. Respondent has not provided any other examples of how the inclusion of these statements or the Hearing Panelist's question at the hearing impacted the outcome of the investigation.

---

[1] The Policy requires that the Written Determination include "a description of the procedural steps taken. . . including any. . . interviews with the parties . . ." (Policy at VI.2).

Accordingly, the Appeal Panel finds that neither the investigator nor the Hearing Panel engaged in procedural error with respect to references to Respondent's lack of participation at the investigation stage.

> 4. *Whether the Investigation Report and Hearing improperly considered references to Complainant possibly being drugged.*

Respondent alleges that the Report and Decision made improper references to Complainant's allegations of possibly being drugged and then failed to weigh Complainant's credibility. (Appeal at 3).

The Report contains several references to Complainant's and Witnesses' speculation that Complainant was drugged, including, but not limited to statements like, "they all seemed like they were drugged."; "the Complainant alleged that, while at the party, the Complainant was drugged"; "all three of us think we were all drugged." (FIR at 2, 17, 20, 42).

The Hearing Panel found that allegations of potential drugging were not supported by a preponderance of the evidence. (Decision at 7). Although this was not found by a preponderance of the evidence, this finding does not mean that the conduct did not occur. It means the evidence did not support that conclusion by a preponderance. The Hearing Panel did not commit procedural error by not evaluating Complainant's credibility with respect to the insufficient evidence. Nothing in the policy requires such an evaluation. Additionally, as this information was alleged in the Formal Complaint, the Hearing Panel had a duty to address it in its decision, which it did.

Accordingly, the Appeal Panel finds that neither the investigator nor the Hearing Panel engaged in procedural error with respect to references to Complainant's allegations of potential drugging.

Respondent's allegations that the Hearing Panel did not adequately weigh Complainant's credibility is addressed further below.

> 5. *Whether the Investigation Report improperly contained rumor, innuendo and improper reputation statements about drugging.*

Respondent alleges the report includes references to the reputation of Sigma Alpha Epsilon and thus amounts to a procedural error. (Appeal at 3-4).

The Final Investigation Report speaks of SAE primarily as the location of the party that occurred on the evening of the incident. (FIR at 5.) The Report also discusses Complainant's disclosure of information regarding the incident to SAE. (FIR at 7 and throughout.)

One witness, ▓▓▓▓▓▓▓, is noted in the Final Investigative Report as stating, "Also, SAE has a reputation of drugging people and doing drugs themselves. I knew this going into it but I didn't expect that to happen to us." (FIR at 19.) This information is relevant as it reveals potential bias of the witness, and therefore was appropriate to include in the Report.

The Decision states, "Throughout the grievance process, Complainant suggested that she might have been drugged on the night/morning of the incident, but the Panel concluded there is

insufficient evidence to suggest drugging and the preponderance of the evidence supports a conclusion that any potential incapacitation was caused by alcohol intoxication." (Decision page 7). No reference is made in the decision to any reputation of SAE for drugging.

There is no indication the Decision contains any information regarding conclusions drawn regarding the reputation of SAE, that such statements caused the Hearing Panel to draw negative conclusions about Respondent, or that such information impacted the outcome in any way. Rather, the Decision specifically finds that the drugging allegation was not supported by a preponderance of the evidence, and SAE is mentioned in the decision only in the context of the location.

Accordingly, the Appeal Panel finds that neither the investigator nor the Hearing Panel engaged in procedural error by reciting information reported by various individuals regarding SAE during the investigation

> 6. *Whether the Investigator failed to seek evidence to undermine the credibility of Complainant.*

Respondent argued that the "Investigative Report" failed to seek Complainant's medical records, and other information that would undermine Complainant's credibility. (Appeal at 4).

As a preliminary matter, the Title IX regulations state that a recipient shall not use a party's treatment records without the voluntary written consent of the student. (34 C.F.R § 106.45(b)(5)(i). The Complainant is not required to give their consent to the use of their records, and the investigator cannot use those records without their consent. Thus, there was no procedural error in connection to the absence of Complainant's treatment records in the investigation.

Respondent also alleged that the investigator did not "seek evidence that may have undermined the credibility of the Complainant." (Appeal at 4). Respondent was provided the opportunity to present evidence in this case, including by presenting evidence that could undermine the Complainant's credibility. Respondent chose not to present such evidence, thus, the investigator was limited to conducting an investigation into the information before her during the investigation stage. This is not a procedural error.

