## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| JOHN NOAKES | Case No. |
| Plaintiff | Judge: |
| v. | MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION |
| UNIVERSITY OF CINCINNATI, ET AL | |
| Defendant | (ORAL ARGUMENT AND EVIDENTIARY HEARING REQUESTED) |

Pursuant to Fed. R. Civ. Proc. 65, Plaintiff John Noakes requests an Order of this Court prohibiting the defendants, University of Cincinnati administrators sued in their official capacities from imposing discipline on John Noakes in violation of the due process guarantees of the United States Constitution during the pendency of this matter.[1]  This Motion is supported by the Verified Complaint, the Affidavit of Scott O'Reilly, and the Affidavit of Harry Plotnick.

---

[1] The Complaint has three counts involving claims under: (I) Title IX; (II) Due Process; and (III, IV) Ohio Administrative Law.  Because a Title IX claim requires significant discovery to evaluate, this Motion will only address counts II, III and IV.

**TABLE OF CONTENTS**

FACTS ........................................................................................................................1

    A.    The Dear Colleague Letter And Regulations .............................................2

    B.    UC Adopts Title IX Policies And Procedures In Response To Pressure From Students, The Public, And The Department Of Education .............................3

    C.    The Disciplinary Proceedings Against John Noakes ..................................6

ARGUMENT ...........................................................................................................13

    A.    The Standard For Resolution Of This Motion ........................................13

    B.    Courts Grant Injunctive Relief To Students In Misconduct Cases ............13

    C.    The Plaintiff Has A Substantial Likelihood Of Success On The Merits ......16

        1.    Due Process .............................................................................16

            a.    Standards ....................................................................16

            b.    Lack Of Notice ............................................................17

            c.    The Use Of Biased Decision-Makers ..............................19

            d.    The Use Of Undisclosed And Unreliable Expert Evidence ....21

            e.    Use Of Statements From Witnesses Who Were Not Present ....22

            f.    The Delay And Failure To Obtain Medical Records Led To A Fundamentally Unfair Hearing ......................................24

        2.    Declaratory Judgement: Ohio Administrative Code ....................26

        3.    Declaratory Judgment: UC Failed To Comply With Its Own Deadlines ....28

    D.    Irreparable Harm ................................................................................29

    E.    Public Interest And Harm To Third Parties ...........................................30

    F.    Nominal Bond Should Be Imposed ......................................................31

CONCLUSION .......................................................................................................31

## TABLE OF AUTHORITIES

## CASES

*B & T Express, Inc. v. PUC of Ohio*, 145 Ohio App.3d 656 (10th Dist. 2001) ........................................27

*City of Pontiac Retired Employees Ass'n v. Schimmel,* 751 F.3d 427 (6th Cir. 2014) .....................................13

*Clay v. United Parcel Service, Inc.*, 501 F.3d 695 (6th Cir. 2007) ........................................................26

*Dixon v. Alabama State Board of Education*, 294 F.2d 150 (5th Cir.) ........................................................17

*Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018) ........................................................................ 1, 24

*Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561 (D.Mass. 2016) ................................................................ 18, 30

*Doe v. Brown Univ.,* 210 F. Supp. 3d 310 (D.R.I. 2016) ........................................................................15

*Doe v. Colgate Univ.*, N.D.N.Y. No. 5:15-cv-1069, 2016 U.S. Dist. LEXIS 48787 (Apr. 12, 2016) ........................................................................30

*Doe v. Cummins*, 662 F.App'x 437 (6th Cir. 2016) ................................................................ 13, 29

*Doe v. Kenyon College*, S.D. Ohio No. 2:20-cv-4972 ........................................................................20

*Doe v. Miami Univ.*, 882 F.3d 579 (6th Cir. 2018) ........................................................................ 1, 21

*Doe v. Middlebury College,* D.Vt. No. 1:15-cv-192, 2015 U.S. Dist. LEXIS 124540 (Sep. 16, 2015) ........................................................................ 15, 30

*Doe v. Oberlin College*, 963 F.3d 580 (6th Cir. 2020) ........................................................................1

*Doe v. Ohio State Univ.*, 219 F. Supp. 3d 645 (S.D.Ohio 2016) ........................................................................25

*Doe v. Ohio State Univ.*, 311 F. Supp. 3d 881 (S.D.Ohio 2018) ........................................................................2

*Doe v. Pennsylvania State Univ.*, M.D.Pa. No. 17-CV-01315, 2017 U.S. Dist. LEXIS 132186 (Aug. 18, 2017) ........................................................................15

*Doe v. Rector & Visitors*, W.D.Va. Civil Action No. 3:19CV00038, 2019 U.S. Dist. LEXIS 108990 (June 28, 2019) ........................................................................15

*Doe v. Rhosdes* College,., W.D. Tenn No. 2:19-cv-02336 (June 14, 2019) (R. 33) ........................................15

*Doe v. Siena College*, N.D.N.Y. No. 1:22-cv-1115, 2023 U.S. Dist. LEXIS 7325 (Jan. 17, 2023) ........................................................................14

*Doe v. Texas A&M University-Kingsville*, S.D. Tex. No. 2:21-cv-00257 (Nov. 5, 2021) ...........................14

*Doe v. Trs. of the Univ. of Pa.*, 270 F. Supp. 3d 799 (E.D. Pa. 2017) ........................................................21

*Doe v. Univ. of Cincinnati*, 872 F.3d 393 (6th Cir. 2017) ........................................................*passim*

*Doe v. Univ. of Colorado*, 255 F. Supp. 3d 1064 (D.Colo. 2017) ........................................................2

*Doe v. Univ. of Connecticut*, D.Conn. No. 3:20cv92, 2020 U.S. Dist. LEXIS 11170 (Jan. 23, 2020) ........................................................................................................................................14

*Doe v. Univ. of Michigan*, 325 F. Supp. 3d 821 (E.D.Mich. 2018) ................................................15

*Doe v. Univ. of Notre Dame*, N.D.Ind. No. 3:17CV298, 2017 U.S. Dist. LEXIS 69645 (May 8, 2017).............................................................................................................................. 15, 19

*Doe v. University of Cincinnati*, 223 F. Supp. 3d 704 (S.D. Ohio 2016), *aff'd* 873 F.3d 393 (6th Cir. 2017) ............................................................................................................................14

*Doe v. Washington & Lee Univ.*, W.D.Va. No. 6:19-cv-00023, 2021 U.S. Dist. LEXIS 74222 (Apr. 17, 2021) ........................................................................................................................21

*Endres v. Northeast Ohio Med. Univ.*, 938 F.3d 281 (6th Cir. 2019) ....................................... 13, 28

*Flaim v. Med. College of Ohio*, 418 F.3d 629 (6th Cir. 2005).............................. 13, 16, 17, 24

*Galloway v. Chesapeake Union Exempted Vill. Schs. Bd. of Educ.*, S.D. Ohio No. 1:11-cv-850 .................20

*Goss v. Lopez*, 419 U.S. 565 (1975). ..............................................................................................23

*Henson v. Honor Comm. of Univ. of Va.*, 719 F.2d 69 (4th Cir. 1983) .........................................13

*In re Murchison*, 349 U.S. 133 (1955)............................................................................................19

*King v. DePauw Univ.*, No. 2:14-cv-70, 2014 U.S. Dist. LEXIS 117075 (S.D. Ind. Aug. 22, 2014)........................................................................................................................................15

*Mathews v. Eldridge*, 424 U.S. 319 (1976) ...................................................................................16

*McMahan & Co. v. Po Folks, Inc.*, 206 F.3d 627(6th Cir. 2000) ...................................................26

*Navarro v. Fla. Inst. of Tech., Inc.*, M.D. Fl. No. 6:22-cv-1950.....................................................20

*Noakes v. Univ. of Cincinnati,* Hamilton County Common Pleas No. A 2101546....................................29

*Nokes v. Miami Univ.*, S.D.Ohio No. 1:17-cv-482, 2017 U.S. Dist. LEXIS 136880 (Aug. 25, 2017) ................................................................................................................ 14, 18, 31

*Ohio State Conf. of the NAACP v. Husted,* 768 F.3d 524 (6th Cir. 2014)....................................13

*Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219 6th Cir. 1996).....................................13

*Ritter v. Oklahoma*, W.D.Okla. No. CIV-16-043, 2016 U.S. Dist. LEXIS 60193 (May 6, 2016)................................................................................................................................ 15, 31

*Roe v. Adams-Gaston*, S.D.Ohio No. 2:17-cv-945, 2018 U.S. Dist. LEXIS 185697 (Apr. 17, 2018)........................................................................................................................................14

*Rose v. Kenyon College,* S.D. Ohio No. C2-00-1299 & C2-00-1378................................................20

*State ex rel. N. Canton Exempted Village School Dist. Bd. of Edn. v. Holt*, 174 Ohio St. 55 (1962) ......................................................................................................................................27

