**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**

| | |
|---|---|
| JOHN NOAKES | Case No. 1:23-cv-00284-MRB |
| PLAINTIFF, | Judge BARRETT |
| v. | |
| THE UNIVERSITY OF CINCINNATI, ET AL | RESPONSE TO DEFENDANTS' MOTION TO DISMISS |
| DEFENDANTS. | |

Plaintiff John Noakes respectfully submits this Response to Defendants' Motion to Dismiss.

(Doc#17.)

**TABLE OF CONTENTS AND SUMMARY OF ARGUMENTS**

FACTS ....................................................................................................................................... 1

This case is one of many cases in which UC has struggled to respond to alleged sexual assaults and sexual misconduct on campuses. And this is one of many cases in this Court, the Sixth Circuit, and around the country that address the various policies and procedures schools like UC have adopted to respond to allegations of sexual assault on campus in direct response to pressure from the U.S. Education Department's Office of Civil Rights ("OCR") related to the enforcement of Title IX. This Court and Sixth Circuit has, in multiple opinions, questioned the legality and constitutionality of these policies and procedures, noting that schools (including UC) have continued to adopt practices that impermissibly reinforce and rely upon gender stereotypes and abrogate the due process rights of students.

A. The Dear Colleague Letter And Regulations ........................................................... 2

In 2011, after years of criticism for being too lax on campus sexual assault, OCR sent a Dear Colleague Letter (the "DCL") to colleges and universities encouraging school to become more aggressive in the investigation and adjudication of sexual violence complaints. The DCL, as well as subsequent guidance and statements provided by OCR, compelled colleges and universities to change their former policies drastically out of fear that the Department would pursue violations of Title IX that could lead to the revocation of all federal funding.

B. UC Adopts Title IX Policies And Procedures In Response To
Pressure From Students, The Public, And The Department Of
Education. ................................................................................................................. 3

In the years preceding the disciplinary actions against John Noakes, there was substantial criticism of UC, both in the student body and in the public media, accusing UC of not taking seriously complaints of female students alleging sexual assault by male students. Against this background, UC has adopted two policies at issue here: The Code of Student Conduct and a separate "Sexual Harassment Policy and Procedures for All Faculty, Students, Employees, and Third Parties," also known as the "Title IX Policy."

C. The Disciplinary Proceedings Against John Noakes ............................................... 6

In September 2021, John Noakes and a female UC student, Jane Roe, engaged in sexual activity after meeting at a fraternity party. Jane Roe, over the next few days, came to believe that she had been drugged and raped. She went to the hospital for a SANE examination and contacted a detective from the Cincinnati Police Department (the police declined to pursue criminal charges). On March 30, 2022, the UC Title IX Office received an online report from the Assistant Director of Fraternity & Sorority Life. Over four months later, on August 18, 2022, a Notice of Commencement of investigation was sent to John Noakes. The notice did not indicate that Jane Roe alleged a 'forcible' sexual assault or that she was unable to provide consent as a result of being drugged or excessive alcohol use. Following an incomplete investigation and a flawed hearing, John Noakes was "responsible" by a hearing panel consisting of individuals who work for a for-profit consulting firm. The hearing panel relied on undisclosed scientific evidence – a blood alcohol calculator from a website – as well as other unreliable evidence. His

ii

appeal was denied by an appeals panel consisting of paid consultantsl affiliated with a law firm that provided training to UC staff and represents colleges and universities in litigation brought by students challenging disciplinary proceedings. Plaintiff was expelled. This litigation followed.

**ARGUMENT** ...................................................................................................................... 12

Defendants' Memorandum fails to address the holdings of controlling authority, including: *Endres v. Northeast Ohio Med. Univ.*, 938 F.3d 281 (6th Cir. 2019); *Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018); *Doe v. Miami Univ.*, 882 F.3d 579 (6th Cir. 2018); *Doe v. Oberlin College*, 963 F.3d 580 (6th Cir. 2020); and *Nokes v. Miami Univ.*, S.D.Ohio No. 1:17-cv-482, 2017 U.S. Dist. LEXIS 136880 (Aug. 25, 2017).

**A. Standard** ............................................................................................................. 12

**B. Eleventh Amendment And Common Law Immunity** ........................................... 12

    **1. The Relief Sought In Count II Is Prospective** ............................................... 13

The Eleventh Amendment does not bar suits for injunctive relief against state officials acting in their official capacities so long as the relief sought is "prospective in nature and designed to ensure future compliance with federal law." *Doe v. Cummins*, 662 Fed. Appx. 437 (6th Cir. 2016).

    **2. The Individual Defendants Sued In Their Official Capacity Are Proper Defendants** ........................................................................................ 16

The Individual Defendants have the necessary connection to the unconstitutional conduct required by *Ex Parte Young*. The Individual Defendants have "some connection" to that alleged violation because, according to the Complaint, they are the officials who have the "responsibility for implementing the various policies and procedures UC has adopted related to student conduct and the enforcement of Title IX. *Taaffe v. Drake*, S.D.Ohio No. 2:15-CV-2870, 2016 U.S. Dist. LEXIS 57397, at *16 (Apr. 29, 2016); *Doe v. Univ. of Cincinnati*, 223 F. Supp. 3d 704, 706 (S.D.Ohio 2016).

**C. Due Process Claims** ............................................................................................ 19

    **1. Standards** ..................................................................................................... 19

    **2. Delay** ............................................................................................................ 20

UC was aware of the allegations against Plaintiff for over four months before he was provided notice. Its own Title IX Policy acknowledges the importance of a timely resolution in its Title IX Policy: "Delayed reporting or filing of a formal complaint may limit the University's ability to gather relevant evidence, to effectively address the conduct at issue, and to initiate the grievance process."

**3.**     **Lack Of Sufficient Notice**............................................................................21

UC merely advised John Noakes initially that he had violated the Code of Conduct without describing – even though known to UC – the precise conduct.  This was insufficient because it failed to characterize the conduct to a sufficient degree to fairly apprise John Noakes of how he violated the Title IX Policy.  *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 603 (D.Mass. 2016); *Nokes v. Miami Univ, supra.*

**4.**     **The Use Of Biased Decision-Makers** ..........................................................24

The Hearing Panel and the Appeals Panel consisted of employees of organizations that provide training, expert advice, and legal representation to educational institutions.  The hearing and appeals panel members derive significant income from training to UC and other schools in Title IX matters.  This problem was exacerbated by the fact that UC has did not make the trainings undertaken by all decisionmakers available on its website prior to the hearing as required by its policy and 34 C.F.R. 106.45(b)(10)(i).

**5.**     **The Use Of Undisclosed And Unreliable Expert Evidence** ........................26

The Hearing Panel considered and relied upon undisclosed scientific evidence in the form of information from a website to estimate Jane Roe's blood alcohol level.  The Sixth Circuit in *Miami Univ.* held that a student states "a cognizable due-process violation" when evidence used by a school's decision makers to adjudicate the claims is not provided to the student.  882 F.3d at 603.  Similarly, in *Endres* the Sixth Circuit found a due process violation where a school relied on a "statistical analysis" that was not provided to a student prior to a disciplinary hearing.  938 F.3d at 301.

**6.**     **Use Of Statements From Witnesses Who Were Not Present** ......................27

In *Univ. of Cincinnati,* 872 F.3d 393, 401 (6th Cir. 2017), the Sixth Circuit held, "Accused students must have the right to cross-examine adverse witnesses 'in the most serious of cases.'"  The statements from adverse witnesses who did not testify were in the investigative report that the Panel reviewed prior to the hearing.  This report was not redacted and there is a strong likelihood that the effect of the evidence would seriously prejudice John Noakes.  The Hearing Panel stated that its findings come "after reviewing all available evidence, including interviews, witness statements and evidence provided to the investigator, presented in the investigation report…"

**7.**     **Failure To Obtain Relevant Evidence Undermining Jane Roe's Credibility** ....................................................................................................28

The investigator failed to obtain evidence in the school's possession concerning the benefits or accommodations that Jane Roe received as a result of her claim to have been a victim of sexual assault.  The Hearing Panel also permitted Jane Roe to falsely testify about the results of her sexual assault exam and present selected photographs.This evidence would have directly impacted Jane Roe's credibility, as such accommodations would be a reason for her to fabricate or exaggerate her claims.  *Doe v. Ohio State Univ.*, 219 F. Supp. 3d 645 (S.D.Ohio 2016); *Doe v. Purdue Univ.*, 928 F.3d 652, 664 (7th Cir. 2019).

8.     Cumulative Error ........................................................................... 29

The core of this Court's university disciplinary hearing jurisprudence is the idea that a school's entire process must be fundamentally fair. *Univ. of Cincinnati*, 872 F.3d at 396 ("The Due Process Clause guarantees fundamental fairness to state university students facing long-term exclusion from the educational process.").

D.    The Title IX Erroneous Outcome Claim ............................................. 30

1.     Standard ...................................................................................... 30

2.     Articulable Doubt ......................................................................... 30

Plaintiff's burden to show articulable doubt is minimal – he only needs to cast doubt on the outcome, not prove actual innocence. Plaintiff not only claimed he was innocent, but he additionally identified several potential flaws in the process which called the outcome into question.

3.     Evidence Of Gender Bias .............................................................. 31

In *Oberlin*, *Baum*, and *Miami*, the Sixth Circuit identified three categories of evidence that can support an inference of gender bias in a valid Title IX erroneous outcome claim: (i) procedural irregularities; (ii) pressure from the Department of Education and other internal and external sources; and (iii) the merits of the decision itself. All three are present in the Complaint.

a.     Procedural Irregularities ...................................................... 31

In *Oberlin*, the Sixth Circuit held that "' clear procedural irregularities' in [a school's] response to the 'allegations of sexual misconduct… will permit a plausible inference of sex discrimination.'" 963 F.3d at 586. Plaintiff, here, has identified a significant number of additional procedural flaws, including: lack of sufficient notice; the use of biased decision makers; the failure of UC to disclose the trainings attended by decision makers; allowing Jane Roe to describe her medical condition without providing medical records; delays; the reliance of undisclosed scientific evidence; the failure of the investigator to disclose important evidence that would impact Jane Roe's credibility; and the provision of hearsay statements to the decision makers without providing Plaintiff an opportunity to confront adverse witnesses.

**b.** **Pressure From The Department Of Education And Others** ................ 32

In *Miami Univ.*, the Sixth Circuit credited claims that "pressure from the government to combat vigorously sexual assault on college campuses and the severe potential punishment – loss of all federal funds – if it failed to comply, led [the school] to discriminate against men in its sexual-assault adjudication process." 882 F.3d at 594. The Sixth Circuit later explained that pressure from Department of Education "provides a backdrop, that, when combined with other circumstantial evidence of bias in [a student's] specific proceeding" supports a plausible claim of gender discrimination. *Baum*, 903 F.3d 586. And in *Oberlin*, like in this case, the Sixth Circuit found that an allegation of gender bias "finds support from [an] allegation that— throughout the pendency of his disciplinary proceeding—the federal Department of Education's Office of Civil Rights" was investigating the school's compliance with Title IX. 963 F.3d at 587

**c.** **The Merits Of The Decision** .................................................................. 33

In *Oberlin*, the Sixth Circuit held that "when the degree of doubt" in a school decision "passes from 'articulable' to grave, the merits of the decision itself, as a matter of common sense, can support an inference of sex bias." 963 F.3d 580 at 587-588. In this case, the record provided no apparent basis for a finding that the alleged victim lacked conscious knowledge of the sexual activity or that the plaintiff perceive the alleged victim to be incapacitated.

