IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| JOHN NOAKES, | : | Case No. 1:23-cv-00284 |
| Plaintiff, | : | Judge Michael R. Barrett |
| v. | : | |
| THE UNIVERSITY OF CINCINNATI, *et al.*, | : | |
| Defendants. | : | |

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR RECONSIDERATION OF ORDER DENYING PRELIMINARY INJUNCTION

Hoping for a "gotcha" moment, counsel for Plaintiff John Noakes ("Noakes") issued discovery requests to the University of Cincinnati ("UC") while serving as counsel for the plaintiffs in a separate federal case, *Roe, et al. v. Univ. of Cincinnati*, No. 1:22-cv-00376-JPH-KLL (SDOH) ("*Roe*"), in late 2024. The requests sought admissions from UC regarding its "practices" and "policies" for providing the Formal Complaint to respondents during Title IX investigations—a topic previously addressed in this case during depositions of two UC employees that occurred in August 2023. Though the responses submitted by UC in *Roe* are entirely consistent with the deposition testimony provided by UC's employees in this case, Noakes presses on with the ploy. He now files a motion asking the Court to reconsider its decision on his motion for preliminary injunction, claiming that the deposition testimony is contradicted by the discovery responses in *Roe*, that UC's deponents made material misrepresentations, and that a "manifest injustice" has occurred as a result.

The motion has no merit. Despite Noakes's strained arguments to the contrary, UC's deponents made no misrepresentations—much less material ones—and their testimony does not contradict the discovery responses in *Roe*. But even if the testimony Noakes complains of

somehow was inaccurate—and it is not—Noakes fails to show how any such inaccuracy is material to the outcome of this Court's and the Sixth Circuit's decisions to deny his request for a preliminary injunction. Indeed, regardless of what policy or practice UC maintained with respect to providing the Formal Complaint to respondents, it is uncontroverted that Noakes actually received the Formal Complaint in November 2022, when he received the Preliminary Investigative Report. And as the Sixth Circuit concluded, Noakes's receipt of that Preliminary Investigative Report unquestionably provided sufficient notice of the allegations against him. Accordingly, the testimony that Noakes believes is allegedly inaccurate has no bearing on, or relevance to, the issue of whether he received due process, and so he cannot possibly establish that the testimony was material or resulted in a manifest injustice—even if inaccurate. For these reasons, and those stated more fully below, the motion should be denied.[1]

## BACKGROUND

**A. The Responses to Requests for Admissions in *Roe*.**

Counsel for Noakes in this case also serves as counsel for the *Roe* plaintiffs. On January 15, 2025, UC submitted answers to Requests for Admissions served by the *Roe* plaintiffs and provided the following responses, in pertinent part:

> REQUEST NO. 2: UC has a policy of not providing copies of Formal Complaints of sexual misconduct to respondents during an investigation.
>
> RESPONSE: . . . . Subject to its general and specific objections, and subject to the protective order, UC denies that, at all times relevant to this matter, it had a

---

[1] UC has not, as Noakes claims, "essentially admitted that the investigator's and the 30(b)(6) witness's testimony about this issue was false." (Doc. 53 at 3, PageID#1916). And Noakes's suggestion that other 30(b)(6) witnesses designated by UC have been accused of "lying to protect the interests of UC" in other cases is as specious as it is irrelevant. (*Id.*, n. 1).

2

policy of not providing copies of Formal Complaints of sexual misconduct to respondents during an investigation.[2]

REQUEST NO. 3: UC has a practice of not providing copies of Formal Complaints of sexual misconduct to respondents during an investigation.

RESPONSE: . . . . Subject to its general and specific objections, and subject to the protective order, UC denies that, at all times relevant to this matter, it had a practice of not providing copies of Formal Complaints of sexual misconduct to respondents during an investigation.

REQUEST NO. 4: As a rule of practice UC does not provide copies of Formal Complaints of sexual misconduct to respondents during an investigation.

RESPONSE: . . . . Subject to its general and specific objections, and subject to the protective order, UC denies that, at all times relevant to this matter, it had a rule of practice to not provide copies of Formal Complaints of sexual misconduct to respondents during an investigation.

REQUEST NO. 5: A formal complaint of sexual misconduct is an internal document that UC uses to make an assessment and then to craft the notice letter and, as a matter of policy and practice, is not provided to respondents.

