IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| JOHN NOAKES<br><br>Plaintiff,<br><br>v.<br><br>THE UNIVERSITY OF CINCINNATI, ET AL.<br><br>Defendants. | Case No. 1:23-cv-00284-MRB<br><br>Judge BARRETT<br><br>REPLY TO RESPONSE TO MOTION FOR RECONSIDERATION OF ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION BASED ON MATERIAL MISREPRESENTATIONS |

Plaintiff John Noakes respectfully submits this Reply to the Response to the Motion for Reconsideration of the Court's Order denying Plaintiff's Motion for a Preliminary Injunction. (Doc#53; Doc#54.)

This motion did not arise out of an effort to create a "'gotcha' moment," but because Noakes was treated differently from other students facing similar allegations at UC. Noakes had a simple request: to view a copy of the complaint or statement that had been filed against him before his interview. Defendants do not deny that other students received such information, but Noakes did not. Instead of simply admitting that UC made a mistake, Defendants tell this Court that the investigator and 30(b)(6) witness did not lie when they said UC has a practice of not providing copies of complaints "during an investigation" because a copy of the complaint is ultimately provided as part of a "Preliminary Investigative Report."

To make this argument work, Defendants attempt to show that the Preliminary Investigative Report is provided to students "during the investigation." But UC has told other courts that the Preliminary Investigative Report is provided "following the investigation" or when the investigator has "completed her investigation." And Noakes was told by UC that the Preliminary Investigative Report would be provided "at the conclusion" of the investigation. To say that "during" means the

same as "following," "conclusion," or "completed" does not make it so any more than saying "black is white," "dogs are cats," or "up is down." This Court should use this Motion to send a clear message to parties before this Court that litigation is not a game, and they can create a manifest injustice by simply saying whatever justifies their actions in one case, and then saying the opposite in a different case.

**A.     The Statements Were False, Regardless Of The Meaning of "During the Investigation."**

Defendants' argument rests substantially, if not completely, on an argument that the statements by UC's witnesses were not false because the formal complaint is shared "during the investigation" when students are provided a copy of the Preliminary Investigative Report *See e.g.* Opposition at 8-9. Of course, a party can always make an "angels dancing on the head of a pin" sort of argument against almost any allegation of a misrepresentation. And there might be some force to this claim with respect to a detail or two in any specific potentially ambiguous deposition answer. But viewed as a whole and in context – particularly the context of UC's prior actions, prior briefing, and prior representations to other courts – it is quite wrong.

**1.     UC Provided Copies Of Statements To Other Students**

The allegations here arose in a specific context: whether UC had a practice of providing copies of formal complaints to students before they were required to provide a statement to the investigator. UC never addresses, much less denies, that UC had provided copies of complaints to other students who had been accused of misconduct before they were asked to provide a statement during approximately the same time period. UC does not submit to this Court any affidavits or other evidence either that this did not occur, or that UC had changed its policy or practices at any time. (An Affidavit from Counsel establishing these facts accompanies this Reply.)

The investigator, when asked about why a copy of the Formal Complaint was not given to Noakes when he asked for a copy said, "that's not something that we do during our investigations."

2

(Shaw Dep., R.31, PageID#1192.) UC's 30(b)(6) witness stated that the decision to not provide a copy of the Formal Complaint prior to meeting with the investigator was a "rule of practice" at the school. These statements, because of UC's inconsistent actions, are false on their face without considering the meaning of "during the investigation." Accordingly, this Court should start with the premise that these statements by the investigator and the 30(b)(6) witness, to the extent they suggest that UC had a "practice" of not providing copies of complaints, were simply and demonstrably not true.

