## COURT OF COMMON PLEAS
## HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STUDENT ALPHA, | : | Civil Action No. A 2305564 |
| | : | |
| Plaintiff, | : | Judge Jennifer L. Branch |
| | : | |
| vs. | : | |
| | : | **DEFENDANT'S MEMORANDUM** |
| UNIVERSITY OF CINCINNATI, | : | **IN OPPOSITION TO PLAINTIFF'S** |
| | : | **MOTION FOR PRELIMINARY** |
| Defendant. | : | **INJUNCTION** |

Defendant University of Cincinnati ("University") submits this Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction.[1]

## I.    INTRODUCTION.

Plaintiff Student Alpha prematurely seeks this Court's intervention to preliminarily enjoin the University from proceeding with its Student Code of Conduct ("SCOC") process.  Plaintiff is a respondent to a *pending* SCOC charge, where he is accused of allegedly violating a University policy.  The University policy at issue is the Sex- and/or Gender Based Misconduct Policy ("Sexual Misconduct Policy").  This case does not involve Title IX or any University policy relating to Title IX.

Importantly, as set forth in the SCOC, the University considers the Plaintiff (respondent) not responsible at this time.  Respondents may not be considered responsible until the University Conduct Board "(Hearing Board") makes such a finding by a preponderance of evidence after conducting a live hearing and any appeal has run its course.  The Plaintiff's hearing has not concluded, the Hearing Board has not issued a decision, and the appeals period has not been

---

[1]      During the Court's January 2, 2024, conference with the parties' counsel, Plaintiff withdrew his Motion for Temporary Restraining Order. Therefore, this Memorandum addresses Plaintiff's Motion for Preliminary Injunction.

triggered. Without a finding of responsibility for violating the SCOC, and the appeals process having run its course, Plaintiff has suffered no injury. Absent that, there is no justiciable issue for this Court's consideration and Plaintiff's request for a preliminary injunction should be denied.

Putting aside the jurisdictional defects to Plaintiff's case, Plaintiff's Motion should be denied since he has not established the preliminary injunction factors by clear and convincing evidence.

First, Plaintiff is unlikely to succeed on the merits. Contrary to what Plaintiff claims in Count I of his Complaint, the Sexual Misconduct Policy is not a R.C. § 111.15 "rule." The Sexual Misconduct Policy simply implements and interprets a pre-existing "rule"—the SCOC. Therefore, the University may continue to seek that its students abide by the SCOC and the Sexual Misconduct Policy. And if they do not, they are subject to a conduct review per the SCOC.

Additionally, Plaintiff cannot show that, because the investigation took more than 60 days, Jane Roe's complaint against him should be dismissed. The SCOC does not permit for such a dismissal. Moreover, the length in time did not inhibit Plaintiff from fairly participating in the process. Plaintiff received notice of the complaint and an invitation to participate in the investigation process a little over a month after the alleged incident occurred. The very short timeframe between the alleged incident and Plaintiff receiving notice allowed Plaintiff to start preserving memories and evidence quickly. And while Plaintiff omits this from his Complaint, he requested several extensions of time during the process.

Second, Plaintiff has suffered no irreparable harm. Plaintiff only speculates that the SCOC process *may* cause him reputational harm but presents no actual evidence of harm. Failure to show actual harm is enough to deny his Motion.

Third, Plaintiff ignores the harm that injunctive relief would impose upon others, including the chilling effect it would have on Jane Roe and how it will affect pending matters before the University's Conduct Office by other complainants. And Plaintiff fails to recognize that the public's interest heavily favors allowing the University to regulate misconduct occurring on its campus.

For these reasons and those discussed more fully below, the Court should deny Plaintiff's Motion.

## II. SUMMARY OF THE UNIVERSITY'S STUDENT CODE OF CONDUCT PROCESS FOR PLAINTIFF.

### A. Jane Roe Reports Inappropriate Touching but Does Not Disclose the Identity of the Plaintiff.

On November 4, 2022, the University's Office of Gender Equity & Inclusion ("OGEI") received an online report from Jane Roe, wherein she indicated that she was "touched inappropriately" ("Report"). (Morgan Shaw Declaration, Exhibit B – Formal Investigative Report at Appx. A).[2] Jane Roe did not disclose the identity of the individual she alleged to have touched her. (Id.)

OGEI contacted Jane Roe on November 7, 2022, inviting her to have a conversation with OGEI to discuss her report, her rights, and also the resources available to her. (Shaw Declaration, Exhibit A). On November 9, 2022, OGEI Investigator Morgan Shaw ("Shaw"), sent Jane Roe an email confirming their meeting date for November 15, 2022. (Id.) Jane Roe and Shaw had a follow-up meeting on November 22, 2022. (Id.) After the meeting, Shaw sent Jane Roe a copy of the formal complaint form. (Id.)

---

[2] Along with this Memorandum in Opposition, the University filed a Motion seeking permission to file certain supporting exhibits under seal. More specifically, Shaw Declaration Exhibits A and B and Guardia Declaration Exhibit C. Once that Motion is granted, the University will file the exhibits under seal. In the interim, the University's counsel has emailed a copy of the to-be-sealed exhibits to both the Court's chambers and Plaintiff's counsel.

