**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

JOHN NOAKES,

     Plaintiff,

     v.

UNIVERSITY OF CINCINNATI, et al.,

     Defendants.

Case No. 1:23-CV-284

Judge Michael R. Barrett

**ORDER**

This matter is before the Court on the motion for reconsideration filed by Plaintiff John Noakes, (Doc. 53), and the response by Defendants University of Cincinnati ("UC"); Alecia Trammer, Director of the Office of Equity, Inclusion, and Community Impact; Adrienne Lyles, Title IX Coordinator; Bleuzette Marshall, Vice President for Equity, Inclusion, and Community Impact; and Ashleigh Wade, Director of Student Conduct and Community Standards, (Doc. 54).

## I. BACKGROUND

On March 30, 2022, the Assistant Director of Fraternity and Sorority Life at UC submitted an online report to the Office of Gender Equity & Inclusion ("OGEI"), indicating that a student, identified as Jane Roe, accused Noakes of sexually assaulting her at a fraternity party in September 2021. (Doc. 1, PageID 22). OGEI investigator Morgan Shaw conducted an intake meeting with Roe on April 6, 2022, but Roe did not submit a signed formal complaint to OGEI until July 26. (*Id.*). Shaw met with Roe again two days after that to discuss the complaint. (*Id.*).

On August 18, 2022, a Notice of Commencement of OGEI Investigation was sent to Noakes, informing him of the allegation "that on September 10, 2021 . . . [he] engaged in vaginal intercourse with [Roe] without [Roe's] consent." (Doc. 30, PageID 1064). The letter informed Noakes that the alleged sexual assault was determined to fall within the scope of UC's Title IX Sexual Harassment Policy and provided an overview of the investigation process, as well as an outline of his rights and responsibilities. (*Id.*, PageID 1064-65). Noakes responded on August 26, expressing his intention to cooperate with the investigation, but requesting additional information, including a copy of the original complaint. (Doc. 1, PageID 24). While Noakes and Shaw continued to correspond, Shaw conducted interviews with Roe and several other witnesses. (*Id.*, PageID 27-36).

Eventually, on November 10, 2022, Shaw provided Noakes with a draft investigative report. (*Id.*, PageID 36). Noakes responded on November 22, admitting that he and Roe "did engage in sexual intercourse," but "vehemently disagree[ing] that the sexual intercourse was not consensual." (*Id.*, PageID 37). Noakes also stated that Roe "did not seem to be impaired nor under the influence of any drugs," and expressed in a follow-up letter that he believed "the report was unreasonably delayed[,] which made it difficult for [him] to obtain witnesses and other evidence to support [his] version of the events." (*Id.*).

On January 10, 2023, Noakes was informed that the matter was referred for a misconduct hearing. (*Id.*, PageID 39). At the February 20 hearing, a panel consisting of employees from TNG Consulting reviewed Shaw's final report, heard testimony from witnesses, and examined both Noakes and Roe. (*Id.*, PageID 40-43). Noakes received a letter from Trammer on March 23, explaining that the panel unanimously found him

responsible for violating UC's Title IX Sexual Harassment Policy, "specifically related to the prohibition against Sexual Assault (Forcible Rape)". (*Id.*, PageID 132). The panel recommended that Noakes be expelled from UC. (*Id.*, PageID 143).

Noakes timely appealed the result, arguing in particular that (1) the panel impermissibly reviewed "highly prejudicial" statements from witnesses who did not appear at the hearing and therefore could not be cross-examined; (2) he had not received sufficient and timely notice of the allegations against him; (3) the investigative process was unduly prolonged, resulting in prejudice; (4) the hearing panel committed multiple errors; and (5) the entire investigation and hearing process had been fundamentally unfair. (*Id.*, PageID 145-53). However, on May 5, an appeals panel consisting of employees from InCompliance Consulting issued a thorough written opinion upholding the result of the hearing in its entirety. (*Id.*, PageID 154-67).

