## <u>MEMORANDUM IN SUPPORT</u>

Plaintiff is a former UC student who was accused of sexual assault by a fellow student. After an investigation conducted pursuant to UC's written policies and procedures, a disciplinary hearing before neutral panelists, and an appeal, Plaintiff was found responsible for sexual misconduct and expelled. Yet, despite receiving more process than required by law, Plaintiff now comes to the Court asking for a determination that the process that he received was fundamentally unfair (Count II) and that the outcome of the disciplinary proceeding was erroneous and caused by gender bias (Count I). Because the allegations in the Complaint do not state a plausible claim regarding either contention, both counts must be dismissed.

With regard to Count I, Plaintiff has failed to plead a plausible Title IX violation by UC because the Complaint is devoid of facts that would allow the Court to infer that the outcome of his disciplinary proceeding was caused by gender bias. To survive a motion to dismiss, Plaintiff must plead facts sufficient to establish a particularized causal connection between the alleged erroneous outcome of his proceeding and gender bias. Plaintiff has failed to do so here, and, instead relies upon outdated and misplaced allegations that fail to establish that the outcome of his proceeding was in any way caused by gender bias.

With regard to Count II, Plaintiff's due process claim against the Individual Defendants in their official capacities fails because none of the purported procedural issues Plaintiff complains of—taken separately or cumulatively—establish a plausible claim that his due process rights were violated. Even when accepted as true, Plaintiff's factual allegations do not establish that he received inadequate notice of the charge against him, was prejudiced by undue delay, or otherwise received a process and hearing that was anything other than fundamentally fair.

1

For these reasons and others stated more fully below, the Court should dismiss Counts I and II of the Complaint, which are Plaintiff's only remaining claims.

## **FACTS**

Plaintiff was a student at UC who was expelled in May 2023 for sexual misconduct following a hearing and appeal. (Compl., Doc. No. 1 at ¶ 4, PageID #3).[4] On March 30, 2022, UC's Office of Gender Equity & Inclusion ("OGEI") received an online report from the Assistant Director of Fraternity and Sorority Life. (*Id*. at ¶ 58, PageID #22). The report indicated that Jane Roe, another student at UC, had alleged that Plaintiff sexually assaulted her during a fraternity party held on September 10, 2021. (*Id*. at ¶¶ 54, 57, PageID #21, 22). OGEI reached out to Roe the following day, and later met with Roe on April 6, 2022. (*Id*. at ¶¶ 59-60, PageID #22).

On July 26, 2022, Roe submitted a Formal Complaint to OGEI containing the sexual assault allegation against Plaintiff. (*Id*. at ¶¶ 54, 62, PageID #21-22). On July 28, 2022, OGEI Investigator Morgan Shaw ("Shaw") met with Roe to discuss the Formal Complaint. (*Id*. at ¶ 63, PageID #22). On August 18, 2022, Shaw provided Plaintiff with a Notice of Commencement of OGEI Investigation ("Notice"). (*Id*. at ¶ 64, PageID #23). The Notice informed Plaintiff that "[t]he Formal Complaint alleges that on September 10, 2021, at approximately 11:49pm, at 2707 Clifton Ave. … [Plaintiff] engaged in vaginal intercourse with [Jane Roe] without [Roe's] consent." (*Id*. at ¶ 64, PageID #23).

Thereafter, Shaw conducted an investigation that included interviews of Roe, Plaintiff, and nine witnesses. (*Id*. at ¶¶ 68, 73, 75, 77, 78, 80, 82, 83, 84, 87, 88, 91, PageID #25-36). In October 2022, Shaw informed Plaintiff that she was "currently interviewing witnesses and gathering evidence. When the Preliminary Investigation Report (PIR) is sent for your review, you will be able to see witness statements including the dates in which I interviewed them." (*Id*. at ¶ 90, PageID #34). On November

---

[4] The facts alleged in the Complaint are taken here as true only for purposes of this motion to dismiss.

4, 2022, Shaw informed Plaintiff that evidence that she required had been delayed and that "good cause exists for the investigator to extend the timeframe of the investigatory process." (*Id*. at ¶ 93, PageID #36). Following the investigation, on November 10, 2022, Shaw provided Plaintiff with a draft investigative report, to which Plaintiff submitted written responses. (*Id*. at ¶¶ 94-96, PageID #36-37).

On January 10, 2023, Plaintiff was informed that the matter had been referred for a hearing. (*Id*. at ¶ 98, PageID #39). Plaintiff appeared at a hearing on February 20, 2023. (*Id*. ¶ at 104, PageID #40-43). The Hearing Panel consisted of employees from TNG Consulting. (*Id*. at ¶ 102 PageID #39-40). The Hearing Panel received and reviewed the investigation report prepared by Shaw. (*Id*. at ¶ 104, PageID #40). At the hearing, Plaintiff testified, presented opening and closing statements, and cross-examined Roe and other witnesses. (*Id*. at ¶ 104, PageID #40-43).

