# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

JOHN NOAKES

PLAINTIFF,

v.

THE UNIVERSITY OF CINCINNATI, ET AL

DEFENDANTS.

Case No. 1:23-cv-00284-MRB

Judge BARRETT

RESPONSE TO DEFENDANTS' RENEWED MOTION TO DISMISS

Plaintiff John Noakes respectfully submits this Response to Defendants' Renewed Motion to Dismiss. (Doc#61.)

## FACTS

This case is one of many cases in which UC has struggled over the past decade to respond to alleged sexual assaults and sexual misconduct on campuses.[1] And this is one of many cases in this Court, the Sixth Circuit, and federal courts around the country that address the various policies and procedures schools like UC have adopted to respond to allegations of sexual assault on campus in direct response to pressure from the U.S. Education Department's Office of Civil Rights ("OCR") related to the enforcement of Title IX.[2] This Court and Sixth Circuit has questioned the legality and constitutionality of these policies and procedures, noting that schools (including UC) have continued

---

[1] *See e.g. Goldblum v. Univ. of Cincinnati,* S.D.Ohio No. 1:19-cv-398, 2022 U.S. Dist. LEXIS 54979 (Mar. 28, 2022), *aff'd* 62 F.4th 244 (6th Cir. 2023); *Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d 586 (S.D.Ohio 2016); *Gischel v. Univ. of Cincinnati*, 302 F. Supp. 3d 961 (S.D.Ohio 2018). Nor are UC's problems with discrimination limited to the response to sexual assault on campus. The Sixth Circuit has found sufficient evidence to support claims that UC used pretextual reasons to cover up unlawful discrimination. *Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 515 (6th Cir. 2021) ("record contains evidence from which a reasonable jury could conclude that [UC's action] was retaliatory rather than innocent"); *Charlton-Perkins v. Univ. of Cincinnati*, 35 F.4th 1053, 1061 (6th Cir. 2022) (UC's failure to hire a person because of gender, then cancelling a search, plausible evidence of pretext).

[2] *See e.g.* Samantha Harris & KC Johnson, *Campus Courts in Court: The Rise of Judicial Involvement in Campus Sexual Misconduct Adjudications*, 22 N.Y.U. J. Legis. & Pub. Pol'y 49 (2019).

to adopt practices that impermissibly reinforce and rely upon gender stereotypes.[3] *See e.g. Doe v. Univ. of Cincinnati,* 223 F. Supp. 3d 704 (S.D. Ohio, 2016), *aff'd* 872 F.3d 393 (6th Cir. 2017). Defendants' Memorandum is, perhaps, most notable for failing address much of this controlling authority, including completely ignoring the holdings of the Sixth Circuit and this Court in the following significant Title IX decisions: *Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018), *Doe v. Oberlin College*, 963 F.3d 580 (6th Cir. 2020), and *Doe v. Miami Univ.*, 882 F.3d 579 (6th Cir. 2018).

## A.    The Dear Colleague Letter And Regulations

In 2011, after years of criticism for being too lax on campus sexual assault, OCR sent a Dear Colleague Letter (the "DCL") to colleges and universities encouraging school to become more aggressive in the investigation and adjudication of sexual violence complaints.[4] The DCL, as well as subsequent guidance and statements provided by OCR, compelled colleges and universities to change their former policies drastically out of fear that the Department would pursue violations of Title IX that could lead to the revocation of all federal funding. Judge Martinez, in commenting on the "wave" of litigation about this issue, observed that the DCL, in part, "generally signaled that OCR had adopted a 'get tough' approach, thus prompting colleges and universities to devote more attention to sexual assault accusations." *Doe v. Univ. of Colorado*, 255 F. Supp. 3d 1064, 1067 (D.Colo. 2017). In this Court, Judge Graham observed that the procedures adopted by schools in response to the DCL were often lacking in basic due process protections:

> Universities have perhaps, in their zeal to end the scourge of campus sexual assaults, turned a blind eye to the rights of accused students. Put another way, the snake might be eating its own tail. Joe Dryden et. al., *Title IX Violations Arising from Title IX Investigations: The Snake Is Eating Its Own Tail*, 53 Idaho L. Rev. 639 (2017).

---

[3] *Doe v. Univ. of Cincinnati, supra; Doe v. Miami Univ.*, 882 F.3d 579 (6th Cir. 2018); *Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018); *Doe v. Oberlin College*, 963 F.3d 580 (6th Cir. 2020).

[4] Dear Colleague Letter: Sexual Violence, Russlynn Ali, Office for Civil Rights, U.S. Dep't of Educ. (Apr. 4, 2011) (https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf).

*Doe v. Ohio State Univ.*, 311 F. Supp. 3d 881, 892-893 (S.D.Ohio 2018).