Finally, Respondent seems to suggest that Complainant's receipt of supportive measures also impacts her credibility. Notably, both the Policy and Title IX regulations provide that both Complainant and Respondent are entitled to supportive measures. (Policy at "Supportive Measures"; 34 C.F.R § 106.44(a)). Supportive measures are "non-disciplinary, non-punitive individualized services offered as appropriate . . . designed to restore or preserve equal access to the recipients education program or activity." (34 C.F.R § 106.30). Additionally, Supportive measures are confidential, "Subject to other confidentiality provisions of this Policy, the University shall maintain as confidential any supportive measures provided to the complainant or respondent. . ." (Policy at "Supportive Measures," III). Whether Complainant received supportive measures and what those supportive measures were is not only confidential, it is irrelevant to the subject of the investigation. Thus, there was no procedural error in connection to the absence of information regarding Complainant's supportive measures.

> 7. *Whether this matter was unduly delayed.*

Respondent alleges that he was prejudiced because although the Title IX Office was aware of the allegations on March 31, 2022, he was not informed about the allegations until August 2022. Respondent further alleges that this delay is a significant error because witnesses were likely to forget important details and physical evidence, including surveillance tapes, could be lost.

The incident in question occurred on September 10, 2021. The Final Investigative Report shows that while the Title IX Office became aware of the initial report on March 30, 2022.[2] This delay of six months was not attributable to the University. Further, there is no requirement that Complainants bring forward their reports within any specific time, or that the University provide notice to the Respondent prior to the receipt of a Formal Complaint. By the time the report was made to the University, memories were already affected and surveillance tapes were certainly long overwritten. This cannot be considered a procedural error, and there is no evidence the University failed to follow the Policy in this regard. There is likewise no specific information in the appeal regarding anything in the University's process that was delayed for inappropriate reasons, thus limiting the Appeals Panel's evaluation of any such claims. Therefore Respondent's appeal does not demonstrate a procedural irregularity that affected the outcome of this matter with regard to any delay.

> 8. *Whether the investigative process was unduly delayed once a formal complaint was filed.*

Respondent alleges that he was prejudiced because the investigative process was unduly delayed once a formal complaint was filed, noting that he did not receive notice for three weeks after the complaint was filed. Further, Respondent alleges that the delay in the investigation through December 6, 2022, was a significant error because witnesses are likely to forget important details and physical evidence, including surveillance tapes, could be lost.

The record does not indicate the reasons for the delays described by the Respondent. However, any surveillance tapes would already have been overwritten even before the University received the initial report of the incident in March 2022. Further, there is no evidence to support Respondent's assertions that a delay in three weeks of getting notice of the formal complaint was material, given that the incident in question had occurred many months earlier and memories were likely already affected due to the passage of time. Surveillance tapes would have long been overwritten. Finally, Respondent provides no analysis of instances in which details were forgotten or evidence was unavailable that would have affected the outcome of the case. Therefore, Respondent's appeal does not demonstrate a procedural irregularity that affected the outcome of this matter with regard to any investigative delay.

> 9. *Whether the Hearing Panel was required to draw an adverse inference from the failure of Complainant to provide important medical records.*

Respondent alleges that the Hearing Panel did not draw an adverse inference from the failure of the Complainant to provide important medical records. However, as the Policy (and Title IX) makes clear, there is no requirement that either party provide medical records to the Title

---

[2] Page 1 of the report suggests that the Maxient report was received on March 31, 2022, but the narrative of page 2 offers more description and indicates that it was received on March 30, 2022.

1000061948v1

IX process.  Further, there is no requirement that the Hearing Panel draw an adverse inference from the failure of the Complainant to provide important medical records.  Indeed, the Hearing Panel does not appear to have drawn adverse inferences from other failures to provide information—including the Respondent's choice not to submit to an interview or explain information gathered during his own investigation.[3]  Because there is no requirement to draw such an adverse inference, the failure to do so is not a procedural irregularity that affected the outcome of this matter.

> 10. Whether Complainant was permitted to provide false and misleading characterizations of medical evidence.

Respondent alleges that Complainant was permitted to provide false and misleading characterizations of medical evidence.  Specifically, Respondent takes issue with Complainant's testimony that the results of a urine test "came back with no drugs or even alcohol in my system, because it had been too long of a period of time, but there were no signs or any other foreign [substance] in my urine."[4]  Respondent claims that allowing this testimony was a substantial procedural error for three reasons:

- Complainant was not qualified to offer an expert conclusion.
- It was fundamentally unfair to allow Complainant to describe medical records without allowing Respondent to review those records.
- Complainant's testimony was incorrect and misleading, because a urine test could have detected heavy drinking for up to five days.