*State ex rel. Ryan v. State Teachers Retirement Sys.*, 71 Ohio St.3d 362 (1994) ................................27

*Williams v. Pennsylvania*, 571 U.S. 1 (2016) ................................................................................19

*Woods v. Willis*, 515 F.App'x 471 (6th Cir. 2013) ...........................................................................21

## OTHER AUTHORITIES

34 C.F.R. 106.45(b)(10)(i) ...............................................................................................................20

R.C. 111.15 ..........................................................................................................................................26

Dear Colleague Letter: Sexual Violence, Russlynn Ali, Office for Civil Rights, U.S. Dep't
    of Educ. (Apr. 4, 2011) ...................................................................................................... 2-3

OCR Docket #15-16-2039 ...................................................................................................................4

OCR Docket #15-16-2178 ...................................................................................................................4

Open Letter From Members Of The Penn Law School Faculty: Sexual Assault
    Complaints: Protecting Complainants And The Accused Students At Universities,
    Feb. 8, 2015 .................................................................................................................................3

*Rethink Harvard's Sexual Harassment Policy,* Boston Globe (Oct. 15, 2014) .................................3

Samantha Harris & KC Johnson, *Campus Courts in Court: The Rise in Judicial Involvement in
    Campus Sexual Misconduct Adjudications*, 22 N.Y.U. J. Legis. & Pub. Pol'y 49 (2019) ...........1

John Noakes is a student at UC.  (Verified Complaint ¶ 4.) He faces expulsion from the school after a hearing panel – composed of paid consultants – found that he engaged in sexual activity with another student, Jane Roe, while she was intoxicated.  The matter was initially reported to the police, who declined to act.  Six months later, the matter was reported to the UC Office of Equity, also known as the Title IX Office.  This Office took no action for months.  After another four months, the Title IX Office initiated a cursory and incomplete investigation.  Six months later,  UC conducted a flawed hearing.  A UC appeals panel (consisting of more paid consultants) found multiple procedural and compliance errors, but still UC refused to grant a new hearing.

The UC process was fundamentally unfair and untethered from the law.  In the absence of injunctive relief from this Court, John Noakes will suffer reputational and other harm both on and off campus.

**FACTS**

This is one of many cases in this Court and around the country that address the various policies and procedures schools like UC have adopted to respond to allegations of sexual assault on campus in direct response to pressure from the U.S. Education Department's Office of Civil Rights ("OCR") related to the enforcement of Title IX.[2]  The Sixth Circuit has, in multiple opinions, questioned the legality and constitutionality of these policies and procedures, noting that schools (including UC) have continued to adopt practices that reinforce and rely upon gender stereotypes and abrogate the due process rights of students.[3]

---

[2] *See e.g.* Samantha Harris & KC Johnson, *Campus Courts in Court: The Rise in Judicial Involvement in Campus Sexual Misconduct Adjudications*, 22 N.Y.U. J. Legis. & Pub. Pol'y 49 (2019).

[3] *Doe v. Univ. of Cincinnati*, 872 F.3d 393 (6th Cir. 2017); *Doe v. Miami Univ.*, 882 F.3d 579 (6th Cir. 2018); *Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018); *Doe v. Oberlin College*, 963 F.3d 580 (6th Cir. 2020).

### A.       The Dear Colleague Letter And Regulations

In 2011, after years of criticism for being too lax on campus sexual assault, the U.S. Education Department's Office of Civil Rights ("OCR") sent a Dear Colleague Letter (the "DCL") to colleges and universities encouraging school to become more aggressive in the investigation and adjudication of sexual violence complaints.[4]  The DCL, as well as subsequent guidance and statements provided by OCR, compelled colleges and universities to change their former policies drastically out of fear that the Department of Education would pursue violations of Title IX that could lead to the revocation of all federal funding.   Judge Martinez, in commenting on the "wave" of litigation about this issue, observed that the DCL, in part, "generally signaled that OCR had adopted a 'get tough' approach, thus prompting colleges and universities to devote more attention to sexual assault accusations." *Doe v. Univ. of Colorado*, 255 F. Supp. 3d 1064, 1067 (D.Colo. 2017).   In this Court, Judge Graham observed that the procedures adopted by schools in response to the DCL were often lacking in basic due process protections:

> Universities have perhaps, in their zeal to end the scourge of campus sexual assaults, turned a blind eye to the rights of accused students. Put another way, the snake might be eating its own tail. Joe Dryden et. al., *Title IX Violations Arising from Title IX Investigations: The Snake Is Eating Its Own Tail*, 53 Idaho L. Rev. 639 (2017).

*Doe v. Ohio State Univ.*, 311 F. Supp. 3d 881, 892-893 (S.D.Ohio 2018).

In 2017, the Department of Education withdrew the Dear Colleague Letter and indicated its intent to issue new guidance "through a rulemaking process that responds to public comment."  In withdrawing the Dear Colleague Letter, OCR observed that prior actions "may have been well-intentioned, but… led to the deprivation of rights for many students—both accused students denied fair process and victims denied an adequate resolution of their complaints." *Id.* at 1-2.   OCR further

---

[4] Dear Colleague Letter: Sexual Violence, Russlynn Ali, Office for Civil Rights, U.S. Dep't of Educ. (Apr. 4, 2011) (https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf).

said:  "Legal commentators have criticized the 2011 Letter . . . for placing "improper pressure upon universities to adopt procedures that do not afford fundamental fairness." As a result, many schools have established procedures for resolving allegations that "lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and are in no way required by Title IX law or regulation."[5]

In 2020, the Department of Education released a Final Rule under Title IX of the Education Amendments of 1972.  The Final Rule, *inter alia*, prescribes a transparent grievance process that treats accused students as innocent until proven guilty, requires the school to state a standard of evidence, and requires the school to provide a hearing process where accused students may question adverse witnesses.[6]

## B.    UC Adopts Title IX Policies And Procedures In Response To Pressure From Students, The Public, And The Department Of Education.

In the years preceding the disciplinary actions against John Noakes, there was substantial criticism of UC, both in the student body and in the public media, accusing UC of not taking seriously complaints of female students alleging sexual assault by male students.  (Verified Complaint ¶ 23.) As described in the Complaint, this has included adverse news coverage and, campus meetings or protests, and enforcement actions concerning UC.   The student newspaper quoted a student who had been sexually assaulted stating, "At the end of the day, UC does not give a f--k because they feel like they don't have to."[7]  In 2020, one of the founders of a group of students critical of UC's response

---

[5] Letter from Office for Civil Rights, U.S. Dep't of Educ. (September 22, 2017). (Available at https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf ), q*uoting Open Letter From Members Of The Penn Law School Faculty:  Sexual Assault Complaints: Protecting Complainants And The Accused Students At Universities*, Feb. 8, 2015; *Rethink Harvard's Sexual Harassment Policy*, Boston Globe (Oct. 15, 2014) (statement of 28 members of the Harvard Law School faculty).

[6] The Biden Administration had indicated that it intends to initiate a new rulemaking in an effort to repeal the 2020 rules.

[7] https://www.newsrecord.org/news/a-troubling-trend-as-on-campus-rape-reports-rise-uc-continues-to-issue-few-alerts/article_743241da-9e57-11eb-bc39-c7bc652c9b61.html

to sexual assault submitted an affidavit to this Court critical of the manner in which Defendant Marshall, who oversees the Title IX Office and UC's response to the problem of sexual assault on campus, saying: she "was good at seeming like she cared, but she did not take Title IX issues seriously. … My impression was that [she] was seeking to save face for the university and placate us, so we would stop talking about the issue."[8]

UC has been the subject of a number of investigations by the Department of Education for the manner in which it investigates and adjudicates allegations of sexual assault and harassment.[9] (Verified Complaint ¶ 26.)  UC also has been the subject of a number of lawsuits in this and other courts for the manner in which it investigates and adjudicates allegations of sexual assault and harassment.  Most notably, in *Doe v. Univ. of Cincinnati*, *supra*, the Sixth Circuit held that UC had violated the due process rights of students by not permitting cross-examination of adverse witnesses in Title IX proceedings.

Against this background, UC has adopted two policies at issue here:  The Code of Student Conduct and a separate "Sexual Harassment Policy and Procedures for All Faculty, Students, Employees, and Third Parties," also known as the "Title IX Policy."  (Verified Complaint ¶¶ 28, 30.) The Code of Student Conduct was codified at O.A.C 3361:40-5-05 pursuant to R.C. 3345.21.  The Title IX Policy was not codified. UC has carved out an exception for the Code of Student Conduct for cases involving sexual harassment under Title IX.  The Student Code of Conduct states:

> (i) The university president has authority to create and implement policies to bring the university in compliance with Title IX regulations and applicable laws. The president may delegate this authority to the proper university department, who must work in consultation with the office of general counsel and in coordination and collaboration with other appropriate university offices.
>
> (ii) Students should refer to university Title IX policies for information on jurisdiction, definitions, hearings, and other related procedures.