**CONCLUSION** ........................................................................................................... 34

## TABLE OF AUTHORITIES

## CASES

*ABC v. Blackwell*, 479 F. Supp. 2d 719 (S.D. Ohio 2006) ............................................................. 17

*Allied Artists Picture Corp. v. Rhodes*, 679 F.2d 656 (6th Cir.1982) .................................................. 17

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .............................................................................................. 12

*Barton v. Summers*, 293 F.3d 944 (6th Cir. 2002) ............................................................................ 14

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................................................ 12

*Briggs v. Univ. of Cincinnati*, 11 F.4th 498 (6th Cir. 2021) .................................................................. 1

*Carten v. Kent State Univ.*, 282 F.3d 391 (6th Cir. 2002) ................................................................. 14

*Charlton-Perkins v. Univ. of Cincinnati*, 35 F.4th 1053 (6th Cir. 2022) ................................................... 1

*Clay v. United Parcel Service, Inc.*, 501 F.3d 695 (6th Cir. 2007) ..................................................... 29

*Dixon v. Alabama State Board of Education*, 294 F.2d 150 (5th Cir.) ............................................ 21

*Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018) ........................................................................... *passim*

*Doe v. Bowling Green State Univ.*, N.D.Ohio No. 3:22-cv-140, 2022 U.S. Dist. LEXIS
  179939 (Sep. 30, 2022) ............................................................................................................ 15, 25

*Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561 (D.Mass. 2016) ......................................................... 22

*Doe v. Citadel*, D.S.C. No. 2:21-cv-04198-DCN, 2022 U.S. Dist. LEXIS 127707 (July 18,
  2022) ......................................................................................................................................... 18

*Doe v. Cummins*, 662 Fed. Appx. 437 (6th Cir. 2016) ........................................................... *passim*

*Doe v. Devine*, 910 F.3d 842 (6th Cir. 2018) ................................................................................... 17

*Doe v. Franklin Pierce Univ.*, D. N.H. No. 22-cv-00188, 2023 U.S. Dist. LEXIS 45883
  (March 17, 2023) ....................................................................................................................... 21

*Doe v. Miami Univ.*, 882 F.3d 579 (6th Cir. 2018) ................................................................ *passim*

*Doe v. N. Michigan Univ.*, 393 F. Supp. 3d 683 (W.D.Mich. 2019) ............................................ 18

*Doe v. Oberlin College*, 963 F.3d 580 (6th Cir. 2020) ............................................................ *passim*

*Doe v. Ohio State Univ.*, 219 F. Supp. 3d 645, 663 (S.D.Ohio 2016) ............................... 14, 28, 29

*Doe v. Ohio State Univ.*, 311 F. Supp. 3d 881, 892-893 (S.D.Ohio 2018) ...................................... 2

*Doe v. Purdue University*, 928 F.3d 652, 666 (7th Cir. 2019) .............................. 14, 26, 29, 33

*Doe v. Syracuse Univ.*, N.D.N.Y. No. 5:19-cv-1467, 2020 U.S. Dist. LEXIS 85708 (May
  15, 2020) .................................................................................................................................... 29

*Doe v. Trs. of the Univ. of Pa.*, 270 F. Supp. 3d 799 (E.D. Pa. 2017) ........................................ 25

*Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d 586 (S.D.Ohio 2016) ................................................ 1

*Doe v. Univ. of Cincinnati*, 223 F. Supp. 3d 704 (S.D. Ohio, 2016) ...................................... 1, 18

*Doe v. Univ. of Cincinnati*, 872 F.3d 393 (6th Cir. 2017) ......................................................... *passim*

*Doe v. Univ. of Cincinnati,* S.D.Ohio No. 1:16-c-v987, 2018 U.S. Dist. LEXIS 51833
(Mar. 28, 2018) ...................................................................................................... 13, 15

*Doe v. Univ. of Colorado*, 255 F. Supp. 3d 1064 (D.Colo. 2017) .................................................. 2

*Doe v. Univ. of Denver*, 1 F.4th 822, 832 (10th Cir. 2021) .......................................................... 32

*Doe v. Univ. of Notre Dame*, N.D.Ind. No. 3:17CV298, 2017 U.S. Dist. LEXIS 69645
(May 8, 2017) .............................................................................................................. 23

*Doe v. Univ. of the Sciences*, 961 F.3d 203 (3d Cir. 2020) .......................................................... 20

*Doe v. Washington & Lee Univ.*, W.D.Va. No. 6:19-cv-00023, 2021 U.S. Dist. LEXIS
74222 (Apr. 17, 2021) ................................................................................................. 25

*Doe v. Wright State Univ.*, S.D.Ohio No. 3:16-cv-469, 2017 U.S. Dist. LEXIS 136225
(Aug. 24, 2017) ........................................................................................................ 13, 15

*Dubay v. Wells*, 506 F.3d 422 (6th Cir. 2007) .......................................................................... 12

*Durham v. McWhorter*, 789 F. App'x 533 (6th Cir. 2020) ......................................................... 16

*Edelman v. Jordan*, 415 U.S. 651 (1974)................................................................................. 13

*Endres v. Northeast Ohio Med. Univ.*, 938 F.3d 281 (6th Cir. 2019) ...................................... 1, 26

*Ex Parte Young*, 209 U.S. 123 (1908)................................................................................ *passim*

*Flint v. Dennison*, 488 F.3d 816 (9th Cir. 2007) ...................................................................... 14

*Gischel v. Univ. of Cincinnati*, 302 F. Supp. 3d 961 (S.D.Ohio 2018)........................................... 1

*Goldblum v. Univ. of Cincinnati,* S.D.Ohio No. 1:19-cv-398, 2022 U.S. Dist. LEXIS 54979
(Mar. 28, 2022), *aff'd* 62 F.4th 244 (6th Cir. 2023) ........................................................... 1

*Hedrick v. W. Michigan Univ.*, W.D.Mich. No. 1:22-cv-308, 2022 U.S. Dist. LEXIS
189225 (Oct. 17, 2022) ................................................................................................. 15

*Herman v. Ohio Univ.*, S.D.Ohio No. 2:19-cv-201, 2019 U.S. Dist. LEXIS 203106 (Nov.
22, 2019) .................................................................................................................... 13

*In re Murchison*, 349 U.S. 133 (1955) .................................................................................... 24

*Mathews v. Eldridge*, 424 U.S. 319 (1976) ........................................................................ *passim*

*McMahan & Co. v. Po Folks, Inc.*, 206 F.3d 627, 632-33 (6th Cir. 2000) .................................... 29

*Menaker v. Hofstra Univ.*, 935 F.3d 20 (2d Cir. 2019) ................................................................ 31

*Nichols v. Muskingum Coll.*, 318 F.3d 674 (6th Cir. 2003)........................................................ 12

*Nokes v. Miami Univ.*, S.D.Ohio No. 1:17-cv-482, 2017 U.S. Dist. LEXIS 136880 (Aug.
25, 2017) .................................................................................................................. *passim*

*Pappas v. James Madison Univ.,* W.D.Va. Civil Action No. 5:22-cv-00028, 2023 U.S. Dist.
LEXIS 56550 (Mar. 31, 2023) ...................................................................................... 18

*Pritchett v. Pitcher*, 117 F.3d 959 (6th Cir. 1997) .................................................................... 27

*Reeves v. Shawnee State Univ.*, S.D.Ohio No. 1:16-CV-00765, 2017 U.S. Dist. LEXIS
29674 (Mar. 1, 2017) ................................................................................................... 16

*Reilly v. Vadlamudi*, 680 F.3d 617, 622 (6th Cir. 2012) ............................................................... 12

*Roe v. Adams-Gaston*, S.D.Ohio No. 2:17-cv-945, 2018 U.S. Dist. LEXIS 185697 (Apr. 17, 2018) ............................................................................................................................... 15

*S&M Brands, Inc. v. Cooper*, 527 F.3d 500, 509 (6th Cir.2008) ................................................... 14

*Saqr v. Univ. of Cincinnati*, S.D.Ohio No. 1:18-cv-542, 2020 U.S. Dist. LEXIS 163394 (Sep. 8, 2020) ............................................................................................................................... 16

*Schwartz v. Univ. of Cincinnati College of Medicine*, 436 F. Supp. 3d 1030, 1038 (S.D.Ohio 2020) ............................................................................................................................................ 15

*Shepard v. Irving*, 77 F. App'x 615 (4th Cir. 2003) ...................................................................... 14

*Sterrett v. Cowan*, 85 F. Supp. 3d 916 (E.D.Mich. 2015) ........................................................... 23

*Taaffe v. Drake*, S.D.Ohio No. 2:15-CV-2870, 2016 U.S. Dist. LEXIS 57397 (Apr. 29, 2016) ................................................................................................................................... 16, 18

*Top Flight Entertainment, Ltd. v. Schuette*, 729 F.3d 623 (6th Cir. 2013) .................................. 16

*Williams v. Pennsylvania*, 571 U.S. 1 (2016) ............................................................................... 24

*Woods v. Willis*, 515 F.App'x 471 (6th Cir. 2013) ........................................................................ 27

## OTHER AUTHORITIES

34 C.F.R. 106.45(b)(10)(i) .............................................................................................................. 25

83 Fed Reg. 230, 61479-61480 (29 Nov. 2018) ........................................................................... 26

R.C. 3345.21 ..................................................................................................................................... 4

O.A.C 3361:40-5-05 .......................................................................................................................... 4

OCR Docket #15-16-2039 ................................................................................................................ 4

OCR Docket #15-16-2178 ................................................................................................................ 4

Dear Colleague Letter: Sexual Violence, Russlynn Ali, Office for Civil Rights, U.S. Dep't of Educ. (Apr. 4, 2011) .......................................................................................... 2-3

Open Letter From Members Of The Penn Law School Faculty:  Sexual Assault Complaints: Protecting Complainants And The Accused Students At Universities, Feb. 8, 2015 ................................................................................................................................. 3

Samantha Harris & KC Johnson, *Campus Courts in Court: The Rise in Judicial Involvement in Campus Sexual Misconduct Adjudications*, 22 N.Y.U. J. Legis. & Pub. Pol'y 49 (2019) ........................ 1

## FACTS

This case is one of many cases in which UC has struggled over the past decade to respond to alleged sexual assaults and sexual misconduct on campuses.[1]  And this is one of many cases in this Court, the Sixth Circuit, and federal courts around the country that address the various policies and procedures schools like UC have adopted to respond to allegations of sexual assault on campus in direct response to pressure from the U.S. Education Department's Office of Civil Rights ("OCR") related to the enforcement of Title IX.[2]  This Court and Sixth Circuit has, in multiple opinions, questioned the legality and constitutionality of these policies and procedures, noting that schools (including UC) have continued to adopt practices that impermissibly reinforce and rely upon gender stereotypes and abrogate the due process rights of students.[3]  *See e.g. Doe v. Univ. of Cincinnati,* 223 F. Supp. 3d 704 (S.D. Ohio, 2016), *aff'd* 872 F.3d 393 (6th Cir. 2017).  Defendants' Memorandum is, perhaps, most notable for failing address much of this controlling authority, including completely ignoring the holdings of the Sixth Circuit and this Court in the following significant decisions:  *Endres v. Northeast Ohio Med. Univ.*, 938 F.3d 281 (6th Cir. 2019); *Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018); *Doe v. Miami Univ.*, 882 F.3d 579 (6th Cir. 2018); and *Nokes v. Miami Univ.*, S.D.Ohio No. 1:17-cv-482, 2017 U.S. Dist. LEXIS 136880 (Aug. 25, 2017).