RESPONSE: . . . . Subject to its general and specific objections, and subject to the protective order, UC denies this Request. UC states Formal Complaints are confidential educational records under the Family Educational Rights and Privacy Act ("FERPA") that form the basis for the Office of Equal Opportunity, formerly known as the Office of Gender Equity and Inclusion ("OGEI"), to initiate the formal grievance process and that, at all times relevant to this matter as a matter of policy and practice, such Formal Complaints were provided to respondents.

REQUEST NO. 6: UC treats Formal Complaint documents as confidential and copies of formal complaints are not provided to respondents as a rule of practice.

RESPONSE: . . . . Subject to its general and specific objections, and subject to the protective order, UC admits that Formal Complaints are confidential educational records under FERPA, but denies that, at all times relevant to this

---

[2] In conjunction with these answers, UC also objected to the *Roe* plaintiffs' requests because, among other things, plaintiffs failed to define what they mean by terms such as "formal complaints," "policy," "practice," "rule of practice," "matter of policy and practice," and "official position," failed to state the relevant time period, and sought information that was not relevant, not designed to lead to the discovery of admissible evidence, and not proportional to the needs of the case. (Doc. 53-1).

3

matter, it had a rule of practice to not provide respondents with copies of Formal Complaints. UC denies any remaining matters contained in this Request.

      REQUEST NO. 7: The official position of the University of Cincinnati is that if a Respondent receives a copy of a Formal Complaint prior to the completion of the investigation they would be less likely to come in to interview and/or not be as open in an interview in sharing information.

      RESPONSE: . . . . Subject to its general and specific objections, and subject to the protective order, UC denies this Request.

      REQUEST NO. 8: The official position of the University of Cincinnati is that providing a copy of a Formal Complaint to the Respondent prior to the completion of the investigation makes it more likely that the Respondent may then only tailor the response based off of whatever is written in that particular document and not share the totality of what he may have seen, heard, witnessed, or experienced.

      RESPONSE: Subject to its general and specific objections, and subject to the protective order, UC denies this Request.

(Doc. 53-1 at 4-7, PageID#1929-32).

### B. The Deposition Testimony in *Noakes*.

Approximately eighteen months before serving the above-outlined discovery requests in *Roe*, counsel for *Roe* deposed two UC employees in connection with Noakes's motion for a preliminary injunction.

First, on August 18, 2023, counsel took the deposition of Dr. Bleuzette Marshall, UC's Rule 30(b)(6) witness and Vice President for Equity, Inclusion, and Community Impact. Dr. Marshall testified regarding UC's practice of not providing the Formal Complaint to respondents prior to Noakes's interview with the university investigator:

      Q: Why did the University not provide him with more details prior to his meeting with Morgan Shaw?

      A: As a rule of practice when a report is made and a Formal Complaint is received the Investigator is to really pull out the essential necessary information to be able to share that with the Respondent so that the Respondent is aware that there is a report and aware of the allegations. The Respondent then has the opportunity

to come in and to share information of what in this case he knows, what he heard, what he saw, what he experienced. Providing additional detail or additional information, I shall say, is not a—a rule of practice for several reasons.

> Q: And those reasons are?
>
> A: Well, one, when there is a Formal Complaint that is a document that is designed for the Complainant. As the Complainant is sharing information the intended audience is not that of the Respondent. Based off of our Formal Complaint form that is an internal document that we use to make an assessment and then craft whatever the Notice letter will be. Other information is that, one, it hasn't been investigated. Two, it limits or it could limit the Respondent from just sharing information and a response may be tailored just to fit whatever has been written. Three, other individuals could be written in the Formal Complaint and that information technically would be confidential. And then I will just stop with 4 that that could potentially lead to retaliation or retaliatory behavior. We treat our Formal Complaint documents as confidential.

(Marshall Depo., Doc. 30, 38:6-25, 39:1-14, PageID#989).

Dr. Marshall then acknowledged twice during her deposition that UC did eventually provide Noakes with the Formal Complaint:

> Q: Now, eventually this Formal Complaint was given to John Doe; wasn't it—or John Noakes, wasn't it?
>
> A: Yes, it was.
>
> Q: Okay. So any confidentiality was then eliminated when you provided it to him, right?
>
> A: And that was at the end of the process.
>
> \* \* \* \*
>
> Q: And, in fact, it is eventually shared with the Respondent; right?
>
> A: Again, yes, it is shared at the conclusion of that process.