2. **The Preliminary Investigative Report Is Not Part Of The Investigation**

Defendants claim that the Preliminary Investigative Report "is considered to be part of the investigation (rather than the conclusion of the investigation)." Opposition at 11. Defendants fail to cite any affidavit, testimony, policy, or other document that actually says this explicitly. Moreover, this claim is contrary to the prior representations of UC to courts, the prior statements of witnesses, and the common meaning of the term "investigation."

a. **UC Has Made Contrary Representations To The Common Pleas Court**

UC has twice represented to the Hamilton County Common Pleas Court that the investigation is, in fact, complete when the Preliminary Investigation Report is prepared. This is directly contrary to what Defendants have told this Court: "the Preliminary Investigative Report does not conclude the investigation—it is issued during the investigation." Opposition at 13.

Plaintiff in this case brought a state law case in the Hamilton Court of Common Pleas. *Noakes v. University of Cincinnati*, Hamilton County Common Pleas No. A2304084. In that case, in opposing a Motion for a Preliminary Injunction, UC said to Judge Hathaway the exact opposite of what it Defendants are saying to this Court. UC submitted a Memorandum of Law stating that "*Following the*

3

*investigation...* Investigator Shaw provided Plaintiff with a draft investigative report."[1] (UC Memorandum at page 2 (emphasis supplied.) The relevant paragraph is set forth here:

> Thereafter, Investigator Shaw conducted an investigation that included interviews of Jane Roe, Plaintiff, and nine witnesses. (*Id.* at ¶¶ 63, 69, 71, 73, 74, 76, 78-80, 83, 84, 86). During the investigation, Investigator Shaw sent weekly emails to Plaintiff informing him that the investigation was ongoing. (*Id.* at ¶¶ 68, 72, 75, 77, 81, 82, 85, 87). Following the investigation, on November 10, 2022, Investigator Shaw provided Plaintiff with a draft investigative report. (*Id.* at ¶ 90). On November 22, 2022, and December 12, 2022, Plaintiff submitted responses to the report. (*Id.* at ¶¶ 90, 91).

Another case involved a different student who had alleged, *inter alia* that there were improper delays in his case, *Student Alpha v. University of Cincinnati*, Hamilton County Common Pleas No. A2305564. In that case, UC told Judge Branch that the Preliminary Investigative Reports was provided to the student after the same investigator had "completed her investigation." (UC Memorandum at 6.)[2] The relevant paragraph is here:

> **E. Plaintiff Received the Preliminary Investigation Report and Requested to Participate in the Informal Resolution Process.**
>
> On April 27, 2023, Shaw informed Plaintiff that she completed her investigation and provided Plaintiff with the Preliminary Investigation Report ("PIR"):
>
>> ... I have completed the evidence gathering process. I am providing you with the opportunity to review a copy of the **Preliminary Investigative Report (PIR)**.

b. **The Common Meaning Of "Investigation" Means That A Report Is Done After The Evidence Gathering Process Is Completed**

UC claims that it is "clear that the investigation is *not* complete" when the Preliminary Investigation Report is prepared because the parties are permitted to submit comments. *Id.* (emphasis

---

[1] The "draft investigative report" referenced in UC's Memorandum is the Preliminary Investigative Report. (Shaw Depo. R.31, PageD#1202; *see also* Email, R.31-16, PageID#1386.)

[2] UC similarly told Judge Branch, in a Motion to Dismiss: "Shaw informed Plaintiff that she had completed her investigation and provided Plaintiff with a draft investigative report." (Motion to Dismiss at 6.)

4

in original).  But when she provided a copy of the Preliminary Investigative Report to Noakes, the investigator seems to have said the opposite in an email: "I have *completed* the evidence gathering process." (Email, R.30-16, PageID#1386 (emphasis supplied).)