**B.     Jane Roe Submits a Formal Complaint, Triggering the Formal Resolution Process under the Student Code of Conduct.**

On November 28, 2022, Jane Roe submitted a formal complaint, which contained additional information identifying: Plaintiff as the person who touched her inappropriately; the date and time of the alleged incident; additional details regarding the incident; and names of individuals identified by Jane Roe as having knowledge of the incident ("Formal Complaint"). (Shaw Declaration, Exhibit B at Appx. B). The filing of the Formal Complaint began the formal resolution process, to be adjudicated according to the Student Code of Conduct ("SCOC"). [3]

On December 5, 2022, Shaw contacted Jane Roe seeking her availability for a phone call. (Shaw Declaration, Exhibit A).  Jane Roe offered a phone call for December 9, 2022. (*Id.*). During this phone call, Shaw gathered additional information needed to provide notice to the respondent (Plaintiff) such as the location of the incident, which was not listed in the Formal Complaint. (Shaw Declaration). Jane Roe shared the location of the incident, which occurred in off-campus housing not affiliated with the University. (*Id.*). Therefore, the incident fell outside the jurisdiction of the University's Title IX Sexual Harassment Policy and within the scope of the SCOC – Sexual Misconduct Policy. (Guardia Declaration, Exhibits D and E).

**C.     Plaintiff Receives Notice of Commencement of OGEI Investigation Close in Time to the Alleged Incident.**

On December 14, 2022, Shaw timely provided Plaintiff with a Notice of Commencement of OGEI Investigation ("Notice") and requested a meeting with Plaintiff. (Shaw Declaration*,* Exhibit B at Appx. D). The Notice informed Plaintiff that Jane Roe had filed a Formal Complaint, and that the Formal Complaint alleged that Plaintiff had engaged in the following conduct:

---

[3]     The SCOC provides notice to students that a report is not the same as the filing of a complaint. (Juan Guardia Declaration, Exhibit D).  A complaint must be filed to initiate the formal resolution process. (Id.)

4

> On November 3, 2022, at approximately 12:30am, at 2441 W. Clifton Ave., Respondent [Student Alpha] touched Complainant [Jane Roe's] breast and stomach without [Jane Roe's] consent.

(*Id*.). Additionally, the Notice set forth detailed information regarding the policy at issue, investigation process, rights and responsibilities, and resources available to both students. (*Id*.). The Notice also asked Plaintiff to, "**Please contact Morgan Shaw directly** . . . **as soon as possible** to set up a meeting to discuss the allegations, go over the investigation and resolution processes, and discuss [Plaintiff's] rights and responsibilities." (*Id*.).

### D. <u>Plaintiff's Opportunity to Fairly Participate in the Investigation Process</u>.

On December 14, 2022, Plaintiff emailed Shaw, seeking to schedule a meeting per the Notice. (Shaw Declaration, Exhibit A). Shaw responded the following day with her availability to meet on December 19, 2022. Plaintiff then had a change of heart and asked Shaw if it would "be possible for [him] to take some more time before meeting [Shaw] so that [he could] consult with a few advisors?" Shaw responded, "Of course, the university closes Dec. 23rd – Jan 2nd, would you like to schedule a time to meet after that? If so I can out a calendar reminder to reach back out to you then." Plaintiff responded on December 17, 2022, "Yes, that would be great." (*Id*.)

On January 4, 2023, Shaw followed-up with Plaintiff as promised to see if he would like to schedule a meeting, and to let her know his availability. (*Id*.). On Saturday, January 7, 2023, Plaintiff responded that he would not meet with Shaw until after she had gathered all the evidence and gave him an opportunity to review it prior to providing his response. (*Id*.). Shaw responded after the weekend on January 9, 2023, and let Plaintiff know that the allegations were set forth in the Notice he received, and that additional information, including the investigation process supportive measures, and how/when evidence is provided and shared with parties will be discussed during their first meeting. (*Id*.). Shaw also shared her availability to meet. (*Id*.).

5

On January 10, 2023, Plaintiff declined the invitation to meet, again stating he only wanted to meet after he was able to review all evidence gathered first. (Shaw Declaration, Exhibit A). On January 12, 2023, Shaw thanked Plaintiff for his email and responded:

> The opportunity to meet with me will remain an option throughout this investigation. Prior to the completion of the Final Investigative Report (FIR), I will send to each party and the party's advisor, if any, the Preliminary Investigative Report (PIR) which will include statements and evidence subject to inspection and review in an electronic format or a hard copy, and the parties will have at least ten (10) business days to submit a written response, which I will consider prior to [t]he completion of the investigative report.

(*Id.*)

Thereafter, Shaw continued with the investigation, which included interviews of Jane Roe and five witnesses. (Shaw Declaration, Exhibit B). Throughout the process, Shaw continued to regularly update Plaintiff, letting him know she was continuing to investigate the Formal Complaint. (*Id.*, Exhibit A).

### E. **Plaintiff Received the Preliminary Investigation Report and Requested to Participate in the Informal Resolution Process.**

On April 27, 2023, Shaw informed Plaintiff that she completed her investigation and provided Plaintiff with the Preliminary Investigation Report ("PIR"):

> … I have completed the evidence gathering process. I am providing you with the opportunity to review a copy of the **Preliminary Investigative Report (PIR)**.