Noakes subsequently brought the underlying suit, raising claims under Title IX of the Education Amendments of 1972 and 42 U.S.C. § 1983.[1] Specifically, Noakes contends that "[c]lear irregularities in UC's response to the allegations of sexual misconduct permit a plausible inference of sex discrimination," and Defendants violated his due process rights by (1) delaying the investigation and adjudication of the matter; (2) failing to provide adequate notice of the allegations; (3) using biased outside consultants as decisionmakers; and (4) generally conducting hearings that were fundamentally unfair. (Doc. 1, PageID 54, 58-61). He argued that he would "suffer reputational and other harm both on and off campus" in the absence of injunctive relief. (Doc. 3, PageID 176).

---

[1] Noakes voluntarily dismissed two additional counts in his complaint. (Doc. 39).

After expedited, limited discovery, the Court held a preliminary injunction hearing on February 15, 2024. (Doc. 46). Although Noakes was "not barred from seeking prospective injunctive relief and any ancillary declaratory relief designed to remedy a continuing violation of federal law," the Court found that (1) Defendants provided Noakes with timely notice that sufficiently informed him of the charges and allowed him a meaningful opportunity to prepare for a hearing; (2) Noakes failed to put forth specific facts in support of his allegation that the hearing and appeal panels were impermissibly biased; (3) the hearing panel did not impermissibly rely on witness statements from individuals who were not present and therefore could not be subject to cross-examination; and (4) Defendants were not required to disclose whether Jane Roe received accommodations, because Noakes put forth "no factual basis that any such accommodations (if they were even extended) were relevant and led Jane Roe to falsify her report or her testimony before the hearing panel." (Doc. 48). Accordingly, the Court concluded that Noakes did not demonstrate a substantial likelihood of success on the merits of his due process claim, and preliminary injunctive relief was inappropriate.

Noakes timely appealed the Court's ruling pursuant to 28 U.S.C. § 1292(a)(1), and following oral arguments, the Sixth Circuit affirmed the Court's denial of injunctive relief on October 25, 2024. Specifically, the Sixth Circuit held that (1) "UC provided [Noakes] with adequate notice"; (2) "UC provided Noakes a constitutionally adequate hearing"; (3) Noakes demonstrated no bias on the part of the disciplinary panels; and (4) the hearing panel did not rely on undisclosed evidence, nor did it deprive Noakes of the right to cross-examine witnesses. (Doc. 51).

4

Noakes now seeks reconsideration of the Court's denial of injunctive relief, arguing that UC made "bad faith misrepresentations" when it "relied upon deposition testimony from the investigator and a 30(b)(6) witness that, as a matter of 'practice,' UC does not provide copies of Formal Complaints to students accused of sexual misconduct before they are interviewed by investigators." (Doc. 53, PageID 1914). Noakes contends that the alleged misrepresentations implicate the questions of adequate notice and panel bias, and the Court must therefore reconsider its denial of a preliminary injunction "to avoid manifest injustice and prevent further irreparable harm." (*Id.*, PageID 1924).

Defendants counter that "UC's deponents made no misrepresentations—much less material ones," and "even if the testimony Noakes complains of was somehow inaccurate . . . Noakes fails to show how any such inaccuracy is material to the outcome of this Court's and the Sixth Circuit's decisions to deny his request for a preliminary injunction." (Doc. 54, PageID 1938-39). Furthermore, "Noakes himself was provided with the Formal Complaint during the investigation when he received the Preliminary Investigative Report. And contrary to Noakes's contention, UC's Title IX Policy and the record evidence make it crystal clear that it is the Final Investigative Report—not the Preliminary Investigative Report—that concludes the investigation." (*Id.*, PageID 1944).

## II. <u>STANDARD OF LAW</u>

The Federal Rules of Civil Procedure do not specifically address motions for reconsideration of interlocutory orders. However, "[d]istrict courts have authority both under common law and Rule 54(b) to reconsider interlocutory orders and to reopen any part of a case before entry of final judgment." *Rodriguez v. Tenn. Laborers Health & Welfare Fund*, 89 F. App'x 949, 952 (6th Cir. 2004); *see Adkisson v. Jacobs Eng'g Grp.,*

*Inc.*, 36 F.4th 686, 694 (6th Cir. 2022); *cf. Luna v. Bell*, 887 F.3d 290, 297 (6th Cir. 2018) (noting that reconsideration is a matter for the Court's sound discretion).