On March 23, 2023, Plaintiff was notified that the Hearing Panel found him responsible for violating UC's Title IX Sexual Harassment Policy and determined that Plaintiff should be expelled from UC. (*Id*. at ¶ 108, PageID #44). On March 30, 2023, Plaintiff appealed the Hearing Panel's decision. (*Id*. at ¶ 112, PageID #47-48). The Appeals Panel consisted of individuals from InCompliance Consulting. (*Id*. at ¶ 115, PageID #48-49). On May 5, 2023, the Appeals Panel denied Plaintiff's appeal. (*Id*. at ¶ 116, PageID #49-53).

Plaintiff filed the Complaint on May 15, 2023. In Count I, Plaintiff seeks monetary damages from UC for violations of Title IX under an "erroneous outcome" theory. (*Id*. ¶¶ 119-128, PageID #54-58). In Count II, Plaintiff seeks declaratory and injunctive relief against the Individual Defendants in their official capacities for violations of his due process rights. (*Id*. ¶¶ 129-139, PageID #58-61).

## ARGUMENT

### I. Legal Standard.

A complaint that fails to state a claim upon which relief can be granted is subject to dismissal under Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, the complaint must

include sufficient facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations and citations omitted). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In deciding whether the complaint is plausible, the Court must interpret it in a light most favorable to the non-moving party, accept factual allegations as true, and give the plaintiff the benefit of reasonable inferences. *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008) (citations omitted). However, the Court is not required to accept as true legal conclusions bereft of supporting factual allegations. *Iqbal*, 556 U.S. at 678.

## II.  Plaintiff Fails To State A Plausible Erroneous Outcome Claim under Title IX.

In Count I, Plaintiff asserts a violation of Title IX under the "erroneous outcome" theory. "A successful 'erroneous outcome' claim requires the plaintiff to show that the 'outcome of [the] University's disciplinary proceeding was erroneous because of sex bias.'" *Doe v. Cummins*, 662 F. App'x 437, 452 (6th Cir. 2016) (quoting *Mallory v. Ohio Univ.*, 76 F. App'x 634, 639 (6th Cir. 2003)). "The gravamen of an erroneous outcome claim is that an 'innocent' person was wrongly found to have committed an offense because of his or her gender." *Marshall v. Ohio Univ.*, No. 2:15-cv-775, 2015 WL 7254213, at *5 (S.D. Ohio Nov. 17, 2015) (internal quotations omitted).

To adequately plead an "erroneous outcome" claim, a plaintiff must allege: "(1) facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding; and (2) a particularized … causal connection between the flawed outcome and gender bias." *Doe v. Miami Univ.*, 882 F.3d 579, 592 (6th Cir. 2018) (quotations omitted).

Here, Plaintiff's Title IX erroneous outcome claim must be dismissed because the Complaint fails to plead facts that would allow the Court to draw the reasonable inference that a

4

causal connection exists between the hearing outcome and gender bias.[5] With respect to this element, "allegations of a procedurally or otherwise flawed proceeding that has led to an adverse and erroneous outcome combined with *a conclusory allegation of gender discrimination* is not sufficient to survive a motion to dismiss." *Cummins*, 662 F. App'x at 452 (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (1994)) (emphasis added). Instead, the complaint must plead facts alleging "a *particularized* … causal connection between the flawed outcome and gender bias." *Id.* (emphasis added) (quoting *Yusuf*, 35 F.3d at 715). "Such allegations might include, *inter alia,* statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Yusuf*, 35 F.3d at 715.[6]

Despite its length, the Complaint falls far short of satisfying this causation requirement. Plaintiff pleads no facts involving statements by members of the hearing panel or by university officials that may serve as evidence of gender bias. Instead, Plaintiff relies on allegations that UC engaged in a "pattern of decision-making" over a number of years that, according to Plaintiff, demonstrates that gender influenced the outcome of his hearing. However, even when accepted as true, Plaintiff's allegations fail to establish the causal connection required under the law.

As an initial matter, the vast majority of the circumstantial allegations Plaintiff asserts regarding alleged indicators of "bias" are not specific to any gender:

---

[5] Nor, for the same reasons stated below in section III, has Plaintiff alleged facts sufficient to cast some articulable doubt on the outcome of his disciplinary proceeding, the first prong of an erroneous outcome claim. In an attempt to shed doubt on the accuracy of the outcome of his hearing, Plaintiff pleads, as part of his Title IX claim, the same allegations of procedural flaws that he pleads in support of his procedural due process claim. But as argued below, those facts do not establish a due process violation. *See infra* section III. UC complied with the requirements of due process and even the Sixth Circuit has now remarked that the panel's decision here is no way "perplexing." *Noakes v. Univ. of Cincinnati*, No. 24-3388, 2024 U.S. App. LEXIS 27189, at *13 (6th Cir. Oct. 25, 2024).

[6] Accordingly, while Plaintiff has also included, as part of this Title IX claim, the same allegations of procedural flaws that he pleads in support of his due process claim, (Compl. at ¶ 123, PageID # 54-57), those allegations alone are insufficient to establish an inference of gender bias. Plaintiff must still plead facts that would allow the Court to infer a causal connection between the outcome and gender bias. For the reasons stated herein, he has not done so.