In 2017, OCR withdrew the Dear Colleague Letter and indicated its intent to issue new guidance "through a rulemaking process that responds to public comment." In withdrawing the DCL, OCR observed that prior actions "may have been well-intentioned, but… led to the deprivation of rights for many students—both accused students denied fair process and victims denied an adequate resolution of their complaints." *Id.* at 1-2. OCR further said: "Legal commentators have criticized the 2011 Letter . . . for placing "improper pressure upon universities to adopt procedures that do not afford fundamental fairness." As a result, many schools have established procedures for resolving allegations that "lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and are in no way required by Title IX law or regulation."[5] In 2020, the Department of Education released a Final Rule under Title IX of the Education Amendments of 1972. The Final Rule, *inter alia*, prescribes a transparent grievance process that treats accused students as innocent until proven guilty, requires the school to state a standard of evidence, and requires the school to provide a hearing process where accused students may question adverse witnesses. That rule was applicable to the facts of this case.

**B.    UC Adopts Title IX Policies And Procedures In Response To Pressure From Students, The Public, And The Department Of Education.**

In the years preceding the disciplinary actions against John Noakes, there was substantial criticism of UC, both in the student body and in the public media, accusing UC of not taking seriously complaints of female students alleging sexual assault by male students. (Complaint ¶23, PageID#11.) As described in the Complaint, this has included adverse news coverage and, campus meetings or

---

[5] Letter from Office for Civil Rights, U.S. Dep't of Educ. (September 22, 2017). (Available at https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf ), q*uoting Open Letter From Members Of The Penn Law School Faculty: Sexual Assault Complaints: Protecting Complainants and the Accused Students at Universities*, Feb. 8, 2015; *Rethink Harvard's Sexual Harassment Policy*, Boston Globe (Oct. 15, 2014) (statement of 28 members of the Harvard Law School faculty).

protests, and enforcement actions concerning UC.   The student newspaper quoted a student who had been sexually assaulted stating, "At the end of the day, UC does not give a f--k because they feel like they don't have to."[6]  In 2020, one of the founders of a group of students critical of UC's response to sexual assault submitted an affidavit to this Court critical of the manner in which Defendant Marshall, who oversees the Title IX Office and UC's response to the problem of sexual assault on campus, saying: she "was good at seeming like she cared, but she did not take Title IX issues seriously. … My impression was that [she] was seeking to save face for the university and placate us, so we would stop talking about the issue."[7]  UC has been the subject of a number of investigations by the Department of Education for the manner in which it investigates and adjudicates allegations of sexual assault and harassment.[8]  (Complaint ¶26, PageID#13.)

Against this background, UC adopted two policies at issue here:  The Code of Student Conduct and a separate "Sexual Harassment Policy and Procedures for All Faculty, Students, Employees, and Third Parties," also known as the "Title IX Policy."  (Doc#1-2; Doc#1-3.) The Code of Student Conduct was codified at O.A.C 3361:40-5-05 pursuant to R.C. 3345.21.  The Title IX Policy was not codified. UC has carved out an exception for the Code of Student Conduct for cases involving sexual harassment under Title IX.  The Title IX Policy contains fewer procedural protections for students accused of sexual misconduct.  These lesser protections include not providing student with notice of "the reported circumstances underlying the alleged violation" and the use of outside consultants – not faculty, staff, or students – as decision-makers.  (Complaint ¶32, PageID#15-16.)

---

[6] https://www.newsrecord.org/news/a-troubling-trend-as-on-campus-rape-reports-rise-uc-continues-to-issue-few-alerts/article_743241da-9e57-11eb-bc39-c7bc652c9b61.html

[7] Case: 1:19-cv-00398, Doc#69-3.

[8] OCR Docket #15-16-2039; OCR Docket #15-16-2178.

The Title IX policy prohibits "Sexual Assault" which includes "Any sexual act directed against another person, without the consent of the complainant, including instances in which the complainant is incapable of giving consent because of incapacitation."[9]  The Title IX Policy provides that no individual involved in the process – including all decisionmakers, "may have a conflict of interest or bias for or against complainants or respondents generally or an individual complainant or respondent. All training materials for staff and decision-makers must "be made publicly available on the University's website." Reports of sexual misconduct may be made by any "means that results in the Title IX Coordinator receiving the verbal or written report."  However, "In order to initiate the grievance process, a complainant must file a formal complaint with the Title IX Coordinator."  Only after a "formal complaint" is received – not when the Title IX Office receives a report – is the accused student provided with notice of the allegations of sexual harassment.  The Title IX Policy notes that "prompt reporting is important to facilitate a thorough investigation" and that  "Delayed reporting or filing of a formal complaint may limit the University's ability to gather relevant evidence, to effectively address the conduct at issue, and to initiate the grievance process."  The Title IX Policy contains certain time requirements for the "reasonably prompt" resolution of allegations.  The Title IX Policy states that "from the date of its receipt of a formal complaint, the investigation, hearing, and issuance of the adjudicating body's report shall be concluded in ninety (90) business days."   The Title IX Policy allows for delays and "the limited extension of timeframes" only for good cause, with written notice to the complainant and the respondent of the delay or extension and the reasons for the action.