The Hearing Panel does not appear to have taken the contested statement into account when reaching a decision.  It is not mentioned in the discussion of Complainant's level of intoxication in reaching the Panel's determination that she was incapacitated, nor did the Panel suggest that it was relying on Complainant's expert opinion on her medical records.[5]  Therefore, it appears that any such testimony about a urine test was not given any significant weight.

Instead, the Panel's decision indicates that Complainant's recollections regarding her level of intoxication were corroborated by other witnesses, whereas Respondent's recollections regarding Complainant's lack of incapacity were not consistent over time, and not corroborated by another witness's testimony.  A reading of the Panel's decision therefore reveals that the decision on whether Complainant was incapacitated turned on the credibility of the parties rather than any descriptions of Complainant's medical records.  Therefore, Respondent's appeal does not demonstrate a procedural irregularity that affected the outcome of this matter with regard to Complainant's statements about her urine test.

> 11. Whether the Panel considered undisclosed scientific evidence.

---

[3] See Final Investigative Report, page 32, which notes that when the investigator relayed the Complainant's request to inquire how the Respondent obtained screenshots from a Jboard conversation, Respondent replied, "We found it as part of our investigation, and we see no reason to share our efforts and sources prior to the hearing."
[4] This quote appears in Complainant's testimony during questioning by the Panel.  Hearing at 01:07:20.
[5] In fact, the Chair stated at the hearing that Complainant was not a medical expert.  Hearing at 01:07:00.

Respondent alleges that the Panel considered information from a website to estimate the blood alcohol level of the Complainant. Respondent claims this is a substantial procedural error because there was no evidence obtained about the accuracy or reliability of the information used, and the scientific evidence used by the Panel was not provided to Respondent in advance of the hearing.

The Panel's decision indicates that it used a Blood Alcohol Content Calculator to calculate a potential 0.19% to 0.23% blood alcohol content for a 150-pound female. The Panel noted, "looking at the level of intoxication is still helpful for evaluating evidence of Complainant's capacity to consent in this matter," and further stated, "While this information is provided as an educational tool only and is not intended to be used for medical or legal advice, the panel considered this information in light of testimony provided by Complainant, Hassel, Gill, and Rizzo as it related to Complainant's observable motor and cognitive function.

Respondent is correct that it was inappropriate for the Panel to use an outside website to calculate blood alcohol content without providing the parties the opportunity to review and provide feedback to the information. However, the Panel's decision does not appear to rely on the calculated blood alcohol content. Instead, the Panel's decision considers Complainant's observed motor and cognitive function, from the perspective of both parties and multiple witnesses. It is Complainant's functioning that became the crux of the Panel's decision regarding her incapacitation, not any calculated blood alcohol content. Indeed, the Panel's reliance on Complainant's functional abilities was appropriate given the definition of "incapacitation" in the Policy, which considers whether the person is capable of exercising rational decision-making and considers factors such as the ability to control physical movement and communicate coherently.

Therefore, while the Appeals Panel finds it was a procedural error for the Panel to calculate blood alcohol content, there is insufficient evidence to demonstrate that the procedural error affected the outcome of the matter.

> 12. *Whether the Hearing Panel did not permit full cross-examination by Respondent's Advisor.*

Respondent alleges that the Hearing Panel did not permit full cross-examination by Respondent's Advisor. The exchange quoted in the appeal involves the advisor asking Complainant whether she asked to provide oral sex to Respondent. The Chair interjected because he did not understand the source of the question. The advisor responded that the Respondent had relayed information to him, but the Chair asked for the questions to be related to what is contained in the record.[6]

---

[6] Respondent's transcript of this exchange in his appeal is not entirely accurate. The transcript should read:

> ADVISOR: Do you ever remember asking to provide oral sex to him?
>
> CHAIR: Can I interject here? Where are we drawing these questions from, the notion of agreeing to go to his room, asking for a condom more than once? I just heard a question about asking perform [sic] oral sex? Are you just making these up out of the blue, or is this coming from somewhere?

The Appeals Panel notes that there was information in the investigative report to suggest that Claimant had engaged in oral sex towards the Respondent. Specifically, Witness Deters indicated that Respondent said that the Complainant got on top of Respondent and "went down," a colloquial term for giving oral sex. Final Investigative Report, page 32. Therefore, the Chair was incorrect in determining that the file was devoid of allegations regarding Complainant giving oral sex. However, the Chair did allow Respondent to give evidence later in the hearing regarding Complainant asking him if she could give him oral sex, and in fact credited Respondent's testimony regarding Complainant's inability to remove Respondent's belt as evidence of incapacitation. Decision at 10.