---

[8] Case: 1:19-cv-00398, Doc#69-3.

[9] OCR Docket #15-16-2039; OCR Docket #15-16-2178.

The Title IX Policy contains fewer procedural protections for students accused of sexual misconduct. These lesser protections include not providing student with notice of "the reported circumstances underlying the alleged violation" and the use of outside consultants – not faculty, staff, or students – as decision-makers. (Verified Complaint ¶ 32.)

The Title IX policy prohibits "Sexual Assault" which includes "Any sexual act directed against another person, without the consent of the complainant, including instances in which the complainant is incapable of giving consent because of incapacitation."[10]  The Title IX Policy provides that no individual involved in the process – including all decision-makers, "may have a conflict of interest or bias for or against complainants or respondents generally or an individual complainant or respondent. All training materials for staff and decision-makers must "be made publicly available on the University's website."

Reports of sexual misconduct may be made by any "means that results in the Title IX Coordinator receiving the verbal or written report."  However, "In order to initiate the grievance process, a complainant must file a formal complaint with the Title IX Coordinator."  Only after a "formal complaint" is received – not when the Title IX Office receives a report – is the accused student provided with notice of the allegations of sexual harassment.  The Title IX Policy notes that "prompt reporting is important to facilitate a thorough investigation" and that  "Delayed reporting or filing of a formal complaint may limit the University's ability to gather relevant evidence, to effectively address the conduct at issue, and to initiate the grievance process."

---

[10]The Title IX Policy defines "Incapacitated or incapacitation" as "A state in which rational decision-making or the ability to consent is rendered impossible because of a person's temporary or permanent physical or mental impairment…"  The Title IX Policy further explains, "Incapacitation is determined based on the totality of the circumstances. Incapacitation is more than intoxication, but intoxication can cause incapacitation."

The Title IX Policy contains certain time requirements for the "reasonably prompt" resolution of allegations. The Title IX Policy states that "from the date of its receipt of a formal complaint, the investigation, hearing, and issuance of the adjudicating body's report shall be concluded in ninety (90) business days." The Title IX Policy allows for delays and "the limited extension of timeframes" only for good cause, with written notice to the complainant and the respondent of the delay or extension and the reasons for the action.

During an investigation, the investigator is required to interview "individuals involved, witnesses, and any other persons determined to have relevant knowledge of the circumstances…" The investigator is supposed to "review of related physical evidence and/or materials…" however, UC may not access medical or psychiatric records without the consent of a party. UC will provide all parties with a copy of the investigative report prior to any hearing "for their review and written response." A live hearing is then conducted to determine responsibility. The Title IX Policy provides that if a party or a witness "does not submit to cross-examination at the hearing, the panel must not rely on any statement of that party or witness in reaching a determination regarding responsibility. However, the Hearing Panel members are still permitted to review statements by absent witnesses in the investigative report. Appeals on certain limited grounds is permitted.

Students found to have engaged in prohibited conduct in violation of the Title IX Policy are subject to a range of sanctions ranging from educational discussions to probation, suspension, or dismissal from the University.

## C.     The Disciplinary Proceedings Against John Noakes

On Friday, September 10, 2021, John Noakes and a female UC student, Jane Roe, engaged in sexual activity after meeting at a fraternity party. Jane Roe, over the next few days, came to believe

that she had been drugged and raped.[11] She went to the hospital for a SANE examination and contacted a detective from the Cincinnati Police Department (the police declined to pursue criminal charges). (Verified Complaint ¶ 55-55.)

On March 30, 2022, the Office of Gender Equity & Inclusion ("OGEI") received an online report from the Assistant Director of Fraternity & Sorority Life.[12] The report indicated that Jane Roe had "recounted an incident that happened in September at a party hosted by Sigma Alpha Epsilon fraternity at their chapter house." Jane Roe alleged that she had been drugged and sexually assaulted by John Noakes. On April 6, 2022, the Jane Roe met with OGEI Investigator Morgan Shaw. (Verified Complaint ¶¶ 58-60.)

Two-and-a-half months later, on July 26, 2022, Jane Roe submitted a signed Formal Complaint. (Verified Complaint ¶ 62.) Over three weeks later, on August 18, 2022, a Notice of Commencement of OGEI Investigation was sent to John Noakes. The notice stated only:

> on September 10, 2021 at approximately 11:49 pm, at 2707 Clifton Ave. (Sigma Alpha Epsilon house) [John Noakes] engaged in vaginal intercourse with [Jane Roe] without [Roe's] consent.

(Verified Complaint ¶ 64.) The notice did not indicate that Jane Roe alleged a 'forcible' sexual assault or that she was unable to provide consent as a result of being drugged or excessive alcohol use. On August 26, 2022 John Noakes responded to Shaw's Notice. He stated, "I intend to fully cooperate with any investigation." Noakes requested more details of the nature of the allegations being made, a

---

[11] John Noakes unequivocally denies Jane Roe's allegations. Specifically, John Noakes unequivocally denies that he violated the UC Code of Student Conduct or the Title IX Policy. The underlying "guilt" or innocence of John Noakes is not relevant to this Motion. *Doe v. Brown Univ.*, 210 F. Supp. 3d 310, 312-313 (D.R.I. 2016) (noting that a courts "only role in this case is to determine whether" a school complied with its policies and emphasizing that "It is not the Court's role to determine the facts of what happened between" the students).

[12] The Title IX Policy differentiates between "reports" and "formal complaints." The Title IX Policy defines a "Formal complaint" as "A document filed by a complainant or signed by the Title IX Coordinator alleging conduct in violation of this Policy against a respondent and requesting that the University investigate the allegation(s) of sexual harassment." A "Report" of sexual misconduct "is not a formal complaint and does not initiate the grievance process."

copy of the complaint filed by Jane Roe, and "the date of the initial contact between [Jane Roe] and the Title IX Office. (Verified Complaint ¶¶ 65-66.)

Shaw did not provide additional information. On August 30, 2022, John Noakes again requested more information about the allegations and the date of the report.[13] Shaw again did not provide any additional details of Jane Roe's accusations and provided misleading information about the date of the report.[14] On August 31, 2011, John Noakes again requested "more details, including a copy of any statements or complaints submitted." He also specifically requested when Jane Roe "first submitted an incident report or otherwise informed the OGEI about the alleged misconduct." Shaw did not respond to any of the requests in John Noakes' August 31, 2022 email. (Verified Complaint ¶ 67.) Shaw eventually told John Noakes that he would "have an opportunity to meet with me to give a verbal statement or provide a written statement." John Noakes responded, "We would like to meet with you, but before doing so would like the opportunity to review the statement provided by the complainant." Shaw told John Noakes that he would only be able to view the statement by Jane Roe after the entire investigation is completed. (Verified Complaint ¶¶ 69-71, 74.)

On September 20, 2022, Shaw met with John Noakes. John Noakes told Shaw that he believed that the sexual activity with Jane Roe was consensual but declined to provide a more detailed statement until after he was told the exact nature of the allegations against him. In particular, John Noakes indicated that he could not prepare a response because he did not know if Jane Roe was claiming that she did not indicate consent to sexual activity, or if she was claiming that her consent was ineffective

---

[13] He specifically requested three pieces of information: (i) a more detailed statement of the conduct that allegedly violates any UC policy; (ii) the date when the complainant first contacted the Title IX Office; and (iii) any accommodations or benefits provided to Jane Roe as a result of her claim to be a victim of sexual misconduct. He added, "This information is vital to my gathering evidence in my defense."

[14] Shaw told Noakes that Jane Roe "submitted a Formal Complaint on July 26, 2022" but did not disclose that the initial report to the Title IX Office had occurred in March.

due to the use of alcohol for drugs. Shaw declined to provide to John Noakes any further information about the nature of the allegations against him. (Verified Complaint ¶ 78.)

Shaw interviewed Roe on August 30, 2022. Jane Roe never told Shaw that she was too intoxicated to consent to sexual activity with John Noakes. She told Shaw, "I was feeling tipsy but no signs of me thinking [to myself that] I need to slow down or stop." Jane Roe later said, "I could tell I'd been drinking. I was tipsy but it wasn't like anything crazy." Jane Roe also indicated that her memory was hazy: "I think the last thing I remember was going back in the house. After that I don't remember anything." She claimed to have "flashes" of memory. Jane Roe told Shaw that she went to the hospital on Sunday to have an examination but did not provide, and Shaw did not request, any medical records. (Verified Complaint ¶ 68.)

Over the next few months, Shaw emailed John Noakes a number of times, stating that she was "continuing to investigate…" Shaw never provided any information on exactly what investigative steps she was taking. During this time, Shaw interviewed nine witnesses (about one each week). All of the witnesses were friends of either John Noakes or Jane Roe and none had any first-hand knowledge of their interaction in the bedroom. (Verified Complaint ¶¶ 72-93.)