---

[1] *See e.g. Goldblum v. Univ. of Cincinnati,* S.D.Ohio No. 1:19-cv-398, 2022 U.S. Dist. LEXIS 54979 (Mar. 28, 2022), *aff'd* 62 F.4th 244 (6th Cir. 2023); *Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d 586 (S.D.Ohio 2016); *Gischel v. Univ. of Cincinnati*, 302 F. Supp. 3d 961 (S.D.Ohio 2018).  Nor are UC's problems with discrimination limited to the response to sexual assault on campus.  Recently, the Sixth Circuit has found sufficient evidence to support claims that UC used pretextual reasons to cover up unlawful discrimination. *Briggs v. Univ. of Cincinnati,* 11 F.4th 498, 515 (6th Cir. 2021) ("record contains evidence from which a reasonable jury could conclude that [UC's action] was retaliatory rather than innocent"); *Charlton-Perkins v. Univ. of Cincinnati*, 35 F.4th 1053, 1061 (6th Cir. 2022) (UC's failure to hire a person because of gender, then cancelling a search, plausible evidence of pretext).

[2] *See e.g.* Samantha Harris & KC Johnson, *Campus Courts in Court: The Rise in Judicial Involvement in Campus Sexual Misconduct Adjudications*, 22 N.Y.U. J. Legis. & Pub. Pol'y 49 (2019).

[3] *Doe v. Univ. of Cincinnati, supra*; *Doe v. Miami Univ.*, 882 F.3d 579 (6th Cir. 2018); *Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018); *Doe v. Oberlin College*, 963 F.3d 580 (6th Cir. 2020).

### A.  The Dear Colleague Letter And Regulations

In 2011, after years of criticism for being too lax on campus sexual assault, OCR sent a Dear Colleague Letter (the "DCL") to colleges and universities encouraging school to become more aggressive in the investigation and adjudication of sexual violence complaints.[4]  The DCL, as well as subsequent guidance and statements provided by OCR, compelled colleges and universities to change their former policies drastically out of fear that the Department would pursue violations of Title IX that could lead to the revocation of all federal funding.  Judge Martinez, in commenting on the "wave" of litigation about this issue, observed that the DCL, in part, "generally signaled that OCR had adopted a 'get tough' approach, thus prompting colleges and universities to devote more attention to sexual assault accusations." *Doe v. Univ. of Colorado*, 255 F. Supp. 3d 1064, 1067 (D.Colo. 2017).  In this Court, Judge Graham observed that the procedures adopted by schools in response to the DCL were often lacking in basic due process protections:

> Universities have perhaps, in their zeal to end the scourge of campus sexual assaults, turned a blind eye to the rights of accused students. Put another way, the snake might be eating its own tail. Joe Dryden et. al., *Title IX Violations Arising from Title IX Investigations: The Snake Is Eating Its Own Tail*, 53 Idaho L. Rev. 639 (2017).

*Doe v. Ohio State Univ.*, 311 F. Supp. 3d 881, 892-893 (S.D.Ohio 2018).

In 2017, OCR withdrew the Dear Colleague Letter and indicated its intent to issue new guidance "through a rulemaking process that responds to public comment."  In withdrawing the DCL, OCR observed that prior actions "may have been well-intentioned, but… led to the deprivation of rights for many students—both accused students denied fair process and victims denied an adequate resolution of their complaints."  *Id.* at 1-2.  OCR further said:  "Legal commentators have criticized the 2011 Letter . . . for placing "improper pressure upon universities to adopt procedures that do not

---

[4] Dear Colleague Letter: Sexual Violence, Russlynn Ali, Office for Civil Rights, U.S. Dep't of Educ. (Apr. 4, 2011) (https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf).

afford fundamental fairness." As a result, many schools have established procedures for resolving allegations that "lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and are in no way required by Title IX law or regulation."[5] In 2020, the Department of Education released a Final Rule under Title IX of the Education Amendments of 1972. The Final Rule, *inter alia*, prescribes a transparent grievance process that treats accused students as innocent until proven guilty, requires the school to state a standard of evidence, and requires the school to provide a hearing process where accused students may question adverse witnesses.[6] That rule was applicable to the facts of this case.

**B.     UC Adopts Title IX Policies And Procedures In Response To Pressure From Students, The Public, And The Department Of Education.**

In the years preceding the disciplinary actions against John Noakes, there was substantial criticism of UC, both in the student body and in the public media, accusing UC of not taking seriously complaints of female students alleging sexual assault by male students.  (Complaint ¶23, PageID#11.) As described in the Complaint, this has included adverse news coverage and, campus meetings or protests, and enforcement actions concerning UC.   The student newspaper quoted a student who had been sexually assaulted stating, "At the end of the day, UC does not give a f--k because they feel like they don't have to."[7]  In 2020, one of the founders of a group of students critical of UC's response to sexual assault submitted an affidavit to this Court critical of the manner in which Defendant Marshall, who oversees the Title IX Office and UC's response to the problem of sexual assault on

---

[5] Letter from Office for Civil Rights, U.S. Dep't of Educ. (September 22, 2017). (Available at https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf ), *quoting Open Letter From Members Of The Penn Law School Faculty:  Sexual Assault Complaints: Protecting Complainants and the Accused Students at Universities*, Feb. 8, 2015; *Rethink Harvard's Sexual Harassment Policy*, Boston Globe (Oct. 15, 2014) (statement of 28 members of the Harvard Law School faculty).

[6] The Biden Administration had indicated that it intends to initiate a new rulemaking in an effort to repeal the 2020 rules.

[7]https://www.newsrecord.org/news/a-troubling-trend-as-on-campus-rape-reports-rise-uc-continues-to-issue-few-alerts/article_743241da-9e57-11eb-bc39-c7bc652c9b61.html

campus, saying: she "was good at seeming like she cared, but she did not take Title IX issues seriously. … My impression was that [she] was seeking to save face for the university and placate us, so we would stop talking about the issue."[8] UC has been the subject of a number of investigations by the Department of Education for the manner in which it investigates and adjudicates allegations of sexual assault and harassment.[9] (Complaint ¶26, PageID#13.)

Against this background, UC has adopted two policies at issue here: The Code of Student Conduct and a separate "Sexual Harassment Policy and Procedures for All Faculty, Students, Employees, and Third Parties," also known as the "Title IX Policy." (Doc#1-2; Doc#1-3.) The Code of Student Conduct was codified at O.A.C 3361:40-5-05 pursuant to R.C. 3345.21. The Title IX Policy was not codified. UC has carved out an exception for the Code of Student Conduct for cases involving sexual harassment under Title IX. The Title IX Policy contains fewer procedural protections for students accused of sexual misconduct. These lesser protections include not providing student with notice of "the reported circumstances underlying the alleged violation" and the use of outside consultants – not faculty, staff, or students – as decision-makers. (Complaint ¶32, PageID#15-16.)

The Title IX policy prohibits "Sexual Assault" which includes "Any sexual act directed against another person, without the consent of the complainant, including instances in which the complainant

---

[8] Case: 1:19-cv-00398, Doc#69-3.

UC suggests that some of the allegations about UC's response to external pressure from OCR and others is "entirely contradictory" because both alleged victims and accused students complain. Def. Memo at PageID#328. But there is nothing contradictory about UC responding to criticism that it fails to take allegations of sexual assault seriously and *also* fails to respect the rights of both the accused and accusers. Just because UC is making nobody happy does not mean it is doing the right thing. Rather, many of the actions in this case can be seen as a response to continued criticism from victims that their prior cases were not handled properly, despite UC previously acing in a biased nature. *See e.g.* Complaint ¶124, PageID#57 "UC was under pressure from students and the community to combat vigorously sexual assault against women...").) *Cf.* Nancy Gertner, *Sex, Lies and Justice*, The American Prospect, Winter 2015 ("The new standard of proof, coupled with the media pressure, effectively creates a presumption in favor of the woman complainant. If you find against her, you will see yourself on 60 Minutes or in an OCR investigation where your funding is at risk. If you find for her, no one is likely to complain.").

[9] OCR Docket #15-16-2039; OCR Docket #15-16-2178.

is incapable of giving consent because of incapacitation."[10]  The Title IX Policy provides that no individual involved in the process – including all decisionmakers, "may have a conflict of interest or bias for or against complainants or respondents generally or an individual complainant or respondent. All training materials for staff and decision-makers must "be made publicly available on the University's website." Reports of sexual misconduct may be made by any "means that results in the Title IX Coordinator receiving the verbal or written report."  However, "In order to initiate the grievance process, a complainant must file a formal complaint with the Title IX Coordinator."  Only after a "formal complaint" is received – not when the Title IX Office receives a report – is the accused student provided with notice of the allegations of sexual harassment.  The Title IX Policy notes that "prompt reporting is important to facilitate a thorough investigation" and that  "Delayed reporting or filing of a formal complaint may limit the University's ability to gather relevant evidence, to effectively address the conduct at issue, and to initiate the grievance process."  The Title IX Policy contains certain time requirements for the "reasonably prompt" resolution of allegations.  The Title IX Policy states that "from the date of its receipt of a formal complaint, the investigation, hearing, and issuance of the adjudicating body's report shall be concluded in ninety (90) business days."    The Title IX Policy allows for delays and "the limited extension of timeframes" only for good cause, with written notice to the complainant and the respondent of the delay or extension and the reasons for the action.

UC first conducts an investigation.  During an investigation, the investigator is required to interview "individuals involved, witnesses, and any other persons determined to have relevant knowledge of the circumstances…"  The investigator is supposed to "review… related physical

---

[10]The Title IX Policy defines "Incapacitated or incapacitation" as "A state in which rational decision-making or the ability to consent is rendered impossible because of a person's temporary or permanent physical or mental impairment…"  The Title IX Policy further explains, "Incapacitation is determined based on the totality of the circumstances. Incapacitation is more than intoxication, but intoxication can cause incapacitation."

evidence and/or materials…" however, UC may not access medical or psychiatric records without the consent of a party.  UC will provide all parties with a copy of the investigative report prior to any hearing "for their review and written response."   A live hearing is then conducted to determine responsibility.  The Title IX Policy provides that if a party or a witness "does not submit to cross-examination at the hearing, the panel must not rely on any statement of that party or witness in reaching a determination regarding responsibility.  However, the Hearing Panel members are still permitted to review statements by absent witnesses in the investigative report.  Appeals on certain limited grounds are permitted.  Students found to have engaged in prohibited conduct in violation of the Title IX Policy are subject to a range of sanctions ranging from educational discussions to probation, suspension, or dismissal from the University.

## C.      The Disciplinary Proceedings Against John Noakes

On Friday, September 10, 2021, John Noakes and a female UC student, Jane Roe, engaged in sexual activity after meeting at a fraternity party.  Jane Roe, over the next few days, came to believe that she had been drugged and raped.[11]  She went to the hospital for a SANE examination and contacted a detective from the Cincinnati Police Department (the police declined to pursue criminal charges).  (Complaint ¶54-55, PageID#21.)

On March 30, 2022, the Office of Gender Equity & Inclusion ("OGEI") received an online report from the Assistant Director of Fraternity & Sorority Life.[12]  The report indicated that Jane Roe

---

[11] John Noakes unequivocally denies Jane Roe's allegations.  Specifically, John Noakes unequivocally denies that he violated the UC Code of Student Conduct or the Title IX Policy.  Of course, the underlying "guilt" or "innocence" of John Noakes is not relevant to this Motion.  *Doe v. Brown Univ.*, 210 F. Supp. 3d 310, 312-313 (D.R.I. 2016) (noting that a courts "only role in this case is to determine whether" a school complied with its policies and emphasizing that "It is not the Court's role to determine the facts of what happened between" the students).