(*Id*. 39:15-22, 44:4-7, PageID#989-990).

Five days later, on August 23, 2023, Investigator Morgan Shaw, who conducted the investigation of the Formal Complaint involving Noakes, testified about UC's practice of not

providing the Formal Complaint to respondents prior to the issuance of the Preliminary Investigative Report:

> Q: Well, when you made the decision to not give him the Formal Complaint prior to November of 2022 were you making that decision based on some policy at the University of Cincinnati?
>
> A: No. It's similar to witness and witness statements and us allowing witnesses to review their statements prior to it going in the Investigative Report. It wasn't a decision based on policy. It was a decision based off of general practices of our office and that's not something that we do during our investigations.

(Morgan Depo., Doc. 31, 63:15-25, PageID#1192).

## ARGUMENT

Noakes argues that UC's answers to the requests for admissions in *Roe*—in which UC denies maintaining a policy or practice of not providing a copy of the Formal Complaint *during an investigation*—are inconsistent with Dr. Marshall's and Investigator Shaw's deposition testimony. Based on this alleged inconsistency, Noakes asserts that Dr. Marshall and Investigator Shaw provided materially false testimony that warrants reconsideration of this Court's decision on Noakes's motion for preliminary injunction. Noakes is wrong on all accounts.

First, Dr. Marshall and Shaw never testified that it was UC's practice not to provide a copy of the Formal Complaint to respondents *during an investigation*. Instead, Dr. Marshall testified that it was UC's practice not to provide a copy of the Formal Complaint to respondents *prior to the respondent's initial meeting with the investigator*. And Shaw testified that it was UC's practice not to provide a copy of the Formal Complaint to respondents *prior to the issuance of the Preliminary Investigative Report*. Neither statement is inconsistent with UC's answers in *Roe* because neither suggests what UC denied in *Roe*—that UC's policy is not to provide the Formal Complaint *during an investigation*. Indeed, Noakes himself was provided with the Formal Complaint during the investigation when he received the Preliminary Investigative Report. And

contrary to Noakes's contention, UC's Title IX Policy and the record evidence make it crystal clear that it is the Final Investigative Report—not the Preliminary Investigative Report—that concludes the investigation. In this regard, Dr. Marshall's and Shaw's testimony was completely accurate and faithful to UC's Title IX Policy and the procedures followed in this case.

Second, even if Noakes could show that Dr. Marshall and Shaw provided inaccurate testimony—and he cannot—Noakes wholly fails to establish that the testimony is material in any way to this Court's and the Sixth Circuit's decision on the preliminary injunction. Both courts concluded that Noakes failed to show that he is likely to succeed on the merits of his due process claim because the record demonstrates that he received adequate notice of the allegations against him. The Sixth Circuit even expressly concluded that the Preliminary Investigative Report—which contained the Formal Complaint—certainly provided Noakes with sufficient notice. Any testimony regarding UC's general practices simply is immaterial to whether Noakes received sufficient process. Accordingly, Noakes cannot demonstrate that a manifest injustice occurred such that reconsideration of this Court's preliminary injunction decision is warranted—even if the testimony was inaccurate.

### I.  Legal Standard.

Motions for reconsideration "are looked at with disfavor and are granted sparingly, typically only when the prior decision appears clearly to be legally or factually erroneous." *Wade v. Franklin Cnty.*, No. 2:21-cv-305, 2024 WL 3163814, at *1 (S.D. Ohio June 25, 2024). Such motions are warranted only under three circumstances: (1) an intervening change in controlling law; (2) the availability of new evidence; and (3) the need to correct clear error to prevent manifest injustice. *Id*. Manifest injustice exists if "there is a fundamental flaw in the court's decision that, without correction, would lead to a result that is both inequitable and contrary to applicable

policy." *Id*. at *2. This is a "high standard" that may be reached only if the court's decision was "based on a clear error of law, such as wholesale disregard, misapplication of, or failure to recognize controlling precedent." *Id*.