Is "evidence gathering process" synonymous with "investigation?"  Yes.  The plain meaning of "investigation" is an inquiry intended to gather evidence of misconduct which may be the basis for discipline.  The term "investigation," is defined as "[a] detailed inquiry or systematic examination." *Am. Heritage Dictionary* 920 (4th ed. 2000); *see Webster's Third New Int'l Dictionary 1189* (1981) (defining "investigation" as "a searching inquiry").[3]  The term is neither ambiguous or an unfamiliar concept. In common usage, the term 'investigation' does not include writing a report – this is something that occurs *after* the investigation is completed, particularly in the Title IX context.  In *Moe v. Grinnell College,* 556 F. Supp. 3d 916, 921 (S.D.Iowa 2021), the court considered a substantially similar school sexual misconduct policy,[4] which, like the UC policy, allowed students to comment on a preliminary investigation report before the investigator prepared a "final investigation report" that would be provided to the decision-makers.  The Moe court observed that "*After the investigation*, the investigator writes a preliminary investigation report…" (emphasis supplied).[5]

The reports, thus, are written as part of the process by which the hearing panel must come to a final decision, but themselves are not part of the investigatory process.[6]  That is confirmed by the

---

[3] *See Johnson v. MBNA Am. Bank, NA*, 357 F.3d 426, 430 (4th Cir. 2004) (adopting definition of "investigation" in main text);

[4] The fact that the policies are substantially similar is not surprising.  As noted in ¶¶ 17-20 of the Complaint, schools generally drafted policies designed to comply with guidance and regulations from the Department of Education.

[5] *Cf. McCarvill v. Nooth,* D.Or. No. 3:11-cv-00464-HZ, 2012 U.S. Dist. LEXIS 64875, at *5 (May 8, 2012) (Inspector General found that "misconduct report was written after the investigation was completed"); *Nelson v. Lausten*, D.Neb. No. 4:14CV3149, 2016 U.S. Dist. LEXIS 146434, at *7 (Aug. 9, 2016), fn. 3 (noting that in DEA asset procedures, "After the investigation, the DEA will submit a written report to the ruling official…")

[6] Defendants try to salvage the 30(b)(6) witness' testimony by parsing the meaning of the term "process."  Noakes merely suggests that the testimony by the witness that the Formal Complaint was given to Noakes "at the end of the process" is clear.  (Marshall Depo., R.30, PageID#989.)  Elsewhere, the witness is careful to

Notice provided to Noakes from UC, which states clearly that the reports are written "At the *conclusion* of the investigation…" (Notice, R.30-3, PageID#1064-1065 (emphasis supplied).)[7] A training slide for a training attended by the investigator, for example, distinguishes between the gathering and organizing of evidence.[8] The preliminary and final reports are shared with the parties so that they can provide feedback and prepare for the hearing.

Defendants' reference to the Title IX Policy does not help them. Opposition at 11. The Policy does not mention "preliminary" or "final" reports or use the phrase "preliminary investigative report" at all. Nor does it state that the Preliminary Investigative Report is done "during" the investigation. The policy states that parties will be given a chance to review evidence and provide comments "Prior to the completion of the investigative *report*…," not "prior to the completion of the investigation." (Policy, Doc#1-3, PageID#120 (emphasis supplied).) Defendants' argument fails

---

differentiate between the investigation and the "adjudication process." She even corrected a question to make it clear that the hearing panel relies on the report (not the investigation):

> Q … And the people involved in the adjudication process, they rely on that investigation?
>
> A They rely on that *report*.

(Marshall Depo., R.30, PageID#991 (emphasis supplied).)

[7] Defendants quote an additional section of the Notice, which provides that parties may "inspect and review the report and evidence" and then provide a response. Opposition at 11.

[8] UC posts the trainings as required by the Title IX regulations.



(https://www.uc.edu/content/dam/uc/titleix/docs/bricker-and-eckler-title-ix-training---summer-2020---level-2-title-ix-investigator-training.pdf)

because the Title IX Policy considers that the 'gathering of evidence' and the 'writing of a report' are distinct concepts – the Title IX Policy has an entirely separate section that describes the investigation process. This policy, rather than helping Defendants, makes it clear that investigations of allegations include "review of related physical evidence and/or materials, review of electronic transmissions, records, and/or other documentation, interviews, and other fact-finding activities…" (Policy, R.1-3, PageID#119.) Nowhere in the section titled, "gathering of evidence" referenced by Defendants is there a mention of the "writing" of a report. Instead, the ability of a party to review and comment upon the evidence gathered is specifically mentioned as having to occur "prior to a hearing," not during the investigation. (Policy, R.1-3, PageID#120.)