> The PIR summarizes the procedural steps of the matter from the receipt of the Formal Complaint through the investigation so far, summarizes all relevant witness statements, and includes all evidence that is directly related to the allegations raised in the Formal Complaint. The PIR does not contain any findings or recommendations concerning responsibility for the misconduct alleged.

> A copy of the PIR and all evidence directly related to this investigation is available. This link shall remain open for **ten (10) business days** from the date of this letter. Your access to this information will end on May 11, 2023 at 5:00 p.m. EST. After this time the link will no longer open the OneDrive file. Parties may only view files in OneDrive and may not edit, download, or print these files.

6

You have **ten (10) business days** from the date of this letter to submit a written response to me, which I will consider prior to completion of the Final Investigative Report. …

(Shaw Declaration, Exhibit A).

On May 8, 2023, Plaintiff emailed Shaw and asked if, prior to submitting his response, whether the matter could go through the informal resolution process. (Shaw Declaration, Exhibit A). Shaw let Plaintiff know that she would share his request with Jane Roe because the informal resolution process requires a mutual agreement between both parties. (*Id*.). On May 10, 2023, Jane Roe declined to participate in informal resolution and Shaw let Plaintiff know on that same day. (*Id*.).

The following day, Plaintiff responded to the PIR stating, in general, that he did not have sufficient information to provide a statement and discussed his concerns with the length of the investigation. (Shaw Declaration, Exhibit A). Shaw responded on the same day, letting Plaintiff know that his email would be included in the Final Investigative Report. (*Id*.). Shaw also let Plaintiff know that he was in possession of all the evidence that was directly related to the allegations raised in the Formal Complaint. (*Id*.). Lastly, Shaw again made herself available for a meeting with Plaintiff if he wanted to discuss anything further, provide additional information, evidence, or witness names. (*Id*.).

F. **Final Investigative Report Submitted to the Office of Student Conduct and Community Standards for Adjudication.**

On May 15, 2023, Shaw sent the Final Investigative Report to Jane Roe, Plaintiff, and to the Office of Student Conduct and Community Standards ("Conduct Office"). (Shaw Declaration, Exhibits A and B).

On June 13, 2023, the Director of the Conduct Office sent Plaintiff a letter notifying him that he was being charged under the SCOC for allegedly violating the SCOC's prohibition against violating

7

University policies or rules. (Guardia Declaration, Exhibit C). The letter also notified him that a procedural review was scheduled for June 23, 2023. (*Id*.) The purpose of the procedural review is to provide information to the parties regarding the adjudication process under the SCOC. (*Id*., Exhibit D).

Plaintiff attended the procedural review with his advisor. (Guardia Declaration, Exhibit C). On June 26, 2023, Plaintiff requested that the hearing to adjudicate the matter not occur until sometime after September 1, 2023. (*Id*.).

On October 9, 2023, Assistant Vice President for Student Affairs & Dean of Students Dr. Juan Guardia ("Dr. Guardia"), who was also serving as the Interim Director of the Conduct Office, emailed Plaintiff requesting his availability for a hearing the week of October 16 and October 23. (Guardia Declaration, Exhibit C).  On October 11, 2023, Plaintiff requested that the hearing not be scheduled until sometime after November 3, but not November 6. (*Id*.). Dr. Guardia worked to coordinate the schedules of the parties, the hearing chair, and the three hearing panel members, and the first available date after Plaintiff's date restrictions was December 19, 2023. (*Id*.). Plaintiff then asked Dr. Guardia to postpone the hearing until some date after January 11, 2024, because he would be out of the country. (*Id*.). Dr. Guardia then rescheduled the hearing to January 19, 2024. (*Id*.).

The hearing started on January 19, 2024, but had to adjourn before its conclusion. (Guardia Declaration). Dr. Guardia is currently working with all the participants to schedule a new date to continue the hearing.  (Id.)  At this point in time, Plaintiff is still considered "not responsible" for violating the Student Code of Conduct and no disciplinary action has been taken against Plaintiff. (*Id*.). Plaintiff is merely faced with the possibility of disciplinary action, and this will not be known until the hearing is concluded and any appeals are completed. (*Id*., Exhibit D).

III.    **LEGAL STANDARD.**

Injunctive relief is an extraordinary remedy and must be approached with great caution. *Cementech, Inc. v. City of Fairlawn*, 109 Ohio St.3d 475, 477, 2006-Ohio-2991, 849 N.E.2d 24, 27, ¶ 10.  Plaintiff must establish his right to this extraordinary relief by proving these factors: (1) a party requesting a preliminary injunction must show that (1) there is a substantial likelihood that the plaintiff will prevail on the merits, (2) the plaintiff will suffer irreparable injury if the injunction is not granted, (3) no third parties will be unjustifiably harmed if the injunction is granted, and (4) the public interest will be served by the injunction. *Procter & Gamble Co. v. Stoneham*, 140 Ohio App. 3d 260, 267, 747 N.E.2d 268, 273 (2000).  And "the party seeking the preliminary injunction must establish a right to the preliminary injunction by showing clear and convincing evidence of each element of the claim." *Vanguard Transp. Sys., Inc. v. Edwards Transfer & Storage Co., Gen. Commodities Div.*, 109 Ohio App. 3d 786, 790, 673 N.E.2d 182, 184 (1996).