"Motions for reconsideration . . . are largely disfavored," but reconsideration of an interlocutory order "is justified when there is '(1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest injustice.'" *Slush Puppie Ltd. v. Icee Co.*, 729 F.Supp.3d 773, 785 (S.D. Ohio 2024) (quoting *Louisville/Jefferson Cnty. Metro Gov't v. Hotels.com, L.P.*, 590 F.3d 381, 389 (6th Cir. 2009)). "To establish manifest injustice a moving party must 'show that there exist[s] a fundamental flaw in the court's decision that without correction would lead to a result that is both inequitable and not in line with applicable policy.'" *Gibson v. Yaw*, No. 1:22-CV-773, 2023 U.S. Dist. LEXIS 62130, at *7 (S.D. Ohio Apr. 7, 2023) (quoting *United States v. Carney*, No. 3:21-CR-98, 2022 U.S. Dist. LEXIS 39503, at *4 (M.D. Tenn. Mar. 4, 2022)). "Furthermore, a court will not find manifest injustice when the moving party simply reargues the issues that were not previously successful." *Nayyar v. Mt. Carmel Health Sys.*, Nos. 2:10-CV-135, 2:12-CV-189, 2014 U.S. Dist. LEXIS 19916, at *7 (S.D. Ohio Feb. 18, 2014).

## III. <u>ANALYSIS</u>

As a threshold matter, the Court looks to whether Noakes has identified genuine misrepresentations or irregularities. Upon review of the briefing and the voluminous record, the Court concludes that he has not. Defendant Marshall testified that UC has a practice of not providing a respondent with a copy of the formal complaint against them until an investigator has conducted an initial interview. Similarly, Defendant Shaw testified that UC has a practice of not providing a respondent with a copy of the formal complaint

6

against them until a preliminary investigative report has been issued. Following that, but prior to the issuance of a final investigative report, a respondent will be provided with a copy of the formal complaint, just as Noakes was.

Noakes bases his argument on UC's responses to requests for admissions in *Roe v. University of Cincinnati*, No. 1:22-CV-376 (S.D. Ohio), a case in which his counsel is serving as counsel for alleged victims of sexual abuse. When counsel "served requests for admission that tested whether UC would stand by the testimony in this case," Noakes alleges that UC "specifically repudiated the testimony of witnesses in this case." (Doc. 53, PageID 1917). But just as it was when the Court denied preliminary injunctive relief, "context is critical here." (Doc. 48, PageID 1887).

In response to a request for admission in *Roe* that stated "UC has a policy of not providing copies of Formal Complaints of sexual misconduct to respondents during an investigation," UC responded and "denie[d] that, at all times relevant to this matter, it had a policy of not providing copies of Formal Complaints of sexual misconduct to respondents during an investigation." (Doc. 53, PageID 1918). The rest of the requests for admissions and answers that Noakes provides are similar or virtually identical in nature. (*See id.*, PageID 1919-21). Thus, the Court agrees with Defendants that "the responses submitted by UC in *Roe* are entirely consistent with the deposition testimony provided by UC's employees in this case." (Doc. 54, PageID 1938).

The deposition testimony given here reflected a practice of using details from the official complaint to construct a notice to the respondent, but withholding the formal complaint itself until the respondent could be interviewed by an investigator. As Defendants observe, Marshall "testified that it was UC's practice not to provide a copy of

the Formal Complaint to respondents *prior to the respondent's initial meeting with the investigator*," and "Shaw testified that it was UC's practice not to provide a copy of the Formal Complaint to respondents *prior to the issuance of the Preliminary Investigative Report.*" (*Id.*, PageID 1943). Noakes was provided with the formal complaint when he received the preliminary investigative report, at which point he was "able to review that information and provide commentary . . . or additional evidence." (Doc. 30, PageID 991). Only after that was the final investigative report issued, which comports with UC's Title IX policy, (Doc. 1, PageID 120), and does not contradict the discovery responses in *Roe*.