5

- "After the Dear Colleague Letter was published, many schools changed their sexual assault and sexual harassment policies and procedures in a manner that, while not completely ignoring due process concerns, shifted the focus more on *victim* advocacy." (Compl., Doc. 1. at ¶ 15, PageID #5).

- "Each of the letter's significant procedural changes increased the chances that an *accused student* would be found responsible for a sexual misconduct allegation." (*Id*. at ¶ 17, PageID #6).

- "The federal government has created a significant amount of pressure on colleges and universities to treat *all those accused of sexual misconduct* with a presumption of guilt." (*Id*. at ¶ 18a, PageID #6-7).

- "She explained that schools are running so scared of violating the civil rights of alleged *victims* that they end up violating the due process rights of defendants instead." (*Id*. at ¶ 18b, PageID #7).

- "In withdrawing the Dear Colleague Letter, OCR observed that prior actions 'may have been well-intentioned, but … led to the deprivation of rights for many students—both *accused students* denied fair process and *victims* denied an adequate resolution of their complaints." (*Id*. at ¶ 19a, PageID #9).

- "As a result, many schools have established procedures for resolving allegations that 'lack the most basic elements of fairness and due process, are overwhelmingly stacked against the *accused*, and are in no way required by Title IX law or regulation." (*Id*. at ¶ 19b, PageID #10).

- "The Final rule, inter alia, prescribes a transparent grievance process that treats *accused students* as innocent until proven guilty, requires the school to state a standard of evidence, and requires the school to provide a hearing process where *accused students* may question adverse witnesses." (*Id*. at ¶ 20, PageID #10).

- "During her confirmation hearings, Lhamon stated that she still believed that 'the regulation permits *students* to rape and sexually harass with impunity.' One scholar who has studied Title IX enforcement extensively wrote: 'During a pre-hearing meeting with [a senator], Lhamon challenged the portrayal of her as someone who only believed *complainants*.'" (*Id*. at ¶ 21b, PageID #10-11).

Because these allegations do not establish bias in favor or against any particular gender, they fail as a matter of law to support any allegation of gender bias. *See Sahm v. Miami Univ.*, 110 F. Supp. 3d 774, 778 (S.D. Ohio 2015) (demonstrating bias in favor of alleged victims of sexual assault claims is not equivalent of demonstrating gender bias); *Cummins*, 662 F. App'x at 453 (same).

6

Plaintiff makes all of the allegations above ostensibly to show that UC was under pressure as a result of various government policies in effect between 2011 and 2020. But there are obvious problems with Plaintiff's approach. First, even if these allegations were gender specific, they merely establish that government policies have flip-flopped over time. Plaintiff alleges that government policies have "treat[ed] all those accused of sexual misconduct with a presumption of guilt." (Compl., Doc. 1, at ¶ 18a, PageID # 7). Then Plaintiff alleges that government policies later "prescribe[d] a transparent grievance process that treats accused students as innocent until proven guilty." (*Id.* at ¶ 20, PageID # 10). These allegations show only that government policies have changed, not that there has been sustained pressure to favor one particular group over any other.

Second, these generalized allegations involve events occurring between 2011 and 2020, and thus cannot possibly be used to show that UC was subject to any government or public pressure at the time of Plaintiff's hearing in 2023. *Cf. Cummins*, 662 F. App'x at 452 (distinguishing *Doe v. Columbia University*, where it was alleged that "*in the weeks leading up to* the plaintiff's hearing" the school and the Title IX investigator had "faced substantial criticism from both the student body and the public media regarding its handling of sexual-assault investigations") (emphasis added). This problem is amplified by Plaintiff's own allegations demonstrating that the government shifted its stance repeatedly between 2011 and 2020, undermining any claim that UC felt pressure to favor one group over another at any particular time, much less in 2023.

Third, it is well-established that "allegations concerning … pressure allegedly exerted on universities by the Department of Education to intensify their response to sexual assault complaints fall short of creating a reasonable inference [of bias]." *Doe v. University of Cincinnati*, 173 F.Supp.3d 586, 602 (S.D. Ohio 2016). Other courts have held the same—general references to federal pressure alone are insufficient to show gender bias. *See Doe v. Univ. of St. Thomas*, 240 F.

Supp. 3d 984, 992 (D. Minn. 2017) ("[T]his Court joins the majority of federal courts in finding a general reference to federal pressure, by itself, is insufficient to show gender bias."); *Marshall*, 2015 WL 7254213, at \*8 (finding insufficient plaintiff's assertion "that OU has succumbed to pressure from the Department of Education to 'crackdown' on perpetrators of sexual assault and sexual misconduct on university campuses").[7] Accordingly, Plaintiff must do more than merely assert general allegations regarding federal pressure—he must set forth allegations that could allow the Court to infer that UC exhibited gender bias in his proceeding due to that pressure.