---

[9]The Title IX Policy defines "Incapacitated or incapacitation" as "A state in which rational decision-making or the ability to consent is rendered impossible because of a person's temporary or permanent physical or mental impairment…"  The Title IX Policy further explains, "Incapacitation is determined based on the totality of the circumstances. Incapacitation is more than intoxication, but intoxication can cause incapacitation."

UC first conducts an investigation. During an investigation, the investigator is required to interview "individuals involved, witnesses, and any other persons determined to have relevant knowledge of the circumstances…" The investigator is supposed to "review… related physical evidence and/or materials…" however, UC may not access medical or psychiatric records without the consent of a party. UC will provide all parties with a copy of the investigative report prior to any hearing "for their review and written response." A live hearing is then conducted to determine responsibility. The Title IX Policy provides that if a party or a witness "does not submit to cross-examination at the hearing, the panel must not rely on any statement of that party or witness in reaching a determination regarding responsibility. However, the Hearing Panel members are still permitted to review statements by absent witnesses in the investigative report. Appeals on certain limited grounds are permitted. Students found to have engaged in prohibited conduct in violation of the Title IX Policy are subject to a range of sanctions ranging from educational discussions to probation, suspension, or dismissal from the University.

## C.    The Disciplinary Proceedings Against John Noakes

On Friday, September 10, 2021, John Noakes and a female UC student, Jane Roe, engaged in sexual activity after meeting at a fraternity party. Jane Roe, over the next few days, came to believe that she had been drugged and raped.[10] She went to the hospital for a SANE examination and contacted a detective from the Cincinnati Police Department (the police declined to pursue criminal charges). (Complaint ¶54-55, PageID#21.)

---

[10] John Noakes unequivocally denies Jane Roe's allegations. Specifically, John Noakes unequivocally denies that he violated the UC Code of Student Conduct or the Title IX Policy. Of course, the underlying "guilt" or "innocence" of John Noakes is not relevant to this Motion. *Doe v. Brown Univ.*, 210 F. Supp. 3d 310, 312-313 (D.R.I. 2016) (noting that a courts "only role in this case is to determine whether" a school complied with its policies and emphasizing that "It is not the Court's role to determine the facts of what happened between" the students).

On March 30, 2022, the Office of Gender Equity & Inclusion ("OGEI") received an online report from the Assistant Director of Fraternity & Sorority Life.[11] The report indicated that Jane Roe had "recounted an incident that happened in September at a party hosted by Sigma Alpha Epsilon fraternity at their chapter house." Jane Roe alleged that she had been drugged and sexually assaulted by John Noakes. On April 6, 2022, the Jane Roe met with OGEI Investigator Morgan Shaw. (Complaint ¶¶ 58-60 PageID#22.)

Two-and-a-half months later, on July 26, 2022, Jane Roe submitted a signed Formal Complaint. (Complaint ¶62 PageID#22.) Over three weeks later, on August 18, 2022, a Notice of Commencement of OGEI Investigation was sent to John Noakes. The notice stated only:

> on September 10, 2021 at approximately 11:49 pm, at 2707 Clifton Ave. (Sigma Alpha Epsilon house) [John Noakes] engaged in vaginal intercourse with [Jane Roe] without [Roe's] consent.

(Complaint ¶64 PageID#23.) The notice did not indicate that Jane Roe alleged a 'forcible' sexual assault or that she was unable to provide consent as a result of being drugged or excessive alcohol use. On August 26, 2022 John Noakes responded to Shaw's Notice. He stated, "I intend to fully cooperate with any investigation." Noakes requested more details of the nature of the allegations being made, a copy of the complaint filed by Jane Roe, and "the date of the initial contact between [Jane Roe] and the Title IX Office." (Complaint ¶¶ 65-66, PageID#23-24.)

Shaw did not provide additional information. On August 30, 2022, John Noakes again requested more information about the allegations and the date of the report.[12] Shaw again did not

---

[11] The Title IX Policy differentiates between "reports" and "formal complaints." The Title IX Policy defines a "Formal complaint" as "A document filed by a complainant or signed by the Title IX Coordinator alleging conduct in violation of this Policy against a respondent and requesting that the University investigate the allegation(s) of sexual harassment." A "Report" of sexual misconduct "is not a formal complaint and does not initiate the grievance process."

[12] He specifically requested three pieces of information: (i) a more detailed statement of the conduct that allegedly violates any UC policy; (ii) the date when the complainant first contacted the Title IX Office; and (iii)

provide any additional details of Jane Roe's accusations and provided misleading information about the date of the report.[13] On August 31, 2022, John Noakes again requested "more details, including a copy of any statements or complaints submitted." He also specifically requested when Jane Roe "first submitted an incident report or otherwise informed the OGEI about the alleged misconduct." Shaw did not respond to any of the requests in John Noakes' August 31, 2022 email. (Complaint ¶67, PageID#25.) Shaw eventually told John Noakes that he would "have an opportunity to meet with me to give a verbal statement or provide a written statement." John Noakes responded, "We would like to meet with you, but before doing so would like the opportunity to review the statement provided by the complainant." Shaw told John Noakes that he would only be able to view the statement by Jane Roe after the entire investigation is completed. (Complaint ¶¶ 69-71, 74 PageID#26-27.)