Even if this rises to the level of a procedural violation, it is immaterial to the outcome. The Panel's determination was based on Complainant's incapacitation—her inability to consent to sexual activity, which would include oral sex. This did not require an analysis of whether she attempted to initiate oral sex. Therefore, there is insufficient evidence to demonstrate that the failure to allow questions about Complainant initiating oral sex affected the outcome of the matter.

> 13. Whether Complainant's submission of pictures of her bruising, and testimony concerning the same, was not relevant.

Respondent states that Complainant's submission of pictures showing bruising that she alleged she sustained as a result of her encounter with Respondent, and her testimony regarding the same, was not relevant evidence to be considered by the Hearing Panel. In support, Respondent offers Ohio case law to support his assertion that "many Ohio Courts have observed that bruising may be consistent with sexual activity and it was error to consider evidence contrary to this established law." (Appeal at 13)

As a preliminary matter, this panel assumes that Respondent is arguing that bruising may be suggestive of *consensual* sexual activity, rather than simply suggestive of sexual activity, as the parties agree that they engaged in sexual activity.

Regardless, Respondent does not offer any argument as to how the submission of these pictures, or Complainant's testimony at the hearing, affected the outcome of the case. There is no discussion of Complainant's pictures, or even her bruising generally, in the Hearing Panel's

---

ADVISOR: No, this is, this is coming from some--obviously I, the advisor of [Respondent] here, so there's obviously another, I don't want to say part to this and it's his part, so these are things that he's relayed to me. I'm just asking whether she is—

CHAIR: Yeah, that's what I wanna point out. We don't have any of this evidence in the record. There's no evidence that, there's no statements that, that [Complainant] was invited to [Respondent's] room, there's no statement [Complainant] asked for a condom more than once, there's no statement that anyone asked anyone about providing oral sex so if we can keep questions to what's contained in evidence, that'd be great.

ADVISOR: Okay.

Hearing at 01:51:20-01:52:26.

decision. Thus, it is difficult for the Appeal Panel to find that the pictures or the testimony had any impact on the Hearing Panel's decision.

In addition, even if the Hearing Panel addressed the pictures or the testimony, it is worth noting that while "relevance" is not defined in the Title IX policy, the preamble to the 2020 Title IX regulations states that relevant evidence may be considered as that which is "pertinent to proving whether facts material to the allegations under investigation are more or less likely to be true . . ." (Preamble, p. 30294) Respondent cited to case law that seemingly stands for the proposition that bruising "may be," "could be," and is "potentially" indicative of consensual sexual activity. Therefore, Respondent's own argument demonstrates that the existence and source of bruising could also be "material to the allegations" in this matter.

Here, though, the Hearing Panel did not rely on bruising in reaching its determination. Accordingly, the Appeal Panel finds that Complainant's submission of pictures and her testimony regarding the same were not procedural error, nor did the inclusion of the information affect the outcome.

> 14. *Whether the Hearing Panel's members had a conflict of interest by virtue of their work with an organization that provides Title IX training and "expert advice" to educational institutions.*

Respondent argues that the Hearing Panel was comprised of individuals from TNG Consulting and ATIXA and because of their respective roles in providing "training and expert advice to educational institutions," there is "a conflict of interest because the chair was required to rule on evidentiary matters related to . . . the investigation in this case and Respondent's challenges" thereto. (Appeal at 14) Respondent continues, stating both that such companies "derive significant income" from training schools and as a result "the employees . . . may be unwilling to take any actions to 'upset' the Title IX Office or its staff." In addition, Respondent states that the Hearing Panel members, by operation of their work with TNG or ATIXA "may be considered advocates," "likely have preconceived notions about Title IX" and "are likely advocates for the specific procedures adopted by the school…"

Respondent's argument suggests that the Hearing Panel members were unable to complete their duties in this matter – rendering a decision based on the record before it – because of their relationship with TNG Consulting and ATIXA. The bases for Respondent's argument, however, have been thoroughly addressed in the preamble to the 2020 Title IX regulations. The Department of Education wrote that it had declined "to state whether particular professional experiences or affiliations do or do not constitute *per se* violations" of Title IX. (Preamble, p. 30252) Instead, the Department stated that a determination of "whether bias exists requires examination of the particular facts of a situation" and that institutions, such as the University, should "apply an objective (whether a reasonable person would believe bias exists), common sense approach to evaluating whether a particular person serving in a Title IX role is biased, exercising caution not to apply generalizations that might unreasonably conclude that bias exists . . ." (Preamble, p. 30252)