On November 10, 2022 – approximately 153 business days from the first report to OGEI and approximately 76 business days from Jane Roe's 'formal' complaint – Shaw provided John Noakes with a draft report to review. (Verified Complaint ¶ 95.) John Noakes requested that the Report correct a mischaracterization of his refusal to provide a statement and include information that might affect the credibility of Jane Roe, such as any supportive measures or other benefits that Jane Roe received as a result of her claim that she was a victim of sexual misconduct. John Noakes also requested that the report remove any references to Jane Roe possibly being drugged since there was no evidence to support such a claim and that the Report indicate that if Jane Roe declined to produce her medical records, the finder of fact should infer that the evidence would be unfavorable and

unsupportive of her story. Shaw made no changes to the investigation. (Verified Complaint ¶¶ 96-98.)

John Noakes was informed that the matter had been referred for a hearing. The hearing was originally scheduled for January 2023 but was rescheduled for February 20, 2023 – well beyond ninety business days from the initial and formal reports to OGEI. The Hearing Panel consisted of individuals who work for a for-profit consulting firm, TNG Consulting. TNG consulting and its affiliates routinely provide expert opinions and testimony on behalf of schools that investigations were adequate in response to challenges by students found to have engaged in sexual misconduct. John Noakes had objected that TNG Consulting and its affiliates are primarily concerned with upholding the interests of educational institutions and serve as advocates for the specific procedures adopted by UC. UC denied the objections.[15] (Verified Complaint ¶¶ 101-104.)

Before the hearing, the members of the Hearing Panel were permitted to review Shaw's entire investigative report, including the statements from witnesses who did not appear at the hearing so they could be cross-examined. At the hearing, Shaw falsely stated that John Noakes "indicated that they were not interested in providing any additional information or a statement…" and one of the panelists improperly questioned Respondent about his refusal to provide a statement. Jane Roe was permitted to testify that she had a rape exam done shortly after the alleged incident; she provided selected pictures and a summary of some test results, but no actual medical records or test results from this examination.[16] John Noakes' Advisor was cut off from asking Jane Roe relevant questions. (Verified Complaint ¶ 105.)

---

[15] UC allowed an objection to the founder of the firm, presumably because Noakes informed UC that this individual was involved in litigation that called his integrity into question. UC just substituted another individual from TNG.

[16] Jane Roe said that there were "no results" in the medical records that she "felt needed to be included."

On March 23, 2023, John Noakes received a letter describing the outcome of the Hearing Panel. John Noakes was found responsible for violating the UC Title IX Policy. The Hearing Panel concluded that Jane Roe was unable to consent to sexual activity due to intoxication.[17] The Hearing Panel concluded that Jane Roe was too intoxicated to consent to sexual activity because she had consumed "roughly six to seven standard drinks" over the course of the evening. The Hearing Panel made this finding despite the statement by Jane Roe to Shaw that that while she had "maybe six to seven" drinks during the night, the cups were small and "half of everything I poured spilled on my dress just from bumping into other people and dancing…" The Hearing Panel used this evidence to calculate Jane Roe's blood alcohol level based on an online calculator provided by the American Addiction Centers.[18] The Hearing Panel calculated that Jane Roe's blood alcohol level was between "0.19% to 0.23%." The Hearing Panel noted that, according to this website, a person with this level of intoxication could suffer "Loss of consciousness and memory impairment…" The Hearing Panel stated that it "considered this information in light of testimony provided by [Jane Roe], and as it related to [Jane Roe's] observable motor and cognitive function." (Verified Complaint ¶¶ 109-111.)

The Hearing Panel claimed that it did not "rely" on statements by witnesses who did not appear. However, the Hearing Panel stated that its findings come "after reviewing all available evidence, including interviews, witness statements and evidence provided to the investigator, presented in the investigation report…" The Hearing Panel also stated that it considered "the witness and party testimony and evidence collected during the investigation" in determining that Jane Roe's "description of her mental and physical condition was ultimately credible." The Hearing Panel recommended that John Noakes be expelled from UC. (Verified Complaint ¶¶ 109-111.)

---

[17] The Hearing Panel rejected the claim that Jane Roe had been drugged.

[18] The Hearing Panel did this even after acknowledging that "Calculating an individual's blood alcohol content (BAC) is an imprecise exercise…" and "this information is provided as an educational tool only and is not intended to be used for medical or legal advice."

11

On March 30, 2023, John Noakes submitted an appeal.  UC appointed an Appeals Panel that, like the hearing panel, consisted of paid consultants.  The paid consultants on the Hearing Panel are affiliated with a law firm that provided training to UC staff and represents colleges and universities in litigation brought by students challenging disciplinary proceedings.[19]  The Appeals Panel acknowledged some procedural or "compliance" flaws in the process but still declined to order a new hearing.  However, the Appeals Panel rejected most of John Noakes' arguments either outright or as not "material to the outcome," ultimately finding that "there is insufficient evidence to demonstrate that the procedural error affected the outcome of the matter"[20]  (Verified Complaint ¶¶ 113-118.)

John Noakes has been expelled from UC and faces severe damage to his academic and professional reputations as well as his prospects of attending another school.  (Verified Complaint ¶¶ 119-120.)

This litigation followed.

---

[19] UC summarily rejected Noakes' objections to the members of the Appeals Panel.

[20] The Appeals Panel credulously accepted – without any analysis – any claims by the Hearing Panel, such as that it had not considered statements from witnesses who had not appeared at the hearing.  The most glaring example is that the Appeals Panel rejected John Noakes' claim of bias in part because (and we swear we are not making this up) the Hearing Panel wrote that the members "did not and [do] not have a bias toward or against either party, or toward or against complainants or respondents."  This is, of course, utter non-sense.  Unless, that is, if one accepts the unlikely proposition that hearing panel members would possibly jeopardize a lucrative contract with the school by admitting to bias.

**ARGUMENT**

**A.     The Standard For Resolution Of This Motion**

The purpose of a preliminary injunction is to preserve the *status quo*.[21] *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 227 (6th Cir. 1996). In considering a preliminary injunction, the court considers four elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is denied; (3) that the threatened injury outweighs any damage that the injunction might cause the defendant; and (4) that the injunction will not disserve the public interest. *City of Pontiac Retired Employees Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014); *Ohio State Conf. of the NAACP v. Husted*, 768 F.3d 524, 532-533 (6th Cir. 2014).

**B.     Courts Grant Injunctive Relief To Students In Misconduct Cases**

While Courts have been appropriately deferential to schools in disciplinary matters, this deference is not without limits, particularly when the alleged misconduct is better characterized as "disciplinary" and not "academic."[22] *See Endres v. Northeast Ohio Med. Univ.*, 938 F.3d 281 (6th Cir. 2019) (distinguishing between academic and disciplinary concerns for due process analysis) In a number of post-DCL cases this Court has granted injunctive relief prohibiting schools from

---

[21] In this case, the *status quo* is that John Noakes is a student in good standing at UC. The individual defendants sued in their official capacity would be compelled to remove any negative notation from John Noakes' disciplinary records that resulted from the allegedly unconstitutional disciplinary process. This, the Sixth Circuit has held, "is nothing more than prospective remedial action." *Doe v. Cummins*, 662 F.App'x 437, 444 (6th Cir. 2016).

[22] UC will certainly make the common observation that school disciplinary hearings are not criminal trials. The Sixth Circuit in *Flaim, infra*, cautioned that this is a "generalized, though unhelpful observation…" 418 F.3d at 635. Regardless, UC is entitled to much less deference because this case involves a disciplinary, not academic dismissal. The Supreme Court has noted that when determining what type of procedural safeguards are required in the educational setting, courts should draw a distinction between academic and disciplinary dismissals. *Horowitz*, 435 U.S. at 87. Procedural requirements are greatly reduced when a student is dismissed for academic, as opposed to disciplinary, reasons. *Horowitz*, 435 U.S. at 87-88. "[D]isciplinary proceedings require more stringent procedural protection than academic evaluations, even though the effects of an adverse decision on the student may be the same." *Henson v. Honor Comm. of Univ. of Va.*, 719 F.2d 69, 74 (4th Cir. 1983).

implementing discipline against students who have raised claims that disciplinary processes failed to comply with constitutional due process mandates:

- In *Roe v. Adams-Gaston*, S.D.Ohio No. 2:17-cv-945, 2018 U.S. Dist. LEXIS 185697 (Apr. 17, 2018), this Court granted a preliminary injunction prohibiting The Ohio State University from expelling a student who alleged that the school disciplinary proceedings violated her constitutional due process right of confrontation.