[12] The Title IX Policy differentiates between "reports" and "formal complaints."  The Title IX Policy defines a "Formal complaint" as "A document filed by a complainant or signed by the Title IX Coordinator alleging conduct in violation of this Policy against a respondent and requesting that the University investigate the allegation(s) of sexual harassment."  A "Report" of sexual misconduct "is not a formal complaint and does not initiate the grievance process."

had "recounted an incident that happened in September at a party hosted by Sigma Alpha Epsilon fraternity at their chapter house." Jane Roe alleged that she had been drugged and sexually assaulted by John Noakes. On April 6, 2022, the Jane Roe met with OGEI Investigator Morgan Shaw. (Complaint ¶¶ 58-60 PageID#22.)

Two-and-a-half months later, on July 26, 2022, Jane Roe submitted a signed Formal Complaint. (Complaint ¶62 PageID#22.) Over three weeks later, on August 18, 2022, a Notice of Commencement of OGEI Investigation was sent to John Noakes. The notice stated only:

> on September 10, 2021 at approximately 11:49 pm, at 2707 Clifton Ave. (Sigma Alpha Epsilon house) [John Noakes] engaged in vaginal intercourse with [Jane Roe] without [Roe's] consent.

(Complaint ¶64 PageID#23.) The notice did not indicate that Jane Roe alleged a 'forcible' sexual assault or that she was unable to provide consent as a result of being drugged or excessive alcohol use. On August 26, 2022 John Noakes responded to Shaw's Notice. He stated, "I intend to fully cooperate with any investigation." Noakes requested more details of the nature of the allegations being made, a copy of the complaint filed by Jane Roe, and "the date of the initial contact between [Jane Roe] and the Title IX Office." (Complaint ¶¶ 65-66, PageID#23-24.)

Shaw did not provide additional information. On August 30, 2022, John Noakes again requested more information about the allegations and the date of the report.[13] Shaw again did not provide any additional details of Jane Roe's accusations and provided misleading information about the date of the report.[14] On August 31, 2022, John Noakes again requested "more details, including a copy of any statements or complaints submitted." He also specifically requested when Jane Roe "first

---

[13] He specifically requested three pieces of information: (i) a more detailed statement of the conduct that allegedly violates any UC policy; (ii) the date when the complainant first contacted the Title IX Office; and (iii) any accommodations or benefits provided to Jane Roe as a result of her claim to be a victim of sexual misconduct. He added, "This information is vital to my gathering evidence in my defense."

[14] Shaw told Noakes that Jane Roe "submitted a Formal Complaint on July 26, 2022" but did not disclose that the initial report to the Title IX Office had occurred in March.

submitted an incident report or otherwise informed the OGEI about the alleged misconduct." Shaw did not respond to any of the requests in John Noakes' August 31, 2022 email. (Complaint ¶67, PageID#25.) Shaw eventually told John Noakes that he would "have an opportunity to meet with me to give a verbal statement or provide a written statement." John Noakes responded, "We would like to meet with you, but before doing so would like the opportunity to review the statement provided by the complainant." Shaw told John Noakes that he would only be able to view the statement by Jane Roe after the entire investigation is completed. (Complaint ¶¶ 69-71, 74 PageID#26-27.)

On September 20, 2022, Shaw met with John Noakes. John Noakes told Shaw that he believed that the sexual activity with Jane Roe was consensual but declined to provide a more detailed statement until after he was told the exact nature of the allegations against him. John Noakes indicated that he could not prepare a response because he did not know if Jane Roe was claiming that she did not indicate consent to sexual activity, or if she was claiming that her consent was ineffective due to the use of alcohol for drugs. Shaw declined to provide to John Noakes any further information about the nature of the allegations against him. (Complaint ¶78 PageID#30-31.)

Shaw interviewed Roe on August 30, 2022. Jane Roe never told Shaw that she was too intoxicated to consent to sexual activity with John Noakes. She told Shaw, "I was feeling tipsy but no signs of me thinking [to myself that] I need to slow down or stop." Jane Roe later said, "I could tell I'd been drinking. I was tipsy but it wasn't like anything crazy." Jane Roe also indicated that her memory was hazy: "I think the last thing I remember was going back in the house. After that I don't remember anything." She claimed to have "flashes" of memory. Jane Roe told Shaw that she went to the hospital on Sunday to have an examination but did not provide, and Shaw did not request, any medical records. (Complaint ¶68, PageID#26.)

Over the next few months, Shaw emailed John Noakes a number of times, stating that she was "continuing to investigate…" Shaw never provided any information on exactly what investigative

steps she was taking. During this time, Shaw interviewed nine witnesses (about one each week). All of the witnesses were friends of either John Noakes or Jane Roe and none had any first-hand knowledge of their interaction in the bedroom. (Complaint ¶¶ 72-93, PageID#27-36.)

On November 10, 2022 – approximately 153 business days from the first report to OGEI and approximately 76 business days from Jane Roe's 'formal' complaint – Shaw provided John Noakes with a draft report to review. (Complaint ¶95, PageID#36.) John Noakes requested that the Report correct a mischaracterization of his refusal to provide a statement and include information that might affect the credibility of Jane Roe, such as any supportive measures or other benefits that Jane Roe received as a result of her claim that she was a victim of sexual misconduct. John Noakes also requested that the report remove any references to Jane Roe possibly being drugged since there was no evidence to support such a claim and that the Report indicate that if Jane Roe declined to produce her medical records, the finder of fact should infer that the evidence would be unfavorable and unsupportive of her story. Shaw made no changes. (Complaint ¶¶ 96-98, PageID#36-37.)

John Noakes was informed that the matter had been referred for a hearing. The hearing was originally scheduled for January 2023 but was rescheduled for February 20, 2023 – well beyond ninety business days from the initial and formal reports to OGEI. The Hearing Panel consisted of individuals who work for a for-profit consulting firm, TNG Consulting. TNG consulting and its affiliates routinely provide expert opinions and testimony on behalf of schools that investigations were adequate in response to challenges by students found to have engaged in sexual misconduct. John Noakes had objected that TNG Consulting and its affiliates are primarily concerned with upholding

9

the interests of educational institutions and serve as advocates for the specific procedures adopted by UC.  UC denied the objections.[15]  (Complaint ¶¶ 101-104, PageID#39-41.)

Before the hearing, the members of the Hearing Panel were permitted to review Shaw's entire investigative report, including the statements from witnesses who did not appear at the hearing so they could be cross-examined.  At the hearing, Shaw falsely stated that John Noakes "indicated that they were not interested in providing any additional information or a statement…"  and one of the panelists improperly questioned Respondent about his refusal to provide a statement.  Jane Roe was permitted to testify that she had a rape exam done shortly after the alleged incident; she provided selected pictures and a summary of some test results, but no actual medical records or test results from this examination.[16]  John Noakes' Advisor was cut off from asking Jane Roe relevant questions. (Complaint ¶105, PageID#41.)

On March 23, 2023, John Noakes received a letter describing the outcome of the Hearing Panel.  John Noakes was found responsible for violating the UC Title IX Policy.   The Hearing Panel concluded that Jane Roe was too intoxicated to consent to sexual activity because she had consumed "roughly six to seven standard drinks" over the course of the evening.[17]   The Hearing Panel made this finding despite the statement by Jane Roe to Shaw that that while she had "maybe six to seven" drinks during the night,  the cups were small and "half of everything I poured spilled on my dress just from bumping into other people and dancing…"  The Hearing Panel used this evidence to calculate Jane Roe's blood alcohol level based on an online calculator provided by the American Addiction

---

[15] UC allowed an objection to the founder of the firm, presumably because Noakes informed UC that this individual was involved in litigation that called his integrity into question.  UC just substituted another individual from TNG.

[16] Jane Roe said that there were "no results" in the medical records that she "felt needed to be included."

[17] The Hearing Panel rejected the claim that Jane Roe had been drugged.

Centers.[18]  The Hearing Panel calculated that Jane Roe's blood alcohol level was between "0.19% to 0.23%."  The Hearing Panel noted that, according to this website, a person with this level of intoxication could suffer "Loss of consciousness and memory impairment…"  The Hearing Panel stated that it "considered this information in light of testimony provided by [Jane Roe], and as it related to [Jane Roe's] observable motor and cognitive function."  (Complaint ¶¶ 109-111, PageID#45-47; Doc#1-4.)  The Hearing Panel claimed that it did not "rely" on statements by witnesses who did not appear.  However, the Hearing Panel stated that its findings came "after reviewing all available evidence, including interviews, witness statements and evidence provided to the investigator, presented in the investigation report…"  The Hearing Panel also stated that it considered "the witness and party testimony and evidence collected during the investigation" in determining that Jane Roe's "description of her mental and physical condition was ultimately credible."  The Hearing Panel recommended that John Noakes be expelled from UC.  (Complaint ¶¶ 109-111, PageID#45-47; Doc#1-4.)

On March 30, 2023, John Noakes submitted an appeal.  UC appointed an Appeals Panel that, like the hearing panel, consisted of paid consultants.  The paid consultants on the Hearing Panel are affiliated with a law firm that provided training to UC staff and represents colleges and universities in litigation brought by students challenging disciplinary proceedings.[19]  The Appeals Panel acknowledged some procedural or "compliance" flaws in the process but still declined to order a new hearing.  The Appeals Panel rejected most of John Noakes' arguments either outright or as not "material to the outcome," ultimately finding that "there is insufficient evidence to demonstrate that

---

[18] The Hearing Panel did this even after acknowledging that "Calculating an individual's blood alcohol content (BAC) is an imprecise exercise…" and "this information is provided as an educational tool only and is not intended to be used for medical or legal advice."

[19] UC summarily rejected Noakes' objections to the members of the Appeals Panel.

the procedural error affected the outcome of the matter"  (Complaint ¶¶113-118, PageOD#48-54; Doc#1-6.)

This litigation followed.

**ARGUMENT**

**A.     Standard**

In deciding whether to grant a Rule 12(b)(6) motion, this Court is required to accept all well-pleaded factual allegations of the Complaint as true and construe the complaint in the light most favorable to the plaintiffs.  *Reilly v. Vadlamudi*, 680 F.3d 617, 622 (6th Cir. 2012), *quoting Dubay v. Wells*, 506 F.3d 422, 426 (6th Cir. 2007). The  Complaint will survive a motion to dismiss if it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" that is, "that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  *See also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Defendants also assert a Rule 12(b)(1) facial challenge to the Court's jurisdiction over certain claims under the Eleventh Amendment. In reviewing a motion under Rule 12(b)(1), the "court may consider evidence outside the pleadings to resolve factual disputes concerning jurisdiction, and both parties are free to supplement the record by affidavits." *Nichols v. Muskingum Coll.*, 318 F.3d 674, 677 (6th Cir. 2003).

**B.     Eleventh Amendment And Common Law Immunity[20]**

**1.     The Relief Sought In Count II Is Prospective**

Defendants claim that Count II of the Complaint fails to seek prospective relief as required by *Ex Parte Young*. Def. Memo. at PageID#320-322.  Defendants' arguments fail to acknowledge or address the contrary and controlling decisions from the Sixth Circuit and this Court.  *Doe v. Cummins*, 662 Fed. Appx. 437 (6th Cir. 2016);  *Doe v. Univ. of Cincinnati,* S.D.Ohio No. 1:16-c-v987, 2018 U.S. Dist. LEXIS 51833 (Mar. 28, 2018); *Doe v. Wright State Univ.*, S.D.Ohio No. 3:16-cv-469, 2017 U.S. Dist. LEXIS 136225, at *17 (Aug. 24, 2017).