**II.     The Deposition Testimony was Accurate and Consistent with UC's Responses in *Roe*.**

Most fundamentally, Noakes's motion must be denied because it fails to establish that Dr. Marshall and Shaw provided false testimony. To begin, there is nothing inconsistent between Dr. Marshall's and Shaw's deposition testimony and the answers provided in UC's discovery responses in *Roe*. In the *Roe* discovery responses, UC denied that, at all times relevant to the *Roe* matter:

- it had a policy of not providing copies of Formal Complaints of sexual misconduct to respondents *during an investigation*; (Response to Request No. 2)

- it had a practice of not providing copies of Formal Complaints of sexual misconduct to respondents *during an investigation*; (Response to Request No. 3)

- it had a rule of practice to not provide copies of Formal Complaints of sexual misconduct to respondents *during an investigation*; (Response to Request No. 4)

- a formal complaint of sexual misconduct, as a matter of policy and practice, is not provided to respondents; (Response to Request No. 5)

- it had a rule of practice to not provide respondents with copies of Formal Complaints; (Response to Request No. 6)

- its official position is that if a Respondent receives a copy of a Formal Complaint *prior to the completion of the investigation* they would be less likely to come in to interview and/or not be as open in an interview in sharing information; (Response to Request No. 7)

- its official position is that providing a copy of a Formal Complaint to the Respondent *prior to the completion of the investigation* makes it more likely that the Respondent may then only tailor the response based off of whatever is written in that particular document and not share the totality of what he may have seen, heard, witnessed, or experienced; (Response to Request No. 8).

8

(Doc. 53-1 at 4-7, PageID#1929-32) (emphasis added). And in response to Request No. 5, UC also stated that "at all times relevant to this matter as a matter of policy and practice, such Formal Complaints *were* provided to respondents." (*Id*. at 5, PageID#1930) (emphasis added).

During deposition testimony, Dr. Marshall and Shaw testified consistent with these responses. The witnesses stated that, at the time of the investigation in this matter, UC maintained a rule of practice of not providing the respondent with the Formal Complaint (a) prior to the respondent's initial interview with the investigator (Dr. Marshall's testimony), and (b) prior to the issuance of the Preliminary Investigative Report (Investigator Shaw's testimony).[3] Neither witness ever testified that UC maintained a policy, practice, or rule of practice of not sharing the Formal Complaint with the respondent *during the investigation*—the language explicitly used by the *Roe* plaintiffs to frame their requests for admissions.[4]

Start with Dr. Marshall's testimony. Dr. Marshall never was asked during the deposition—and thus never gave an answer regarding—whether UC had a practice of not providing the Formal Complaint to the respondent *during the investigation*. Rather, Dr. Marshall was asked: "Why did the University not provide [Noakes] with more details *prior to his meeting with Morgan Shaw*?" In her response to this question, Dr. Marshall stated that "[a]s a rule of practice when a report is made and a Formal Complaint is received the Investigator is really to pull out the essential necessary information to be able to share that with the Respondent so that the Respondent is aware

---

[3] As discussed further below, and contrary to Noakes's suggestion, UC's Title IX Policy is clear that the Preliminary Investigative Report *is* issued during the investigation; it does not conclude the investigation.

[4] In footnote 4 of his motion for reconsideration, Noakes disingenuously remarks that "UC often uses the term, 'during an investigation,'" implying that UC chose to use that term in an effort to "pars[e] … too finely" the testimony of its deponents. (Doc. 53 at PageID#1918). But UC did not choose that language. Rather, the *Roe* plaintiffs chose that language in framing their discovery requests, and UC merely answered the questions that it was asked.

9

that there is a report and aware of the allegations." (Marshall Depo., Doc. 30, 38:6-20, PageID#989). Dr. Marshall then explained the reasons for this rule of practice. (*Id.* 38:21-25, 39:1-14). Nowhere, however, did Dr. Marshall ever say that UC had a rule of practice of not providing the Formal Complaint *during the investigation* at all.

Shaw's testimony is entirely consistent with Dr. Marshall's testimony and UC's answers to the *Roe* requests. The question posed to Shaw was: "Well, when you made the decision to not give him the Formal Complaint prior to November of 2022 were you making that decision based on some policy at the University of Cincinnati?" The date used by counsel for Noakes in this question—November 2022—is the date that the Preliminary Investigative Report was issued (which included the Formal Complaint). And Shaw answered: "It's similar to witness and witness statements and us allowing witnesses to review their statements prior to it going in the Investigative Report. It wasn't a decision based on policy. It was a decision based off of general practices of our office and that's not something that we do during our investigations." (Morgan Depo., Doc. 31, 63:15-25, PageID#1192). Like Dr. Marshall, Shaw never testified that UC's practice was not to disclose the Formal Complaint *during the investigation* at all.