Finally, the fact that the "evidence gathering process" was completed when the Preliminary Investigative Report was provided to the parties is consistent with the fact that no investigative work was subsequently done. All that happened was that the investigator simply attached comments to the unchanged document and called in "Final." She did not do any additional investigative work after Jane Roe provided her with some photographs. (Shaw Depo., R.31, PageID#1201.) Nor did she do any work in response to an email from Noakes after he reviewed the Preliminary Investigative Report.[9]

**B.   The Misrepresentations Were Material Because UC Benefited From Its Shifting Positions**

This Court should reconsider the Order denying the Motion for a Preliminary Injunction to avoid manifest injustice so that UC is not shielded from its own bad faith misrepresentations and so that it may not benefit from its shifting positions before this Court.

---

[9] Noakes had stated that he would not do an interview until he could review the formal complaint. He received a copy of the formal complaint with the PIR, but the investigator did not seek to then conduct an interview even though, in her view, the investigation was ongoing. The obvious explanation: as she said in her email, she considered the evidence gathering process completed.

7

In assessing "manifest injustice," this Court should consider that the "responsible" finding by UC was highly significant, even life altering, to Noakes. Noakes was accused of a sexual assault and faced expulsion. In circumstances like these, "time and again [the Sixth] circuit has reiterated that students have a substantial interest at stake when it comes to school disciplinary hearings for sexual misconduct." *Doe v. Baum*, 903 F.3d 575, 582 (6th Cir. 2018), *citing Doe v. Miami Univ.*, 882 F.3d 579, 600 (6th Cir. 2018).

Plaintiff generally relies on the prior briefing, but makes two quick additional observations:

First, Defendants' claims that the misrepresentations are not material is belied by their own briefing – the testimony of the 30(b)(6) witness was important enough to quote at length in Defendants' Sixth Circuit brief. Yet… Defendants do not even address that the school, in responding to the requests for admissions in *Roe*, specifically denied the truth of multiple *reasons* that the 30(b)(6) witness gave for not providing a copy of the formal complaint to Noakes. (Marshall Depo. R.30, PageID#989.) And intentional misrepresentations by Defendants' witnesses calls into question all information they provided and casts doubt on any of Defendants' other factual claims that this Court previously relied upon.

Second, this Court need only review *Doe v. Oberlin College*, 963 F.3d 580, 587 (6th Cir. 2020), to see how this case would have played out legally if the witnesses had testified truthfully and admitted that they made a procedural error in failing to provide Noakes with a copy of the complaint when he requested it prior to his interview. This admission, under *Oberlin*, would have been evidence of bias in the process. In that case, the Sixth Circuit has held that "Procedural irregularities provide strong support for [a student's] claim of bias…" 963 F.3d at 587. Defendants do not address this precedent – which is consistent with the views of other Circuits in school discipline cases. *See e.g. Menaker v. Hofstra Univ.*, 935 F.3d 20, 33 fn. 48 (2d Cir.2019), ("procedural irregularity alone already suggests bias").

**CONCLUSION**

The Court should reconsider the Motion for Preliminary Injunction. In order to avoid manifest injustice and prevent further irreparable harm, the Motion for Preliminary Injunction should be granted.

                                              Respectfully submitted,

                                              /s/ Joshua A. Engel
                                              Joshua Adam Engel (0075769)
                                              Scott O'Reilly (0075717)
                                              ENGEL AND MARTIN, LLC
                                              4660 Duke Dr., Suite 101
                                              Mason, OH 45040
                                              (513) 445-9600
                                              engel@engelandmartin.com

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been electronically served via the Court's electronic filing system this March 7, 2025 upon all counsel of record.

/s/ Joshua Engel
Joshua Engel