Plaintiff has done nothing to establish this clear "right" and certainly cannot satisfy his burden on any of the four factors. As a result, injunctive relief is not warranted.

IV.    **ARGUMENT.**

   a.  **Plaintiff is Not Likely to Succeed on the Merits.[4]**

      i.  *Plaintiff's claims are not justiciable and this Court lacks jurisdiction.*

This Court's jurisdiction is limited to "justiciable matters." Ohio Constitution, Article IV, Section 4(B). Stated another way, if a matter is not justiciable, the Court does not have jurisdiction over said matter. In its Motion to Dismiss, which is pending before the Court, the University contends that Plaintiff's claims are not ripe for judicial review as they are wholly contingent on the occurrence or non-occurrence of a future event, i.e. the outcome of Plaintiff's student conduct

---

[4]    The University incorporates its arguments in its Motion to Dismiss fully into this Opposition to Plaintiff's Motion.

hearing and any subsequent appeal. See *Ohio Renal Assn. v. Kidney Dialysis Patient Protection Amendment Comm.*, 154 Ohio St.3d 86, 2018-Ohio-3220, 111 N.E.3d 1139, ¶ 12 (A case is not yet ripe if "it rests on contingent future events that may not occur as anticipated or may never occur at all.").

In response, Plaintiff attempts to compare this matter to *Noakes v. University of Cincinnati*, Hamilton Co. Common Pleas No. A 2101546 ("*Noakes I*") and *Noakes v. University of Cincinnati*, Hamilton Co. Common Pleas No. A 2304084 ("*Noakes II*"). Plaintiff's case is markedly different.

Unlike *Noakes I* and *Noakes II*, Plaintiff has filed this matter **before** the conclusion of the University's SCOC process. To date, Plaintiff is still considered "not responsible" for the alleged misconduct, has not incurred any injury, and any possible injury is dependent on future events. Accordingly, Plaintiff's claims are not ripe for review and this Court lacks jurisdiction.

As each of Plaintiff's claims are not justiciable, and this Court does not have jurisdiction over the matter, as a matter of law this case cannot proceed to the merits. This alone warrants denial of Plaintiff's Motion for a Preliminary Injunction.

If, however, the Court decides to consider the merits of Plaintiff's Counts I & II, as explained below, Plaintiff is unlikely to succeed on the merits of either claim.

    ii.  *Count I: The Sexual Misconduct Policy Implements and Interprets the SCOC, which is a R.C. § 111.15 Rule.*

In Count I, Plaintiff seeks a declaratory judgment that the University failed to adopt its Sexual Misconduct Policy in accordance with R.C. § 111.15. The University was under no such obligation.

First off, Plaintiff is accused of engaging in misconduct prohibited by the University's SCOC, specifically nonacademic misconduct that violates University policies (i.e. the Sexual Misconduct Policy). (Guardia Declaration, Exhibit D at Section (C)(1)(cc)). Plaintiff concedes the

SCOC is a "rule" that the University adopted per R.C. § 111.15. (Compl. at ¶¶ 70-71). In other words, the University is free to proceed against Plaintiff pursuant to its SCOC.

Contrary to Plaintiff's contention, the University did not also have to adopt the Sexual Misconduct Policy through R.C. § 111.15. The Sexual Misconduct Policy is not itself a "rule" as defined under that statute and, consequently, is not subject to that rulemaking process.

R.C. § 111.15 defines "rule" as "any rule, regulation, bylaw, or standard having a general and uniform operation adopted by an agency under the authority of the laws governing the agency; any appendix to a rule; and any internal management rule." *Id*. In interpreting the meaning of "rule" in R.C. § 111.15(A)(1), the Ohio Supreme Court has looked to precedent involving the Ohio Administrative Procedures Act, R.C. § 119.01(C),[5] which defines "rule" with language similar to R.C. § 111.15(A). *See O'Neal v. State*, 167 Ohio St.3d 234, 2021-Ohio-3663, 192 N.E.3d 358, ¶ 26. Based on that precedent, the Ohio Supreme Court has held that, in determining whether any policy or action constitutes a "rule" under R.C. § 111.15, courts must distinguish between "an administrative action that establishes a policy or standard and one that merely implements or interprets a rule or statute that already exists." *Id*. at ¶ 27. Under this line of cases, "[a]n action that establishes a new policy or standard is a rule . . . ; one that implements or interprets a pre-existing rule or statute is not." *Id*.

The University's Sexual Misconduct Policy is not a "rule" under this definition because it simply implements a pre-existing one—the SCOC. Again, Plaintiff concedes the SCOC is a "rule" that the University adopted per R.C. § 111.15. (Compl. at ¶¶ 70-71). The Sexual Misconduct Policy simply implements and interprets the provision of the SCOC that lists as a nonacademic

---

[5] As discussed below, R.C. § 119.01 has no applicability here because universities like the University are not "agencies" as defined under that statute.

11

misconduct violation violating "University policies." (Guardia Declaration, Exhibit D at Section (C)(1)(cc)).