But even if Noakes could point to genuine misrepresentations, he still misses the mark in asserting that "UC benefited from its shifting positions." (Doc. 56, PageID 1963). The issue of notice is straightforward on its face: "[i]n this context, notice must include a statement of the specific charges and grounds which, if proven, would justify expulsion." (Doc. 51, PageID 1903) (internal quotation marks omitted). To that end, the Court determined that "[t]he notice sent to Noakes on August 18, 2022, stated clearly that he was accused of engaging in nonconsensual intercourse with Jane Roe; it also included a specific address and a specific date and time." (Doc. 48, PageID 1888). Defendants thus "provided Noakes with sufficient notice of the charges against him and a meaningful opportunity to prepare for the hearing." (*Id.*) (internal quotation marks and citations omitted). On appeal, the Sixth Circuit agreed:

> UC emailed Noakes with the date, time, and location of the alleged incident. It informed Noakes that Roe had formally accused him of having nonconsensual sex with her in violation of the Title IX Policy. It also summarized UC's grievance process and Noakes's rights. In turn, the Title IX Policy—linked to in the notice—stated on the second page that a person cannot "consent" while "incapacitated." Title IX Policy, R. 1-3, PageID 104. On the next page, it explained that "incapacitation" includes "impairment resulting from drugs or alcohol."

> *Id.* at PageID 105. Read with the Title IX Policy it linked to, UC's August 2022 email notified Noakes that Roe had accused him of nonconsensual sex, and that incapacitation might be at issue. The email may by itself have satisfied due process's notice requirement. *See Flaim*, 418 F.3d at 638-39.

> But even assuming UC's initial email alone did not suffice, the preliminary report, which Noakes received on November 10, 2022, did. It noted that Roe drank alcohol before the alleged assault and also believed she had been drugged. It also summarized Shaw's interviews of other witnesses, who recalled Roe appearing intoxicated. The report placed incapacitation at the heart of Noakes's case. It afforded him over three months to prepare his defense. Thus, Noakes is unlikely to succeed on the claim that he lacked fair notice. See *Martinson v. Regents of Univ. of Mich.*, 562 F. App'x 365, 373-74 (6th Cir. 2014) (holding that notice one month before disciplinary hearing provided adequate time to prepare); *Cummins*, 662 F. App'x at 447 (same); *Doe v. Miami Univ.*, 882 F.3d 579, 603 (6th Cir. 2018) (three weeks).

(Doc. 51, PageID 1904).

In order to meet his burden, Noakes must "present information that would support a different analysis or conclusion." *United States v. Scherer*, 2:19-CV-3634, 2021 U.S. Dist. LEXIS 124990, at *8 (S.D. Ohio July 6, 2021). This is so because the Sixth Circuit counsels that "courts should not 'reconsider a matter once resolved in a continuing proceeding.'" *Howe v. City of Akron*, 801 F.3d 718, 739 (6th Cir. 2015) (quoting 18B Charles Alan Wright, Arthur R. Miller, and Edward H. Cooper, Federal Practice and Procedure: Jurisdiction and Related Matters § 4478 (4th ed. 2015)).

Noakes argues that the alleged misrepresentations "concerned the legal issue of whether the notice provided by UC was sufficient under *Matthews v. Eldridge*, 424 U.S. 319 (1976), because it failed to include sufficient details known at the time and with sufficient time to prepare a response before any initial interview." (Doc. 53, PageID 1922). But Noakes received notice that satisfied the requirements of due process,

notwithstanding when he was first provided with a copy of the formal complaint or whether UC misrepresented its own practices. The alleged misrepresentations would therefore be immaterial to the determinations of both this Court and the Sixth Circuit.

The same holds true for Noakes's threadbare claim that the alleged misrepresentations confirm his earlier allegations of bias in UC's investigation and hearing process. And because the motion for reconsideration otherwise merely attempts to relitigate issues already decided—both by this Court and the Sixth Circuit—the Court finds no manifest injustice or any other circumstance warranting reconsideration.

## IV. **CONCLUSION**

For the foregoing reasons, the motion for reconsideration, (Doc. 53), is **DENIED**.[2]

**IT IS SO ORDERED.**

    */s/ Michael R. Barrett*
Michael R. Barrett
United States District Judge

---

[2] In the interest of clarity, the Court takes this opportunity to note that its order of March 4, 2025, (Doc. 55), denying as moot Defendants' motion to dismiss of July 7, 2023, was a docket management measure done so without prejudice, rendering the motion subject to renewal, if appropriate.