This he has failed to do. True, Plaintiff includes allegations about UC in an effort to plead that gender bias was the cause of the outcome of his proceeding. But those allegations are inadequate to establish the requisite causal connection. Plaintiff pleads as follows:

- "In the course of implementing these policies and procedures, UC has adopted practices that reinforce and rely upon *gender stereotypes* and abrogate the due process rights of students." (*Id.* at ¶ 2, PageID # 2).

- "On information and belief, UC, like other schools nationwide, was scared of being investigated or sanctioned by the Department of Education for not taking seriously complaints from female students alleging sexual assault by male students." (*Id.* at ¶ 22, PageID # 11).

- "In the years preceding the disciplinary actions against John Noakes, there was substantial criticism of UC, both in the student body and in the public media, accusing UC of not taking seriously complaints of female students alleging sexual assault by male students." (*Id.* at ¶ 23, PageID # 11).

- "In 2022, following a series of reports of sexual assaults on campus, the News Record noted that 'social pressures make it difficult for women to come forward with allegations of assault.'" (*Id.* at ¶ 23e, PageID # 12).

- "UC has a pattern and practices of both not taking allegations of sexual assault against female students seriously. UC also has a pattern and practice of not respecting the due process rights of both accused students and alleged victims." (*Id.* at ¶ 24, PageID # 12).

---

[7] Plaintiff also spots his Complaint with a couple more allegations that mention alleged bias in favor of females. *See* Compl., Doc. 1, at ¶ 18a, PageID #6-7 (alleging that an article written in 2014 "noted that different standards were applied to men and women"); *id.* at ¶ 18g, PageID #9 (alleging that "[i]n 2015, the Office's director, Catherine Lhamon, told a national media publication that "[w]e don't treat rape and sexual assault as seriously as we should," citing data "about the rate of unwanted sexual activity experienced specifically by college women."). But these allegations suffer from the same defects as those above because they are only general allegations related to alleged government pressure and date back to 2014 and 2015, close to a decade before Plaintiff's hearing in this matter.

These allegations suffer from the same defect as Plaintiff's generalized allegations about government pressure. First, one allegation is not specific to either gender. (*Id.* at ¶ 2). Second, all of the allegations involve events that happened "in the *years* preceding" Plaintiff's disciplinary proceeding. Plaintiff's hearing occurred in 2023, and the Complaint makes no allegation that UC was under pressure or criticism during that period of time—that is, in the days or weeks "leading up to" Plaintiff's hearing. *Cf. Cummins*, 662 F. App'x at 452. In fact, the very latest allegation is from 2022. But that allegation does not implicate gender bias—it merely recites a report from a student newspaper claiming that social pressures make it difficult for women to come forward with allegations of assault. Accordingly, none of the allegations Plaintiff sets forth are sufficient to show that gender bias could have caused the outcome of Plaintiff's proceeding.

Third, the allegations are again internally inconsistent and thus fail to establish any bias against any particular group at any particular time. Plaintiff alleges, on the one hand, that UC engaged in a pattern and practice of "not taking allegations of sexual assault against female students seriously." (Compl., Doc. 1 at ¶ 24, PageID #12). Then Plaintiff alleges in the very next sentence that UC had a pattern or practice of "not respecting the due process rights of both accused students and alleged victims." (*Id.*). To further the confusion, Plaintiff then claims that "[i]n many instances accused students, not just alleged victims, have filed complaints with OCR." (*Id.* at ¶ 27, PageID # 14).[8] Far from establishing a plausible inference that gender bias caused the outcome of Plaintiff's proceeding, these allegations only leave one wondering which particular group it is that UC is alleged to have been biased against and when that bias is alleged to have occurred.

---

[8] In an apparent attempt to provide some modernity to his allegations, Plaintiff cites a law review article written in 2022. But the article merely notes that the government policies upon which Plaintiff now relies to establish gender bias have swung the "pendulum" both ways. (Compl., Doc. 1 at ¶ 27, PageID #14).

Finally, Plaintiff includes two other allegations against UC that similarly cannot establish causation. In paragraph 25, Plaintiff alleges that UC has been involved in other lawsuits due to "the manner in which it investigates and adjudicates allegations of sexual assault and harassment." (Compl., Doc. 1, at ¶ 25, PageID # 13). Plaintiff cites *Doe v. University of Cincinnati*, 872 F.3d 393 (6th Cir. 2017), a case in which "the Sixth Circuit held that UC had violated the due process rights of students by not permitting cross-examinations of adverse witnesses in Title IX hearings." (*Id.*) But as Plaintiff concedes, that case occurred years before Plaintiff's hearing and involved a due process claim where there was no allegation or finding of gender bias.

In paragraph 26, Plaintiff asserts that UC is currently subject to five open Title IX investigations from the Department of Education. (*Id.* at ¶ 26, PageID # 13-14). Plaintiff lists investigations dating back to 2016 and provides no information regarding those investigations, let alone any allegations connecting those investigations to gender bias. And Plaintiff simply is not entitled to go on a discovery fishing expedition on the basis of such inconclusive allegations. *Doe v. Miami*, 882 F.3d at 593 (allegations must "raise a reasonable expectation that discovery will reveal circumstantial evidence of gender discrimination" to survive a motion to dismiss).