On September 20, 2022, Shaw met with John Noakes. John Noakes told Shaw that he believed that the sexual activity with Jane Roe was consensual but declined to provide a more detailed statement until after he was told the exact nature of the allegations against him. John Noakes indicated that he could not prepare a response because he did not know if Jane Roe was claiming that she did not indicate consent to sexual activity, or if she was claiming that her consent was ineffective due to the use of alcohol for drugs. Shaw declined to provide to John Noakes any further information about the nature of the allegations against him. (Complaint ¶78 PageID#30-31.)

Shaw interviewed Roe on August 30, 2022. Jane Roe never told Shaw that she was too intoxicated to consent to sexual activity with John Noakes. She told Shaw, "I was feeling tipsy but no signs of me thinking [to myself that] I need to slow down or stop." Jane Roe later said, "I could tell I'd been drinking. I was tipsy but it wasn't like anything crazy." Jane Roe also indicated that her

---

any accommodations or benefits provided to Jane Roe as a result of her claim to be a victim of sexual misconduct. He added, "This information is vital to my gathering evidence in my defense."

[13] Shaw told Noakes that Jane Roe "submitted a Formal Complaint on July 26, 2022" but did not disclose that the initial report to the Title IX Office had occurred in March.

memory was hazy:  "I think the last thing I remember was going back in the house. After that I don't remember anything."  She claimed to have "flashes" of memory.  Jane Roe told Shaw that she went to the hospital on Sunday to have an examination but did not provide, and Shaw did not request, any medical records.  (Complaint ¶68, PageID#26.)

Over the next few months, Shaw emailed John Noakes a number of times, stating that she was "continuing to investigate…"  Shaw never provided any information on exactly what investigative steps she was taking.  During this time, Shaw interviewed nine witnesses (about one each week).  All of the witnesses were friends of either John Noakes or Jane Roe and none had any first-hand knowledge of their interaction in the bedroom.  (Complaint ¶¶ 72-93, PageID#27-36.)

On November 10, 2022 – approximately 153 business days from the first report to OGEI and approximately 76 business days from Jane Roe's 'formal' complaint – Shaw provided John Noakes with a draft report to review.   (Complaint ¶95, PageID#36.) John Noakes requested that the Report correct a mischaracterization of his refusal to provide a statement and include information that might affect the credibility of Jane Roe, such as any supportive measures or other benefits that Jane Roe received as a result of her claim that she was a victim of sexual misconduct.  John Noakes also requested that the report remove any references to Jane Roe possibly being drugged since there was no evidence to support such a claim and that the Report indicate that if Jane Roe declined to produce her medical records, the finder of fact should infer that the evidence would be unfavorable and unsupportive of her story.  Shaw made no changes.  (Complaint ¶¶ 96-98, PageID#36-37.)

John Noakes was informed that the matter had been referred for a hearing.  The hearing was originally scheduled for January 2023 but was rescheduled for February 20, 2023 – well beyond ninety business days from the initial and formal reports to OGEI.  The Hearing Panel consisted of individuals who work for a for-profit consulting firm, TNG Consulting.   TNG consulting and its affiliates routinely provide expert opinions and testimony on behalf of schools that investigations were

adequate in response to challenges by students found to have engaged in sexual misconduct. John Noakes had objected that TNG Consulting and its affiliates are primarily concerned with upholding the interests of educational institutions and serve as advocates for the specific procedures adopted by UC. UC denied the objections.[14] (Complaint ¶¶ 101-104, PageID#39-41.)

Before the hearing, the members of the Hearing Panel were permitted to review Shaw's entire investigative report, including the statements from witnesses who did not appear at the hearing so they could be cross-examined. At the hearing, Shaw falsely stated that John Noakes "indicated that they were not interested in providing any additional information or a statement…" and one of the panelists improperly questioned Respondent about his refusal to provide a statement. Jane Roe was permitted to testify that she had a rape exam done shortly after the alleged incident; she provided selected pictures and a summary of some test results, but no actual medical records or test results from this examination.[15] John Noakes' Advisor was cut off from asking Jane Roe relevant questions. (Complaint ¶105, PageID#41.)

On March 23, 2023, John Noakes received a letter describing the outcome of the Hearing Panel. John Noakes was found responsible for violating the UC Title IX Policy. The Hearing Panel concluded that Jane Roe was too intoxicated to consent to sexual activity because she had consumed "roughly six to seven standard drinks" over the course of the evening. The Hearing Panel made this finding despite the statement by Jane Roe to Shaw that that while she had "maybe six to seven" drinks during the night, the cups were small and "half of everything I poured spilled on my dress just from bumping into other people and dancing…" The Hearing Panel used this evidence to calculate Jane

---

[14] UC allowed an objection to the founder of the firm, presumably because Noakes informed UC that this individual was involved in litigation that called his integrity into question. UC just substituted another individual from TNG.