In this case, the Respondent challenged the designation of the Hearing Panel members and the University's Title IX Office reviewed that challenge and denied it. Moreover, the Hearing

Panel stated in its written notification that the Panel "did not and does not have a bias toward or against either party, or toward or against complainants or respondents." (Decision at 3) In addition, the Hearing Panel's analysis of the record available to it, as well as the credibility of those that testified, is further evidence that no such bias or conflict of interest existed.

Accordingly, the Appeal Panel finds that the Hearing Panel members did not have a conflict of interest in this matter by virtue of their relationship with ATIXA and TNG Consulting.

15. *Whether the Hearing Panel Members were permitted to serve on the panel.*

In addition to his argument that the Hearing Panel had a conflict of interest by operation of its relationship with TNG Consulting and ATIXA, Respondent argued that the Panel Members were ineligible to serve because they lacked an affiliation with the University. For reasons that are not entirely clear, Respondent bases his argument on both the Student Code of Conduct and the Title IX Policy. As to the latter, the Policy is clear that the Hearing Panel pool "shall consist of individuals who are trained on issues relating to this Policy as well as how to conduct hearings." (Policy, VII.D.iii.1) There is no mention of the Panel needing, or even anticipating, that its members "will include faculty and staff." Similarly, while the significance of the University's Student Code of Conduct is unclear to the Appeal Panel, the code itself states that "Students should refer to university Title IX policies for information on jurisdiction, definitions, hearings, and other related procedures." (Code of Conduct, A.3.f.ii) (emphasis added)

As Respondent has not offered evidence as to how this alleged procedural irregularity affected the outcome of this matter, the Appeal Panel finds that it was not a procedural error to include non-University personnel on the Hearing Panel.

16. *Whether the University's failure to post the trainings that this Hearing Panel attended, prior to the hearing, impacted the outcome of the matter.*

Respondent argues that he was unable to evaluate the specific trainings that the Hearing Panel attended prior to the hearing in this matter. Respondent states that he was unable to determine whether the training was "adequate or contained bias." (Appeal at 16)

Respondent overlooks the fact that a prior basis for his appeal is his belief that the Hearing Panel members were collectively, and individually, biased against him by virtue of their affiliation with TNG Consulting or ATIXA. And, in that argument, Respondent noted that he objected to the Hearing Panel members and that objection was reviewed and rejected by the University's Title IX Office.

Nevertheless, the Appeal Panel is cognizant of the fact that the University has a website dedicated to the training materials that were utilized by various members of its Title IX operation, and that none of the Hearing Panel members for this matter are listed. Thus, Respondent is correct in noting that he did not have an opportunity to review the trainings undertaken by the panel members. However, the Appeal Panel is unclear how this *impacted the outcome* in this matter and Respondent has not offered any argument regarding as much. Despite this, the Hearing Panel's decision appears consistent with the University's Title IX policy and procedure.

Accordingly, the Appeal Panel finds that while it was perhaps a compliance error to not make available the specific training materials that the Hearing Panel members received, that is not a requirement of the hearing procedures and therefore does not constitute a procedural violation. Further, the Appeal Panel does not find that the failure to post the trainings impacted the outcome of this matter.

> 17. *Whether, taken together, the accumulation of errors that Respondent has raised "suggest a process that was biased and fundamentally unfair."*

Respondent argued as his final basis for appeal that the University's process suffered from an "accumulation of errors" that "suggest a process that was biased and fundamentally unfair."

The University's policy does not permit an "accumulation of errors" appeal. As a result, the Appeal Panel directs Respondent to the specific responses provided above. For instance, as Respondent states that he was not made aware of the "exact charges he faced," the Appeal Panel directs Respondent to No. 2, above.

Accordingly, the Appeal Panel finds that Respondent's "accumulation of errors" argument is not a recognized basis for appeal under the University's Title IX Policy.

IV.  Conclusion

Having disposed of each appeals basis individually, above, the Appeal Panel hereby dismisses the appeal in its entirety. The Hearing Panel's Decision stands.

May 4, 2023

Melissa Carleton
Kylie Stryffeler
Jeff Knight

INCompliance Consulting