- In *Nokes v. Miami Univ.*, S.D.Ohio No. 1:17-cv-482, 2017 U.S. Dist. LEXIS 136880 (Aug. 25, 2017), this Court granted a preliminary injunction prohibiting Miami University from suspending a student who had alleged that the school had acted in violation of his constitutional due process rights to notice and confrontation of adverse witnesses.

- In *Doe v. University of Cincinnati*, 223 F. Supp. 3d 704 (S.D. Ohio 2016), *aff'd* 873 F.3d 393 (6th Cir. 2017), this Court granted a preliminary injunction prohibiting the Defendant in this case from suspending a student who had alleged that the school had acted in violation of his constitutional due process right to confront adverse witnesses.

These cases all represent situations where students who had credible evidence that a school employed an unfair disciplinary process has demonstrated sufficient facts to warrant the issuance of equitable relief on either a preliminary or permanent basis. This Court is hardly alone in providing such relief:

- In *Doe v. Siena College*, N.D.N.Y. No. 1:22-cv-1115, 2023 U.S. Dist. LEXIS 7325 (Jan. 17, 2023), the court granted a preliminary injunction after observing that a student had identified particular evidentiary weaknesses behind the school's finding of responsibility, including the failure to consider exculpatory evidence.

- In *Doe v. Univ. of Connecticut*, D.Conn. No. 3:20cv92, 2020 U.S. Dist. LEXIS 11170 (Jan. 23, 2020), the court granted a preliminary injunction on a student's due process claim; the court said noted that without injunctive relief the student will suffer irreparable harm from a gap in his education: "Money damages cannot compensate him for these harms, in part because they would be virtually impossible to determine. How does one know why one's job or school application is rejected?"

- In *Doe v. Texas A&M University-Kingsville*, S.D. Tex. No. 2:21-cv-00257 (Nov. 5, 2021) (R. 18)[23] the court granted a preliminary injunction to a student after noting that the school "did not adequately refute [the student's] specific complaints regarding how the evidence was handled, the unfairness of the hearing, and the appearance of rushing to a predetermined adverse result."

---

[23] https://storage.courtlistener.com/recap/gov.uscourts.txsd.1849372/gov.uscourts.txsd.1849372.18.0_1.pdf

- In *Doe v. Rector & Visitors*, W.D.Va. Civil Action No. 3:19CV00038, 2019 U.S. Dist. LEXIS 108990 (June 28, 2019), the court granted a preliminary injunction on a due process claim after observing that the school's interests were limited where "the timeframe for completion of the investigation has already lasted far longer than the typical… period set forth in the Title IX Procedures, and the University has not offered any explanation for the delay."

- In *Doe v. Rhosdes* College,., W.D. Tenn No. 2:19-cv-02336 (June 14, 2019) (R. 33),[24] the court granted a preliminary injunction to a student who alleged a school acted in a discriminatory manner and cited this Court for the proposition that "Within the Sixth Circuit, a suspension that occurs after an unfair hearing may constitute an irreparable harm… let alone an expulsion." (Citation omitted.))

- In *Doe v. Univ. of Michigan*, 325 F. Supp. 3d 821 (E.D.Mich. 2018), a court granted a preliminary injunction prohibiting a public university from continuing with an unconstitutional disciplinary process on the grounds that "at this very moment, the University may be denying Plaintiff due process protections to which he is entitled."

- In *Doe v. Pennsylvania State Univ.*, M.D.Pa. No. 17-CV-01315, 2017 U.S. Dist. LEXIS 132186 (Aug. 18, 2017), a court granted a preliminary injunction to student who had alleged that a school acted in violation of his due process right to confrontation in disciplinary proceedings.

- In *Doe v. Univ. of Notre Dame*, N.D.Ind. No. 3:17CV298, 2017 U.S. Dist. LEXIS 69645 (May 8, 2017), the court concluded that a student facing discipline for an allegation of sexual misconduct has demonstrated "at least some likelihood of success on the merits of his breach of contract claim and of irreparable harm."

- In *Ritter v. Oklahoma*, W.D.Okla. No. CIV-16-043, 2016 U.S. Dist. LEXIS 60193 (May 6, 2016), the court observed that "universities must ensure that the rights of both the accused and the accuser are protected." The school was ordered to stay any discipline and to permit a student facing discipline for an allegation of misconduct to attempt to complete all remaining graduation requirements.

- In *Doe v. Brown Univ.*, 210 F. Supp. 3d 310, 313 (D.R.I. 2016), a school was ordered to vacate its finding and sanction against the student and expunge his record after the court concluded that the school improperly conducted a disciplinary hearing on an allegation of sexual misconduct.

- In *Doe v. Middlebury College,* D.Vt. No. 1:15-cv-192, 2015 U.S. Dist. LEXIS 124540 (Sep. 16, 2015), the court found that a student accused of sexual misconduct had "demonstrated a sufficiently serious question regarding whether [the school] violated its policies." The court ordered the school to not expel the student and allow him to remain enrolled in his courses.

- In *King v. DePauw Univ.*, No. 2:14-cv-70, 2014 U.S. Dist. LEXIS 117075 (S.D. Ind. Aug. 22, 2014), the court found that a student accused of sexual misconduct had demonstrated likely

---

[24] https://storage.courtlistener.com/recap/gov.uscourts.tnwd.84801/gov.uscourts.tnwd.84801.33.0_1.pdf

success on breach of contract claims against the school. The court prohibited the school from enforcing a suspension and ordered that the student be permitted to enroll in and attend the school without restriction.

**C.      The Plaintiff Has A Substantial Likelihood Of Success On The Merits**

**1.      Due Process**

There were numerous due process violations in this case; this memorandum will focus on only a few as Plaintiff has asked to Court for expedited discovery to better support these and the other claims identified in the Complaint.

**a.      Standards**

It is well established in this Circuit that John Noakes is entitled to due process in the disciplinary proceedings held at UC. *Flaim v. Med. College of Ohio*, 418 F.3d 629 (6th Cir. 2005) ("In this Circuit we have held that the Due Process Clause is implicated by higher education disciplinary decisions."); *Univ. of Cincinnati*, 872 F.3d at 399 ("State universities must afford students minimum due process protections before issuing significant disciplinary decisions.").

In determining whether UC provided constitutionally adequate due process, the competing interests of the governmental institution and the individual must be balanced. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). In *Mathews*, the Supreme Court established the familiar three-part test: "[T]he specific dictates of due process generally require[] consideration of three distinct factors": (1) the nature of the private interest subject to official action; (2) the risk of erroneous deprivation under the current procedures used, and the value of any additional or substitute procedural safeguards; and (3) the governmental interest." *Id.*

### b.  Lack of Notice

The Supreme Court requires that students be given notice of the charges against them.  *Goss v. Lopez*, 419 U.S. 565, 581 (1975).  "Notice satisfies due process if the student had sufficient notice of the charges against him and a meaningful opportunity to prepare for the hearing." *Flaim*, 418 F.3d at 638.[25]

In this case, UC merely advised John Noakes initially that he had violated various aspects of the Code of Conduct without describing – even though known the UC – the precise conduct.  This was insufficient because it failed to characterize the conduct to a sufficient degree to fairly apprise John Noakes of how he violated the Title IX Policy.  Specifically, the Notice, by only referring to the Title IX Policy, failed to inform John Noakes whether he was accused of "forcible" sexual assault, or whether he was accused on engaging in sexual activity with a person who was incapacitated due to intoxication.  The Notice also failed to comply with the Title IX Regulations which require that notice include "sufficient details known at the time and with sufficient time to prepare a response before any initial interview."  34 C.F.R. 106.45(b)(2).

John Noakes repeatedly asked for more clarification – these requests were refused even though the investigator had this information easily available.  UC had no good reason to not provide this information.  Nor would this have been burdensome, since under the Student Code of Conduct students are entitled to receive notice informing the students not just of the basic conduct allegedly constituting a violation of school rules but also "about the reported circumstances underlying the alleged violation."

---

[25] In *Dixon v. Alabama State Board of Education*, 294 F.2d 150 (5th Cir.), *cert. denied*, 368 U.S. 930 (1961), which the Supreme Court acknowledged as a "landmark decision," the Fifth Circuit stated that to comply with constitutional protections "The notice should contain a statement of the specific charges and grounds which, if proven, would justify expulsion…".

Limited notice describing that a student was merely alleged to have "committed sexual misconduct" and referring to the policy has been found by Court to be insufficient.  In *Nokes v. Miami Univ.*, *supra*, this Court found that a student had a substantial likelihood of success on a due process claim for preliminary injunction purposes where the Notice from the school created a "moving target." Like UC, Miami's policy contemplated at least two different situations – force and incapacity – where a party cannot give consent to sexual activity.[26]  This Court rejected a claim that simply referring a student to the policy, "should have placed [the student] on notice that all forms of consent would be at issue, thus giving him an adequate opportunity to prepare for his defense…"  And this Court rejected the idea that even if the initial notice was deficient, the inclusion of a more specific theory of intoxication in the investigative report provided to the parties before the hearing cured the deficiency because, by then the report would also have been provided to the decisions-makers.  This Court said, "[the student] received 'notice' of this new theory of intoxication only after he had been required to submit a statement, other witness statements, and evidence of his own for inclusion in the hearing packet in response to the initial version of events."  *Id.* at *34.