The Eleventh Amendment does not bar suits for injunctive relief against state officials acting in their official capacities so long as the relief sought is "prospective in nature and designed to ensure future compliance with federal law." *Cummins*, 662 Fed. Appx. at 444 *citing Ex Parte Young*, 209 U.S. 123, 155-56, (1908), and *Edelman v. Jordan*, 415 U.S. 651, 666-69 (1974).[21]  Plaintiff's claims in this case are not barred by the Eleventh Amendment because he seeks prospective relief, including an injunction "vacating any disciplinary findings [and] compelling Defendants to remove any negative notation from Plaintiff's disciplinary records."  (Complaint, PageID#64.)

In *Cummins*, the Sixth Circuit held that the Eleventh Amendment did not prohibit injunctive relief requiring UC officials to remove negative disciplinary information from a student's educational records.  In that case, just like in this case, the Sixth Circuit considered claims by two students that the University of Cincinnati's procedures in the adjudication of their sexual-assault cases failed to meet

---

[20] As for the Title IX claim, because UC is an institution that voluntarily participates in federal spending programs, it has waived its Eleventh Amendment immunity for Title IX (Count I) purposes pursuant to 42 U.S.C. § 2000d-7. *Herman v. Ohio Univ.*, S.D.Ohio No. 2:19-cv-201, 2019 U.S. Dist. LEXIS 203106, at *8 (Nov. 22, 2019).

[21] UC cites *Cummins* extensively elsewhere but fails to address this aspect of the decision.

the minimum requirements of due process as required by the Fourteenth Amendment.[22]  The Sixth

Circuit flatly rejected the exact same argument made by Defendants here:

> Because [the students] are seeking prospective equitable relief, their claims are not
> barred by the Eleventh Amendment. [The students] are requesting an injunction
> against the individual defendants in their official capacity "prohibiting the imposition
> of, or reporting of, any disciplinary actions under the UC Code of Student Conduct."
> … If successful, this claim would not require the court to grant any retroactive or
> compensatory remedy. Rather, the individual defendants would merely be compelled
> to remove the negative notation from [the students'] disciplinary records that resulted
> from the allegedly unconstitutional disciplinary process. This is nothing more than
> prospective remedial action.

662 F.App'x at 444.  *See also Carten v. Kent State Univ.*, 282 F.3d 391, 396 (6th Cir. 2002) (stating that a

claim for reinstatement to school is a claim for prospective relief allowed under the Eleventh

Amendment); *Doe v. Purdue University*, 928 F.3d 652, 666 (7th Cir. 2019) (injunction requiring officials

to expunge a finding of guilt from a student's disciplinary record was not precluded by the Eleventh

Amendment); *Shepard v. Irving*, 77 F. App'x 615, 620 (4th Cir. 2003) (action to remove negative notation

on student transcript was "prospective in nature" and not barred by Eleventh Amendment); *Flint v.*

*Dennison*, 488 F.3d 816, 825 (9th Cir. 2007) (expungement of a school disciplinary record is prospective

injunctive relief).

*Cummins* is dispositive of Defendants' prospective relief arguments.[23]  Although an

unpublished decision, since *Cummins* this Court has held that an injunction seeking to prevent the

---

[22] As in *Cummins*, the injunctive relief sought in this case does not require any monetary obligation.  The *Cummins*
court observed that if the injunctive relief does not impose a monetary burden upon the State itself, then the
injunctive relief usually can be considered prospective in nature and is allowable under the Eleventh
Amendment.  662 F.App'x 437 at 444 (describing the monetary issue as "a factor often dispositive when
examining the availability of injunctive relief under the Eleventh Amendment").  This is because injunctive
"relief should not be granted if the relief is tantamount to an award of damages for a past violation of federal
law, even though styled as something else."  *Barton v. Summers*, 293 F.3d 944, 947 (6th Cir. 2002).  *S&M Brands,*
*Inc. v. Cooper*, 527 F.3d 500, 509 (6th Cir.2008), cited by Defendants, is distinguishable on this basis.  Def. Memo
at PageID#320.  *S&M Brands* was a disguised attempt to recover money damages or refunds from a state and
was thus barred by the Eleventh Amendment.

[23] The primary decision cited by Defendants, *Doe v. Ohio State Univ.*, 219 F. Supp. 3d 645 (S.D.Ohio 2016), was
decided a month before *Cummins* and, as a result, is no longer good law to the extent it is contrary to *Cummins*.

imposition of disciplinary sanctions by a school is prospective relief not barred by the Eleventh Amendment. In *Doe v. Univ. of Cincinnati*, for example, a case presenting nearly identical claims for relief, this Court followed *Cummins* on this issue, stating:

> The Sixth Circuit has held that a request that individual defendants sued in their official capacity be enjoined from reporting any disciplinary actions taken by the university would not require the court to grant any retroactive or compensatory remedy.

2018 U.S. Dist. LEXIS 51833, at *4 .[24] In *Doe v. Wright State Univ.*, this Court similarly held, "to the extent [the student] is seeking to prevent [a school] from reporting, through disclosures of his transcript and student record, that he was expelled for disciplinary reasons, such relief is constitutionally permissible" under the Eleventh Amendment. 2017 U.S. Dist. LEXIS 136225, at *17. In addition, by vacating the disciplinary finding, Plaintiff would be reinstated as a student in good standing at UC – relief that this Court has *also* specifically held to be prospective. *See Roe v. Adams-Gaston*, S.D.Ohio No. 2:17-cv-945, 2018 U.S. Dist. LEXIS 185697, at *44 (Apr. 17, 2018) ("[The student] seeks prospective relief to end a continuing violation of federal law: an injunction restoring her as a student and prohibiting further disciplinary proceedings that violate her constitutional rights."); *Schwartz v. Univ. of Cincinnati College of Medicine*, 436 F. Supp. 3d 1030, 1038 (S.D.Ohio 2020) ("Plaintiff's claims against the individual defendants in their official capacities are permissible to the

---

The only post-*Cummins* decision Defendants rely upon is from the Northern District of Ohio, *Doe v. Bowling Green State Univ.*, N.D.Ohio No. 3:22-cv-140, 2022 U.S. Dist. LEXIS 179939 (Sep. 30, 2022). This decision, to the extent it is contrary to *Cummins* and the decisions of this Court, is not persuasive (much less controlling). Shepardizing the case shows the weakness of this decision as authority. Only one case has cited to *Bowling Green* – and not only did that court not even mention the Eleventh Amendment aspect of the *Bowling Green* decision, that court, citing *inter alia Cummins*, reached the exact opposite conclusion on this particular issue. *Hedrick v. W. Michigan Univ.*, W.D.Mich. No. 1:22-cv-308, 2022 U.S. Dist. LEXIS 189225, at *29 (Oct. 17, 2022) (explaining that "declaratory and prospective injunctive relief, including reinstatement… and the expungement of any reference to [a student's] expulsion" was "not barred by the Eleventh Amendment; they are permitted by *Ex Parte Young*.").

[24] This 2018 decision was issued *after* the Sixth Circuit affirmed this Court's grant of a preliminary injunction. In the Sixth Circuit, UC did not even raise any Eleventh Amendment issues. *See* Appellant's Brief, Case: 16-4693 (Doc#14.)

extent Plaintiff seeks reinstatement…"); *Reeves v. Shawnee State Univ.*, S.D.Ohio No. 1:16-CV-00765, 2017 U.S. Dist. LEXIS 29674, at *10 (Mar. 1, 2017) ("the Eleventh Amendment would not prohibit official capacity claims against university officials for injunctive relief requiring a plaintiff's reinstatement…"); *Saqr v. Univ. of Cincinnati*, S.D.Ohio No. 1:18-cv-542, 2020 U.S. Dist. LEXIS 163394, at *20-21 (Sep. 8, 2020) (rejecting Eleventh argument by UC because students sought "prospective relief in the form of an Order reinstating them as students. And that prospective relief is designed to prevent alleged ongoing federal law violations").

## 2. The Individual Defendants Sued In Their Official Capacity Are Proper Defendants

Defendants claim that the Individual Defendants lack the necessary connection to the unconstitutional conduct required by *Ex Parte Young*. Def. Memo. at PageID#322-324. Defendants' argument confuses the standard required for (i) claims seeking monetary relief against state officials in their individual capacity and (ii) claims seeking injunctive relief against state officials in their official capacity. As with Defendants' arguments concerning prospective relief, Defendants fail to acknowledge or address the contrary and controlling decisions from this Court and the Sixth Circuit.

*Ex Parte Young* allows for claims seeking prospective relief against state officials who have "some connection" to the ongoing federal violation. *Durham v. McWhorter*, 789 F. App'x 533, 534 (6th Cir. 2020). The "some connection" standard, when it comes to state officials sued in an official capacity for injunctive relief, is satisfied by showing that the defendant has "responsibility" for the unconstitutional practice so that they can be ordered to provide the requested relief. *Saqr* 2020 U.S. Dist. LEXIS 163394, at *22-23 ("the 'some connection' requirement… is typically stated in terms of 'responsibility'"),[25] *citing Top Flight Entertainment, Ltd. v. Schuette*, 729 F.3d 623, 634 (6th Cir. 2013) (the

---

[25] In *Saqr*, the primary case cited by Defendants, the plaintiffs merely stated that school officials were "agents and decision makers" at UC. The Saqr plaintiffs failed, as is done in the Complaint here, to "include any allegations as to positions that [defendants] hold" that "grants authority to implement the injunctive relief that the [plaintiffs] desire." 2020 U.S. Dist. LEXIS 163394, at *23-24. *Compare Taaffe, infra.*, 2016 U.S. Dist. LEXIS

"some connection" standard is satisfied by naming officials who have "responsibility for" the allegedly unconstitutional actions). *See also Doe v. Dewine*, 910 F.3d 842, 849 (6th Cir. 2018) (finding sufficient connection where the defendants were "actively involved with administering" the challenged laws); *Allied Artists Picture Corp. v. Rhodes*, 679 F.2d 656, 665 fn.5 (6th Cir.1982) (noting that *Ex Parte Young* requires only "that the state officer sued have 'some connection" with the enforcement of the allegedly unconstitutional" policy). *See also ABC v. Blackwell*, 479 F. Supp. 2d 719, 729 (S.D. Ohio 2006) (finding sufficient connection where the defendant controlled the applicable process). In this case, the alleged constitutional violation was the finding of responsibility for violations of the Title IX Policy and the subsequent dismissal of Plaintiff from UC. The Individual Defendants have "some connection" to that alleged violation because, according to the Complaint, they are the officials who have the "responsibility for implementing the various policies and procedures UC has adopted related to student conduct and the enforcement of Title IX." (Complaint ¶¶ 6(c), 7(c), 8(c), 9(c), Page ID#3-4.)

Defendants' focus on what role each individual Defendant played in the unconstitutional process incorrectly applies *Ex Parte Young* by confusing cases seeking injunctive, as opposed to monetary, relief. In a suit for money damages against a state official sued in his or her individual capacity, the plaintiff must allege that the defendant was personally involved in the actions constituting a violation of the plaintiff's constitutional rights; but in a suit for injunctive relief, the focus is on whether the Individual Defendants can provide the relief requested. This Court has explained:

> It is true that in a suit for money damages against a state official sued in his or her individual capacity, the plaintiff must allege that the defendant was personally involved in the actions constituting a violation of the plaintiff's constitutional or statutory rights. But when only prospective injunctive relief is requested, that type of showing is unnecessary. *The proper defendants in such an action are the ones who have the power to provide the relief sought, whether or not they were involved in the allegedly illegal conduct at issue.* Otherwise, plaintiffs in these types of situations would potentially be left without any remedy if

57397, at *19 (finding that the proper defendant in a lawsuit against a state university was the officials with "authority to reinstate the Plaintiffs to their former positions").

the groups of defendants who violated the law and those who could fix the problem if ordered to do so were mutually exclusive.