In fact, both Shaw and Dr. Marshall specifically acknowledged in their depositions that the Formal Complaint *is* shared *during the investigation* because it is disclosed in the Preliminary Investigative Report. Shaw stated that the Formal Complaint is treated like witness statements— it is not disclosed until the Preliminary Investigative Report is disclosed. (*Id.*). And Dr. Marshall testified similarly. (Marshall Depo., Doc. 30, 45:12-21, PageID#991) ("we take that information, put it into a Preliminary Investigation Report so that both parties are able to review that information and provide commentary on it or additional evidence, and then after that then we create a Final Investigation Report …").

Noakes recognizes that his allegations of false testimony fail if the Preliminary Investigative Report is considered to be part of the investigation (rather than the conclusion of the investigation), so he resorts to misrepresenting UC's "Policy" on that topic. In footnote 4, Noakes claims that "UC's Policy is clear that the 'Preliminary Investigative Report' is *not* part of the investigation process but is compiled [] *after* the investigation is done." (Doc. 53 at 5 n.4, PageID#1918). In support of this erroneous assertion, he quotes the following passage from the Notice sent to Noakes by email on August 18, 2022: "At the conclusion of the investigation, the Investigator will prepare a written Preliminary Investigative Report …" (Notice, Doc. 30-3, PageID#1064-65). But the Notice *is not* UC's Title IX Policy. And Noakes purposefully fails to quote additional language in the Notice that contradicts any notion that the Preliminary Investigative Report constitutes the actual conclusion of the investigation:

> The PIR and all evidence directly related to the allegations will be provided to the Complainant, the Respondent, and the Parties' advisors to allow for equal opportunity to inspect and review the report and evidence. The Parties will have at least ten (10) business days to submit a written response to the Investigator, *which the Investigator will consider prior to completion of the Final Investigative Report*.

(*Id.*) (emphasis added). This passage provides additional context and makes clear that the investigation *is not* complete until the investigator considers the parties' responses to the Preliminary Investigative Report and issues the (aptly named) Final Investigative Report.

Indeed, the Notice is consistent with UC's actual Title IX Policy, which Noakes completely fails to address in his motion. The Title IX Policy states as follows:

> Prior to the completion of the investigative report, the University shall send to each party and the party's advisor, if any, the evidence subject to inspection and review in an electronic format or hard copy, and the parties will have at least ten (10) business days to submit a written response, which the investigator will consider prior to completion of the investigative report.

(Doc. 1-3 at 18, PageID#120). Like the Notice, this provision makes clear that the investigation is not concluded until the parties have had a chance to review the evidence (provided in the Preliminary Investigative Report) and to submit a response to the investigator. That response must be considered by the investigator before the Final Investigative Report is issued.[5]

In aid of his argument that the Preliminary Investigative Report concludes the investigation, Noakes also quotes testimony by Dr. Marshall out of context. At two points during her deposition, Dr. Marshall stated that Noakes was provided the Formal Complaint "at the end" and "conclusion" of the "process." (Marshall Depo., Doc. 30, 39:21-22, 44:6-7, PageID#989-990). But when read in the context of Dr. Marshall's later testimony, it is clear that Dr. Marshall was not suggesting that the Preliminary Investigative Report concluded the investigation. At times during the deposition, counsel for Noakes confusingly used the word "process" when questioning Dr. Marshall. This caused Dr. Marshall to seek specific clarification regarding counsel's use of that term and to then explicitly spell out the entire investigatory process to ensure the record was clear:

> Q: So is the investigation an essential part of the University of Cincinnati process?
>
> A: *Which process are you referencing?*
>
> Q: Okay. Well, okay. So let's be clear. Jane Roe makes a Complaint. The University starts a formal process and part of that is an investigation; right?
>
> A: So are you saying that Jane Roe files a Formal Complaint?
>
> Q: Yeah.
>
> A: And then the University automatically starts its *process*?