Consider the ramifications of a contrary conclusion. A ruling stating otherwise would have major ramifications for the codes of conduct of state agencies and public institutions of higher education, whose codes of conduct, like the University's here, include "violating university policies" or "violating federal, state, or local law," as examples of misconduct. Those provisions would no longer be valid. Instead, the codes of conduct would become tomes, akin to the Ohio Revised Code itself, listing verbatim all policies and laws. That absurd result cannot be what the Ohio legislature intended when enacting R.C. § 111.15.  *See* R.C. 1.47(C); *State ex rel. Clay v. Cuyahoga Cnty. Med. Examiner's Off.*, 2017-Ohio-8714, 152 Ohio St. 3d 163, 167, 94 N.E.3d 498, 503.

For these reasons, the Sexual Misconduct Policy is not, as a matter of law, a "rule" as defined by R.C. § 111.15(A)(1). Accordingly, the University was under no legal obligation to comply with the rulemaking requirements of that statute.

Plaintiff presents no evidence or clear and convincing legal argument to the contrary. Consequently, he is unlikely to succeed on the merits of Count I.

   iii.  *Count II: Plaintiff was Not Unduly Burdened by the Reasonable Extension in Time to the Grievance Process.*

In Count II, Plaintiff seeks a declaratory judgment that the University violated its Sexual Misconduct Policy by not concluding the adjudication of the allegations against Plaintiff within 60 days. Plaintiff is unlikely to succeed on the merits of this claim.[6]

---

[6]    For Plaintiff to even bring Count II, he must abandon Count I. Count II depends upon the University's Sexual Misconduct Policy being valid. If the Sexual Misconduct Policy is void, as Plaintiff claims it is, there is no time requirement and the University is free to take more than 60 days.

A simple review of the Sexual Misconduct Policy reveals that the 60-day "requirement" that Plaintiff relies upon is, in fact, not a requirement at all. The Sexual Misconduct Policy provides only that "[c]omplaints will *generally* be resolved within 60 days of the filing of a complaint". (Guardia Declaration, Exhibit E) (emphasis added). The Sexual Misconduct Policy then explicitly states that "in some circumstances, complaints may take longer to resolve". (*Id*.). Additionally, the Sexual Misconduct Policy provides that: "[w]ithin seven days of the filing of a complaint, a Deputy Title IX Coordinator or designee will *generally* initiate a meeting with the respondent"; and "[w]ithin 14 days of the filing of a complaint, a Deputy Title IX Coordinator or designee will begin interviewing witnesses, *as appropriate*, and review relevant evidence". (*Id*.) (emphasis added).

Thus, the language of the Sexual Misconduct Policy makes it abundantly clear that the 60-day provision in the policy, and each of the investigative time guidelines, are not stringent requirements. To extend the timeline, the Sexual Misconduct Policy only requires that the University provide: (i) written notice to the parties of the action that the timeline would be extended; and (ii) regular updates regarding the status of the complaint. Contrary to Plaintiff's assertion in his Complaint, the Sexual Misconduct Policy does not require "good cause" for extension of the Policy's timeframe guidelines. (*Id*.).

These requirements were undoubtedly satisfied here.  Shaw provided regular updates to Plaintiff throughout her investigation. (Shaw Declaration, Exhibit A). In fact, Plaintiff himself asked for additional time and extensions throughout the process. (Shaw Declaration, Exhibit A; Guardia Declaration, Exhibit C).

Contrary to Plaintiff's claim, he was not "prejudiced in his ability to defend against the allegations" because he "was unable to recall some of the events of that day and obtain witnesses or

evidence." (Motion, p. 14). To support his claim of "prejudice," Plaintiff compares the present matter to *Noakes I*. In *Noakes I*, the plaintiff had a learning disability, had limited ability to recall past events, and when asked for a statement a year after the alleged event, he had no recollection of the incident. *Noakes v. University of Cincinnati*, Hamilton Co. Common Pleas No. A 2101546. Plaintiff's case is markedly different. For one, Plaintiff does not allege to have a learning disorder.

Moreover, Plaintiff was given an opportunity to meet with the investigator a little over a month after the incident. The University received the Formal Complaint on November 28, 2022. (Shaw Declaration, Exhibit A). Shaw needed additional information from Jane Roe for purposes of issuing the Notice to Plaintiff. (*Id*.). Shaw worked with Jane Roe to get a meeting scheduled, and they met on Friday, December 9, 2022. (*Id*.). From that meeting, Shaw was able to gather information regarding the location of where the alleged incident occurred. (*Id*.). With complete information, Shaw then worked to draft the Notice and was able to issue it to Plaintiff on December 14, 2022. (*Id*.). The Notice read:

> On November 3, 2022, at approximately 12:30am, at 2441 W. Clifton Ave., Respondent [Student Alpha] touched Complainant [Jane Roe's] breast and stomach without [Jane Roe's] consent.

Therefore, not only did Plaintiff receive the Notice close in time to when the Formal Complaint was filed, but he also received it very close in time to when the alleged incident occurred, only the month prior. (Shaw Declaration, Exhibit A). This very close in time Notice, with complete details of the alleged touching without consent, allowed Plaintiff to start gathering and preserving evidence immediately.