In sum, Plaintiff has failed to allege sufficient facts to support his Title IX claim because he relies upon outdated and inconsistent allegations that do not allow for a reasonable inference that gender bias caused the outcome of his hearing. Count I accordingly should be dismissed.

## III. Plaintiff Fails to State a Plausible Due Process Claim.

In Count II, Plaintiff brings an *Ex parte Young* claim alleging that the Individual Defendants in their official capacities deprived him "of life, liberty, or property, without due process of law" in violation of the Fourteenth Amendment to the U.S. Constitution. (*Id.* at ¶ 131, PageID #58).[9] To

---

[9] Plaintiff also invokes the Fifth Amendment in Count II, but the Fifth Amendment due process clause applies only to the United States government and its officials. *See Dusenbery v. United States*, 534 U.S. 161, 167 (2002).

state a claim for a violation of procedural due process, Plaintiff must allege that (1) he had a property or liberty interest of which he was deprived, and (2) the state did not afford him adequate procedural rights prior to the deprivation. *Ingraham v. Wright*, 430 U.S. 651, 672 (1977).

While the Sixth Circuit has held that state universities must afford students minimum due process protections before issuing significant disciplinary decisions—*Doe v. University of Cincinnati*, 872 F.3d 393, 399 (6th Cir. 2017)—Plaintiff's allegations fail to establish a plausible claim that the Individual Defendants failed to afford him adequate procedural rights. Where a party properly alleges the existence of a property or liberty interest,[10] "the question remains what process is due." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). The Sixth Circuit has explained the parameters of adequate procedural rights for students facing disciplinary action:

> At a minimum, a student facing suspension is entitled to "the opportunity to be 'heard at a meaningful time and in a meaningful manner.'" While the exact outlines of process may vary, universities must "at least" provide notice of the charges, an explanation of the evidence against the student, and an opportunity to present his side of the story before an unbiased decision maker. …
>
> Even in the case of a sexual assault accusation—where "[a] finding of responsibility will … have a substantial and lasting impact" on the student—the protection afforded to him "need not reach the same level … that would be present in a criminal prosecution." Review under *Mathews* asks only whether John Doe "had an opportunity to 'respond, explain, and defend,'" not whether a jury could constitutionally convict him using the same procedures.

*Doe v. Univ. of Cincinnati*, 872 F.3d at 399-400 (internal citations omitted). When examined against these principles, the Complaint makes it clear that what Plaintiff seeks is more process than he is constitutionally due. Plaintiff's notion of process would transform student disciplinary proceedings into a court of law. (Compl., Doc. 1 at ¶ 137, PageID #59-61).

---

[10] Defendants do not concede that Plaintiff has a protected property or liberty interest in continuing his education at UC, or otherwise.

11

### A. Alleged delay in the provision of notice.

Plaintiff alleges that UC unduly delayed the investigation and adjudication of the matter because "John Noakes was not provided notice until August 18, 2022 – over four months after the UC Title IX Office became aware of the allegations and over three weeks after a formal complaint was filed." (*Id.* at ¶ 137a, PageID #59.) Plaintiff also complains that UC's Title IX Policy requires that all matters be completed within 90 business days, which time period expired prior to the Outcome Letter dated March 23, 2023. (*Id.* at ¶ 157-60, PageID #63). These allegations fail to establish a plausible due process violation.

The Sixth Circuit has made clear that due process in the student disciplinary context requires only that the accused receive "sufficient notice of the charges against him and a meaningful opportunity to prepare for the hearing." *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 638 (6th Cir. 2005). When courts analyze whether notice is sufficient, they consider the amount of time the student had to prepare for the hearing—not how long the university took to notify the student after the filing of a complaint. *Cummins*, 662 F. App'x at 447 (provision of notice one month before hearing was sufficiently timely to satisfy due process requirements); *Doe v. Miami Univ.*, 882 F.3d 579, 603 (6th Cir. 2018) (providing notice three weeks before the disciplinary hearing was sufficiently timely to satisfy due process requirement). In fact, due process only compels a university to provide the accused student notice "pre-expulsion." *Cummins*, at 446.

The Complaint unquestionably acknowledges that UC fulfilled this obligation—providing Plaintiff with notice three weeks after his accuser filed a formal complaint and almost six months before the hearing. *E.g. Id.* at 447. Contrary to Plaintiff's suggestion, UC did not have a duty to provide Plaintiff with notice of allegations until the formal complaint was filed. (Title IX Policy, Doc. 1-3, PageID #115); *Noakes*, 2024 U.S. App. LEXIS 27189 at *9.