[15] Jane Roe said that there were "no results" in the medical records that she "felt needed to be included."

Roe's blood alcohol level based on an online calculator provided by the American Addiction Centers.[16] The Hearing Panel calculated that Jane Roe's blood alcohol level was between "0.19% to 0.23%." The Hearing Panel noted that, according to this website, a person with this level of intoxication could suffer "Loss of consciousness and memory impairment…" The Hearing Panel stated that it "considered this information in light of testimony provided by [Jane Roe], and as it related to [Jane Roe's] observable motor and cognitive function." (Complaint ¶¶ 109-111, PageID#45-47; Doc#1-4.) The Hearing Panel claimed that it did not "rely" on statements by witnesses who did not appear. However, the Hearing Panel stated that its findings came "after reviewing all available evidence, including interviews, witness statements and evidence provided to the investigator, presented in the investigation report…" The Hearing Panel also stated that it considered "the witness and party testimony and evidence collected during the investigation" in determining that Jane Roe's "description of her mental and physical condition was ultimately credible." The Hearing Panel recommended that John Noakes be expelled from UC. (Complaint ¶¶ 109-111, PageID#45-47; Doc#1-4.)

On March 30, 2023, John Noakes submitted an appeal. UC appointed an Appeals Panel that, like the hearing panel, consisted of paid consultants. The paid consultants on the Hearing Panel are affiliated with a law firm that provided training to UC staff and represents colleges and universities in litigation brought by students challenging disciplinary proceedings. The Appeals Panel acknowledged some procedural or "compliance" flaws in the process but still declined to order a new hearing. The Appeals Panel rejected most of John Noakes' arguments either outright or as not "material to the outcome," ultimately finding that "there is insufficient evidence to demonstrate that the procedural error affected the outcome of the matter" (Complaint ¶¶113-118, PageOD#48-54; Doc#1-6.)

---

[16] The Hearing Panel did this even after acknowledging that "Calculating an individual's blood alcohol content (BAC) is an imprecise exercise…" and "this information is provided as an educational tool only and is not intended to be used for medical or legal advice."

This litigation followed.

<strong>ARGUMENT</strong>

**A.      Standard**

In deciding whether to grant a Rule 12(b)(6) motion, this Court is required to accept all well-pleaded factual allegations of the Complaint as true and construe the complaint in the light most favorable to the plaintiffs. *Reilly v. Vadlamudi*, 680 F.3d 617, 622 (6th Cir. 2012), *quoting Dubay v. Wells*, 506 F.3d 422, 426 (6th Cir. 2007). The Complaint will survive a motion to dismiss if it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" that is, "that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). *See also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

**B.      The Title IX Erroneous Outcome Claim**

Defendants fail to substantively address the holdings of some of the most important Title IX decisions from the Sixth Circuit, such as *Baum*, *Miami Univ.,* and *Oberlin College*. These controlling decisions compel the Court to deny to Motion.

**1.      Standard**

To present a Title IX claim under the erroneous outcome theory, a plaintiff must allege facts sufficient to (1) cast some articulable doubt on the accuracy of the disciplinary proceeding's outcome, and (2) demonstrate a particularized causal connection between the flawed outcome and gender bias. *Baum*, 903 F.3d at 585; *Miami Univ.*, 882 F.3d at 592; *Oberlin College*, 963 F.3d at 586.

### 2.  Articulable Doubt

A plaintiff's burden to show articulable doubt is minimal – he only needs to cast doubt on the outcome, not prove actual innocence. *Z.J. v. Vanderbilt Univ.*, 355 F. Supp. 3d 646, 679 (M.D.Tenn. 2018) ("The pleading burden as to the first element — articulable doubt — is 'not heavy'"). *See also Doe v. Marymount Univ.*, 297 F. Supp. 3d 573, 584 (E.D.Va.2018) ("The first element of an erroneous outcome claim – casting articulable doubt on the accuracy of the outcome – is not a significant barrier for [a plaintiff] to cross."); *Doe v. Syracuse Univ.*, 341 F. Supp. 3d 125, 138 (N.D.N.Y.2018) (noting that Plaintiff has only a "minimal burden of casting some articulable doubt on the accuracy of the outcome of the disciplinary proceeding").[17]  Plaintiff satisfies this burden by listing possible procedural errors in ¶¶ 122-123 of the Complaint.  This aspect of the Complaint is challenged only in a cursory manner in a footnote.  Def. Memo. at PageID#2028, fn. 5.

### 3.  Evidence Of Gender Bias

Defendants argue that Plaintiff must show a causal connection between the "hearing outcome and gender bias." Def. Memo. at PageID#2027-2028, *quoting Doe v. Cummins*, 662 F.App'x 437 (6th Cir. 2016).  Defendants, further, suggest, relying on *Cummins*, that the complaint must plead facts alleging "a particularized … causal connection between the flawed outcome and gender bias. *Id.* The unpublished *Cummins* decision no longer accurately states the law in this Circuit.  The Sixth Circuit clarified this standard in *Oberlin College*, a case not addressed in Defendants' Memo.  The court said, "We have never held that, to be 'particularized' in this sense, the effects of the causal bias must be

---

[17] The *Doe v. Regents* court explained the articulable doubt burden at the pleading stage:

> It is not the Court's finding that the outcome of the disciplinary proceedings was definitively erroneous... After the evidence is collected and presented, the Plaintiff's allegations of an erroneous outcome may no longer be plausible. However, such considerations are inappropriate for this Court at the motion to dismiss phase of the trial.