In *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 603 (D.Mass. 2016), a federal court warned that a student should not be "expected to defend himself against [a] vague and open-ended charge."  The court observed, "There is little practical difference between a school failing to inform the accused of the charge against him or…  having informed him of the formal charge, refusing to provide him with

---

[26] In *Nokes*, the initial notice provided to the student suggested that the student had committed sexual assault by the use of force or threat of force; at the hearing the theory of the case against the student shifted to intoxication.  While this makes the facts of *Nokes* more disturbing than this case, the basic idea behind the opinion – that simply citing a student to a section of a policy is sufficient and failing to mention the alleged victim's "alleged severe intoxication—or any alcohol consumption, for that matter" creates a due process violation – remains applicable.

the specific factual conduct alleged to have given rise to the charge." *Id.* The *Notre Dame*[27] court went further, noting that providing the student with access to the investigative report detailing alleged misconduct still does not constitute adequate notice. In *Notre Dame*, *supra*, the court observed that a detailed report including witness statements does "not provide [the student] with a statement of the particular conduct alleged to have been a violation of particular" policies. 2017 U.S. Dist. LEXIS 69645, at *29.[28]

### c.    The Use Of Biased Decision-Makers

A disinterested decision maker who has not prejudged the case is a part of the fundamental guarantee against arbitrary and capricious government conduct.   Due Process requires that a decisionmaker be neutral. *See Williams v. Pennsylvania*, 571 U.S. 1, 8 (2016) (due process requires "'an absence of actual bias' on the part of a judge."), *quoting In re Murchison*, 349 U.S. 133, 136 (1955).  In this case, the Hearing Panel and the Appeals Panel consisted of employees of organizations that provide training, expert advice, and legal representation to educational institutions.  As a result of this work, they were unable to evaluate if there had been a full, fair, and equitable investigation in this case but, instead, merely evaluated whether UC adhered to procedures that were, in many cases, recommended by their own firms.

The Hearing Panel members were associated with TNG Consulting and ATIXA, which are organizations that routinely provide opinions on behalf of schools that investigations were adequate

---

[27] The *Notre Dame* decision was vacated as part of the settlement between the parties. , 2017 U.S. Dist. LEXIS 217816 (Dec. 27, 2017).  This is of no consequence as the decision is cited not as binding precent but for its persuasive value.

[28] The *Nokes*, *Brandeis* and *Notre Dame* courts all warn that vague and non-specific charges that merely recount the school code section do not provide sufficient notice.  Application of the *Mathews* test makes the due process violation apparent:  (1) John Noakes' interest is significant; (2) providing sufficient notice will, as the Court recognized in *Nokes,* have permitted *Nokes* the opportunity to present relevant evidence and statements in the investigative report and better prepare for a hearing; and (3) UC has no interest in not providing this information when requested by a student.  This would be a different case if UC did not have the information when requested by Noakes or if Noakes had requested a burdensome detailed list of all evidence prior to providing a statement.

in response to challenges by students found to have engaged in sexual misconduct. Their own website says, "We are frequently called upon to serve as expert witnesses and litigation strategists for K-12 and college cases in state and federal courts, in government investigations (OCR, program reviews, etc.), and internal investigations. TNG consultants have been expert witnesses in more than 100 state and federal cases." [29] The Appeals Panel members work for an affiliate of Bricker & Eckler, a firm that provides training, legal representation, and expert advice to educational institutions including UC. Notably, Bricker & Eckler represents schools in responding to Title IX claims by students.[30]

The staff and lawyers who work for these firms may have preconceived notions about Title IX issues and are almost certainly concerned with upholding the interests of the educational institutions that pay their bills, not the rights of students. This was a conflict of interest because in this case, the Hearing Panel and the Appeals Panel were required to rule on matters related to the investigation in this case and the actions of the Title IX Office. These firms derive significant income from training to schools in Title IX matters, and thus the employees of that organization may be unwilling to take any actions to "upset" the Title IX Office.[31]

This problem was exacerbated by the fact that UC has did not make the trainings undertaken by all panel members available on its website prior to the hearing as required by its policy and  34 C.F.R. 106.45(b)(10)(i). The Appeals Panel excused this as a minor "compliance error," but the disclosure requirement has a purpose: to allow students to determine if the decision-makers received training that was free of bias. This is, the Department of Education seemingly believed, is an essential

---

[29] https://www.tngconsulting.com/consulting/expert-services/expert-witness-and-litigation-support/

[30] *See e.g. Rose v. Kenyon College,* S.D. Ohio No. C2-00-1299 & C2-00-1378*; Galloway v. Chesapeake Union Exempted Vill. Schs. Bd. of Educ.,* S.D. Ohio No. 1:11-cv-850; *Doe v. Kenyon College*, S.D. Ohio No. 2:20-cv-4972; *Navarro v. Fla. Inst. of Tech., Inc.*, M.D. Fl. No. 6:22-cv-1950.

[31] To pick an easy example: John Noakes claimed that the Title IX Office unduly delayed the investigation and adjudication of his matter. How likely is it that the Appeals Panel will find that the same people who hire the Appeals Panel's Firm for this and other matters (such as training programs) acted inappropriately?

part of providing both parties a fair process and a necessary safeguard to improve the impartiality, reliability, and legitimacy of Title IX proceedings.[32]

### d.  The Use Of Undisclosed And Unreliable Expert Evidence

The Hearing considered undisclosed scientific evidence in the form of information from a website to estimate Jane Roe's blood alcohol level of the Complainant.  This was a substantial procedural due process error under two Sixth Circuit Precedents:

First, the Sixth Circuit in *Miami Univ.* held that a student states "a cognizable due-process violation" when evidence used by a school's decision-makers to adjudicate the claims against a student is not provided to the student.  882 F.3d at 603.  In this case, the hearing Panel relied on information from an outside source without disclosing this information to John Noakes or his advisor.  Even UC's Appeals Panel admits this point:  "it was inappropriate for the Panel to use an outside website to calculate blood alcohol content without providing the parties the opportunity to review and provide feedback to the information."[33]

Second, the Sixth Circuit in *Woods v. Willis*, 515 F.App'x 471, 483-484 (6th Cir. 2013), held that "assuming, *arguendo*, that hearsay evidence can constitute substantial evidence to support [an administrative] decision, the evidence must be at the very least reliable and of proven probative value."  The Sixth Circuit added:  "the touchstone of due process is reliability."  *Id.*  See also *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974) ("the touchstone of due process is protection of the individual against

---

[32] *Compare Doe v. Trs. of the Univ. of Pa.*, 270 F. Supp. 3d 799, 823-24 (E.D. Pa. 2017) (university's training materials for employees who were involved in disciplinary proceedings "encourage[d] the employees to believe the accuser and presume the accused's guilt"); *Doe v. Washington & Lee Univ.*, W.D.Va. No. 6:19-cv-00023, 2021 U.S. Dist. LEXIS 74222 (Apr. 17, 2021) (gender bias could be inferred from a Title IX Coordinator's presentation).

[33] The Appeals Panel concluded that this was not material because "the Panel's decision does not appear to rely on the calculated blood alcohol content."  The obvious rejoinder is: why include it, then?  It is also demonstrably not true.  The Outcome Letter (page 8) states, "the panel considered this information in light of testimony provided by [Jane Roe.]"

arbitrary action of government"). In this case, there was no evidence about the accuracy or reliability of the information used. In fact, the Panel used this information even while acknowledging that "Calculating an individual's blood alcohol content (BAC) is an imprecise exercise, and measurements based on limited inputs like gender, weight, number of drinks, and timespan produce only rough approximations." A Forensic Toxicologist tells this Court that this evidence is highly unreliable:

> The information on this website is not accurate or reliable. The conclusion by the Hearing Panel about the likely level of intoxication of the Complainant, and the possible effects of alcohol on her reflexes, speech, and mental capacity was not based on sufficient facts or data. Nor were they the product of reliable principles and methods. Typically, experts in the field of forensic toxicology consider many factors that impact how an individual is affected by alcohol consumption… Many of the factors considered by the Hearing Panel when computing the predicted blood alcohol range for the Complainant were speculative…. Their imprecise computation does not result in a rough approximation. It results in an entirely unreliable estimation of the blood alcohol concentration and does not appear to have included consideration of the rate of metabolism and excretion of alcohol in that computation. Notwithstanding the lack of reliable data upon which to calculate an individual's blood alcohol concentration, the Hearing Panel concludes that " ... however, looking at the level of intoxication is still helpful for evaluating evidence of Complainant's capacity to consent in this matter." The use of estimates and speculation in computing a predicted blood alcohol concentration does not meet the requisite evidentiary standard of a reasonable degree of scientific certainty or probability applicable to legal proceedings in the United States.