*Taaffe v. Drake*, S.D.Ohio No. 2:15-CV-2870, 2016 U.S. Dist. LEXIS 57397, at *16 (Apr. 29, 2016) (emphasis supplied, citation omitted). Consistent with this analysis, the Complaint alleges that the Individual Defendants have "the authority to provide all of the injunctive relief sought in this Complaint." (Complaint ¶¶ 6(b), 7(b), 8(b), 9(b), PageID#3-4.) *Cf. Doe v. N. Michigan Univ.*, 393 F. Supp. 3d 683, 693 (W.D.Mich. 2019) ("Plaintiff can pursue a claim against Defendants… in their official capacities that would grant Plaintiff reinstatement"). This Court has provided injunctive relief against similarly situated school officials. In *Doe v. Univ. of Cincinnati*, this Court ordered injunctive against the UC administrators responsible for implementing the school's Title IX policy.[26] 223 F. Supp. 3d at 706. And in *Roe v. Adams-Gaston*, this Court found that officials, including the school's who oversaw the schools Title IX reports and investigations and had "responsibility and authority for the discipline of all students," were proper defendants under *Ex Parte Young*.[27] 2018 U.S. Dist. LEXIS 185697, at *41-42

---

[26] In *Reeves v. Shawnee State Univ.*,, this Court rejected a motion to dismiss against certain school officials. The school, like UC, had argued that the individual defendant were not proper defendants not because of their limited role, but because they lacked the authority to reinstate the plaintiff. This Court denied the Motion to Dismiss, allowing further discovery on the issue. 2017 U.S. Dist. LEXIS 29674, at *10-12. While Plaintiff believes the Motion should just be denied outright, the Court could, instead, like in *Reeves*, deny the Motion without prejudice and permit discovery. Defendants could then raise the matter again at summary judgment (or Plaintiff could file an appropriate Motion to Substitute if discovery reveals that a different official at UC should have been named).

[27] At a minimum, Defendant Lyles, as the Title IX Coordinator for UC, is a proper defendant. Courts have found that the Title IX Coordinator for a school was a proper defendant in a §1983 due process claim. (Complaint ¶8, PageID#3-4 (identifying Lyles as Title IX Coordinator).) *Doe v. Citadel*, D.S.C. No. 2:21-cv-04198-DCN, 2022 U.S. Dist. LEXIS 127707, at *13-16 (July 18, 2022) (injunctive relief, including expungement of a disciplinary record, was property directed at a school's Title IX coordinator); *Pappas v. James Madison Univ.*, W.D.Va. Civil Action No. 5:22-cv-00028, 2023 U.S. Dist. LEXIS 56550, at *54 (Mar. 31, 2023). (Title IX coordinator was appropriate school official because the Title IX Coordinator "has oversight over" the University's Title IX policy).

3.      **State Law Declaratory Judgment Claims**

Plaintiff acknowledges that the Eleventh Amendment, absent a waiver, prohibits this Court from exercising Supplemental jurisdiction over the State Law Declaratory Judgment Claims in Counts III and IV.[28]   Plaintiff asserted these claims out of a belief that judicial economy is served by the resolution of all related claims in a single case.   However, UC appears unwilling to waive sovereign immunity for this limited purpose and wishes instead to have these claims heard in a separate state court proceeding.   Plaintiff will simply agree to the dismissal of Counts III and IV without prejudice and re-file those claims in the Court of Common Pleas.

C.      **Due Process Claims**

Defendants fail to address the holdings of some of the most important student due process decisions from the Sixth Circuit beyond *Doe v. Univ. of Cincinnati*, such as *Endres, Baum*, and *Doe v. Miami Univ.* These decisions should lead the court to deny to Motion.

1.      **Standards**

Defendants do not contest that John Noakes is entitled to due process in the disciplinary proceedings held at UC.   *See Flaim v. Med. College of Ohio*, 418 F.3d 629 (6th Cir. 2005); Univ. of Cincinnati, 872 F.3d at 399.29  In determining whether UC provided constitutionally adequate due process, the competing interests of the governmental institution and the individual must be balanced. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). In *Mathews*, the Supreme Court established the familiar three-part test: "[T]he specific dictates of due process generally require[] consideration of three distinct factors": (1) the nature of the private interest subject to official action; (2) the risk of erroneous

---

[28] The Court does not need to reach the question of whether Counts III and IV are cognizable under the Ohio Declaratory Judgment Act.  Plaintiff notes that Judge Branch found, as a matter of Ohio state law, that such claims were available against UC.  (Doc#3-3.)  Plaintiff requests leave, should UC indicate a future desire to waive Eleventh Amendment immunity, to address Defendants' substantive arguments on these Counts.

[29] Defendants argue that the Complaint "fails to adequately establish that the Individual Defendants had the requisite connection to the due process violations of which he complains."  This is responded to *supra*.

deprivation under the current procedures used, and the value of any additional or substitute procedural safeguards; and (3) the governmental interest." Id.

### 2. Delay

Defendants generally argue that the notice, investigation, and adjudication of this matter was not unduly delayed because the school complied with its policies. Def. Memo. at PageID#331-332. But this fails to engage with the issue. *Cf. Doe v. Univ. of the Sciences*, 961 F.3d 203, 212 (3d Cir. 2020) (rejecting argument that simply because complied with its policy, the student "was treated fairly"). The simple fact remains that UC was aware of the allegations against Plaintiff for over four months before he was provided notice. Applying the *Mathews* balancing test, UC's failure to provide written notice, when the information was in its possession and the burden of providing notice is slight, states a due process violation because (as the Complaint alleges) this delay made it difficult, if not impossible, for John Noakes to defend himself. (Complaint ¶95-96, PageID#36; Complaint ¶ 106, PageID#44.) By the time UC provided notice, Plaintiff had forgotten important details and lost the ability to obtain physical evidence, including surveillance tapes.[30] UC cannot suggest otherwise. Its own Title IX Policy acknowledges the importance of a timely resolution in its Title IX Policy: "Delayed reporting or filing of a formal complaint may limit the University's ability to gather relevant evidence, to effectively address the conduct at issue, and to initiate the grievance process."[31] In other words,

---

[30] UC mischaracterizes the Complaint by suggesting that "the allegations in the Complaint show that [the investigator] continually kept Plaintiff apprised of the investigation" in the fact of continued delays. Def. Memo. at PageID#332. True, the investigator provided occasional *pro forma* emails to Plaintiff stating only that she was "continuing to investigate." But the investigator did not indicate what, if any, investigative steps she had taken, even when asked for additional information by Plaintiff. (Complaint ¶90, PageID#34.)

[31] Even after notice was provided, UC did not move with deliberate speed. UC took another five months to schedule the matter for a hearing – no explanation was ever provided why it took so long to interview the two parties and nine witnesses (which is the only "investigation" actually done since no effort was made to actually obtain other evidence). (*See* Complaint ¶¶68-91, PageID#25-35.) UC is correct that the failure to comply with the 90-day timeline in its policy does not create a due process violation. Def. Memo. at PageID#332. But Defendants fail to acknowledge the Complaint alleges that Plaintiff was prejudiced by the delay – which creates the due process concerns. (Complaint ¶161, PageID#64.)

applying the *Mathews* factors, UC's own policy shows that the burden of UC providing timely notice is outweighed by the benefit that providing timely notice would reduce the likelihood of error.

### 3. Lack of Sufficient Notice

The Supreme Court requires that students be given notice of the charges against them. *Goss v. Lopez*, 419 U.S. 565, 581 (1975). "Notice satisfies due process if the student had sufficient notice of the charges against him and a meaningful opportunity to prepare for the hearing." *Flaim*, 418 F.3d at 638.[32] In this case, UC merely advised John Noakes initially that he had violated the Code of Conduct without describing – *even though known to UC* – the precise conduct. This was insufficient because it failed to characterize the conduct to a sufficient degree to fairly apprise John Noakes of how he violated the Title IX Policy. Specifically, the Notice, by only referring to the Title IX Policy, failed to inform John Noakes whether he was accused of "forcible" sexual assault, or whether he was accused of engaging in sexual activity with a person who was "incapacitated" due to drugs or intoxication.

John Noakes repeatedly asked for more clarification – these requests were refused even though the investigator had this information easily available. UC had no good reason to not provide this information. *Compare Doe v. Franklin Pierce Univ.*, D. N.H. No. 22-cv-00188, 2023 U.S. Dist. LEXIS 45883 (March 17, 2023) (finding no due process violation where "the University corrected most of these errors once [the student] brought them to its attention," including providing additional information "after he requested it"). Nor, applying *Mathews,* can UC claim this have been burdensome, since under the Student Code of Conduct students are entitled to receive more detailed notice informing them not just of the basic conduct allegedly constituting a violation of school rules but also "about the reported circumstances underlying the alleged violation."

---

[32] In *Dixon v. Alabama State Board of Education*, 294 F.2d 150 (5th Cir.), *cert. denied*, 368 U.S. 930 (1961), which the Supreme Court acknowledged as a "landmark decision," the Fifth Circuit stated that to comply with constitutional protections "The notice should contain a statement of the specific charges and grounds which, if proven, would justify expulsion…".

Defendants argue, instead, that "nothing in the law requires notice in disciplinary proceedings" to specify the nature of the alleged misconduct. Def. Memo. at PageID#333. Not so. The Title IX regulations require that notice include "sufficient details known at the time and with sufficient time to prepare a response before any initial interview." 34 C.F.R. 106.45(b)(2). In *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 603 (D.Mass. 2016), a federal court warned that a student should not be "expected to defend himself against [a] vague and open-ended charge." The court observed, "There is little practical difference between a school failing to inform the accused of the charge against him or… having informed him of the formal charge, refusing to provide him with the specific factual conduct alleged to have given rise to the charge." *Id.* And in *Nokes v. Miami Univ, supra*, a decision Defendants completely fail to address, this Court found that a student had a substantial likelihood of success on a due process claim for preliminary injunction purposes where the notice from the school created a "moving target." Like UC, Miami's sexual misconduct policy contemplated at least two different situations – force and incapacity – where a party cannot give consent to sexual activity.[33] This Court rejected a claim that simply referring a student to the policy, "should have placed [the student] on notice that all forms of consent would be at issue, thus giving him an adequate opportunity to prepare for his defense…"

Defendants' focus, instead, on whether a student had adequate time to prepare for a hearing is misplaced because it ignores that the investigation is an essential part of the process – by the time he was provided more details about the nature of his conduct prior to the hearing, John Noakes had already been asked to provide a statement, evidence, and a list of witnesses to the investigator.

---

[33] In *Nokes*, the initial notice provided to the student suggested that the student had committed sexual assault by the use of force or threat of force; at the hearing the theory of the case against the student shifted to intoxication. While this makes the facts of *Nokes* more disturbing than this case, the basic idea behind this Court's opinion, that simply citing a student to a section of a policy is sufficient and failing to mention the alleged victim's "alleged severe intoxication – or any alcohol consumption, for that matter" creates a due process concern, remains applicable.