---

[5] The Policy's use of the term "investigative report" is clearly a reference to the Final Investigative Report because that is the report which is then "simultaneously distributed to all parties and their advisors, if any, at least ten (10) business days prior to a hearing …" (*Id.*).

>Q: Well, let me—let's—let's be real clear here; right?
>
>A: Okay.
>
>Q: In looking at the August 18th Notice it says, "University of Cincinnati is initiating an investigation"; right?
>
>A: Yes.
>
>Q: Ok. I assume an investigation is pretty important then; right?
>
>A: Yes, it is.
>
>Q: Ok. Is it an essential part of the entire process that the University goes through?
>
>A: *When you are talking about the entire process what do you mean?*
>
>Q: Well, why not just have a hearing? Why—Why do you guys conduct an investigation?
>
>A: Well, we conduct an investigation as neutral fact finders to gather as much information as possible and then *we take that information, put it into a Preliminary Investigation Report so that both parties are able to review that information and provide commentary on it or additional evidence*, and then after that we create a Final Investigation Report and share it with both parties again for them to provide feedback, and we send it to our—the adjudication process.

(*Id*. 44:8-25, 45:1-21, PageID#990-91) (emphasis added). This exchange occurred after Dr. Marshall stated that Noakes was provided the Formal Complaint at the "end" or "conclusion" of the "process." And it makes clear Dr. Marshall's view of the entire investigatory process, which is consistent with UC's Title IX Policy. Contrary to Noakes's contrived claim, the Preliminary Investigative Report does not conclude the investigation—it is issued during the investigation.

For the foregoing reasons, Dr. Marshall and Investigator Shaw provided accurate testimony that in no way contradicts UC's answers to the *Roe* requests for admissions. Noakes's motion should be denied on this basis alone.

### III. Noakes Cannot Establish that the Deposition Testimony Constitutes a Manifest Injustice.

Even if Noakes could establish that Dr. Marshall's and Shaw's testimony in this case was somehow inaccurate—and he cannot—he still cannot establish that the complained-of testimony was material to the outcome of this Court's and the Sixth Circuit's preliminary injunction decision and that, accordingly, a manifest injustice resulted here.

Noakes claims that the alleged inaccuracies in Dr. Marshall's and Shaw's testimony were material because the misrepresentations concerned "the legal issue of whether the notice provided by UC was insufficient under *Mathews v. Eldridge*." (Doc. 53 at 9, PageID#1992). But the testimony Noakes complains of actually had no bearing on whether Noakes received adequate notice of the allegations against him. The testimony concerns whether UC maintained a practice of disclosing the Formal Complaint to respondents and what that practice was. But regardless of what UC's practice may or may not have been, the fact remains—and Noakes does not and cannot dispute it—that Noakes *was* provided a copy of the Formal Complaint when he received the Preliminary Investigative Report in November 2022. And in affirming this Court's decision on the motion for preliminary injunction, the Sixth Circuit expressly held that the Preliminary Investigative Report provided notice sufficient for due process purposes: "But even assuming UC's initial email alone did not suffice, the preliminary report, which Noakes received on November 10, 2022, did." *Noakes v. Univ. of Cincinnati*, No. 24-3388, 2024 WL 4579453, *3 (6th Cir. Oct. 25, 2024).

Noakes stresses that he "argued that UC's decision to not provide a copy of the formal complaint during the investigation violated due process guarantees under the *Mathews* test" and believes it to be somehow significant that UC cited Dr. Marshall's allegedly false testimony in its brief to the Sixth Circuit. (Doc. 53 at 9, 10, PageID#1922-23). But these arguments simply fail to

show that the testimony is material in any way to this Court's and the Sixth Circuit's decisions. Again, it is uncontroverted that UC provided Noakes with a copy of the Formal Complaint during the investigation when it gave Noakes the Preliminary Investigative Report. This Court and the Sixth Circuit rejected Noakes's claim that Noakes did not receive sufficient notice—in large part based on the disclosure of that Preliminary Investigative Report. And UC cited Dr. Marshall's deposition testimony—which was not false—only in reference to her explanation of the significant government interest in protecting witnesses and maintaining the integrity of the investigation. Noakes connects no dots, and cannot connect dots, between the alleged inconsistencies in Dr. Marshall's and Shaw's testimony and this Court's and the Sixth Circuit's conclusions regarding whether he received adequate process.[6] The alleged testimony—true or false—had no bearing on those conclusions.