On April 27, 2023, Plaintiff had an additional opportunity to have his memory jogged when he received the Preliminary Investigative Report for his review and to provide comments. (*Id*.). Even after receiving the set of evidence that would be shared with the Hearing Board, Plaintiff chose to not provide a written statement, evidence, or witness names. (*Id*.). Instead, Plaintiff objected to the process,

14

including the timeline, and his objections were incorporated into the Final Investigative Report for the Hearing Board to consider. (*Id.*).

In sum, Plaintiff has not established by clear and convincing evidence that the University violated the flexible time guideline in its Sexual Misconduct Policy, or that any extension caused him any prejudice. This is particularly true given that Plaintiff was the source of many requested continuances. For these reasons, Plaintiff is unlikely to succeed on the merits of Count II.

iv.  *Neither Count I or II of Plaintiff's Complaint are cognizable under the Ohio Declaratory Judgment Act of any other private right of action.*

Plaintiff is also unlikely to succeed on the merits of Counts I & II because neither claim is cognizable under the Ohio Declaratory Judgment Act. The Ohio Declaratory Judgment Act does not allow Plaintiff to obtain a declaration of rights or status with respect to "rules" as defined in R.C. § 111.15. Ohio's Declaratory Judgment Act provides as follows:

> Any person interested under a deed, will, written contract, or other writing constituting a contract or any person whose rights, status, or other legal relations are affected by a constitutional provision, statute, *rule as defined in section 119.01* of the Revised Code, municipal ordinance, township resolution, contract, or franchise may have determined any question of construction or validity arising under the instrument, constitutional provision, statute, rule, ordinance, resolution, contract, or franchise and obtain a declaration of rights, status, or other legal relations under it.

R.C. § 2721.03 (emphasis added). While the Act expressly authorizes a person to obtain a declaration of "rights, status, or other legal relations" with respect to a "rule as defined in section 119.01," the Act lacks similar authorization to seek such a declaration with respect to rules defined under R.C. § 111.15, as Plaintiff attempts to do here.[7]

---

[7]     The University, of course, does not concede that the Sexual Misconduct Policy is a "rule" as defined in R.C. § 111.15, as discussed above. But Plaintiff asserts that it is such a rule, and so he cannot have it both ways. He cannot, in Count I, assert that the University has violated R.C. § 111.15 because the Sexual Misconduct Policy is a rule, and then, for purposes of Count II, claim that it is not a rule to skirt the clear terms of the Act.

15

This omission is significant and indicates a legislative intent to remove rules under R.C. § 111.15 from the purview of the Declaratory Judgment Act. The Ohio Revised Code draws a clear line between rules "as defined under section 119.01" (the Ohio Administrative Procedures Act) and rules defined under section 111.15. As defined in section 119.01, a rule is "any rule, regulation, or standard, having a general and uniform operation, adopted, promulgated, and enforced by any agency under the authority of the laws governing such agency." This definition of "rule," by including the term "agency" within the definition, is limited to "bodies fitting the definition of 'agency' as contained in R.C. § 119.01(A)(1)." *Bd. of Trustees of Ohio State Univ. v. Dept. of Admin. Servs.*, 68 Ohio St. 2d 149, 429 N.E.2d 428, 430-31 (Ohio 1981). And because the Ohio Supreme Court has held that universities are "not agencies within the meaning of R.C. § 119.01(A)," (*Id.* at 430), R.C. § 119.01 does not apply to rules promulgated by universities such as UC.[8]

Instead, as Plaintiff implicitly acknowledges in his Complaint, public universities in Ohio are subject only to rulemaking procedures under R.C. § 111.15. This statute sets out a different rulemaking regime than the regime under Chapter 119—one that is not subject to some of the procedural requirements in Chapter 119. *E.g.*, *Parfitt v. Columbus Correctional Facility*, 62 Ohio St. 2d 434, 406 N.E.2d 528, 531 (1980) ("R.C. 111.15 provides and has provided for filing of rules with the Secretary of State and the Director of the Legislative Reference Bureau without following the procedures in R.C. Chapter 119.").

The division between Chapter 119 and R.C. § 111.15 leaves no ambiguity with respect to the legislature's intent to exclude R.C. § 111.15 from the purview of the Declaratory Judgment

---

[8]     The Court did hold that where a university "acts as an appendage of an agency within the definition of R.C. 119.01(A), it must comply with the duties imposed on that agency just as the agency would be bound." *Bd. of Trustees of Ohio State Univ. v. Dept. of Admin. Servs.*, 429 N.E.2d at 430. But there is no allegation that such a circumstance applies here.

16

Act. Ohio features two statutory regimes for rulemaking. One of those regimes, Chapter 119, is expressly included among the list of instruments and laws regarding which a person may obtain a declaration under § 2721.03. The other, R.C. § 111.15, is not. Had the legislature wished to authorize declaratory judgments with respect to rules as defined under R.C. § 111.15, it would have explicitly said so, as it did for rules as defined under Chapter 119. *See O'Neal v. State*, 146 N.E.3d 605, 611 (Ohio Ct. App. 2020) (opining without deciding that causes of action raising issues pertaining to rules as defined under R.C. § 111.15 "arguably" fail to fall within the parameters of the Ohio declaratory judgment statute). Yet, it did not.