Nor can Plaintiff rely on the purported lapse of the 90-day time period in UC's Title IX Policy to establish a due process violation. *Doe v. Univ. of Cincinnati*, 173 F.Supp.3d at 603 ("[A]n allegation that the disciplinary board violated its own policies and procedures does not state a claim for a due process violation."). Despite Plaintiff's claim, the allegations in his Complaint show that Shaw continually kept Plaintiff apprised of the investigation. And although UC's Title IX Policy provides that the "University shall make appropriate efforts to ensure" completion of the grievance process within 90 days, it also provides that "these timeframes are estimations of the duration of time necessary" and that "[t]emporary delay of the grievance process or the limited extension of timeframes for good cause, with written notice to the complainant and the respondent of the delay or extension and the reasons for the action, are permissible." (Compl., Doc. 1-3 at § IX, PageID #114). The policy also provides that "[w]here parties, witnesses, and/or evidence needed by the investigator are delayed, temporarily unavailable, and/or otherwise withheld, good cause exists for the investigator to extend the timeframe of the investigatory process as necessary to complete a thorough and appropriate review of the matter." (Compl., Doc. 1-3 at § VII, PageID #120-121).

As Plaintiff's Complaint indicates, Shaw abided by these provisions. On November 4, 2022, one month prior to the expiration of the 90-day deadline, Shaw sent an email to Plaintiff stating that "evidence needed by the investigator [was] delayed" and that "good cause exists for the investigator to extend the timeframe of the investigatory process." (Compl., Doc.1 at ¶ 93, PageID #36). Consequently, Plaintiff's "undue delay" allegations do not state a plausible claim that Plaintiff's due process rights were violated.

### B. Alleged insufficiency of notice.

Plaintiff also claims that the Notice from Shaw "did not include sufficient details known at the time." (*Id*. at ¶ 123, PageID #55). This claim is also deficient. As outlined in Plaintiff's

13

Complaint, on August 18, 2022, Shaw provided notice to Plaintiff that the investigation involved an allegation that on "September 10, 2021 at approximately 11:49 pm, at 2707 Clifton Ave. … [John Noakes] engaged in vaginal intercourse with [Jane Roe] without [Roe's] consent." (Compl., Doc. 1 at ¶ 64, PageID #23). Plaintiff suggests that this Notice was inadequate because it "did not state that Jane Roe alleged she was incapacitated and therefore incapable of consent due to alcohol and/or drugs." (*Id*. at ¶123, PageID #55). But nothing in the law requires notice in disciplinary proceedings (or even criminal indictments) to include that level of detail. *Cummins*, 662 F. App'x at 447 (quoting *Flaim*, 418 F.3d at 638) ("Notice satisfies due process if the student had sufficient notice of the charges against him and a meaningful opportunity to prepare for the hearing.").

Further, Plaintiff was placed on notice of allegations regarding incapacitation—both by the formal Notice provided by Shaw and by other information provided to Plaintiff throughout the course of the disciplinary process. The Notice provided by Shaw stated that Roe did not give "consent." (Compl., Doc. 1 at ¶ 64, PageID #23). A quick reading of UC's Title IX Policy by Plaintiff and his advisor would have revealed how that word is interpreted under the policy. For example, the policy provides that "[a] person cannot give consent if the person is mentally or physically incapacitated." The policy then defines "incapacitation" to include "physical or mental impairment resulting from drugs or alcohol." (Compl., Doc. 1-3 at PageID #104). Additionally, as outlined in Plaintiff's Complaint, on November 10, 2022, Shaw provided Plaintiff with a draft investigative report that contained the specifics of Roe's allegations—nearly three months prior to the hearing. (Compl., Doc. 1 at ¶ 94, PageID #36). And Plaintiff responded to the preliminary investigative report by acknowledging that the issue in the case was "consent" and "impairment." (*Id*. at ¶ 95, PageID #37). The Sixth Circuit recognized that this preliminary report placed

14

incapacitation at the center of the case and afforded Plaintiff ample time to prepare a defense. *Noakes*, 2024 U.S. App. LEXIS 27189 at *6-7.

### C. Alleged bias of decision-makers.

Plaintiff alleges that UC "used biased outside consultants as decision-makers on both the Hearing Panel and the Appeal Panel." (*Id*. at ¶ 137, PageID #60). While "a biased decisionmaker [is] constitutionally unacceptable," *Withrow v. Larkin*, 421 U.S. 35, 47 (1975), "[i]n the university setting, a disciplinary committee is entitled to a presumption of honesty and integrity, absent a showing of *actual bias*." *McMillan v. Hunt*, No. 91-3843, 1992 WL 168827, at *2 (6th Cir. July 21, 1992) (citing *Ikpeazu v. Univ. of Neb.*, 775 F.2d 250, 254 (8th Cir. 1985)) (emphasis added). Thus, "[a]lleged prejudice of university hearing bodies must be based on more than mere speculation and tenuous inferences." *Duke v. N. Texas State Univ.*, 469 F.2d 829, 834 (5th Cir. 1972). Examples of allegations that may establish a plausible claim of actual bias include allegations of personal animosity, illegal prejudice, or a personal or financial stake in the outcome. *Doe v. Bowling Green State Univ.*, No. 3:22-cv-140, 2022 U.S. Dist. LEXIS 179939, at *25 (N.D. Ohio Sept. 30, 2022).