2017 U.S. Dist. LEXIS 211408, at *49.

limited to the plaintiff's own case." 963 F.3d at 586. The Sixth Circuit, thus, clarified that the allegations of gender bias need not necessarily arise within the investigation and adjudication of the claims against the student. In doing so, the Sixth Circuit rejected the exact same argument now put forward by Defendants. 963 F.3d at 586 ( [the school] argues that, to show a "particularized causal connection" between the flawed outcome and sex bias, [a plaintiff] must identify some bias unique to his own proceeding. But that argument misreads our precedents…"). A review of the Sixth Circuit's primary erroneous outcome decisions since *Cummins* illustrate that the Complaint falls squarely within controlling precedents. In *Oberlin, Baum,* and *Miami*, the Sixth Circuit identified three categories of evidence that can support a plausible inference of gender bias in a valid Title IX erroneous outcome claim: (i) procedural irregularities; (ii) pressure from the Department of Education and other internal and external sources; and (iii) the merits of the decision itself. All three are present in the Complaint.

### a. Procedural Irregularities

In *Oberlin,* the Sixth Circuit held that "' clear procedural irregularities' in [a school's] response to the 'allegations of sexual misconduct… will permit a plausible inference of sex discrimination.'" 963 F.3d at 586, *quoting Menaker v. Hofstra Univ.*, 935 F.3d 20, 33 (2d Cir. 2019). In *Oberlin*, as in this case, the school unreasonably delayed the adjudication of the claims against the student and failed to complete the matter within the time frames identified in the policy. (Complaint ¶157-160, PageID#63.) This case is even stronger than *Oberlin* because Plaintiff, here, has identified a significant number of additional procedural flaws, all of which must be accepted as true for Rule 12(b)(6) purposes. These include, as described *supra:* lack of sufficient notice; the use of biased decision makers; the failure of UC to disclose the trainings attended by decision makers; allowing Jane Roe to describe her medical condition without providing medical records; delays; the reliance of undisclosed scientific evidence; the failure of the investigator to disclose important evidence that would impact Jane Roe's credibility; and the provision of hearsay statements to the decision makers without

providing Plaintiff an opportunity to confront adverse witnesses. (Complaint ¶123, PageID#54-55.) *Cf Doe v. Univ. of Denver*, 1 F.4th 822, 832, n.8 (10th Cir. 2021) (*citing Oberlin* for proposition that "'disturbing procedural irregularities' can certainly lower the threshold for how much additional evidence of sex bias is needed to make a case worthy of a jury's time and consideration").

This Court's decision that the procedural errors identified in the Complaint do not rise to a constitutional due process violation does not change the outcome for Title IX purposes. This information is still relevant for Title IX purposes under *Oberlin* even if the procedural violations do not amount to a constitutional violation, as the failure to comply with policies could support a plausible inference of gender discrimination. As this Court noted in another case involving UC, "an allegation that the disciplinary board violated its own policies and procedures does not state a claim for a due process violation." *Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d 586, 603 (S.D.Ohio 2016)

### b.    Pressure From the Department of Education And Others

The historical and regulatory backdrop described in the Complaint is necessary to properly evaluate the conduct of UC. The Complaint alleges that "UC has been the subject of a number of investigations by the Department of Education for the manner in which it investigates and adjudicates allegations of sexual assault and harassment." (Complaint ¶26, PageID#13.) The Sixth Circuit has been clear that pressure from the Department of Education and other sources may support an inference of gender bias. In *Miami Univ.*, the Sixth Circuit credited claims that "pressure from the government to combat vigorously sexual assault on college campuses and the severe potential punishment – loss of all federal funds – if it failed to comply, led [the school] to discriminate against men in its sexual-assault adjudication process." 882 F.3d at 594. The Sixth Circuit later explained that pressure from Department of Education "provides a backdrop, that, when combined with other circumstantial evidence of bias in [a student's] specific proceeding" supports a plausible claim of gender discrimination. *Baum*, 903 F.3d 586.

### c.     The Merits Of The Decision

In *Oberlin*, the Sixth Circuit held that "when the degree of doubt" in a school decision "passes from 'articulable' to grave, the merits of the decision itself, as a matter of common sense, can support an inference of sex bias." 963 F.3d 580 at 587-588, *citing* Purdue Univ., 928 F.3d at 669. In *Oberlin*, like in this case, the court considered a claim that a female student could not consent because she was under the influence of drugs or alcohol. The *Oberlin* court expressed concern that the record provided no apparent basis for a finding that the alleged victim lacked conscious knowledge of the sexual activity or that the accused student perceived the alleged victim to be incapacitated. Similarly, in this case, the Complaint alleges that Jane Roe never told the investigator that she did not consent to sexual activity with Plaintiff or that "she was too intoxicated to consent to sexual activity," merely that her memory was "hazy." (Complaint ¶68, PageID#25-26.)