(Plotnick Aff. ¶ 6.)

### e. Use Of Statements From Witnesses Who Were Not Present

Fundamental fairness includes the ability to confront adverse witnesses when the information supplied by those witnesses is the reason for the adverse action and there is a question of credibility to be resolved by the finder of facts. In *University of Cincinnati*, the Sixth Circuit, in a case examining the due process rights of students at a public school, held, "Accused students must have the right to cross-examine adverse witnesses 'in the most serious of cases.'" 872 F.3d at 401. The court further elaborated on the benefit of cross-examination to the entire process:

> But if a university's procedures are insufficient to make "issues of credibility and truthfulness . . . clear to the decision makers," that institution risks removing the wrong students, while overlooking those it should be removing. *See Furey v. Temple Univ.*, 884

F. Supp. 2d 223, 252 (E.D. Pa. 2012). "The concern would be mostly academic if the disciplinary process were a totally accurate, unerring process, never mistaken and never unfair. Unfortunately, that is not the case, and no one suggests that it is." [*Goss v. Lopez*, 419 U.S. 565, 579-580 (1975)].

872 F.3d at 403. In this case, the Hearing Panel ultimately had to decide who was more credible – John Noakes of Jane Roe. The Outcome Letter states, "Complainant's description of her state of intoxication was ultimately determined to be credible. Credibility is largely a function of consistency and corroboration."

The Hearing Panel was aware that it could not rely on witness statements from witnesses who were not present and subject to cross-examination. The Outcome Letter claims that "the panel did not rely on any statements of these witnesses in reaching a determination regarding responsibility." However, this claim by the Hearing Panel cannot be the end of the matter. The statements from these witnesses were in the investigative report that the Panel reviewed prior to the hearing and there is a strong likelihood that the effect of the evidence would seriously prejudice John Noakes. The Hearing Panel's letter indicates elsewhere that it did, in fact, rely on these statements in reaching a conclusion. The Hearing Panel stated that its findings come "after reviewing all available evidence, including interviews, witness statements and evidence provided to the investigator, presented in the investigation report…" Elsewhere, the Hearing Panel stated that it considered "the witness and party testimony and evidence collected during the investigation" in determining that Jane Roe's "description of her mental and physical condition was ultimately credible." The value of these statements is confirmed by the efforts of the Chair of the Hearing Panel to reopen the hearing to hear from these witnesses. When that was not practicable, the Chair wrote, "The remaining witness testimony will be accepted as provided in the investigation report and the panel will begin deliberations."[34]

_____

[34] When John Nokes objected that this was not permissible, the Chair lied and suggested that he was intending to give John Noakes the "choice" to allow these statements to be considered. His email did not indicate that this was a "choice" of the parties but indicated a foregone conclusion. .

Applying the *Mathews* test, the Sixth Circuit in *Univ. of Cincinnati* and *Baum* indicated that students have a significant interest and that cross-examination will lead to more accurate and reliable outcomes. In contrast, the burden on UC of redating statements from the investigative report before it is provided to the hearing panel is minimal and avoids the possibility that the hearing panel would be unable to put aside these statements. In this case, powerfully inculpatory statements were provided to the hearing panel with no opportunity for cross-examination. This prevented a fair hearing as it is difficult, if not impossible, to prove that these statements did not influence the outcome. '

### f. The Delay And Failure To Obtain Medical Records Led To A Fundamentally Unfair Hearing

The core of this Court's university disciplinary hearing jurisprudence is the idea that a school's entire process must be fundamentally fair. *Flaim*, 418 F.3d at 635 fn.1 ("a public university student who is facing serious charges of misconduct that expose him to substantial sanctions should receive a fundamentally fair hearing"); *Univ. of Cincinnati*, 872 F.3d at 396 ("The Due Process Clause guarantees fundamental fairness to state university students facing long-term exclusion from the educational process."). Here, there is evidence the process was unfair from the start. John Noakes was treated like a suspect and the investigator refused to seek evidence that might undermine the credibility of Jane Roe.

The unfairness begins with the undue delay in this matter. The Title IX Office was aware of the allegations on March 31, 2022, but John Noakes was not informed about the allegations until August 2022. This delay made it difficult, if not impossible, for John Noakes to defend himself. By this time, he had forgotten important details and saw no need to obtain physical evidence, including surveillance tapes. True, the delay of six months prior to March 2022 was not attributable to the University. But, the UC Title IX Policy acknowledges the importance of a timely resolution in its Title IX Policy: "Delayed reporting or filing of a formal complaint may limit the University's ability to

24

gather relevant evidence, to effectively address the conduct at issue, and to initiate the grievance process." John Noakes' advisor, an experienced form sex-crimes prosecutor, explained:

> John Noakes was prejudiced in his ability to defend himself because of the significant delays in this matter... In my experience as an attorney, a prompt investigation is more likely to lead to accurate and reliable findings because recollections are fresh and evidence is more readily available. It is well known in investigations of sexual assault that memories dim, witnesses become inaccessible, and evidence is lost. Even though some memories may have faded and some evidence lost between the incident and the initial report to UC, this problem was made worse by the failure of UC to initiate a timely investigation. As a result of the delay by UC in providing notice to John Noakes, memories continued to fade and John Noakes was prejudiced in his ability to obtain potentially exonerating physical evidence, such as video tapes, or relevant witnesses statements. All of this information may have been useful to John Noakes; by the time he was made aware of the allegations, it was too late to obtain this evidence.

(O'Reilly Aff. ¶ 6.)

Second, the investigator failed to obtain evidence in the school's possession concerning the benefits or accommodations that Jane Roe received as a result of her claim to have been a victim of sexual assault. In *Doe v. Ohio State Univ.*, 219 F. Supp. 3d 645, 663 (S.D.Ohio 2016), this Court noted that this is "critical evidence" because in a "case where the panel's decision hinged on a credibility decision" evidence of accommodations or benefits might "impeach [an] accuser's credibility."

Third, UC failed to seek Jane Roe's medical records and then permitted Jane Roe to falsely testify about the results of her sexual assault exam and present selected photographs. A forensic pathologist with experience in these matters explains that this impacted the ability to have a fair hearing:

> The failure of the investigator to obtain the Complainant's medical records from the SANE examination, combined with permitting the Complainant to testify about the results of her SANE examination, significantly prejudiced Plaintiff in his ability to adequately and meaningfully defend himself during the hearing.
>
> Medical records associated with a SANE examination arc likely to provide highly relevant evidence that is necessary for Plaintiff to prepare an adequate defense. It is a significant deviation from best practices to conduct a review of allegations of sexual assault without seeking to obtain and review these records.

> I understand that the Complainant was permitted to testify at the hearing that the results of a urine test "came back witl1 no drugs or even alcohol in my system, because it had been too long of a period of time." This is a misleading statement. In fact, some drugs implicated in drug facilitated sexual assaults may be found in urine samples up to 72 hours after ingestion. Urine samples are commonly obtained as part of a SANE examination where there are allegations of drug and alcohol facilitated sexual assault. It appears that urine test results were also not submitted for consideration by the Hearing Panel.

(Plotnick Aff. ¶¶ 7-9. True, Jane Roe was not required to produce such records – but in that case the Hearing Panel should have drawn an adverse inference and not permitted any testimony or evidence about the examination.[35] Her advisor explains the prejudice to John Noakes:

> where relevant information is in the possession of Jane Roe and not produced, the Hearing Panel should either have drawn an adverse inference that the information would be harmful to her or prohibited Jane Roe from testifying about the results of her SANE examination. The failure to do either of these things made it difficult of John Noakes to meaningfully defend himself at the hearing.

(O'Reilly Aff. ¶4.)[36]

## 2. Declaratory Judgement: Ohio Administrative Code

UC is an "Agency" as that term is defined in R.C. 111.15(A)(2). The Student Code of Conduct is a "Rule" as that term is defined in R.C. 111.15(A)(1). The Student Code of Conduct was filed by UC in accordance with R.C. 111.15 and has been codified in the Ohio Administrative Code.

The Title IX Policy is a "Rule" as that term is defined in R.C. 111.15(A)(1). However, the Title IX Policy was not filed by UC and has not been codified in the Ohio Administrative Code.

UC apparently sought to avoid the filing requirements of R.C. 111.15 by carving out an exception for the Code of Student Conduct for cases involving sexual harassment under Title IX.

---

[35] The Sixth Circuit has indicated that where relevant information is in the possession of one party and not produced, an adverse inference may be drawn that the information would be harmful to the party which failed to produce it. *Clay v. United Parcel Service, Inc.*, 501 F.3d 695, 712 (6th Cir. 2007), *quoting McMahan & Co. v. Po Folks, Inc.*, 206 F.3d 627, 632-33 (6th Cir. 2000).