(Complaint ¶¶ 42-45, PageID#19.)  In *Nokes,* this Court rejected the idea that even if the initial notice was deficient, the inclusion of more specificity prior to the hearing cured the deficiency because by then the report would also have been provided to the decisions-makers.  This Court said, "[the student] received 'notice' of this new theory… only after he had been required to submit a statement, other witness statements, and evidence of his own for inclusion in the hearing packet in response to the initial version of events."  *Id.* at *34.  Similarly, in *Sterrett v. Cowan*, 85 F. Supp. 3d 916, 927 (E.D.Mich. 2015), a student alleged a sufficient due process claim to survive a motion to dismiss when he alleged he did not receive sufficient notice prior to an interview conducted by the school's investigator, even though he later received sufficient notice prior to a hearing.  And, in *Doe v. Univ. of Notre Dame*, N.D.Ind. No. 3:17CV298, 2017 U.S. Dist. LEXIS 69645 (May 8, 2017),[34] a court went further, noting that providing the student with access to the investigative report detailing alleged misconduct still does not constitute adequate notice.  In *Notre Dame, supra*, the court observed that a detailed report including witness statements does "not provide [the student] with a statement of the particular conduct alleged to have been a violation of particular" policies. 2017 U.S. Dist. LEXIS 69645, at *29.[35]

---

[34] The *Notre Dame* decision was vacated as part of the settlement between the parties.  2017 U.S. Dist. LEXIS 217816 (Dec. 27, 2017).  This is of no consequence as the decision is cited not as binding precent but for its persuasive value.

[35] Defendants argue that a "quick read" of the UC policy would have provided sufficient notice,  Def. Memo. at PageID#334.  The *Nokes, Brandeis* and *Notre Dame* courts all rejected this argument.  These courts warned that vague and non-specific charges that merely recount the school code section do not provide sufficient notice.  The *Notre Dame* court said:

> This amounts to no notice at all. It doesn't tell him what he is alleged to have done wrong… Instead, it is merely general language parroting the laundry list of offenses identified [in the policy.]  This so-called "notice of charges" could not be further from revealing particular policy violations implicated, much less specific allegations of [the student's] objectionable conduct.

2017 U.S. Dist. LEXIS 69645, at *28-29.

23

4.    The Use Of Biased Decision-Makers

A disinterested decision maker who has not prejudged the case is a part of the fundamental guarantee against arbitrary and capricious government conduct. Due Process requires that a decisionmaker be neutral. *See Williams v. Pennsylvania*, 571 U.S. 1, 8 (2016) (due process requires "'an absence of actual bias' on the part of a judge."), *quoting In re Murchison*, 349 U.S. 133, 136 (1955).

Defendants first argue that school disciplinary committees are "entitled to a presumption of honesty and integrity." Def. Memo. at PageID#334. But the cases cited by UC involve committees composed of educators, which is not this case. That presumption has never been extended to adjudications performed by for-profit private companies. The decision-makers here were not screened like jurors to minimize bias and they do not have tenure to insulate them from consequences of an unpopular decision – thus many of the safeguards of either the adversary system or academic institutions were lacking, weakening the justification for a presumption of honesty and integrity.

In this case, the Hearing Panel and the Appeals Panel consisted of employees of organizations that provide training, expert advice, and legal representation to educational institutions. The Hearing Panel members were associated with TNG Consulting and ATIXA, which are organizations that routinely provide opinions on behalf of schools that investigations were adequate in response to challenges by students found to have engaged in sexual misconduct. The Appeals Panel members work for an affiliate of Bricker & Eckler, a firm that provides training, legal representation, and expert advice to educational institutions including UC. Notably, Bricker & Eckler represents schools in responding to Title IX claims by students.

Defendants are correct that the simply because the organizations that provide the hearing and appeals panel expressed opinions on issues does not mean that they are biased. Def. Memo. at PageID#335. But Defendants also acknowledge that examples of allegations that may establish a plausible claim of actual bias include " a personal or financial stake in the outcome." Def. Memo. at

24

PageID#335, *citing Doe v. Bowling Green State Univ.*, 2022 U.S. Dist. LEXIS 179939 at *25 (internal quotations omitted).  The Complaint meets this standard:  the hearing and appeals panel members derive significant income from training to UC and other schools in Title IX matters and thus are unwilling to take criticize investigation or take any other any actions to "upset" the Title IX Office or its staff.  (Complaint ¶¶102(c), 123(m), 137(c),  PageID#40, 56, 60.)  Similarly,  the Complaint alleges that the staff and lawyers who work for these firms may have preconceived notions about Title IX issues and are almost certainly concerned with upholding the interests of the educational institutions that pay their bills, not the rights of students.  (Complaint ¶¶102, 137, PageID#39, 59.)  This was a conflict of interest because in this case, the Hearing Panel and the Appeals Panel were required to rule on matters related to the investigation in this case and the actions of the Title IX Office.  These firms derive significant income from training to schools in Title IX matters, and thus the employees of that organization may be unwilling to take any actions to "upset" the Title IX Office or suggest that their own training was inadequate.

This problem was exacerbated by the fact that UC has did not make the trainings undertaken by all decisionmakers available on its website prior to the hearing as required by its policy and 34 C.F.R. 106.45(b)(10)(i).  The Appeals Panel excused this as a minor "compliance error," but the disclosure requirement has a purpose: to allow students to determine if the decision-makers received training that was free of bias.  Courts have observed that trainings can be a significant source of bias in Title IX proceedings.  *See e.g. Doe v. Trs. of the Univ. of Pa.*, 270 F. Supp. 3d 799, 823-24 (E.D. Pa. 2017) (university's training materials for employees who were involved in disciplinary proceedings "encourage[d] the employees to believe the accuser and presume the accused's guilt"); *Doe v. Washington & Lee Univ.*, W.D.Va. No. 6:19-cv-00023, 2021 U.S. Dist. LEXIS 74222 (Apr. 17, 2021) (gender bias could be inferred from a Title IX Coordinator's presentation).  The Department of Education believed that disclosure was an essential part of providing both parties a fair process and a necessary safeguard

to improve the impartiality, reliability, and legitimacy of Title IX proceedings. 83 Fed Reg. 230, 61479-61480 (29 Nov. 2018) (disclosure "would benefit complainants and respondents… by ensuring the existence of records that could be used during an investigation by the Department or in private litigation").

### 5. The Use Of Undisclosed And Unreliable Expert Evidence

The Hearing Panel considered and relied upon undisclosed scientific evidence in the form of information from a website to estimate Jane Roe's blood alcohol level. Defendants respond that this is permissible because schools have no obligation to retain and produce expert witnesses and that there is no due process right to formal discovery in university disciplinary hearings. Def. Memo. at PageID#339. This misses the point of the relevant Sixth Circuit precedents, including *Miami Univ* and *Endres*. These cases establish that a student's due process rights are violated when a decision maker relies on information from an outside source without disclosing this information to the student prior to the hearing. The Sixth Circuit in *Miami Univ.* held that a student states "a cognizable due-process violation" when evidence used by a school's decision makers to adjudicate the claims is not provided to the student. 882 F.3d at 603[36] Similarly, in *Endres* the Sixth Circuit found a due process violation where a school relied on a "statistical analysis" that was not provided to a student prior to a disciplinary hearing. The Court was concerned that "[w]ithout knowing that the [scientific evidence] even existed," the student "could not have responded." 938 F.3d at 301. *See also Purdue Univ.*, 928 F.3d at 663 ("withholding the evidence on which it relied in adjudicating his guilt was itself sufficient to render the process fundamentally unfair").[37]

---

[36] . Even UC's Appeals Panel admits this point: "it was inappropriate for the Panel to use an outside website to calculate blood alcohol content without providing the parties the opportunity to review and provide feedback to the information."

[37] Defendants make no effort to defend the hearing panel's use of unreliable evidence. (Complaint ¶123(j), PageID#55.) This is *also* a due process violation under Sixth Circuit precedents. *Woods v. Willis*, 515 F.App'x 471, 483-484 (6th Cir. 2013) ("the evidence must be at the very least reliable and of proven probative value").

### 6.     Use Of Statements From Witnesses Who Were Not Present

Fundamental fairness includes the ability to confront adverse witnesses when the information supplied by those witnesses is the reason for the adverse action and there is a question of credibility to be resolved by the finder of facts.  In this case, the Hearing Panel ultimately had to decide who was more credible – John Noakes or Jane Roe.  In *University of Cincinnati*, the Sixth Circuit held, "Accused students must have the right to cross-examine adverse witnesses 'in the most serious of cases.'"  872 F.3d at 401.  The Hearing Panel was aware that, consistent with this precedent, it could not rely on witness statements from witnesses who were not present and subject to cross-examination. [38]  The Outcome Letter claims that "the panel did not rely on any statements of these witnesses in reaching a determination regarding responsibility."  However, this conclusory assertion by the Hearing Panel cannot be the end of the matter.  The statements from these witnesses were in the investigative report that the Panel reviewed prior to the hearing.  This report was not redacted and there is a strong likelihood that the effect of the evidence would seriously prejudice John Noakes; the Complaint alleges that the "Hearing Panel would be unable to put aside these statements."[39] (Complaint ¶123(b), PageiD#54.)  The Hearing Panel's letter indicates elsewhere that it did, in fact, rely on these statements in reaching a conclusion.  The Hearing Panel stated that its findings come "after reviewing *all available evidence, including interviews, witness statements* and evidence provided to the investigator, presented in the investigation report…"  (Complaint ¶109(d), PageID#46 (emphasis supplied).)  Elsewhere, the Hearing Panel stated that it considered "the witness and party testimony and evidence collected during

---

[38] In *Univ. of Cincinnati*, the Sixth Circuit held that the hearing panel could consider written statements from the parties.  872 F.3d at 405 ("UC may still open the hearing with a [] report summary that includes the parties' 'out-of-court' statements…").  But, of course, the parties must still be available to answer questions about their statements in order to satisfy due process requirements.

[39] In trials, a curative instruction to a jury to disregard inadmissible evidence is effective only where the evidence is not "so pronounced and persistent that it permeate[d] the entire atmosphere of the trial or so gross as probably to prejudice the defendant." *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997).

the investigation" in determining that Jane Roe's "description of her mental and physical condition was ultimately credible."[40]

### 7. Failure To Obtain Relevant Evidence Undermining Jane Roe's Credibility

The Complaint alleges that the investigator failed to obtain evidence in the school's possession concerning the benefits or accommodations that Jane Roe received as a result of her claim to have been a victim of sexual assault. (Complaint ¶112(f), PageID#47.) Defendants do not address this aspect of the claim although it is, perhaps, one of the clearest due process violations. This evidence would have directly impacted Jane Roe's credibility, as such accommodations would be a reason for her to fabricate or exaggerate her claims.[41] In *Doe v. Ohio State Univ.*, 219 F. Supp. 3d 645 (S.D.Ohio 2016), the school failed to disclose that a student had received academic benefits, such as being able to repeat classes, as a result of her claim to have been a victim of sexual assault. This Court noted that this is "critical evidence" because in a "case where the panel's decision hinged on a credibility decision" evidence of accommodations or benefits might "impeach [an] accuser's credibility." 219 F. Supp. 3d at 663

Defendants do, however, address the claim that UC failed to seek Jane Roe's medical records or other evidence in her possession.[42] Defendants are correct that "Universities are not required to

---

[40] The value of these statements is confirmed by the efforts of the Chair of the Hearing Panel to reopen the hearing to hear from these witnesses. When that was not practicable, the Chair wrote, "The remaining witness testimony will be accepted as provided in the investigation report and the panel will begin deliberations." When John Nokes objected that this was not permissible, the Chair lied and suggested that he was only intending to give John Noakes the "choice" to allow these statements to be considered.

[41] The Appeal decision simply asserted that since such accommodations are required to be provided by federal law, they are irrelevant. Doc#1-6, PageID#160.) This makes no sense. But for her claim that she was a victim of sexual misconduct, Jane Roe would not have received the accommodations. The trier of fact should have been free to assess the impact of these measures on Jane Roe's credibility in the context of other factors, such as the delay in reporting.