Even less convincingly, Noakes argues that the allegedly false testimony is material because it somehow shows UC's bias, which—he claims—was a component of his due process claim. But Noakes's bias argument was based on alleged bias on the part of the hearing panel—not Shaw and Dr. Marshall. And again, Noakes provides no explanation of how allegedly inaccurate testimony regarding UC's practice of disclosing the Formal Complaint is evidence of any sort of bias against Noakes during the disciplinary proceeding or how it shows he did not receive sufficient process.

---

[6] In reviewing footnotes 6 and 7 of Noakes's motion, it becomes clear that Noakes has manufactured this "false testimony" argument simply to relitigate the rejected argument that he did not receive adequate notice. (Doc. 53 at 10, 11, PageID#1923-24). In footnote 6, Noakes cites all of the cases he previously relied upon to argue the merits of his notice argument. (*Id.*). And in footnote 7, Noakes questions the accuracy and completeness of the Sixth Circuit's decision. (*Id.*). A motion for reconsideration, however, "is inappropriate if the plaintiff is merely trying to 'relitigate issues previously considered and rejected' …" *Wade*, 2024 WL 3163814, at *1 (quoting *Zobel v. Contech Enters.*, No. 2:14-cv-2721, 2017 WL 1064731, at *1 (S.D. Ohio Mar. 21, 2017)).

And Noakes's attempt to bolster his "manifest injustice" argument with citations to case law is unavailing. Noakes first cites *AMF Bowling Ctrs., Inc. v. Tanase*, No. 3:23-cv-448-HEH, 2024 WL 3298440 (E.D. Va. Mar. 1, 2024), for the proposition that "reconsideration is proper because of the new evidence regarding prior misrepresentations." (Doc. 53 at 8, PageID#1921). But the court in *Tanase* expressly stated that it did not "believe this is a reconsideration motion" and, moreover, the context of that case was whether the court should grant a continuance of a deposition "to allow new counsel to be adequately prepared for Defendant's deposition and to correct any misrepresentations prior to the deposition, pursuant to Virginia Rule of Professional Conduct 3.3." *Id*. at *1. Whatever was going on in *Tanase*, it bears no resemblance to the situation here.

Noakes fares no better with his citations to *Anderson v. Credit One Bank*, *Nat'l Ass'n*, No. 16cv3125-MMA (AGS), 2018 WL 2287329 (S.D. Cal. May 17, 2018), and *Quinn v. City of Kansas City*, 64 F. Supp. 2d 1084, 1094 (D. Kan. 1999). Contrary to Noakes's misleading quotation, the Court in *Anderson* based its decision to grant a motion to reconsider on "newly discovered evidence," not false testimony. *Anderson*, 2018 WL 2287329 at *5. Further, the plaintiff's deposition testimony in *Anderson* "plainly contradict[ed]" his earlier filed declaration. *Id*. at *4. As discussed above, there is no such "plain contradiction" here despite Noakes's attempt to manufacture one. *Quinn* involved a finding that false testimony constituted grounds to rescind a settlement agreement. 64 F. Supp. 2d at 1094. And there, the Court specifically noted that the decision was based on "clear-cut evidence of false testimony." *Id*. Nothing of the sort occurred in this case.

In sum, Noakes has failed to show that any false testimony occurred in this case. But even if he could, he simply cannot show that such testimony had any material effect on this Court's and

the Sixth Circuit's conclusion that he received sufficient process. Noakes received the Formal Complaint with the Preliminary Investigative Report months before his hearing. Nothing that Dr. Marshall or Investigator Shaw testified to regarding UC's practice of disclosing the Formal Complaint changes that.

## CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court deny Plaintiff's motion for reconsideration.

Respectfully submitted,

*/s/ Dominick S. Gerace*
Dominick S. Gerace (0082823)
Jada M. Colon (0099048)
Taft Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, Ohio 45202-3957
Telephone: (513) 381-2838
Fax: (513) 381-0205
dgerace@taftlaw.com
jcolon@taftlaw.com

*Attorneys for Defendants*

**<u>CERTIFICATE OF SERVICE</u>**

      I certify that on February 28, 2025, I filed the foregoing using the Court's CM/ECF system, which will send electronic notice of such filing to all parties of record.

                                               */s/ Dominick S. Gerace*