To be sure, the Ohio Declaratory Judgment Act has been amended multiple times while rulemaking under § 111.15 has been in existence. Even so, the legislature has not elected to add this provision to the list of instruments and laws expressly delineated in § 2721.03, thereby signaling an intent to deny litigants the ability to seek a declaratory judgment respecting rules defined under that section. *E.g.*, *Hoops v. United Telephone Co. of Ohio*, 50 Ohio St. 3d 97, 553 N.E.2d 252, 256 (1990) ("The General Assembly is presumed to have known that its designation of a remedy would be construed to exclude other remedies, consistent with the statutory construction maxim of *expressio unius est exclusio alterius*."). Consequently, Plaintiff's claims must be dismissed because he is not entitled to a declaratory judgment with respect to rules defined under R.C. § 111.15.

Nor is there any other private right of action available for Plaintiff to bring the claims he brings under Counts I & II. Ohio courts have held that they "will not infer that a statute grants a private right of action unless the language of the statute indicates a clear intent that the legislature intended such a remedy." *Cirino v. Bureau of Workers' Comp.*, 171 N.E.3d 840, 848 (Ohio Ct.

17

App. 2021). There is no explicit language in R.C. § 111.15 allowing a private party to assert a claim for alleged violations of those provisions.

And in determining whether a private right of action should be inferred from a statute, Ohio courts rely on a three-part test: (1) whether the statute creates a right in favor of the plaintiff, (2) whether there is any indication of legislative intent, explicit or implicit, to create or deny a remedy through private right of action, and (3) whether it is consistent with the underlying purposes of the legislative scheme to infer such a remedy. *Anderson v. Smith*, 964 N.E.2d 468, 472 (Ohio Ct. App. 2011). Application of this test shows that no private right of action can be inferred for either of the claims Plaintiff asserts in Counts I & II.

With respect to R.C. § 111.15, the statute does not purport to confer any rights in Plaintiff. Rather, the statute obligates certain state agencies to follow procedures with respect to the filing of rules as defined under that section. There also is no indication of legislative intent to create a right or remedy through a private right of action. In fact, the opposite is true. As discussed above, the Ohio Legislature has indicated, through the state declaratory judgment statute, an intent to *deny* litigants the ability to obtain declaratory judgments with respect to rights or status related to R.C. § 111.15—exactly what Plaintiff seeks to do here.

In sum, because both counts of the Complaint seek a declaratory judgment regarding purported "rules" under R.C. § 111.15, and not rules as defined under Chapter 119, Plaintiff is unlikely to succeed on the merits of either count.

### b. Plaintiff Will Not Suffer Irreparable Harm if the Court Denies his Motion.

Irreparable harm is an injury for which, after its occurrence, there could be no plain, adequate, and complete remedy at law, and for which money damages would be impossible, difficult, or incomplete. A showing of irreparable harm requires proof of actual irreparable harm

18

or the existence of an actual threat of such injury. Actual irreparable harm is usually not presumed, but instead must be proved by the movant. *Columbus v. State*, 2023-Ohio-2858, ¶ 19, 223 N.E.3d 540, 549 (cleaned up). Speculative harm will not suffice. *State v. City of Cincinnati Citizen Complaint Authority*, 2019-Ohio-5349, 139 N.E.3d 947 (Ohio Ct. App. 1st Dist. Hamilton County 2019).

Plaintiff argues that the "risk of suspension or dismissal" as well as the possibility of "reputational and other harm" constitute irreparable harm. (Motion, pp. 1, 18). However, these contentions do not establish any actual irreparable harm. These supposed harms are purely speculative because Plaintiff's attendance at the University has continued uninterrupted and his education records do not show any discipline relating to this matter. *Aero Fulfillment Servs.,* 1st Dist. Hamilton No. C-060071, 2007-Ohio-174, at ¶ 26 ("Where the threat of harm is speculative, the moving party must do more than make a conclusory allegation of the threat of harm. There must be evidence to support that allegation.").

Tellingly, every case Plaintiff cites to support his claim of irreparable harm involves situations where the various universities' disciplinary processes were completed and finalized *prior* to the plaintiff seeking a preliminary injunction. See, e.g., *Noakes v. Univ. of Cincinnati*, Hamilton Co. Common Pleas No. A 2101546 (Plaintiff's appeal was denied on April 29, 2021 and sanctions were imposed which were to take effect in August 2021); *Roe v. Adams-Gaston*, 2018 U.S. Dist. LEXIS 185697, *12 (S.D. Ohio) (Plaintiff's Complaint was filed approximately three weeks after Ohio State University upheld the hearing officer's decision and plaintiff's expulsion on appeal); *Nokes v. Miami Univ.*, 2017 U.S. Dist. LEXIS 136880, *17 (S.D. Ohio August 25, 2017) (Plaintiff filed his complaint one month after his appeal was affirmed and Miami University's disciplinary decision became final); *Doe v. Univ. of Cincinnati*, 223 F. Supp. 3d 704,