Plaintiff alleges that UC used biased decision-makers because: (1) the Hearing Panel members are associated with organizations "that routinely provide opinions on behalf of schools that investigations were adequate in response to challenges by students found to have engaged in sexual misconduct;" and (2) the Appeals Panel members were affiliated with a firm that "derives significant income from providing training and legal representation to UC in Title IX matters and that represents schools in responding to Title IX claims." (Compl., Doc. 1 at ¶ 137, PageID #60).

Even if accepted as true, Plaintiff's allegations do not establish actual bias. For one, a decision-maker is not "disqualified simply because he has taken a position, even in public, on a

policy issue related to the dispute[.]" *Welch v. Barham*, 635 F.2d 1322, 1326 (8th Cir. 1980); *see also Doe v. Univ. of Cincinnati*, 173 F.Supp.3d at 601–602 (citing *Gomes v. Univ. of Maine Sys.*, 365 F.Supp.2d 6, 31–32 (D. Me. 2005) (explaining the fact that the hearing board chair participated in sexual assault victim advocacy programs did not demonstrate that she was biased against the plaintiff in his sexual misconduct disciplinary hearing). Nor is a decision-maker disqualified for belonging to an entity that has a contractual relationship with the school. The mere existence of such a contractual relationship does not demonstrate that the decision-maker "ha[d] a pecuniary interest *in the outcome*" of the proceeding, *e.g.*, *Withrow*, 421 U.S. at 47 (emphasis added), and therefore is not sufficient to establish actual bias. As the Sixth Circuit recently reiterated in this case, bias must be "evident from the record," not inferred from speculative associations or prior professional roles. *Noakes*, 2024 U.S. App. LEXIS 27189, at *9–10.

At most, Plaintiff's allegations establish a relationship between UC and entities to which the decision-makers belong. But the fact that the decision-makers are affiliated with entities that provide certain arms-length business services to UC is not evidence of actual bias. *E.g., Cummins*, 662 Fed. Appx. at 454 (the court will not "indulge in unreasonable inferences" concerning alleged bias). Plaintiff makes no allegations that the panel members exhibited personal animosity, illegal prejudice, or had a personal or financial stake in the outcome. Instead, Plaintiff relies on institutional associations and generalized skepticism of the university's chosen process—precisely the kind of "shots in the dark" the Sixth Circuit declined to credit at the preliminary injunction stage.

### D. Alleged cross-examination and evidentiary errors.

Plaintiff argues that various evidentiary errors occurred during the hearing that violated his right to due process. He asserts that the Hearing Panel: (1) improperly reviewed and relied on statements from witnesses who failed to appear before the Hearing Panel and were not subject to

cross-examination; (2) did not permit full cross-examination by his advisor; (3) relied on evidence of a blood-alcohol calculator that was not disclosed prior to the hearing; and (4) relied on blood-alcohol and SANE evidence that was not supported by expert testimony. (Compl., Doc. 1 at ¶¶ 137d-g, PageID #60). Plaintiff also argues that the investigation failed to seek relevant evidence regarding Roe's SANE examination and that the Hearing Panel failed to draw a negative inference from Roe's failure to produce such evidence. (*Id*. at ¶ 137h, PageID #60-61). None of these allegations establishes a viable due process claim.

First, it is axiomatic that a university is "not required to facilitate witness questioning at every nonacademic misconduct hearing." *Doe v. Univ. of Cincinnati*, 872 F.3d at 405. "[C]ross-examination is 'essential to due process' only where the finder of fact must choose 'between believing an accuser and an accused.'" *Id.* (quoting *Flaim*, 418 F.3d at 641). Here, the Hearing Panel heard from both the accuser and the accused, as well as numerous other witnesses, all of whom were subject to cross-examination. The panel was not required to hear from all possible witnesses, and could have, if it wished, considered hearsay in making a decision. *Bowling Green State Univ.*, 2022 U.S. Dist. LEXIS 179939 (consideration of summaries that include hearsay is not a procedural due process violation). And contrary to Plaintiff's allegation, the Hearing Panel did not rely upon statements made by witnesses who did not appear. (Doc. 1-6, PageID #156.)

Moreover, Plaintiff had the opportunity to cross-examine Roe, so none of the concerns extant in cases like *Doe v. University of Cincinnati*, 872 F.3d at 401-405, are present here. Plaintiff alleges only that, during one exchange, the Hearing Panel cut off his questioning of Roe. But Plaintiff is not entitled to unlimited questions or to ask every question he wishes. *Doe v. Mich. State Univ.*, 989 F.3d 418, 431 (6th Cir. 2021) (Plaintiff entitled to "'some form of cross-examination' that allows for a fact-finder to more accurately make a determination of credibility

and to witness the claimant's demeanor on the stand."); *Cummins*, 662 F. App'x at 448 (limiting cross-examination to preapproved written questions comported with due process even if panel "did not ask all of the questions [the accused students] submitted," and did not permit follow-up); *Doe v. Ohio State Univ.*, 219 F. Supp.3d 645, 660-61 (S.D. Ohio 2016) (Plaintiff had "no clearly established right to a trial-type cross-examination."). Plaintiff had the opportunity to thoroughly question his accuser, and the Hearing Panel had the opportunity to assess the accuser's credibility. *E.g.*, *Doe v. University of Cincinnati*, 872 F.3d at 403 (university's procedures must be sufficient to make "issues of credibility and truthfulness … clear to the decision makers."). That is all due process requires.