### d.     Plaintiff Has Sufficiently Alleged Bias On the Basis Of Gender

UC suggests that some the allegations about UC's response to external pressure from OCR and others "are not specific to any gender." Def. Memo at PageID#2029. This ignores the allegations in the Complaint that internal or external pressure may promote stereotypes which permit an inference of gender bias sufficient to defeat a motion to dismiss even when the school's conduct could also be described as pro-victim. (Complaint ¶ 2 ("UC has adopted practices that reinforce and rely upon gender stereotypes…").) The Complaint alleges that "like other schools nationwide, was scared of being investigated or sanctioned by the Department of Education for not taking seriously complaints of female students alleging sexual assault by male students. (Complaint ¶ 21.) The Complaint also alleges that "there was substantial criticism of UC, both in the student body and in the public media, accusing UC of not taking seriously complaints of female students alleging sexual assault by male students…" (Complaint ¶ 22.) Many of the actions in this case can be seen as a response to continued criticism from female victims that their prior cases were not handled properly, despite UC previously

acing in a biased nature. *See e.g.* Complaint ¶124, PageID#57 "UC was under pressure from students and the community to combat vigorously sexual assault against women...".) Cf. Nancy Gertner, *Sex, Lies and Justice*, The American Prospect, Winter 2015 ("The new standard of proof, coupled with the media pressure, effectively creates a presumption in favor of the woman complainant. If you find against her, you will see yourself on 60 Minutes or in an OCR investigation where your funding is at risk. If you find for her, no one is likely to complain.").

Defendants rely on *Sahm v. Miami Univ.*, 110 F. Supp.3d 774, 778 (S.D. Ohio 2015), to argue that the Complaint only alleged bias in favor of alleged victims of sexual assault, which is not equivalent of demonstrating gender bias). Def. Memo. at PageID#2029. Two courts of appeals have rejected this argument as a reason to dismiss a Title IX claim. In *Schwake v. Arizona Bd. of Regents*, 967 F.3d 940, 948 (9th Cir. 2020), the Ninth Circuit explained that "Sex discrimination need not be the only plausible explanation or even the most plausible explanation for a Title IX claim to proceed." 967 F.3d at 948. In *Doe v. Regents of the Univ. of Minnesota*, 999 F.3d 571, 579 (8th Cir. 2021), the Eighth Circuit reversed a district court's conclusion that a school's bias in favor of the victims of sexual assault precludes a reasonable inference of bias against male students. These decisions have clarified that, in assessing the possible existence of gender bias, courts should consider that internal or external pressure may promote stereotypes and, as a result, contain sufficient indicia of specific intent to permit an inference of gender bias – even when the school's conduct could also be described as pro-victim. What is often charactered as "pro-survivor" or "pro-victim" may be, in reality, the adherence to entrenched gender stereotypes that aligned with the schools' interest in avoiding federal investigation and sanction. One Court said:

> We are not unmindful that the combination of this statistical disparity and overt anti-respondent bias – a combination not unlikely to recur with some frequency at other schools – raises palpable concerns that schools might be making a distinction without a real difference and that stereotypes and prejudices against a class protected by Title IX (males) are beginning to infect the enforcement of sexual-misconduct policies under the auspices of presumptions regarding an unprotected class (respondents).

*Doe v. Univ. of Denver*, 952 F.3d 1182, 1201 (10th Cir. 2020).

UC next argues that suggestion that shifting federal government policies between 2011 and 2020 "show only that government policies have changed, not that there has been sustained pressure to favor one particular group over any other." Def. Memo. at PageID#2030. Defendants similarly argue that "generalized allegations involve events occurring between 2011 and 2020… cannot possibly be used to show that UC was subject to any government or public pressure at the time of Plaintiff's hearing in 2023." Def. Memo. at PageID#2030-2031. Defendants ignore that the Complaint recounts criticism of the school and its administrators from 2021 and 2022. (Complaint ¶ 23.) Defendants also ignore that the events in this case occurred during the Biden administration, which had promised to renew the crackdown on schools. The Complaint specifies that the Biden Administration had "vowed to scrap the Trump administration's new regulation on campus sexual misconduct" and that President Biden had re-nominated the same individual to again run the Department of Education's Office of Civil Rights who had previously pressured schools. (Complaint ¶21.) Other courts have credited pressure from the federal government for claims that occurred during the Biden administration. *See e.g. Doe v. Trustees of Hamilton College,* N.D.N.Y. No. 6:22-CV-214, 2024 U.S. Dist. LEXIS 70616, at *20 (Apr. 18, 2024) (incident and hearing in 2021); *Doe v. Bd. of Regents of the Univ. Sys. of Maryland,* D.Md. Civil Action No. ADC-23-3100, 2024 U.S. Dist. LEXIS 70557, at *4 (Apr. 17, 2024) (hearing in 2022).