[36] Even though the Hearing Panel did not find that Jane Roe was drugged, medical evidence contradicting her claim would have impacted her credibility.

Nothing in the Revised Code appears to permit this end-run around the Statute.[37]  The purpose of filing requirement is to provide the public with an opportunity to review the substantive portions of new rules to determine whether the rules exceed the scope of UC's authority, conflict with other rules, or conflict with the legislative intent of the statute pursuant to which the rules are being adopted.

The Ohio Supreme Court has long been clear that rules that have not been filed are invalid. *State ex rel. N. Canton Exempted Village School Dist. Bd. of Edn. v. Holt*, 174 Ohio St. 55 (1962) ("the resolution here under consideration is invalid by reason of not having been filed with the Secretary of State pursuant to law"); *State ex rel. Ryan v. State Teachers Retirement Sys.*, 71 Ohio St.3d 362 (1994) (resolutions passed by agency by not filed in accordance with R.C. 111.15 were invalid).  In *Holt*, the Ohio Supreme Court said clearly:

> Section 111.15, Revised Code, was enacted by the General Assembly to protect parties from bureaucratic red tape created by regulations and rules of administrative agencies…. The general rule is that ignorance of the law is no excuse. The General Assembly of Ohio has modified this with regard to rules of administrative agencies and clearly stated that until properly filed with the Secretary of State such rules are invalid.

174 Ohio St. 55, 57.

Why does this make a difference?  Because every other allegation of misconduct at UC is evaluated by hearing panel composed of faculty, staff and (except for "non-title IX sexual harassment" cases) students.  But for cases involving allegations of sexual misconduct, UC has decided to abandon this model and employ outside consultants.  In other words, UC has carved-out decision making for these types of cases to consultants who are not educators and have no interest in the academic success

---

[37] The closest case counsel can locate is *B & T Express, Inc. v. PUC of Ohio*, 145 Ohio App.3d 656 (10th Dist. 2001).  In that case, an agency attempted to adopt a federal rule by reference.  The court invalidated this approach, noting that "R.C. 111.15 was not intended to help administrative agencies adopt rules and regulations more efficiently. In fact, quite the opposite is true."  The Legislature subsequently adopted in R.C. 111.15(D)(5) a streamlined procedure for the adoption of "Any proposed rule that must be adopted verbatim by an agency pursuant to federal law or rule" – a situation that is inapplicable here.

of students. *Cf. Endres*, 938 F.3d at 298 (when school officials exercise their "'historic judgment' as educators to evaluate the student… their decision is entitled to substantial deference.").

### 3. Declaratory Judgment: UC Failed To Comply With Its Own Deadlines

The discipline imposed by UC was in violation of the time requirements of the Title IX Policy (assuming it is valid). UC received notice of the complaint against John Noakes on March 31, 2022. UC received a 'formal complaint' against John Noakes on July 26, 2022. The outcome letter from the Hearing Panel was dated March 23, 2023.

The Title IX Policy states that "from the date of its receipt of a formal complaint, the investigation, hearing, and issuance of the adjudicating body's report shall be concluded in ninety (90) business days." The adjudicating body's report was not concluded within the time frame set forth in the Title IX Policy. Ninety business days from when the Title IX Office first became aware of the allegations against John Noakes on March 31, 2022 would be approximately August 9, 2022. Ninety business days from when a Formal Complaint was submitted to the Title IX Office on July 26, 2022 would be approximately December 5, 2022. March 23, 2023 – when the Outcome Letter was sent – is not even close.

UC did not find that good cause existed for any limited extension of timeframes. The Appeals decision acknowledges (page 8) that "The record does not indicate the reasons for the delays." Emails from the Investigator that she was "continuing to investigate" do not constitute Good Cause. UC, thus, acted in violation of the Title IX and the UC Code of Student Conduct by failing to conclude its investigation and adjudication of the allegations against John Doe within 90 business days of the formal complaint.[38] As a result of the delay, John Doe was prejudiced in his ability to defend against the allegations. John Doe was unable to recall some of the events of that day and obtain witnesses or

---

[38] John Noakes was responsible for a short delay necessitated by his advisor receiving cancer treatments. But excluding this time does not bring UC into compliance with the ninety business day standard.

evidence. And the Appeals Panel noted that because of the long delay in this case, "memories were already affected and surveillance tapes were certainly long overwritten."

A case before the Hamilton County Common Pleas Court presented similar facts. *Noakes v. Univ. of Cincinnati,* Hamilton Co. Common Pleas No. A 2101546. In that case, the court (Branch, J.) found that UC had failed to complete an investigation and adjudication of a Title IX matter within the time frame set forth in a prior version of the school's policies.[39] The court issued a preliminary injunction in favor the student prohibiting the imposition of discipline (attached as Exhibit) after concluding that "Plaintiff has shown by clear and convincing evidence that he is entitled to a declaration from this Court that the University violated both its Title IX and SCOC policies when" the school's investigator did not comply with the then-existing time frames.

## D.    Irreparable Harm

The Verified describes the irreparable harm John Noakes will suffer if a preliminary injunction is not granted. The Sixth Circuit has held that school discipline constitutes irreparable harm because of the risk of damage to a student's academic and professional reputations and the adverse effect on a student's ability to enroll at other institutions of higher education and to pursue a career. *Univ. of Cincinnati,* 872 F.3d at 407 ("Were we to vacate the injunction, Doe would be suspended for a year and suffer reputational harm both on and off campus based on a finding rendered after an unfair hearing. Accordingly, this factor weighs in favor of preliminary relief."). *See also Cummins*, 662 F.App'x at 445 (6th Cir. 2016) "adverse disciplinary decision did, and continues to, impugn [a student's] reputation and integrity…" This, combined with the fact that the violation of constitutional rights is presumed to constitute irreparable harm, *Overstreet v. Lexington-Fayette Urb. Cty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002), is sufficient to satisfy the requirement of irreparable harm.

---

[39] UC appears to have changed its policies in response to Judge Branch's decision.

**E.      Public Interest and Harm to Third Parties**

An injunction will not cause any harm to third parties or UC.  UC remains able to enforce its rules and regulations in a manner consistent with the language in the Student Code of Conduct. Moreover, in light of the fact that John Noakes was permitted to remain on campus for over a year after the report, there is no suggestion that UC is concerned that John Noakes poses a risk to other students on the campus.[40]  *Compare Middlebury Coll.*, 2015 U.S. Dist. LEXIS 124540, at *14 (finding no harm to public when Plaintiff remained a student at school following the study-abroad program during which the alleged assault occurred).

Moreover, an injunction is also in the public interest.  "[I]t is always in the public's interest that a student be treated fairly before being disciplined."  *Ritter*, 2016 U.S. Dist. LEXIS 60193, at *8. This is because if a college student is to be marked for life as a sexual predator, it is reasonable to require that he be provided a fair opportunity to defend himself and an impartial arbiter to make that decision.  *Doe v. Colgate Univ.*, N.D.N.Y. No. 5:15-cv-1069, 2016 U.S. Dist. LEXIS 48787, at *9 (Apr. 12, 2016), *citing Brandeis Univ.*, 177 F. Supp. 3d at 573.  Moreover, this Court acts to support a broad public interest in enforcing fundamental contract rights and fairness.  On the other hand, the failure to grant an injunction would harm the public because it would permit an educational institution  to violate the contractual rights of all current and future students on an ongoing basis while this case is resolved, which necessarily would cause substantial, irreparable harm to those students.

---

[40] If that had been the case, UC would have sought to remove John Noakes immediately after the allegation was made and would not have waited months before imposing discipline.

### F.      Nominal Bond Should Be Imposed

Federal Rule of Civil Procedure 65 provides that "The court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."

UC is an educational institution. Accordingly, because money is not an issue for the Defendants and the school is not likely to suffer any potential losses if an injunction is granted, this Court should not require a bond. *Nokes*, 2017 U.S. Dist. LEXIS 136880, at *42 ("There is no requirement of a bond."); *Ritter*, 2016 U.S. Dist. LEXIS 60193, at *9 (granting injunction to student; concluding "a bond is not required under the circumstances present here"); *Univ. of Cincinnati*, 223 F. Supp. 3d at 704 (setting nominal bond of $1 for preliminary injunction against school);

## CONCLUSION

Pursuant to Fed. R. Civil P. 65, this Court should, following a hearing, grant a Preliminary Injunction prohibiting UC from imposing any disciplinary sanctions against John Noakes.

Respectfully submitted,


_____/s/ Joshua A. Engel_____
Joshua Adam Engel (0075769)
Scott O'Reilly (0075717)
Anne Tamashasky (0064393)
ENGEL AND MARTIN, LLC
4660 Duke Dr., Suite 101
Mason, OH 45040
(513) 445-9600
engel@engelandmartin.com