[42] Defendants note that the Title IX regulations prohibits UC from accessing Jane Roe's medical records. This is not correct. The Regulations prohibit UC from *requiring* a student to provide records; the regulations do not prevent the school from *asking* for them. The fact that Jane Roe explained why she did not provide the records does not help Defendants, as only three possibilities seem likely to satisfy due process: (i) Jane Roe should have been required to produce the records; ((ii) Jane Roe should have been prohibited from testifying about them,

28

seek out or even disclose every possible piece of evidence…" Def. Memo. at PageID#339. OK…, but that is not the due process problem alleged in the Complaint. The Complaint alleges the due process problems arose when the Hearing Panel permitted Jane Roe to falsely testify about the results of her sexual assault exam and present selected photographs.[43] (Complaint ¶104(f), PageID#42-43.) This was the problem this Court identified in *Doe v. Ohio State*, where the alleged victim was permitted to provide false testimony to the hearing panel. This Court said:

> The Court has rules to apply in adversary proceedings. But here, without discovery or mandatory disclosures, Doe is left to rely on the beneficence of the university administrators… In this case, Doe alleges that he had no way to know about critical evidence that would impeach his accuser's credibility, and this was a case where the panel's decision hinged on a credibility decision.

219 F. Supp. 3d at 662-663. Other courts agree. In *Doe v. Purdue Univ.*, , the Seventh Circuit found a due process violation where there was a failure to "probe whether… evidence was reason to disbelieve" the accuser, even though the decision-maker "may have concluded in the end that [the student's] impeachment evidence did not undercut [the accuser's] credibility." 928 F.3d at 664. And in *Doe v. Syracuse Univ.*, N.D.N.Y. No. 5:19-cv-1467, 2020 U.S. Dist. LEXIS 85708 (May 15, 2020), a student had alleged that "the University and the University's investigators failed to obtain available exculpatory evidence." The court concluded that "Such allegations cast an articulable doubt on the outcome of the disciplinary proceeding…" 2020 U.S. Dist. LEXIS 85708, at *27.

### 8. Cumulative Error

T̲he core of this Court's university disciplinary hearing jurisprudence is the idea that a school's entire process must be fundamentally fair. *Flaim*, 418 F.3d at 635 fn.1 ("a public university student

---

or (iii) the hearing panel should have drawn an adverse inference from the failure to produce these records. *Compare* Def. Memo. at PageID#340.

[43] The Sixth Circuit has indicated that where relevant information is in the possession of one party and not produced, an adverse inference may be drawn that the information would be harmful to the party which failed to produce it. *Clay v. United Parcel Service, Inc.*, 501 F.3d 695, 712 (6th Cir. 2007), *quoting McMahan & Co. v. Po Folks, Inc.*, 206 F.3d 627, 632-33 (6th Cir. 2000).

who is facing serious charges of misconduct that expose him to substantial sanctions should receive a fundamentally fair hearing"); *Univ. of Cincinnati*, 872 F.3d at 396 ("The Due Process Clause guarantees fundamental fairness to state university students facing long-term exclusion from the educational process."). Here, there is evidence the process was unfair from the start because John Noakes was treated like a suspect and the investigator refused to seek evidence that might undermine the credibility of Jane Roe.

## D.      The Title IX Erroneous Outcome Claim

Defendants fail to address the holdings of some of the most important Title IX decisions from the Sixth Circuit, such as *Baum*, *Miami Univ.*, and *Doe v. Oberlin College*, 963 F.3d 580 (6th Cir. 2020). These decisions should lead the court to deny to Motion.

### 1.      Standard

To present a Title IX claim under the erroneous outcome theory, a plaintiff must allege facts sufficient to (1) cast some articulable doubt on the accuracy of the disciplinary proceeding's outcome, and (2) demonstrate a particularized causal connection between the flawed outcome and gender bias. *Baum*, 903 F.3d at 585; *Miami Univ.*, 882 F.3d at 592; *Oberlin College*, 963 F.3d at 586.

### 2.      Articulable Doubt

A plaintiff's burden to show articulable doubt is minimal – he only needs to cast doubt on the outcome, not prove actual innocence.  *Doe v. Marymount Univ.*, 297 F. Supp. 3d 573, 584 (E.D.Va.2018) ("The first element of an erroneous outcome claim – casting articulable doubt on the accuracy of the outcome – is not a significant barrier for [a plaintiff] to cross.").  Plaintiff not only claimed he was innocent, but he additionally identified several potential flaws in the process which called the outcome into question.  This aspect of the Complaint is challenged only in a cursory manner in a footnote.  Def. Memo. at PageID#326.

### 3.      Evidence Of Gender Bias

Defendants argue that Plaintiff must show a particularized link between the "hearing outcome and gender bias."  Def. Memo. at PageID#326-27, *quoting Cummins*, 662 F.App'x at 452.  But the unpublished *Cummins* decision no longer accurately states the law.  The Sixth Circuit clarified this standard in *Oberlin College*.  In doing so, the Sixth Circuit rejected the exact same argument now put forward by Defendants:

> [the school] argues that, to show a "particularized causal connection" between the flawed outcome and sex bias, [a plaintiff] must identify some bias unique to his own proceeding. But that argument misreads our precedents. We have never held that, to be "particularized" in this sense, the effects of the causal bias must be limited to the plaintiff's own case… What [a student] must show here, rather, is simply that he alleged facts supporting an inference of sex bias in his particular proceeding.

963 F.3d at 586.  A review of the Sixth Circuit's primary erroneous outcome decisions since *Cummins* – again, none of which are cited by Defendants – illustrate that the Complaint falls squarely within controlling precedents.  In *Oberlin, Baum,* and *Miami*, the Sixth Circuit identified three categories of evidence that can support an inference of gender bias in a valid Title IX erroneous outcome claim: (i) procedural irregularities; (ii) pressure from the Department of Education and other internal and external sources; and (iii) the merits of the decision itself.  All three are present in the Complaint.

### a.      Procedural Irregularities

In *Oberlin,* the Sixth Circuit held that "' clear procedural irregularities' in [a school's] response to the 'allegations of sexual misconduct… will permit a plausible inference of sex discrimination.'" 963 F.3d at 586, *quoting Menaker v. Hofstra Univ.*, 935 F.3d 20, 33 (2d Cir. 2019).  In *Oberlin*, as in this case, the school unreasonably delayed the adjudication of the claims against the student and failed to complete the matter within the time frames identified in the policy.  (Complaint ¶157-160, PageID#63.)

This case is even stronger than *Oberlin* because Plaintiff, here, has identified a significant number of additional procedural flaws.  These include, as described *supra:* lack of sufficient notice; the

use of biased decision makers; the failure of UC to disclose the trainings attended by decision makers; allowing Jane Roe to describe her medical condition without providing medical records; delays; the reliance of undisclosed scientific evidence; the failure of the investigator to disclose important evidence that would impact Jane Roe's credibility; and the provision of hearsay statements to the decision makers without providing Plaintiff an opportunity to confront adverse witnesses.  (Complaint ¶123, PageID#54-55.)  *Cf  Doe v. Univ. of Denver*, 1 F.4th 822, 832, n.8 (10th Cir. 2021) (*citing Oberlin* for proposition that "'disturbing procedural irregularities' can certainly lower the threshold for how much additional evidence of sex bias is needed to make a case worthy of a jury's time and consideration").[44]

### b.    Pressure From the Department of Education And Others

The historical and regulatory backdrop described in the Complaint is necessary to properly evaluate the conduct of UC.  The Complaint alleges that "UC has been the subject of a number of investigations by the Department of Education for the manner in which it investigates and adjudicates allegations of sexual assault and harassment." (Complaint ¶26, PageID#13.)  The Sixth Circuit has been clear that pressure from the Department of Education and other sources may support an inference of gender bias.  In *Miami Univ.*, the Sixth Circuit credited claims that "pressure from the government to combat vigorously sexual assault on college campuses and the severe potential punishment – loss of all federal funds – if it failed to comply, led [the school] to discriminate against men in its sexual-assault adjudication process." 882 F.3d at 594. The Sixth Circuit later explained that pressure from Department of Education "provides a backdrop, that, when combined with other circumstantial evidence of bias in [a student's] specific proceeding" supports a plausible claim of

---

[44] In *Univ. of Denver*, the Tenth Circuit also held that deficiencies in an investigation permitted an inference of gender bias.  The court cited, among other problems, the failure of an investigative report to discuss any of the alleged victim's "potential motives for making a false report."  1 F.4th at 833.

gender discrimination. *Baum*, 903 F.3d 586. And in *Oberlin*, like in this case, the Sixth Circuit found that an allegation of gender bias "finds support from [an] allegation that—throughout the pendency of his disciplinary proceeding—the federal Department of Education's Office of Civil Rights" was investigating the school's compliance with Title IX. 963 F.3d at 587.[45]

  **c.**  **The Merits Of The Decision**

  In *Oberlin*, the Sixth Circuit held that "when the degree of doubt" in a school decision "passes from 'articulable' to grave, the merits of the decision itself, as a matter of common sense, can support an inference of sex bias." 963 F.3d 580 at 587-588, *citing* Purdue Univ., 928 F.3d at 669. In *Oberlin*, like in this case, the court considered a claim that a female student could not consent because she was under the influence of drugs or alcohol. The *Oberlin* court expressed concern that the record provided no apparent basis for a finding that the alleged victim lacked conscious knowledge of the sexual activity or that the accused student perceived the alleged victim to be incapacitated. Similarly, in this case, the Complaint alleges that Jane Roe never told the investigator that she did not consent to sexual activity with Plaintiff or that "she was too intoxicated to consent to sexual activity," merely that her memory was "hazy." (Complaint ¶68, PageID#25-26.)[46]

---

[45] In *Purdue*, the Seventh Circuit, in an opinion by Judge, now Justice, Barrett, acknowledged that Title IX claims by students facing discipline for sexual misconduct arise "against the backdrop" of the DCL. The court acknowledged that "a school's federal funding was at risk if it could not show that it was vigorously investigating and punishing sexual misconduct." The court concluded that the pressure from the Department of Education is relevant because it gives accused students "a story about why [a school] might have been motivated to discriminate against males accused of sexual assault." 928 F.3d at 668-669.

[46] Defendants suggest that they are merely pro-victim, not biased on the basis of gender. Def. Memo. at PageID328. Two courts of appeals have rejected this argument as a reason to dismiss a Title IX claim. In *Schwake*, the Ninth Circuit explained that "Sex discrimination need not be the only plausible explanation or even the most plausible explanation for a Title IX claim to proceed." 967 F.3d at 948. In *Univ. of Minnesota*, the Eighth Circuit reversed a district court's conclusion that a school's bias in favor of the victims of sexual assault precludes a reasonable inference of bias against male students. 999 F.3d at 579. These decisions have clarified that, in assessing the possible existence of gender bias, courts should consider that internal or external pressure may promote stereotypes and, as a result, contain sufficient indicia of specific intent to permit an inference of gender bias – even when the school's conduct could *also* be described as pro-victim.

**CONCLUSION**

The Motion should be denied on Counts I and II. If UC declines to waive Eleventh Amendment Immunity, Counts II and IV may be dismissed without prejudice.

Respectfully submitted,

_____/s/ Joshua A. Engel_____
Joshua Adam Engel (0075769)
Scott O'Reilly (0075717)
Anne Tamashasky (OH 0064393)
ENGEL AND MARTIN, LLC
4660 Duke Dr., Suite 101
Mason, OH 45040
(513) 445-9600
engel@engelandmartin.com

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been electronically served via the Court's electronic filing system this July 24, 2023 upon all counsel of record.

/s/ Joshua Engel
Joshua Engel