19

709 (S.D. Ohio November 30, 2016) (Plaintiff's appeal was affirmed and his sanctions became effective before filing suit); *Doe v. Siena Coll.*, 2023 U.S. Dist. LEXIS 7325, *35-36 (N.D. N.Y. Jan. 17, 2023) (Plaintiff filed suit two days after the appeal panel affirmed the hearing decision and issued sanctions); *Doe v. Univ. of Conn.*, 2020 U.S. Dist. LEXIS 11170, *3 (D.Conn. January 23. 2020) ("Before he filed this lawsuit, the Plaintiff had been suspended as a student at UCONN and was not permitted to register for Spring 2020 classes."); *Doe v. Texas A&M University – Kingsville, et al.*, No. 2:21-cv-00257, *1 (S.D. Tex. Nov. 5, 2021) (Plaintiff received notice from the Office of Research & Graduate Studies affirming the original findings and sanctions before commencing litigation.); *Doe v. Rhodes College*, No. 2:19-cv-02336 (W.D. Tenn. June 14, 2019) (Plaintiff was expelled before commencing legal action); *Doe v. Pa. State Univ.*, 276 F. Supp. 3d 300, 306 (M.D. Pa. Aug. 18, 2017) (Plaintiff sought a preliminary injunction the day after his university appeal was denied); *Doe v. Univ. of Notre Dame*, 2017 U.S. Dist. LEXIS 69645 (N.D. Ind. May 8, 2017) (Plaintiff's appeal was denied and he was expelled prior to seeking a preliminary injunction.); *Ritter v. Oklahoma*, 2016 U.S. Dist. LEXIS 60193, *1 (W.D. Okla. May 6, 2016) (Plaintiff filed his lawsuit "after OCU expelled him for an alleged violation of the university's policy regarding sexual misconduct."); *Doe v. Middlebury Coll.*, 2015 U.S. Dist. LEXIS 124540, *4 (D.Vt. Sept. 16, 2015) (Plaintiff filed the action two days after his appeal was denied.); *King v. Depauw Univ.*, 2014 U.S. Dist. LEXIS 117075, *25 (S.D. Ind. Aug. 22, 2014) ("Three days after Babington issued her decision [denying his appeal and imposed sanctions], King filed this action and moved for a preliminary injunction").

Seemingly acknowledging the barrier presented by the cases he relies upon, Plaintiff then claims, in a footnote in his Motion, and not via any admissible evidence, that merely attending a student conduct hearing will cause him to suffer unwarranted stress and that constitutes irreparable

harm. At this juncture, Plaintiff's alleged harm is speculative and far from immediate. He simply has not met his burden of proving actual irreparable harm by clear and convincing evidence, which is fatal to his Motion.

> **c. A Preliminary Injunction Would Cause Substantial Harm to Others and Would Not Serve the Public Interest.**

Plaintiff's argument that "an injunction will not cause any harm to third parties or to [the University]" demonstrates a lack of awareness of the effects of enjoining the University's disciplinary procedures.

Take first the effects on Jane Roe. An injunction would deprive Jane Roe of a forum to address the alleged harm she claims to have been caused by Plaintiff. As a result, a chilling effect ensues. Students like Jane Roe will be less likely to report sexual misconduct knowing the University's ability to respond to those reports could be fruitless. Moreover, a ruling enjoining the University from enforcing its SCOC provision against violating University rules and policies would jeopardize pending matters in the Conduct Office. Therefore, denying other complainant students, who have no connection to this litigation, from having their complaints processed.

Next, consider the effects on the University. The public interest is not served by enjoining the University's disciplinary procedures. *See, e.g.*, *Roe v. Dir., Miami Univ., Office of Cmty. Standards*, No. 1:19-CV-136, 2019 WL 1439585, at *9 (S.D. Ohio Apr. 1, 2019) (noting that preventing university from enforcing its disciplinary procedures would not be in the public interest); *Doe v. Univ. of Cincinnati*, No. 1:15-CV-600, 2015 WL 5729328, at *3 (S.D. Ohio Sept. 30, 2015) ("[G]ranting a temporary restraining order would likely disturb the University's ability to enforce its disciplinary procedures, which would not be in the public interest."); *Doe v. Transylvania Univ.*, No. CV 5:20-145-DCR, 2020 WL 1860696, at *13 (E.D. Ky. Apr. 13, 2020) (recognizing that the public also has an interest in universities' enforcement of his disciplinary

procedures); *see also Pierre vs. the University of Dayton*, 143 F.Supp.3d 703, 714 (S.D. Ohio 2015).

    Accordingly, these final factors weigh in favor of denying Plaintiff's Motion.

## V.   CONCLUSION.

    For all of the above reasons, the University respectfully requests that this Court deny Plaintiff's Motion for Preliminary Injunction.

<div style="margin-left: 40%;">

Respectfully submitted,

/s/ Louise M. Griffin
Louise M. Griffin (0095724)
DINSMORE & SHOHL LLP
255 E. 5th Street, Suite 1900
Cincinnati, OH  45202
Phone:    513.977.8200
Fax:    513.977.8141
Email:    louise.griffin@dinsmore.com

*Counsel for Defendant*

</div>

22

**CERTIFICATE OF SERVICE**

I hereby certify that a true and accurate copy of the foregoing was served this 22nd day of

January, 2024, upon the following by email, pursuant to Civ.R. 5(B)(2)(f):

Joshua A. Engel
Scott O'Reilly
Engel and Martin, LLC
4660 Duke Drive, Suite 101
Mason, OH 45040
engel@engelandmartin.com
soreilly@engelandmartin.com

*Attorneys for Plaintiff*

/s/ *Louise M. Griffin*
Louise M. Griffin

23