Next, Plaintiff alleges that the Hearing Panel "improperly relied on scientific and medical evidence that was not reliable and supported by sufficient expert testimony," including the calculation of Roe's blood alcohol level and the SANE examination. (Compl., Doc. 1 at ¶ 137, PageID #60). Due process, however, places no obligation on UC to retain and produce expert witnesses in relation to such information. *See Ohio State Univ.*, 219 F. Supp. 3d at 661 ("The fiscal and administrative burden on a university would be significant if it had to retain experts, present live expert testimony at student disciplinary hearings, and prepare a cross-examination of the other side's expert witness.").[11]

Plaintiff then alleges that the Hearing Panel did not disclose evidence regarding a blood-alcohol calculation prior to considering it in its decisions. But "there is no clearly established due process right to formal discovery in university disciplinary hearings." *Doe v. Ohio State Univ.*, 219

---

[11] While the Court later reconsidered its earlier ruling on expert testimony in *Doe v. Ohio State University*, this reconsideration occurred in the context where the university had denied the respondent the opportunity to present his own expert testimony—an allegation not present here. 311 F. Supp. 3d 881, 894-96 (S.D. Ohio 2018) Indeed, the Court's reconsideration made no suggestion that due process could require that the university itself produce expert testimony.

18

F. Supp. 3d at 659. Moreover, the Hearing Panel made clear that the blood alcohol calculation was an "educational tool" and used the information only in conjunction with its consideration of testimony at the hearing. *Noakes*, 2024 U.S. App. LEXIS 27189, at *10–11 (the panel's reference to online calculator does not amount to a due process violation).

Finally, Plaintiff alleges that the investigator "failed to seek and/or obtain significant relevant evidence," including Roe's medical records, and that the Hearing Panel failed to draw a negative inference from Roe's failure to produce such evidence. (Compl., Doc. 1 at ¶ 137h, PageID #60-61). There is no authority, however, for the proposition that due process "requires certain thoroughness to an investigation." *Ohio State Univ.*, 219 F. Supp. 3d at 657. Universities are not required to seek out or even disclose every possible piece of evidence. *Id.*, at 662 (declining to extend the rule set forth in *Brady v. Maryland*). Indeed, obtaining this information presents a second problem. If the Due Process Clause requires UC to obtain Roe's medical records, that requirement would be in conflict with a federal statute. Title IX, 34 C.F.R. § 106.45(b)(5)(i), prohibits UC from accessing Roe's medical records.[12] *See also Noakes*, 2024 U.S. App. LEXIS 27189, at *16 ("Schools cannot access or disclose a witness's medical records without their consent").

Further, with respect to Plaintiff's allegation that the Hearing Panel failed to draw a "negative inference" from Roe's failure to produce medical evidence, there is no authority for the proposition that due process required such an inference to be applied. Moreover, Plaintiff's Complaint acknowledges that the Hearing Panel heard testimony from Roe regarding the results of the SANE exam and the reasons for *her* decision not to release the records. Roe testified that

---

[12] This also implicates the constitutional-avoidance canon of statutory construction. That canon "is a tool for choosing between competing plausible interpretations of a statutory text, resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts." *Clark v. Martinez*, 543 U.S. 371, 381 (2005).

she "didn't release those because there was too much time had passed before I got the SANE exam," and that there "was not results to that I felt needed to be included." (Compl., Doc. 1 at ¶ 104, PageID #42). Consequently, Plaintiff had more than adequate opportunity to present his case regarding the SANE examination and medical records to the Hearing Panel.

### E.  Cumulative error.

Plaintiff alleges that the "accumulation of errors" outlined in his Complaint suggest a process that was biased and fundamentally unfair. (Compl., Doc. 1 at ¶ 137, PageID #61). However, as discussed above, Plaintiff fails adequately to allege a single error. Plaintiff was provided with a fundamentally fair hearing. The hearing was live. (*Id*. at ¶ 104, PageIDs #40-43). Plaintiff had the opportunity to be present at the hearing, give testimony, cross-examine Roe, and cross-examine five witnesses. (*Id*.). Requiring UC to provide trial-type procedures would fly in the face of established due process precedent in student disciplinary cases.

### <u>CONCLUSION</u>

For the reasons set forth above, Defendants respectfully request that the Court dismiss Counts I and II of the Complaint.

Respectfully submitted,

*/s/ Dominick S. Gerace*
Dominick S. Gerace (0082823)
Jada M. Colon (0099048)
Taft Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, Ohio 45202-3957
Telephone: (513) 381-2838
Fax: (513) 381-0205
dgerace@taftlaw.com
jcolon@taftlaw.com

*Attorneys for Defendants*

20

## **CERTIFICATE OF SERVICE**

I certify that on June 16, 2025, I filed the foregoing using the Court's CM/ECF system, which will send electronic notice of such filing to all parties of record.

*/s/ Dominick S. Gerace*