Defendants are correct that "general references to federal pressure alone are insufficient to show gender bias." (Def. Memo. at PageID#2030.) But that is not this case. The Complaint alleges – and Defendants ignore – the particularized allegation that the school was under **five** open civil rights investigations at the time of the Complaint. (Complaint ¶ 26.) This direct – not generalized-- pressure on UC from the Department of Education, when combined with other allegations, supports an inference of gender bias. Defendant's argument is directly contrary to the considered views of the Sixth Circuit and other courts of appeals accepting that the federal government has pressured schools

to adopt a more rigorous approach to campus sexual misconduct allegations and found that alleged university overreaction is relevant to alleging a plausible Title IX discrimination claim. As noted *supra,* the Sixth Circuit, in *Miami Univ.,* credited claims that pressure from the government to respond to allegations of sexual assault on campus could support a plausible claim of gender discrimination even if although "alternative non-discriminatory explanations for the defendants' behavior may exist." 882 F.3d at 594.

In particular, courts have found that the fact that a school **was actually under investigation** from the Department of Education has been found relevant in Title IX cases based on the plausible inference that a school would fear the loss of federal funding if it could not show that it was vigorously investigating and punishing sexual misconduct. *See Doe v. Stonehill College, Inc.,* 55 F.4th 302, 335 (1st Cir.2022) (collecting cases; "We agree with the consensus among the circuits that pressure from a federal investigation into a school's handling of sexual misconduct cases can establish background indicia of sex discrimination"). In *Baum,* the Sixth Circuit found it significant that "[a]round two years before [the plaintiff's] disciplinary proceeding, the federal government launched an investigation to determine whether the university's process for responding to allegations of sexual misconduct discriminated against women."[18] 903 F.3d at 586. And in *Oberlin*, like in this case, the Sixth Circuit found that an allegation of gender bias "finds support from [an] allegation that—throughout the pendency of his disciplinary proceeding—the federal Department of Education's Office of Civil Rights" was investigating the school's compliance with Title IX. 963 F.3d at 587.

Other circuits agree have that the fact that a school was actually under investigation from the Department of Education can, on a 12(b)(6) standard, support an inference of gender discrimination

---

[18] The *Baum* court's reliance on a two-year old investigation by OCR refutes UC's argument that pressure from the federal government years before the alleged incident with Jane Roe is not relevant. Compare Def. Memo. at PageID#2030.

to permit a Title IX claim to survive.  In *Purdue*, the Seventh Circuit acknowledged that Title IX claims by students facing discipline for sexual misconduct arise "against the backdrop" of threats from the Department of Education.  The court acknowledged that "a school's federal funding was at risk if it could not show that it was vigorously investigating and punishing sexual misconduct." 928 F.3d at 668. The court concluded that the pressure from the Department of Education is relevant because it gives accused students "a story about why [a school] might have been motivated to discriminate against males accused of sexual assault." 928 F.3d at 669. The Eighth Circuit, in *Doe v. Univ. of Arkansas - Fayetteville*, 974 F.3d 858, 865 (8th Cir. 2020), reversed the dismissal of a Title IX claim, noting that, as in this case, the school was under investigation by OCR when the claims against the student were adjudicated.  The court said, "External pressure on a university to demonstrate that it acted vigorously in response to complaints by female students may support an inference that a university is biased based on sex, although not necessarily in a particular case." 974 F.3d at 865.  *See also Univ. of Minnesota*, 999 F.3d at 578 (noting that "external pressure from public attention and the threatened loss of federal funding 'provides a backdrop…' that could support a bias claim).  Similarly, in *Univ. of the Sciences*, the Third Circuit held that "university overreaction to [the DCL] or other public pressure is relevant to alleging a plausible Title IX discrimination claim." 961 F.3d at 210 (citations omitted). Finally, in *Schwake*, the Ninth Circuit observed that the Department of Education had "initiated an investigation of the University for possible Title IX violations in the University's handling of sexual misconduct complaints" and found that "It is also 'entirely plausible' that such pressure would affect how the University treated respondents in sexual misconduct disciplinary proceedings on the basis of sex." 967 F.3d at 948.

## C.      The Due Process Claim

Plaintiff, in light of prior decision from this Court and the Court of Appeals, will no longer pursue his due process claim.

20

**CONCLUSION**

The Motion should be denied on Counts I.

Respectfully submitted,

_____/s/ Joshua A. Engel_____
Joshua Adam Engel (0075769)
Scott O'Reilly (0075717)
Anne Tamashasky (OH 0064393)
ENGEL AND MARTIN, LLC
4660 Duke Dr., Suite 101
Mason, OH 45040
(513) 445-9600
engel@engelandmartin.com

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been electronically served via the Court's electronic filing system this July 11, 2025 upon all counsel of record.

/s/ Joshua Engel
Joshua Engel